**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

**MOTION INFORMATION STATEMENT**

Docket Number(s): 22-354, 22-374 _____    _____ Caption [use short title] _____

Motion for: EMERGENCY STAY PENDING APPEAL __

_____

_____

Set forth below precise, complete statement of relief sought:

Stay pending appeal the district court's

preliminary injunction order requiring CoreRx, Inc.,

to manufacture and supply

certain amounts of the generic enalapril

by March 4, 2022 and March 17, 2022.

Emergency relief requested by March 2, 2022.

Bionpharma v. CoreRx v. Azurity

MOVING PARTY: Azurity Pharmaceuticals, Inc.          OPPOSING PARTY: Bionpharma, Inc.

☐ Plaintiff          ☐ Defendant

☑ Appellant/Petitioner          ☐ Appellee/Respondent

MOVING ATTORNEY: Eli B. Richlin          OPPOSING ATTORNEY: Charles A. Weiss & Marisa Marinelli

[name of attorney, with firm, address, phone number and e-mail]

Wilson, Sonsini, Goodrich & Rosati, P.C.          Holland & Knight

1301 Avenue of the Americas, 40th Floor          W. 52nd St.

New York, NY 10019          New York, NY 10019

Court- Judge/ Agency appealed from: USDC, SDNY/Judge John G. Koeltl

Please check appropriate boxes:                    FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
                                                    INJUNCTIONS PENDING APPEAL:

Has movant notified opposing counsel (required by Local Rule 27.1):    Has this request for relief been made below?    ☑ Yes  ☐ No
☑ Yes  ☐ No (explain):_____               Has this relief been previously sought in this court?    ☐ Yes  ☑ No
                                                    Requested return date and explanation of emergency: March 2, 2022
                                                    The preliminary injunction requires CoreRx, Inc., to manufacture and supply Bionpharma
                                                    with months of product on March 4, 2022. That act of infringement will irreparably harm Azurity and CoreRx
Opposing counsel's position on motion:              immediately. The district court granted an administrative stay so that this Court
☐ Unopposed  ☑ Opposed  ☐ Don't Know                could adjudicate this motion, but that administrative stay expires on March 2, 2022.
Does opposing counsel intend to file a response:
☑ Yes  ☐ No  ☐ Don't Know

Is oral argument on motion requested?    ☐ Yes  ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes  ☑ No  If yes, enter date:_____

Signature of Moving Attorney:

/s/ Eli B. Richlin _____  Date: 2/25/22 _____    Service by: ☑ CM/ECF  ☑ Other [Attach proof of service]

Form T-1080 (rev.12-13)

# Nos. 22-354, 22-374
# United States Court of Appeals for the Second Circuit

———————

BIONPHARMA INC.,
PLAINTIFF-APPELLEE

*v.*

CORERX, INC.,
DEFENDANT-APPELLANT

*v.*

AZURITY PHARMACEUTICALS, INC.,
INTERVENOR- APPELLANT

———————

*APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, NO. 1:21-CV-10656 (JGK)*

———————

**INTERVENOR-APPELLANT AZURITY PHARMACEUTICALS, INC.'S
MEMORANDUM IN SUPPORT OF ITS EMERGENCY MOTION TO STAY**

———————

ELI B. RICHLIN
*Wilson Sonsini
Goodrich & Rosati, P.C.
1301 Avenue of the Americas
New York, NY 10019
(212) 999-5800*

*Counsel for Intervenor-Appellant Azurity Pharmaceuticals, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for Intervenor-Appellant Azurity Pharmaceuticals, Inc. states that Azurity Pharmaceuticals, Inc. is a wholly-owned subsidiary of CurtisPharma Intermediate Holdings Inc. and that no publicly traded company hold more than 10% of its stock.

Dated: February 25, 2022              Respectfully submitted,

                                      WILSON SONSINI GOODRICH & ROSATI
                                       Professional Corporation

                                      */s/ Eli B. Richlin*
                                      ELI B. RICHLIN
                                      *Counsel for Intervenor-Appellant Azurity*
                                      *Pharmaceuticals, Inc.*

ii

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

INTRODUCTION ...................................................................................... 1

BACKGROUND ........................................................................................ 3

      A.    Azurity and Epaned® ..................................................... 3

      B.    Azurity's Disputes with Bionpharma ........................................ 4

      C.    Azurity's Disputes with CoreRx............................................. 5

      D.    Bionpharma's Suit Against CoreRx ........................................ 6

ARGUMENT ............................................................................................ 8

    I.    Azurity is likely to prevail on appeal. ................................................. 9

      A.    This Court is likely to allow Azurity to supplement the record.......................................................................... 9

      B.    Azurity is likely to prevail on appeal of the preliminary injunction. .......................................................... 10

            1.    The district court erred in finding that Bionpharma is likely to prevail on the merits of its contract claim. ................................................................. 12

            2.    Bionpharma failed to show that it would suffer irreparable harm absent a preliminary injunction.......... 15

            3.    The balance of equities favors denying the preliminary injunction. ................................................. 18

            4.    The preliminary injunction undermines the public interest......................................................................... 20

II.   Azurity would suffer irreparable harm absent a stay of the
      preliminary injunction. ........................................................................ 21

III.  The Court should stay the preliminary injunction because the
      balance of equities favors Azurity and CoreRx. ................................ 22

IV.   A stay of the preliminary injunction would further the public
      interest. ................................................................................................ 23

V.    In the alternative, this Court should grant an administrative stay.
      ............................................................................................................... 23

CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apple Inc. v. Samsung Elecs. Co.,*
    809 F.3d 633 (Fed. Cir. 2015) .......................................................21

*Azurity v. Bionpharma,*
    No. 1:21-cv-01286-LPS (D. Del. filed Sept. 10, 2021).................5

*Azurity v. Bionpharma,*
    No. 1:21-cv-01455-LPS (D. Del. filed Oct. 15, 2021)..................5

*Azurity v. Bionpharma,*
    No. 21-1926 (Fed. Cir. filed May 6, 2021) ...................................4

*Azurity v. CoreRx,*
    No. 1:21-cv-01522-LPS (D. Del. filed Oct. 27, 2021)..................5

*Azurity v. CoreRx,*
    No. 8:21-cv-02515-VMC-SPF (M.D. Fla. filed Oct. 26, 2021).....................5

*Citigroup Global Mkts. v. VCG Special Opportunities Master Fund,*
    598 F.3d 30 (2d Cir. 2010) .....................................................8, 11

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009) .......................................................15

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007) .........................................................15

*Harford Courant Co., LLC v. Carroll,*
    986 F.3d 211 (2d Cir. 2021) .......................................................11

*Hilton v. Braunskill,*
    481 U.S. 770 (1987)......................................................................8

*Hirschfeld v. Bd. of Elections in N.Y.,*
    984 F.2d 35 (2d Cir. 1993) .........................................................16

*Kamerling v. Massanari*,
  295 F.3d 206 (2d Cir. 2002) ..........................................................................15

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011)...........................................................................................14

*Miss Am. Org. v. Mattel, Inc.*,
  945 F.2d 536 (2d Cir. 1991) ..........................................................................17

*Mohammed v. Reno*,
  309 F.3d 95 (2d Cir. 2002) ........................................................................8, 11

*Monticello Ins. Co. v. Hale*,
  284 F.Supp.2d 898 (S.D. Ohio 2003)...........................................................14

*Moreno-Godoy v. Kartagener*,
  7 F.4th 78 (2d Cir. 2021) ...............................................................................13

*Munaf v. Geren*,
  553 U.S. 674 (2008).........................................................................................10

*NFL Mgmt. Council v. NFL Players Ass'n*,
  No. 17-3510, Dkt.40 (2d Cir. Nov. 3, 2022) .................................................23

*Nken v. Holder*,
  556 U.S. 418 (2009)...........................................................................................8

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
  429 F.3d 1364 (Fed. Cir. 2005) .....................................................................20

*Planetlite Co. v. Gleason-Tiebout Glass Co.*,
  234 A.D. 304 (N.Y. 1st Dep't 1932) .............................................................13

*Resolution Trust Corp. v. Elman*,
  949 F.2d 624 (2d. Cir. 1991) .........................................................................22

*Reuters Ltd. v. United Press Int'l, Inc.*,
  903 F.2d 904 (2d Cir. 1990) ..........................................................................17

*Roberts v. Karimi*,
  251 F.3d 404 (2d Cir. 2001) ..........................................................................12

vi

*Sanofi-Synthelabo, Inc. v. Apotex, Inc.*,
  470 F.3d 1368 (Fed. Cir. 2006) ....................................................20

*Schlessinger v. Valspar Corp.*,
  686 F.3d 81 (2d Cir. 2012) .........................................................12

*Silvergate v. Bionpharma*,
  No. 1:18-cv-0-1962-LPS (D. Del. Filed Dec. 12, 2018) ...............................4

*Silvergate v. Bionpharma*,
  No. 1:19-cv-01067-LPS (D. Del. filed June 7, 2019) ...................................4

*Silvergate v. Bionpharma*,
  No. 20-cv-01256-LPS (D. Del. filed Sept. 18, 2021)....................................4

*Team Rubicon Global v. Team Rubicon*,
  No. 20-1852, Dkt.36 (2d Cir. July 13, 2020) ...............................23

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
  60 F.3d 27 (2d Cir. 1995) ....................................................11, 17

*Trump v. Int'l Refugee Assistance Project*,
  137 S.Ct. 2080 (2017)................................................................12

*Tucker Anthony Realty Corp. v. Schlesinger*,
  888 F.2d 969 (2d 1989) ...............................................................22

*United States SEC v. Citigroup Global Mkts., Inc.*,
  673 F.3d 158 (2d Cir. 2012) .........................................................21

*United States v. Aulet*,
  618 F.2d 182 (2d Cir. 1980) ...........................................................10

*Village Taxi Corp. v. Beltre*,
  91 A.D.3d 92 (N.Y. 2d Dep't 2011).............................................12

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008)................................................................10, 11

**STATUTES**

35 U.S.C. §282 ................................................................................14

**RULES**

Fed. R. App. P. 10(e) .......................................................................10

**MISCELLANEOUS**

Fed. Prac. & Proc. §2948.1 .............................................................16

Scalia & Garner, *Reading Law* ......................................................15

## INTRODUCTION

The district court entered a preliminary injunction which will cause immediate and irreparable harm to Intervenor-Appellant Azurity Pharmaceuticals, Inc. by moving a patent-infringing pharmaceutical product onto the market no later than March 4, 2022. Azurity seeks an expedited stay of the preliminary injunction to forestall this harm, or at the least an administrative stay so the Court can fully consider this motion. The court's order requires Defendant CoreRx, Inc. to supply Plaintiff Bionpharma Inc. with nine months of a generic pharmaceutical product (Product) in violation of Azurity's patent rights: nearly two-thirds by March 4, 2022, and the rest due by March 17, 2022. The Product's prolonged presence on the marketplace will cause irreversible disruptions to Azurity's business, which Azurity likely will be unable to recover from because both Bionpharma and CoreRx are judgment proof. As a result, Azurity respectfully requests that on or before March 2, 2022, this Court stay the preliminary injunction pending Azurity's appeal.

First, the district court's grant of Bionpharma's motion for a preliminary injunction was erroneous. As the plaintiff, Bionpharma has the burden of proving the elements of its breach of contract claim, including that its supply agreement to buy the Product from CoreRx is an enforceable agreement. There, Bionpharma failed because it offered no evidence that the Product does not infringe Azurity's valid patents. But the district court flipped the burden and presumed the contract valid.

1

The court's misapplication of the burden of proof is reversible legal error. Additionally, the court misinterpreted the supply agreement, which provides that there is no breach where, as here, a supply interruption prevents CoreRx from delivering Product. (*See* Section I.B below.) The district court also erred by excluding highly relevant evidence from the record. (*See* Section I.A below.)

Second, Azurity and CoreRx will suffer irreparable harm absent a stay. If CoreRx sells the Product to Bionpharma as required by the preliminary injunction, CoreRx and Bionpharma will infringe on Azurity's patents, causing tens of millions of dollars in damages. CoreRx has conceded that it would be unable to pay these damages; Biopharma also likely could not pay. As a result, Azurity would face millions in unrecoverable damages, irreversible harm to its patent-protected market share, and long-term damage to Azurity's overall revenue, research and development, and workforce. This Court will likely allow Azurity to supplement the record with documents that the district court considered and which are important to this appeal. (*See* Section II below.)

Third, the balance of equities favors Azurity. Bionpharma is unlikely to suffer any harm from a stay, let alone irreparable harm. Any purported harm is of Bionpharma's own making. Bionpharma launched at risk, knowing that Azurity would enforce its patents. Now that its conduct has come home to roost, Bionpharma cannot be heard to complain that its customers will blame it for failing to deliver the Product

2

it should not have promised it could deliver. Moreover, the district court erred in finding a single self-serving and speculative affidavit from Bionpharma's CEO— the only evidence of irreparable harm proffered by Bionpharma—sufficient to show irreparable harm. (*See* Section III below.)

Finally, the public interest clearly favors a stay, as Congress has already decided that the interest in preserving the incentive to innovate outweighs the interest in cheaper drug prices during a patent's term. The district court erred by concluding otherwise and replacing its own judgment for that of Congress. (*See* Section IV below.)

## BACKGROUND

### A.     Azurity and Epaned®

Azurity[1] is a specialty pharmaceutical company whose flagship product—Epaned®—is an oral solution that treats hypertension and other heart conditions in adults and children. Dkt.68 at 2-3. The active ingredient in Epaned® is enalapril maleate. *Id.* Before Azurity's Epaned®, enalapril tablets needed to be compounded or crushed for patients with difficulty swallowing, leading to inaccuracy and cross-contamination. Dkt.69-2 at 80-82. Azurity researched for nearly a decade to alleviate

---

[1] Azurity and Silvergate Pharmaceuticals, Inc.—Azurity's predecessor-in-interest—are both referred to as "Azurity."

this "pill-burden." Dkt.68 at 2. It has done so with Epaned®, for which Azurity holds

New Drug Application No. 208686, Ex.4, and numerous patents[2] in addition to pa-

tents for other stable oral liquid formulations of enalapril,[3] Exs.3; 68 at 3.

### B.     Azurity's Disputes with Bionpharma

Bionpharma holds an Abbreviated New Drug Application (ANDA) for a ge-

neric version of Azurity's Epaned®. Dkt.1 at 2. In launching this Product, Bion-

pharma knew that it "risk[ed]" "lengthy patent litigation against the branded drug

owner." Dkt.27 at 7.  Unsurprisingly, Azurity sued Bionpharma for patent infringe-

ment. *Silvergate v. Bionpharma*, No. 1:18-cv-0-1962-LPS (D. Del. Filed Dec. 12,

2018) (three patents); *Silvergate v. Bionpharma*, No. 1:19-cv-01067-LPS (D. Del.

filed June 7, 2019) (one patent).  The trial resulted in judgment of non-infringement

for Bionpharma on those patents. Ex.11. This judgment is presently on appeal.[4] *See*

*Azurity v. Bionpharma*, No. 21-1926 (Fed. Cir. filed May 6, 2021).

---

[2] U.S. Patent Nos. 9,669,008; 9,808,442; 10,039,745; 10,154,987; 10,772,868; 10,786,482; 11,040,023; and 11,141,405.

3 E.g., U.S. Patent Nos. 10,799,476; 10,918,621; and 11,173,141.

4 Azurity also sued Bionpharma for infringement regarding several related patents. *Silvergate v. Bionpharma*, No. 20-cv-01256-LPS (D. Del. filed Sept. 18, 2021).  The parties agreed to dismiss this action, pending the outcome of Azurity's appeal. Ex.6 at 3.

Since trial, Azurity has brought two additional suits against Bionpharma for infringement of newly obtained patents. *Azurity v. Bionpharma*, No. 1:21-cv-01286-LPS (D. Del. filed Sept. 10, 2021); *Azurity v. Bionpharma*, No. 1:21-cv-01455-LPS (D. Del. filed Oct. 15, 2021). These two cases are currently being litigated.

## C. Azurity's Disputes with CoreRx

CoreRx has manufactured and supplied Bionpharma with its Product. Dkt.32 at 2. Their supply agreement includes a provision that excuses CoreRx from supplying Product in the event of a "Supply Interruption." Ex.8. After Bionpharma began selling its Product in August 2021, Dkt.1 at 2, Azurity sued CoreRx for patent infringement. *Azurity v. CoreRx*, No. 8:21-cv-02515-VMC-SPF (M.D. Fla. filed Oct. 26, 2021); *Azurity v. CoreRx*, No. 1:21-cv-01522-LPS (D. Del. filed Oct. 27, 2021). Azurity and CoreRx settled those disputes, Ex.14, and both cases were dismissed without prejudice. Ex.15; Ex.16.

As part of the settlement agreement, Azurity agreed to release CoreRx for damages incurred from any past acts of infringement, and CoreRx agreed to stop manufacturing its Product. Ex.14. The agreement expressly provides that if CoreRx resumes manufacture of its Product, CoreRx loses the release for all past damages. *Id.* at 3-5. Azurity also agreed to indemnify CoreRx. *Id.* at 6-7.

Azurity stands ready to enforce its contractual and patent rights. Far from Bionpharma's arguments that Azurity and CoreRx are "affiliates" or "sister

5

companies," and that Azurity would not sue CoreRx, in the event that CoreRx resumes infringement, Azurity will renew litigation against CoreRx, seeking tens of millions of dollars in damages for both past and future infringement. Dkt.68 at 4-6.

### D. Bionpharma's Suit Against CoreRx

Shortly after Azurity and CoreRx settled, CoreRx informed Bionpharma that it could no longer supply Bionpharma with the infringing Product. *Id.* at 3. Bionpharma filed suit, alleging that CoreRx's refusal to supply the infringing Product breached their supply agreement. Dkt.1. Bionpharma also moved for a preliminary injunction, Dkts.8-16, 27, and sought for CoreRx to supply Bionpharma with enough Product to "ti[de] it" over for "nine months," Ex.10 at 3-4; Dkt.40 at 6.

The district court held a hearing on Bionpharma's motion on January 25, 2022. Ex.10. At the hearing, the district court also questioned whether Azurity would sue CoreRx and the scope of available damages in the event of any suit. *Id.* at 18-22.

On January 27, 2022, the district court granted Bionpharma's request for a preliminary injunction. Ex.6. It acknowledged that the burden was on Bionpharma to "demonstrate ... the existence of an agreement", but faulted CoreRx for "fail[ing] to make any proffer that would raise doubts as to the legality of the" supply agreement. Op.20. The court also rejected CoreRx's argument that its inability to supply Product due to Azurity's patents constitutes a "Supply Interruption" as defined in

6

the supply agreement. Op.20-21. Additionally, the district court found that Bion-pharma would be irreparably harmed simply because its CEO "sw[ore] to its claimed harm." Op.16.

When considering the balance of harms, the court found "implausibl[e]" CoreRx's assertion that Azurity would sue it and dismissed its other concerns be-cause it was "aware that contracting with Bionpharma … might expose it to potential liability." Op.23-24. It did not consider the harm to Azurity.

On February 2, 2022, Azurity filed a motion to intervene to appeal the prelim-inary injunction, and also sought to supplement the record to include the settlement agreement and evidence of the irreparable harm Azurity faced from continued sup-ply by CoreRx of infringing Product. Dkts.66, 67.

On February 4, 2022, the district court entered the preliminary injunction or-der, which forces CoreRx to breach the settlement agreement and resume supplying Bionpharma with the infringing product on March 4, 2022. Ex.7. CoreRx immedi-ately filed a motion to stay the preliminary injunction pending appeal, and also timely filed a notice of appeal. Dkts.82, 86. The district court denied the stay. Ex.5.

On February 24, 2022, the district court granted Azurity's motion to intervene for the limited purpose of appeal of the preliminary injunction order and denied its motion to supplement the record. Ex.5 at 15-17. The court held that permissive in-tervention was warranted because Azurity would "assist in the just and equitable

7

adjudication of … the issues between the parties" and would provide this Court "with a 'fuller picture'" of the merits. *Id.* at 16. Yet the district court stated that the declaration of Azurity's CEO was "not necessary." *Id.* On February 25, 2022, Azurity filed a notice of appeal of the preliminary injunction and motion to supplement ruling, along with this emergency motion to stay the preliminary injunction pending Azurity's appeals.

## ARGUMENT

A stay pending appeal is "an exercise of judicial discretion." *Nken v. Holder*, 556 U.S. 418, 433 (2009). Courts consider four factors in exercising this discretion: (1) likelihood of success on the merits; (2) irreparable injury to the applicant; (3) injury to other parties; and (4) public interest. *Id.* at 434. Courts take a "flexible approach" and apply a "sliding scale." For example, if the balance of hardships tips decisively in an applicant's favor, it need not prove that it will more likely than not succeed on the merits. *Citigroup Global Mkts. v. VCG Special Opportunities Master Fund*, 598 F.3d 30, 38 n.8 (2d Cir. 2010). Ultimately, "[t]he necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other [stay] factors," *Mohammed v. Reno*, 309 F.3d 95, 101 (2d Cir. 2002), which allows courts to apply "individualized judgments." *Hilton v. Braunskill*, 481 U.S. 770, 777 (1987).

This Court should stay the injunction pending appeal.

## I.     Azurity is likely to prevail on appeal.

The district court erred in denying Azurity's motion to supplement the record (Section I.A below), and in granting Bionpharma's motion for a preliminary injunction (Section I.B below).

### A.     This Court is likely to allow Azurity to supplement the record.

The district court erred in refusing to allow Azurity to supplement the record with the declaration of Azurity's then-CEO, Amit M. Patel, who explains in detail the significant irreparable harm Azurity will suffer from the preliminary injunction. Dkt.68 at 6-9. The district court called this declaration "not necessary." Op.17. But two facts bely that assertion. One, that declaration answers the district court's question about whether Azurity would sue CoreRx. When CoreRx stated that it "kn[e]w with certainty" that Azurity would sue, the district court retorted, "[p]lease, please, you don't know that." Ex.10 at 12-13.

Two, the district court allowed Azurity to intervene because Azurity "will assist in the just and equitable adjudication" of the issues and "will provide [this Court] with a 'fuller picture' to evaluate" the preliminary injunction. Op.16-17. To do that, Azurity is entitled to present this Court with the relevant information, especially

when the district court considered Azurity's "representation that it will sue" found in Patel's declaration. Op.6.

The district court's concern that Bionpharma will be unable to respond to Patel's declaration is unfounded. Ex.5 at 17. Bionpharma had an opportunity to respond during the hearing on Azurity's motion to intervene, has another opportunity to respond in opposition to this motion, and has yet another opportunity to respond on appeal.

This Court will likely allow Mr. Patel's declaration to supplement the record. *See* Fed. R. App. P. 10(e); *United States v. Aulet*, 618 F.2d 182, 187 (2d Cir. 1980) (supplementing record); . The district court's "fail[ure] to suggest what principle of law or equity would be served by [this Court] … shielding [itself] from the knowledge of what transpired below" is reversible error. *Aulet*, 618 F.2d at 187. There is "no justification in this case for ignoring these materials which bear heavily on the merits of appellant's claim." *Id.*

B.      **Azurity is likely to prevail on appeal of the preliminary injunction.**

A preliminary injunction is an "extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). To warrant a preliminary injunction, a plaintiff must establish likelihood of success on the merits, likelihood of irreparable harm without an injunction, that the equities tip in its favor, and that an injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The party moving for

preliminary relief bears the burden for all four prongs, *see Citigroup.*, 598 F.3d at 34 (quoting *Winter*, 555 U.S. at 20), as opposed to the more lenient balancing approach this Court employs for stays pending appeal, *see Mohammed*, 309 F.3d at 100-101.

Additionally, when a preliminary injunction "provide[s] the movant with substantially all the relief sought," the movant must "meet the higher standard of substantial, or clear showing of, likelihood of success." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-35 (2d Cir. 1995). Here, the district court's preliminary injunction provides Bionpharma with "substantially all the relief" that it seeks. Indeed, Bionpharma admitted that the amount of Product that the preliminary injunction compels CoreRx to supply "would be sufficient to tie Bionpharma over until it's able to get a new manufacturer up and running," Ex.10 at 3, which is the principal relief sought in its complaint, Dkt.1 at 9.

But under either standard, Bionpharma failed to prove any of the four requirements for a preliminary injunction. This Court "review[s] *de novo* the District Court's legal conclusions in deciding to grant a motion for a preliminary injunction, but review[s] its ultimate decision to issue the injunction for abuse of discretion." *Harford Courant Co., LLC v. Carroll*, 986 F.3d 211, 218 (2d Cir. 2021). "Here, of course, this Court is not asked to grant a preliminary injunction, but to stay one. In assessing the lower courts' exercise of equitable discretion, it brings to bear an

11

equitable judgment of its own." *Trump v. Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017) (cleaned up). The district court erred in granting the preliminary injunction, and this Court is likely to vacate it on appeal.

> **1.     The district court erred in finding that Bionpharma is likely to prevail on the merits of its contract claim.**

The district court committed at least two independent reversible legal errors in holding that Bionpharma proved that it is likely to prevail on the merits.

*First*, Bionpharma sued CoreRx for breach of contract. Dkt.1 at 8. To prevail on a breach of contract claim under New York law, Bionpharma "must prove … that an enforceable contract existed." *Roberts v. Karimi*, 251 F.3d 404, 407 (2d Cir. 2001). The district court correctly acknowledged that the burden is on the "plaintiff [to] demonstrate ... the existence of an agreement" as part of its prima facie case, Op.17 (internal quotation marks omitted), and that CoreRx disputed this element. *Id.* But in evaluating CoreRx's argument, the district court committed reversible legal error by flipping the burden onto CoreRx to ***dis***prove the existence of a valid contract.

As the district court acknowledged, "it is true that 'New York courts will not enforce illegal contracts.'" Op.20 (quoting *Schlessinger v. Valspar Corp.*, 686 F.3d 81, 85 (2d Cir. 2012)); *Village Taxi Corp. v. Beltre*, 91 A.D.3d 92, 98, 101 (N.Y. 2d Dep't 2011) (holding that contract provision contravening civil "[g]eneral

[o]bligation[]"—namely, licensing regulations—was "unenforceable"). *But see Planetlite Co. v. Gleason-Tiebout Glass Co.*, 234 A.D. 304, 305 (N.Y. 1st Dep't 1932) (non-binding case citing no authority, decided 90 years ago and not cited since). CoreRx argued below that the district court should not enforce the supply agreement because CoreRx's sale of the Product to Bionpharma under the agreement violates Azurity's valid patents. The district court rejected this argument because "CoreRx has failed to make any proffer that would raise doubts as to the legality of the" supply agreement. Op.20.

But this ruling was legal error: the Court incorrectly placed the burden of proof on CoreRx to prove the invalidity of the contract. *See Moreno-Godoy v. Kartagener*, 7 F.4th 78, 85 (2d Cir. 2021) ( "To prevail on a breach-of-contract claim in New York, a plaintiff must prove: "(1) the existence of a contract."). Therefore, the lack of evidence in the record regarding the purported noninfringement or invalidity of Azurity's patents should have compelled the conclusion that Bionpharma failed to prove the first element of its breach of contract claim—the existence of a valid contract. Instead, the district court reached the opposite conclusion based on its misapplication of the burden, which is reversible legal error.

Rather than relying on any evidence regarding purported noninfringement or invalidity, the district court reasoned that, in Azurity's motion for a preliminary injunction in one of the Delaware cases, "Judge Stark held that Bionpharma's product

13

did not violate [Azurity's] patent." Op.18. This is simply incorrect. Bionpharma *did not contest* infringement on Azurity's motion. *See* Ex.2 at 60:1-9. Nor is there any evidence in the record suggesting that Azurity's additional patents are invalid. Instead, Azurity's patents are presumed valid under federal statute, 35 U.S.C. §282, and only "clear and convincing evidence" can "overcome this presumption" of validity. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95-97 (2011). Once again, Bionpharma's total failure of proof should have compelled the conclusion that Bionpharma did not prove the first element.

Additionally, the district court misinterpreted the supply agreement. Section 5.11 of the agreement provides "[i]f CoreRx is unable to supply any Product ordered by Bion in accordance with the terms of this Agreement, then CoreRx shall use Commercially Reasonable Efforts to remedy the problem or secure an alternative source of supply within a reasonable time at no cost to Bion." Ex.8 at 13. CoreRx is unable to supply Product because doing so would subject it to bankrupting liabilities for patent infringement. The district court erred in ruling that "CoreRx has not demonstrated that it is <u>unable</u> to supply" and so "failed to demonstrate the applicability of section 5.11, which governs <u>supply interruptions</u>." *Id.*

At the very least, the definition of "Supply Interruption" is ambiguous because it is missing a word. *Id.*; *see Monticello Ins. Co. v. Hale*, 284 F.Supp.2d 898, 905-906 (S.D. Ohio 2003) ("Although the omitted words are fairly obvious, the Court

14

cannot interpret that paragraph as it assumes it should have been written." "[A]s written, the missing words unquestionably create ambiguity."). And even if it were not, the context makes the phrase "unable to supply" ambiguous. For example, Section 5.11 discusses the phrase broadly. Ex.8 at 12 ("unable to remedy the problem *or* secure an alternative source of supply" (emphasis added)); *see* Scalia & Garner, *Reading Law*, 116 (conjunctive/disjunctive canon). These ambiguities counsel in favor of staying the preliminary injunction because they present at least a substantial question that the district court misinterpreted the supply agreement.

### 2. Bionpharma failed to show that it would suffer irreparable harm absent a preliminary injunction.

The district court erred in concluding that Bionpharma established irreparable harm. "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Irreparable harm must be "neither remote nor speculative, but actual and imminent" harm, *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007), for which "money damages cannot provide adequate compensation," *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002).

The district court concluded that Bionpharma would suffer irreparable harm absent the preliminary injunction because, if Bionpharma could not provide its

15

retailers Product, they would blame Bionpharma. Op.14. This conclusion is erroneous for at least two reasons.

First, any purported harm from Bionpharma's patent infringement and the resulting litigation is harm of Bionpharma's own making. Indeed, Bionpharma admitted that in developing and marketing its generic, it knowingly "accept[ed] the risk and burden of lengthy patent litigation against the branded drug owner," Azurity, and that it (along with CoreRx) had "known from day one that patent litigation [against Azurity] was likely, if not inevitable." Dkts.27 at 7; 40 at 15. Any harm of one's own making cannot qualify as irreparable harm. *See Hirschfeld v. Bd. of Elections in N.Y.*, 984 F.2d 35, 40 (2d Cir. 1993) (holding "claim of irreparable injury" "meritless because any injury in the absence of the stay would be self-inflicted"); *see also* Fed. Prac. & Proc. §2948.1. The district court recognized this principle when it discounted CoreRx's harm, *see* Op.24, but committed legal error in failing to apply the same principle to discount Bionpharma's harm.

Second, the district court erred by holding a conclusory, self-serving affidavit from Bionpharma's CEO—Bionpharma's only evidence on irreparable harm—sufficient to establish irreparable harm. Op.16-17. This Court requires that a movant make "a clear showing" of irreparable harm. *Mazurek*, 520 U.S. at 972 (emphasis omitted). A movant, therefore, must introduce evidence of specific business that it will lose and the specific harm that will flow from that loss. General assertions of

16

decreased popularity or overall frustration of customers simply do not suffice. These requirements ensure "that the harm—although not quantifiable—is not speculative." *Tom Doherty*, 60 F.3d at 38.

Bionpharma's CEO's affidavit falls far short of this high standard. For instance, the CEO testified generally about the importance of reputation and Bionpharma's good reputation. Dkt.10 at 9. He mentioned that the inability to supply will cause Bionpharma to breach (unspecified) contracts and that those contracts specifically contemplated a potential supply failure. *Id.* at 10. But the CEO then asserted—without specifics, substantiation, or corroborating evidence—that failing to deliver "orders for Product" would "drive its customers to seek to purchase their [other] generic pharmaceutical products from any other of Bionpharma's competitors" and would "irreversibly damage[e] [Bionpharma's] reputation and goodwill." *Id.* at 9-10. That last proclamation is nothing more than the self-serving and conclusory speculation, which is clearly insufficient. *See Miss Am. Org. v. Mattel, Inc.*, 945 F.2d 536, 546 (2d Cir. 1991) ("a single affidavit, from [movant's] Vice President for Marketing, that repeat[ed] the allegations of harm but furnishe[d] no actual proof" did not establish irreparable harm). By contrast, the movants in the *Reuters*, relied on by the district court, had far more evidence. Op.13-14; *see Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (offering a survey of current customers

17

to show loss-of-business). In the end, any purported loss of Bionpharma's is purely economic. Ex.14 at 6-7.

### 3. The balance of equities favors denying the preliminary injunction.

The district court erred in determining that the balance of harms favors Bionpharma. The preliminary injunction requires CoreRx to breach its contractual obligations to Azurity and infringe Azurity's patents, subjecting CoreRx to bankrupting liability, before Bionpharma's claim can be resolved on its merits. Under the settlement agreement, the manufacture of a single bottle of the infringing Product exposes CoreRx to liability for all past acts of infringement, resulting in a tens-of-millions dollar judgment. Exs.8 at §§2.3-2.5; Dkts.33 at 9; 68 at 5-6.

The district court erred by discounting CoreRx's clear harm. First, it found it "implausibl[e]" that "Azurity, CoreRx's sister company, would risk bankrupting CoreRx." Op.23. But Azurity's CEO testified: "[B]oth parties are only looking towards their own interests" and no other entity was involved in any of either parties' litigation decisions. Dkt.68 at 4. The CEO also clarified that Azurity would indeed sue CoreRx—for past and future infringement as well as treble damages—if CoreRx resumed its infringing behavior. *Id.* at 4-6.

The district court also discounted CoreRx's harm because "Bionpharma's Agreement with CoreRx specifically provides that it will indemnify CoreRx for any

costs associated with patent infringement." Op.23-24. But after the district court issued its opinion, Bionpharma has since reneged on that promise. Dkt.73 at 3-4. Regardless, Bionpharma lacks the funds to satisfy a judgment in the tens of millions of dollars. *See* Dkt.68 at 9. Thus, CoreRx's concern about Bionpharma's inability to indemnify it is based on far more than "conclusory doubt." Op.24.

Additionally, the district court discounted CoreRx's harm because "CoreRx was—or should have been—aware that contracting with Bionpharma to manufacture [the Product] might expose it to potential liability." Op.24. But if that is so, Bionpharma's harm should be discounted to the same extent, or more. Bionpharma expressly admitted that it knowingly "risk[ed]" "lengthy patent litigation against the branded drug owner." Dkt.27 at 7. *See* Section I.B.2 above. The district court's inconsistent application of the "harm-of-one's-own-making" principle is yet another reversible legal error.

The district court did not even consider the harm to Azurity in balancing the equities, even though the preliminary injunction robs Azurity of any remedy for those acts of patent infringement. *See* Op.23-24. Regardless of what happens in other litigation, CoreRx and Bionpharma will likely be unable to satisfy the monetary judgement. Dkts.33 at 9; 68 at 9.

Independently, without a stay, CoreRx will again manufacture the Product for Bionpharma to sell as a generic alternative to Epaned®, resulting in downward price

pressure that will alter the marketplace for Epaned® and may force Azurity to launch an authorized generic. Dkt.68 at 8. Once launched, removing the authorized generic from the market would be difficult, perhaps impossible, even if Bionpharma is found infringing and forced to remove its generic. *Id*. For Azurity, that would mean millions in unrecoverable losses, lost market share and/or price reduction, and reductions to Azurity's workforce, R&D, and sales of its other cardiovascular products, even if Bionpharma were to lose on the merits. *Id.* at 6-7.

Lastly, even if Bionpharma could show irreparable harm—it cannot, *see* Section I.B.2—any damage to Bionpharma's reputation from a temporary supply disruption would be outweighed by the harm to CoreRx and Azurity because Azurity, unlike Bionpharma, can satisfy any resulting monetary judgment. *Id.* at 9.

### 4. The preliminary injunction undermines the public interest.

The district court erred in determining that the preliminary injunction furthers the public interest. Congress has articulated a strong public interest in protecting pharmaceutical patents. *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364 (Fed. Cir. 2005). Indeed, without robust protection against generic entry during the patent's term, incentives for research and development are lost. *Sanofi-Synthelabo, Inc. v. Apotex, Inc.*, 470 F.3d 1368, 1383-84 (Fed. Cir. 2006). It was, in part, because of these incentives that Azurity invested the resources necessary to develop Epaned®.

20

The district court discounted this public interest because "no court has ever found Bionpharma to be in breach of the federal patent laws." Op.25. But the district incorrectly placed the burden to disprove the existence of a valid contract on CoreRx, and therefore erroneously concluded that the lack of evidence of noninfringement or invalidity exonerated Bionpharma. *See* Section I.B.1 above.

On the other side of the ledger, the district court credited Bionpharma's argument that "[i]f Bionpharma's Product were to be taken off the market, children— Bionpharma's primary user—and their parents would suffer." Op.24. But that is error. Congress has already decided that incentivizing innovation outweighs the interest in cheaper drug prices during the patent's term. *See United States SEC v. Citigroup Global Mkts., Inc*., 673 F.3d 158, 163-164 (2d Cir. 2012); *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015) (Where a patent holder can meet market demand "the public interest nearly always weighs in favor of protecting property rights.").

## II.    Azurity would suffer irreparable harm absent a stay of the preliminary injunction.

As noted, irreparable harm means harm that cannot be compensated in monetary damages. *See* Section I.B.2 above. For the reasons explained above, Azurity would suffer irreparable harm absent a stay. That is, Azurity would be unable to recover down the road tens of millions of dollars for patent infringement from

CoreRx and Bionpharma because they are likely judgment proof, and Azurity would be unable to recover from the disruptions that Bionpharma's Product's presence in the marketplace would cause. *See* Section I.C above. These types of harms are clearly irreparable. *See Resolution Trust Corp. v. Elman*, 949 F.2d 624 (2d. Cir. 1991) (irreparable harm established by unrecoverable loses); *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d 1989) (irreparable harm established by bankrupting liability).

## III. The Court should stay the preliminary injunction because the balance of equities favors Azurity and CoreRx.

As explained above, CoreRx and Azurity will suffer significant harm absent a stay, while Bionpharma would suffer little to none. *See* Sections I.B.2 & I.B.3.

Moreover, there is no evidence that Bionpharma will run out of Product or be unable to deliver Product to its customers if it does not receive a shipment from CoreRx *on March 4 or 17, 2022*—the deadlines set by the preliminary injunction. Ex.7 at 2. To the contrary, Bionpharma explained that the 18,000 bottles of Product required by the preliminary injunction "would ti[de] Bionpharma over until its able to get a new manufacturer up and running." Ex.10 at 3. Thus, it cannot be that Bionpharma would suffer all of its purported harms from waiting a short period of time for this Court to resolve Azurity's appeal of the preliminary injunction. In contrast, denial of the stay would immediately irreparably harm CoreRx and Azurity because

22

once Bionpharma receives and begins selling the product, Azurity will be without effective recourse.  *See* Section I.B.3.

## IV.    A stay of the preliminary injunction would further the public interest.

A stay would further the public interest for the same reasons that granting the preliminary injunction harms the public interest. *See* Section I.B.4 above.

## V.    In the alternative, this Court should grant an administrative stay.

If this Court is unable to rule on this stay request before the preliminary injunction compels CoreRx to deliver Product to Bionpharma, it should administratively stay the preliminary injunction until it can fully consider and rule on this stay motion. This Court routinely grants administrative stays in cases like this one, involving expedited appeal and a district court's injunction ruling. *See, e.g.*, *Team Rubicon Global v. Team Rubicon*, No. 20-1852, Dkt.36 (2d Cir. July 13, 2020); *NFL Mgmt. Council v. NFL Players Ass'n*, No. 17-3510, Dkt.40 (2d Cir. Nov. 3, 2022).

A brief administrative stay would not harm Bionpharma: there is no evidence that Bionpharma will run out of product and be unable to fulfill its orders *on March 4, 2022*. But if the March 4, 2022, day of compulsion comes and goes without a ruling—administrative or otherwise—Azurity and CoreRx could never be made whole.

23

## CONCLUSION

This Court should stay the district court's preliminary injunction pending Azurity's appeal. In the alternative, this Court should issue an administrative stay until it rules on Azurity's stay motion. Azurity requests that this Court rule on this stay motion or enter an administrative stay on or before March 2, 2022, before the district court's order would compel CoreRx to deliver Product to Bionpharma.

Respectfully submitted,

*/s/ Eli B. Richlin*
ELI B. RICHLIN
  *Wilson Sonsini*
  *Goodrich & Rosati*
  *1301 Avenue of the Americas*
  *New York, New York 10019*
  *(212) 999-5800*


*Counsel for Intervenor-Appellant Azurity Pharmaceuticals, Inc.*

FEBRUARY 25, 2022

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1.     This document complies with Fed. R. App. P. 27(d)(2) because it contains 5,199 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2.     This document complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

FEBRUARY 25, 2022

/s/ Eli B. Richlin
ELI B. RICHLIN

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | |
|---|---|
| BIONPHARMA INC., | |
| Plaintiff-Appellee, | |
| v. | Docket Nos. 22-354, 22-374 |
| CORERX, INC., | |
| Defendant-Appellant, | |
| AZURITY PHARMACEUTICALS, INC., | |
| Intervenor-Appellant. | |

## DECLARATION OF ELI B. RICHLIN IN SUPPORT OF INTERVENOR-APPELLANT AZURITY PHARMACEUTICALS, INC.'S MEMORANDUM IN SUPPORT OF ITS <u>EMERGENCY MOTION TO STAY</u>

I, Eli B. Richlin, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am an attorney with the law firm of Wilson Sonsini Goodrich & Rosati, P.C., counsel for Intervenor-Appellant Azurity Pharmaceuticals, Inc. ("Azurity") in the above-captioned action and in *Bionpharma Inc. v. CoreRx, Inc.*, C.A. No. 21-10656-JGK (S.D.N.Y) (the "SDNY Action"). I am a member the Bar of the state of New York and am admitted to practice before this Honorable Court. I am familiar with the facts set forth in this declaration.

2. This declaration is submitted in support of Azurity's motion pursuant to 28 U.S.C. § 1292 and F.R.A.P. Rule 8(a) for a stay of the Order of the Southern District of New York entered on February 4, 2022, granting Plaintiff Bionpharma Inc.'s ("Bionpharma") Motion for Preliminary Injunction (the "Order").

3. Attached hereto as Exhibit 1 is a true and correct copy of the Redacted Public Version of District of Delaware's August 2, 2021 Opinion in *Silvergate Pharm., Inc. v. Bionpharma Inc.*, C.A., No. 18-1962-LPS (D. Del.) (regarding the '008, '442, and '745 Patents) and *Silvergate Pharm. Inc. v. Bionpharma Inc.*, C.A. No. 19-1067-LPS (D. Del.) (regarding the '987 Patent).

4. Attached hereto as Exhibit 2 is a true and correct excerpt of the February 1, 2021 Transcript of Bench Trial in *Silvergate Pharm., Inc. v. Bionpharma Inc.*, C.A., No. 18-1962-LPS (D. Del.) (regarding the '008, '442, and '745 Patents) and *Silvergate Pharm. Inc. v. Bionpharma Inc.*, C.A. No. 19-1067-LPS (D. Del.) (regarding the '987 Patent).

5. Attached hereto as Exhibit 3 is a true and correct listing of Azurity's New Drug Application ("NDA") No. 208686 for Epaned®.

6. Attached hereto as Exhibit 4 is a true and correct listing of certain of Azurity's Epaned® patents (U.S. Patent Nos. 9,669,008, 9,808,442, 10,039,745, 10,154,987, 10,772,868, 10,786,482, 11,040,023, and 11,141,405).

## CERTIFICATE OF SERVICE

I, Eli Richlin, hereby certify under penalty of perjury that on February 25, 2022, I caused to be served a copy of this Emergency Motion to Stay Pending Appeal on all parties by filing it with the Court's electronic filing system and by emailing counsel for the parties.

*/s/ Eli B. Richlin*
ELI B. RICHLIN

7.    Attached hereto as Exhibit 5 is a true and correct copy of the district court's February 25, 2022 Opinion and Order granting Azurity's Motion to Intervene and Denying CoreRx's Motion to Stay Pending Appeal in the SDNY Action.

8.    Attached hereto as Exhibit 6 is a true and correct copy of the district court's January 27, 2022 Opinion and Order granting Bionpharma's request for preliminary injunction in the SDNY Action.

9.    Attached hereto as Exhibit 7 is a true and correct copy of the district court's February 4, 2022 preliminary injunction order in the SDNY Action.

10.    Attached hereto as Exhibit 8 is a true and correct copy of the supply agreement between Bionpharma and CoreRx.

11.    Attached hereto as Exhibit 10 is a true and correct copy of the Transcript of the January 25, 2022 Hearing for Bionpharma's Motion for Preliminary Injunction in the SDNY Action.

12.    Attached hereto as Exhibit 11 is a true and correct copy of the April 29, 2021 Final Judgment issued in *Silvergate Pharm., Inc. v. Bionpharma Inc.*, C.A., No. 18-1962-LPS (D. Del.) (regarding the '008, '442, and '745 Patents); *Silvergate Pharm. Inc. v. Bionpharma Inc.*, C.A. No. 19-1067-LPS (D. Del.) (regarding the '987 Patent).

13.    Attached hereto as Exhibit 13 is a true and correct copy of the May 17, 2021 Joint Stipulation of Dismissal filed in *Silvergate Pharm., Inc. v. Bionpharma Inc.*, C.A., No. 20-1256-LPS (D. Del.).

14.    Attached hereto as Exhibit 14 is a true and correct copy of Azurity and CoreRx, Inc.'s November 24, 2021 Litigation Settlement Agreement settling *Azurity Pharm., Inc. v. CoreRx, Inc.*, Case No. 8:21-cv-2515-VMC-SPF (M.D. Fla.) and *Azurity Pharm., Inc. v. CoreRx, Inc.,* C.A., No. 21-1522-LPS (D. Del.)

15.    Attached hereto as Exhibit 15 is a true and correct copy of a Notice of Dismissal Without Prejudice filed on November 26, 2021 in *Azurity Pharm., Inc. v. CoreRx, Inc.*, Case No. 8:21-cv-2515-VMC-SPF (M.D. Fla.)

16.    Attached hereto as Exhibit 16 is a true and correct copy of Notice of Dismissal Without Prejudice filed on November 26, 2021 in *Azurity Pharm., Inc. v. CoreRx, Inc.*, C.A., No. 21-1522-LPS (D. Del.).

Dated: February 25, 2022

*s/ Eli B. Richlin*
Eli B. Richlin

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
erichlin@wsgr.com

**CERTIFICATE OF SERVICE**

I, Eli Richlin, hereby certify under penalty of perjury that on February 25, 2022, I caused to be served a copy of this Declaration in Support of Azurity's Emergency Motion to Stay Pending Appeal on all parties by filing it with the Court's electronic filing system and by emailing counsel for the parties.

/s/ Eli B. Richlin
ELI B. RICHLIN

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SILVERGATE PHARMACEUTICALS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | C.A. No. 18-1962-LPS |
| v. | : | C.A. No. 19-1067-LPS |
| | : | **REDACTED PUBLIC** |
| BIONPHARMA INC., | : | **VERSION 8/2/21** |
| | : | |
| Defendant. | : | |
| | : | |

Jack B. Blumenfeld, Megan E. Dellinger, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE

Wendy Devine, Kristina M. Hanson, Jody Karol, WILSON SONSINI GOODRICH & ROSATI PC, San Francisco, CA

Natalie Morgan, WILSON SONSINI GOODRICH & ROSATI PC, San Diego, CA

Ty Callahan, Granville Kaufman, WILSON SONSINI GOODRICH & ROSATI PC, Los Angeles, CA

     Attorneys for Plaintiff


Kenneth L. Dorsney, Cortlan S. Hitch, MORRIS JAMES LLP, Wilmington, DE

Andrew M. Alul, Roshan P. Shrestha, TAFT STETTINIUS & HOLLISTER LLP, Chicago, IL

     Attorneys for Defendant


**OPINION**


April 27, 2021
Wilmington, Delaware

**STARK**, U.S. District Judge:

Silvergate Pharmaceuticals, LLC ("Silvergate" or "Plaintiff") sued Bionpharma Inc. ("Bionpharma" or "Defendant") for patent infringement under 35 U.S.C. § 271(e)(2) based on Bionpharma's filing of Abbreviated New Drug Application ("ANDA") No. 212408. (C.A. No. 18-1962 D.I. 1; C.A. No. 19-1067 D.I. 1) Silvergate initially alleged that the marketing and sale of the product described in Bionpharma's ANDA will infringe Silvergate's U.S. Patent Nos. 9,669,008 (the "'008 patent"), 9,808,442 (the "'442 patent"), 10,039,745 (the "'745 patent"), and 10,154,987 (the "'987 patent"). (C.A. No. 18-1962 D.I. 1; C.A. No. 19-1067 D.I. 1) As the parties worked through discovery, they narrowed their disputes, leaving for the Court only the issues of whether Silvergate has proven infringement of the asserted claims of its '745 and '987 patents. (*See* C.A. No. 19-1067 D.I. 157 at 1)

Silvergate concedes that Bionpharma does not literally infringe. Instead, Silvergate contends that it has proven infringement under the doctrine of equivalents ("DOE"). (C.A. No. 19-1067 D.I. 157 Ex. 2 at 9-21)[1] Bionpharma counters that legal bars – specifically, prosecution history estoppel, disclosure-dedication, and claim vitiation – prevent Silvergate from prevailing on its DOE theories. (*Id.* Ex. 3(a) at 23-41) In the alternative, Bionpharma asserts that its accused product will not infringe. (*Id.* at 41-71)

The Court held a five-day remote bench trial (using videoconferencing technology) in February 2021. (D.I. 180-89)[2] Thereafter, the parties submitted post-trial briefing (D.I. 176, 179, 205-06) and proposed findings of fact (D.I. 175, 177-78, 204, 207).

---

[1] All remaining citations to the record are to C.A. No. 19-1067.

[2] Trial was consolidated with Silvergate's co-pending case against Amneal Pharmaceuticals, LLC ("Amneal"), another ANDA filer. (*See* C.A. No. 19-678) This opinion addresses only the Bionpharma portions of that trial.

Pursuant to Federal Rule of Civil Procedure 52(a), and having considered the entire record in this case and the applicable law, the Court concludes that: (1) Silvergate is barred by prosecution history estoppel from asserting DOE infringement of the "buffer limitation;" (2) Silvergate failed, in any event, to prove that Bionpharma's proposed product contains an equivalent to the "buffer" of the claims; and (3) Silvergate disclosed and dedicated to the public the accused equivalent of the "preservative limitation."

The Court's findings of fact and conclusions of law are set forth in detail below.[3]

## FINDINGS OF FACT

### I.  The Parties

1.  Plaintiff Silvergate Pharmaceuticals, Inc. ("Silvergate") is a corporation organized and existing under the laws of Delaware with a principal place of business at 8 Cabot Road, Suite 2000, Woburn, Massachusetts 01801.  Silvergate is a wholly-owned subsidiary of Azurity Pharmaceuticals, Inc ("Azurity").  (Statement of Uncontested Facts (D.I. 175) ("SUF") ¶ 1)

2.  Silvergate was founded to develop high-quality pediatric-appropriate medicines. (SUF ¶ 2)

3.  Defendant Bionpharma Inc. ("Bionpharma") is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 600 Alexander Rd., # 2-4B, Princeton, New Jersey 08540.  (SUF ¶ 3)

---

[3] Certain findings of fact are also provided in connection with the Court's legal analysis later in this Opinion.

## II.    The Witnesses

### A.    Silvergate Witnesses

4.     Michael Beckloff co-founded Silvergate in 2010 and has served as Silvergate's Chief Development Officer.  (SUF ¶ 5)  He is currently the Chief Development Officer for Azurity.  (SUF ¶ 4; Beckloff Tr. 72[4])

5.     Dr. Gerold Mosher is the Vice President of Drug Development for Azurity.  (SUF ¶ 6)  Dr. Mosher joined Silvergate in 2013 and has served as its Vice President of Drug Development.  (SUF ¶ 7)

6.     Dr. Mosher was principally responsible for the formulation and development of Silvergate's product, Epaned®.  (SUF ¶ 8)

7.     Dr. Steven Byrn is a professor at Purdue University.  (SUF ¶ 9; Byrn Tr. 139)  Dr. Byrn is an expert in pharmaceutical formulation and chemistry.  (SUF ¶ 10)  Dr. Byrn is the only expert involved in this case who has direct, hands-on experience working with the active pharmaceutical ingredient ("API") enalapril maleate in liquid formulations.  (Byrn Tr. 142-43)

8.     However, Dr. Byrn has never had primary responsibility formulating a drug product that has received regulatory approval or been commercialized.  (Byrn Tr. 151-52)  Dr. Byrn has not formulated any liquid drug products with sodium benzoate, citric acid, sodium citrate, methylparaben, or propylparaben.  (Byrn Tr. 152-53, 300)

9.     While the Court accepted Dr. Byrn as an expert in pharmaceutical formulation and chemistry (Byrn Tr. 143, 226), this does not mean that the parties' experts' relative qualifications – and relative familiarity and experience with issues directly pertinent to this case – become irrelevant.

---

[4] Citations to the trial transcript (D.I. 180-89) are in the form: "([Witness last name] Tr. [page number])."

10.    Dr. John Mahan is a board-certified pediatric nephrologist who has been practicing pediatric nephrology since 1984.  (SUF ¶ 11)  He is an expert on the treatment of pediatric hypertension, left ventricular disease, and heart failure.  (SUF ¶ 12)  Dr. Mahan is the Director of the Pediatric Nephrology Fellowship Program at Nationwide Children's Hospital at Ohio State University, the Director of the Center for Faculty Development at Nationwide Children's Hospital, a Research Investigator at the Nationwide Children's Hospital Research Institute, and a Professor of Pediatrics at the College of Medicine, Ohio State University.  (SUF ¶ 11)

**B.    Bionpharma Witnesses**

11.    Travis Webb is a formulation scientist at CoreRx, Inc. ("CoreRx"), a contract development and manufacturing organization that developed Bionpharma's proposed Product ("CoreRx").  (SUF ¶¶ 15-16)

12.    At Bionpharma's direction, Travis Webb conducted a study to prepare and evaluate formulations of enalapril oral solutions using alternative preservatives and pH modifiers with no buffer.  (Webb Dep. Tr. 207-08; PTX-74 at CORE-ESOL-00020449; PTX-00175 at CORE-ESOL-00011009)

13.    Dr. Janice Cacace is the senior director of formulation at CoreRx and is Webb's supervisor.  (SUF ¶ 18)

14.    Usha Sankaran is the associate vice president of regulatory affairs at Bionpharma.  (SUF ¶ 20)  She is responsible for compilation, preparation, review, and submission of applications to the U.S. Food and Drug Administration ("FDA") and communications with the FDA regarding such applications.  (Sankaran Dep. Tr. 17-18)[5]

---

[5] Pursuant to the parties' agreement, certain testimony was admitted via deposition designations provided to the Court by email on February 5, 2021.  (*See generally* Tr. 311-13, 1098-99; D.I.

15. Phanindranath Punji oversees projects related to development of pharmaceutical drugs for Bionpharma. (SUF ¶ 22)

16. Dr. Richard Moreton is an expert in pharmaceutical formulation. (SUF ¶ 13; Moreton Tr. 383) He holds a Ph.D. from University of Wales, College of Cardiff, in Pharmaceutics. (Moreton Tr. 376) Dr. Moreton has nearly 40 years of experience as a formulation scientist. (Moreton Tr. 376-80, 502) He is a member of the Royal Pharmaceutical Society of Great Britain, Royal Society of Chemistry, and American Chemical Society. (Moreton Tr. 380-81) He has authored between 80 and 100 articles and other publications, and is a contributing author of entries in the Handbook of Pharmaceutical Excipients. (Moreton Tr. 381-82) He has developed "hundreds" of pharmaceutical formulations, including oral solutions, many of which have received regulatory approval and have been marketed commercially; for example, Tyzeka®, a hepatitis B oral solution drug. (Moreton Tr. 382-83) He has prepared formulations directly related to the issues in this case, e.g., formulations with citric acid and sodium citrate as buffers (Moreton Tr. 542) and formulations with sodium benzoate as preservatives (Moreton Tr. 555).

### C. Person Of Ordinary Skill In The Art

17. A person of ordinary skill in the art ("POSA") has a Ph.D. in pharmacy, pharmaceutical science, chemistry, or a similar subject related to formulations, with at least minimal post-degree experience in formulating pharmaceutical products; or at a minimum a bachelor's degree in pharmacy, pharmaceutical science, chemistry or a similar subject, with at least five years of post- degree practical experience in formulating pharmaceutical products. (Byrn Tr. 225-26)

---

182) Citations to depositions are in the format "([Deponent Last Name] Dep. Tr. [Page Number(s)])."

18.     A POSA would also have experience with pharmaceutical excipients, including their selection and use in drug formulations. With regard to the therapeutic application of the invention, a POSA would routinely collaborate with a medical doctor with experience treating hypertension and other cardiovascular conditions – particularly in pediatric patients – or a clinical pharmacologist. (*Id.*)

19.     Dr. Moreton did not offer a definition of a POSA at trial.[6]

### III.     Silvergate's Epaned® Product

20.     Silvergate's parent, Azurity, is the holder of New Drug Application ("NDA") No. 208686 for the oral liquid medication known by the trade name Epaned®. (SUF ¶ 25)

21.     Epaned® is approved by the FDA and is an angiotensin converting enzyme ("ACE") inhibitor that is a ready-to-use oral solution. (SUF ¶ 26)

22.     The composition of Epaned® is as follows:



---

[6] Although he did not offer a definition, the Court finds that Dr. Moreton is a person of at least ordinary skill under Silvergate's definition and that, in his testimony, he provided opinions from the perspective of a POSA.

23. The pH of Epaned® is between about 3.1 to about 3.5. (SUF ¶ 30)

24. The active ingredient of Epaned® is enalapril maleate. (*Id.*)

25. Epaned® is indicated for treatment of symptomatic heart failure. (SUF ¶ 28) Epaned® is also indicated for treatment of asymptomatic left ventricular dysfunction, to decrease the rate of development of overt heart failure and reduce hospitalization for heart failure. (SUF ¶ 29)

26. Epaned® is additionally indicated for treatment of hypertension in adults and children older than one month, to lower blood pressure. (SUF ¶ 27)

27. Enalapril was initially approved by the FDA in 1985 as tablets for oral administration and was marketed under the trade name Vasotec®. (SUF ¶ 32)

28. Oral tablets are not convenient for children or elderly patients; for these patients, a liquid formulation might be more appropriate. (Moreton Tr. 375)

29. Silvergate's first product was an enalapril powder for reconstitution dosage form known as the Epaned® Kit. (SUF ¶ 33)

30. Epaned® Kit was approved by the FDA in 2013. (SUF ¶ 34)

31. On September 20, 2016, the FDA approved Silvergate's NDA No. 208686 as an oral solution for, among other things, treatment of pediatric and adult hypertension. (SUF ¶ 31)

32. Silvergate discontinued Epaned® Kit in early 2017, after FDA refused to grant orphan drug exclusivity for the Kit and after the launch of the Epaned® oral solution. (Beckloff Tr. 87-88, 94-95, 119-20)

## IV. Bionpharma's ANDA Product

33. Bionpharma submitted Abbreviated New Drug Application ("ANDA") No. 212408 to the FDA under the provisions of 21 U.S.C. § 355(j), seeking approval for a generic version of Silvergate's Epaned® product (the "Bionpharma ANDA Product" or "ANDA Product"). (SUF ¶ 35)

7

34.     Bionpharma's ANDA Product is stable at about 5±3° C for at least 24 months. (SUF ¶ 37)

35.     Bionpharma's ANDA Product does not contain mannitol or silicon dioxide.  (SUF ¶ 38)

36.     The pH of Bionpharma's ANDA Product is between about 3 and about 3.5.  (SUF ¶ 39)

37.     Bionpharma's proposed label states that Bionpharma's ANDA Product is indicated for the treatment of heart failure and left ventricular dysfunction.  (SUF ¶ 40)

38.     The formulation of Bionpharma's ANDA Product is described in its ANDA and, in particular, set forth in the composition statement submitted with the ANDA.  According to that composition statement, the qualitative and quantitative formulation of Bionpharma's ANDA Product is as follows:



39.     CoreRx, a contract manufacturer, developed Bionpharma's ANDA Product.

(Punji Tr. 25)

## V.     Scientific Background And Technological Concepts

40.     The goal when developing an oral liquid formulation is a stable, bioavailable product that is easy to administer.  (Moreton Tr. 515-16)  An oral liquid formulation would have a water or co-solvent based vehicle for delivery, a preservative (for a multi-dose oral liquid formulation), buffer to maintain pH, flavoring agent to mask taste, an antioxidant to reduce oxidative degradation, and a humectant to protect the formulation from drying out.  (*Id.*)

41.     A pharmaceutical formulation is a combination of bulk active drugs with inactive excipients to make the final medicines or medicinal products.  (Moreton Tr. 374)  Active drugs need to be formulated because they are administered in small quantities per dose and are difficult for patients to manipulate.  (*Id.*)  The formulation is bulked to make it more manageable for the patient or the caregiver.  (*Id.*)

42.     A formulator takes into account the patient population and the disease state when determining what type of dosage form to prepare for a drug.  (Moreton Tr. 375)  The most common oral dosage form is a tablet, which is not convenient for certain patients, such as older (geriatric) patients or children (pediatric) patients.  (*Id.*)  A formulator also needs to evaluate the dose and the properties of the drug and the methods of manufacture, costs, and the type of excipients that are compatible with the drug.  (*Id.*)

### A.     Acid-Base Neutralization Reactions And Buffers

43.     In chemistry, acids are generally substances that ionize in water and are capable of donating hydrogen ions.  (Moreton Tr. 517)  Bases are generally substances that ionize in water and can accept hydrogen ions.  (*Id.*)  A strong acid such as hydrochloric acid and a strong base such as sodium hydroxide react – in what is called a neutralization reaction – to form a salt

9

and water.  An exemplary reaction is depicted below:

$$HCl \quad + \quad NaOH \quad \rightarrow \quad H_2O \quad + \quad NaCl$$

| Hydrochloric acid | Sodium hydroxide | Water | Sodium Chloride (salt) |

(Moreton Tr. 517)

44.    The pH scale represents acidity or alkalinity of a solution on a 0 to 14 scale. (Moreton Tr. 518)  pH is the negative log of the hydrogen ion concentration in aqueous solution. (Byrn Tr. 215-16)  Lower pH values indicate a more acidic solution while higher numbers indicate an alkaline solution.  (*Id.*)  A pH of 7 is neutral, indicating a solution in which there are no excess acidic or basic components.  (*Id.*)

45.    A buffer is typically a mixture of a weak acid and its salt, called the conjugate base.  (Moreton Tr. 518-19)  Unlike a strong acid, a buffer acid does not dissociate fully when dissolved in water.  (Byrn Tr. 218-19; Moreton Tr. 518-19; DTX-1087.3-4)  As depicted in the equation below, a reversible arrow in the equation means that the equilibrium can move towards the acid, HA, or towards the conjugate base, A⁻.  Buffers maintain the pH of the liquid in the formulation by resisting changes in pH when a small quantity of acid or base is added.

$$HA \quad \rightleftharpoons \quad H^+ \quad + \quad A^-$$

| Weak Acid | $\rightleftharpoons$ | Hydrogen ion | + | Conjugate Base |

(Byrn Tr. 218, 231; Moreton Tr. 518-19; DTX-1080.4-6; DTX-1086.3-4; DTX-1087.6-8)

46.    Chemists use the Henderson-Hasselbalch equation to compute the pH of a buffer solution, in which pKa is the dissociation constant of the weak acid, [A-] is the concentration of the conjugate base, and [HA] is the concentration of the weak acid:

$$pH = pK_a + \log \frac{[A^-]}{[HA]}$$

(Moreton Tr. 518-19; DTX-1080.4-6; DTX-1086.3-4; DTX-1087.4-5)

47.     When weak acid [HA] and conjugate base [A⁻] are equal, the pH is equal to pKa

(because log 1 = 0).  (Moreton Tr. 518-19; DTX-1087.6-8)  The equation also explains why the

pH of a buffered solution changes only gradually: pH increases only by a small amount because

the change in the ratio of [A⁻]/[HA] is dampened by the log factor in the equation.  (Moreton Tr.

525-26)

48.     Because pH is a logarithmic scale, a change in pH of 1 is a tenfold change

between the concentrations of acid and its conjugate base.  A pH change of 2 is a 100-fold

change in concentrations.  (Moreton Tr. 525-26)

49.     Some weak acids, such as citric acid and maleic acid, have more than one acidic

hydrogen, and are referred to as "polyprotic" acids; each acidic hydrogen has a separate pKa.

(DTX-1087.12; *see also* Byrn Tr. 221-22; Moreton Tr. 539, 569)

50.     Chemical buffers operate by consuming acid or base.  (DTX-1087.8; *see also*

Byrn Tr. 218, 231; Moreton Tr. 517)

51.     An acid is a compound that donates protons.  (Byrn Tr. 215; Moreton Tr. 517)

A base is a compound that picks up, or accepts, protons.  (*Id.*)

52.     A strong acid is very reactive and easily donates its protons.  A strong base is

very reactive and easily picks up protons.  (Byrn Tr. 216)

53.     A hydroxide is an example of a strong base.  (Byrn Tr. 216; Moreton Tr. 527)

54.     If one adds additional acid or base to a solution with a buffer, the buffer will

consume the excess acid or base and the pH will remain stable.  (Byrn Tr. 221; Webb Dep. Tr.

66)

55.    There are at least two ways to create a buffer. (Byrn Tr. 218-19)

56.    The first way to create a buffer is to add the acid and a salt. The salt is the conjugate base. (*Id.*; Mosher Tr. 652) It is not necessary always to have an equivalent amount of weak acid and conjugate base; the amount is dependent on the needs of the buffer system and how many hydrogen or hydroxide ions are produced that need to be neutralized by the buffer system. (Byrn Tr. 255)

57.    The second way to create a buffer is by adding a substoichiometric amount of sodium hydroxide or other strong base to a weak acid. A substoichiometric amount is not enough to completely react with the acid. (Byrn Tr. 219-20, 254)

58.    The pKa of an acid indicates how strong the acid is. (Byrn Tr. 222)

59.    It is critical to maintain the pH in a pharmaceutical liquid formulation because excess hydrogens or hydroxide ions can react with the active ingredient and render it unstable and degrade it. For stability, a drug product needs to have a formulation that retains the molecule of the drug in its proper form throughout the shelf life. (Byrn Tr. 223-24)

60.    Dr. Cacace, a member of the team that developed Bionpharma's ANDA Product, acknowledged that "most drugs have a pH that they like to be at" and it is a "requirement" to have control over the pH. (Cacace Dep. Tr. 27)

## B.    Buffer Capacity And Buffer Species Concentration

61.    Buffer capacity of a buffer system is the amount of strong acid or base that the buffer system can "absorb" before the pH of the buffer solution changes significantly. (Moreton Tr. 522-23; DTX-1087.11-12) Buffer capacity is directly proportional to the buffer species concentration for simple buffer. (Byrn Tr. 160) When the concentration of buffer increases –

that is, the sum of the concentrations of the weak acid and its conjugate base that is present in the solution increases – the buffer capacity increases. (Moreton Tr. 522-23) Buffer capacity can be calculated with the Van Slyke equation, where $\beta$ is buffer capacity, and $C$ is the total concentration of buffer species:

$$\beta = 2.3C \ \frac{K_a[H_3O^+]}{(K_a + [H_3O^+])^2}$$

(*Id.*; *see also* Byrn Tr. 158-59 (buffer capacity is quantitative measure of resistance of solution containing buffering agent to change of pH; for simple buffers, higher concentration of buffer means higher concentration of buffer species); DTX-1081.1)

62.    The total buffer species concentration is a good indicator of buffer capacity. (Moreton Tr. 522-23; DTX-1087.12) The buffer capacity is at maximum in a solution containing nearly equal amounts of a weak acid and its conjugate base, and it falls off as the ratio of conjugate base to acid changes. (Moreton Tr. 519-20; DTX-1086.4; DTX-1087.12)

63.    The useful pH range of a buffer is approximately pKa ± 1 pH unit. (Moreton Tr. 523-24; DTX- 1087.11-12) Outside this range, there is not enough of either the weak acid or the weak base to react with added base or acid. (Moreton Tr. 523-24) If more acid or base is then added, the capacity of the buffer system to neutralize it is exceeded, resulting in the new addition sharply changing pH. (*Id.*)

64.    The Lewis reference states that "[a]lthough *it is difficult to give an exact limit*, it is generally accepted that a solution has a useful buffer capacity provided the value of [salt]/[acid] lies within the range of 10 to 0.1 . . . a particular acid can be employed for making useful buffer solutions of pH laying within the range of pKa -1 to pKa +1." (DTX-1086.4)

(emphasis added)  It also gives the example of a pKa of 4.76, and states that it would be best "for preparing buffer solutions whose pH's *are roughly in the range of 3.75 to 5.75.*" (*Id.* at 4-5) (emphasis added)  The important aspect of matching pKas with pHs is to ensure that the solution remains buffered. (DTX-1087.12)

65.     If the pKa of a weak acid is below one unit from the pH of the solution, there will be substantially less weak acid present as the equilibrium between weak acid and its conjugate base (or salt) will shift towards the conjugate base (salt), with the result being that the solution will have little capacity to neutralize any base added to or generated in the solution. (Moreton Tr. 540; Byrn Tr. 432-34; DTX-1080.7; DTX-1086.4-5; DTX-1087.12-13)  If the pKa of the weak acid is greater than 1 unit from the pH of the solution, the equilibrium will shift towards the acid, and there will be very little conjugate base (salt) present to neutralize any acid added to or generated in the solution. (Moreton Tr. 540)

66.     While buffers are included in pharmaceutical liquid dosage forms to resist changes in pH, the primary concern is not any acid or base added to the product after formulation (because the formulation is bottled and sealed); the primary concern is that components within the formulation (such as excipients) may degrade into acid compounds (and thus lower the pH) or basic compounds (and thus raise the pH). (Moreton Tr. 523)

67.     A weak acid buffer, HA, works by reacting with the base to neutralize it. (Moreton Tr. 525-27)  However, as more and more base is added, the weak acid of the buffer is exhausted, at which point the buffered solution reaches a point outside the buffer region. (*Id.*) When the weak acid component is exhausted, even a few drops of added base can sharply increase the pH of the solution, resulting in the pH curve shooting up dramatically. (*Id.*) Similarly, when a small amount of acid is added to the buffer system, the weak conjugate base,

A⁻, reacts with the acid to neutralize it. Therefore, the change in the concentration of hydrogen ion $H^+$ in the solution is minimal and there is very little or no change in pH of the overall solution at the beginning. (*Id.*) Eventually the weak base component of the buffer is exhausted, at which point, a few additional drops of acid can sharply change the pH of the solution. (*Id.*; *see also* DTX-1087.8-9)

68.     As the amount of buffer (buffer species concentration) is increased in the solution, it takes a greater volume of strong base (or strong acid) to change the pH of the buffered solution. (Moreton Tr. 526-27) The greater the concentration of buffer species, the more the system can absorb and the better the buffer will protect against the addition of a base. (*Id.*; *see also* Byrn Tr. 217-18; DTX-1080.4-7; DTX-1087.6-7, 11-12)

69.     A pH adjuster is a chemical that, unlike a buffer, is typically a strong acid or a strong base (such as hydrochloric acid or sodium hydroxide) and is used to alter the pH. (Moreton Tr. 527)

## VI.     Silvergate's Patents

### A.     Asserted Patents

70.     The Asserted Patents in this case are United States Patent Nos. 10,039,745 (the "'745 patent") and 10,154,987 (the "'987 patent"). (SUF ¶ 42)

71.     The '745 patent, entitled "Enalapril Formulations," issued on August 7, 2018. (SUF ¶ 43)

72.     The '745 patent issued from application No. 15/802,341 (the "'341 application"), which was filed on November 2, 2017. The '341 application is a continuation of the '622 application. (SUF ¶ 44)

73.     The '987 patent, entitled "Enalapril Formulations," issued on December 18, 2018.

(SUF ¶ 45)

74.     The '987 patent issued from application No. 16/003,994 (the "'994 application"), which was filed on June 8, 2018. The '994 application is a continuation of the '341 application. (SUF ¶ 46)

**B.     Asserted Claims**

75.     Silvergate asserts that Bionpharma's ANDA Product will directly infringe claims 4, 7, and 10 of the '745 patent, and that Bionpharma will indirectly infringe (through inducement and contributory infringement) claims 20, 23, and 30 of the '987 patent (collectively, the "Asserted Claims."). (D.I. 157 Ex. 1 ¶ 45)

76.     Claims 4, 7, and 10 of the '745 patent depend from independent claim 1, which recites:

> A stable oral liquid formulation, comprising: (i) about 0.6 to about
> 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or
> solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5
> mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate;
> (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water;
> wherein the formulation is stable at about 5±3° C for at least 12
> months; and wherein the stable oral liquid formulation has about
> 95% w/w or greater of the initial enalapril amount and about 5%
> w/w or less total impurity or related substances at the end of the
> given storage period.

(PTX-003)

77.     Claim 4 of the '745 patent recites: "The stable oral liquid formulation of claim 1, wherein the formulation does not contain mannitol." (*Id.*)

78.     Claim 7 of the '745 patent recites: "The stable oral liquid formulation of claim 1, wherein the pH of the stable oral liquid formulation is between about 3 and about 3.5." (*Id.*)

79.     Claim 10 of the '745 patent recites: "The stable oral liquid formulation of claim 1, wherein the formulation is stable at about 5±3° C for at least 24 months." (*Id.*)

80.     Claims 20 and 23 of the '987 patent depend from independent claim 18, which recites:

> A method of treating heart failure in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; wherein the formulation is stable at about 5±3° C. for at least 12 months; and wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

(PTX-004)

81.    Claim 20 of the '987 patent recites: "The method of claim 18, wherein the formulation does not contain mannitol or silicon dioxide." (*Id.*)

82.    Claim 23 of the '987 patent recites: "The method of claim 18, wherein the formulation is stable at about 5±3° C. for at least 24 months." (*Id.*)

83.    Claim 30 of the '987 patent depends from independent claim 25, which recites:

> A method of treating left ventricular dysfunction in a subject comprising administering to that subject a therapeutically effective amount of a stable oral liquid formulation, the stable oral liquid formulation comprising: (i) about 0.6 to about 1.2 mg/ml enalapril or a pharmaceutically acceptable salt or solvate thereof; (ii) a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate; (iii) about 0.7 to about 1.2 mg/ml sodium benzoate; and (iv) water; wherein the formulation is stable at about 5±3° C. for at least 12 months; and wherein the stable oral liquid formulation has about 95% w/w or greater of the initial enalapril amount and about 5% w/w or less total impurity or related substances at the end of the given storage period.

(*Id.*)

84.    Claim 30 of the '987 patent recites: "The method of claim 25, wherein the formulation is stable at about 5±3° C. for at least 24 months."

85.    The "buffer limitation" of the Asserted Claims is "a buffer comprising about 0.8 to about 3.5 mg/ml citric acid and about 0.1 to about 0.8 mg/ml sodium citrate."

86.     The "preservative limitation" of the Asserted Claims is "about 0.7 to about 1.2 mg/ml sodium benzoate."

87.     The term "about," when used in the Asserted Claims, means "approximately." (SUF ¶ 41)

## C.     Other Members Of The Epaned® Patent Family

88.     U.S. Patent No. 9,669,008 (the "'008 patent"), entitled "Enalapril Formulations," issued on June 6, 2017.  (SUF ¶ 47)

89.     The '008 patent issued from application No. 15/081,603 (the "'603 application"), which was filed on March 25, 2016.  The '603 application claims priority to provisional application No. 62/310,198, filed on March 18, 2016.  (SUF ¶ 48)

90.     U.S. Patent No. 9,808,442, entitled "Enalapril Formulations," issued on November 7, 2017.  (SUF ¶ 49)

91.     The '442 patent issued from application No. 15/613,622 (the "'622 application"), which was filed on June 5, 2017.  The '622 application is a continuation of the '603 application.  (SUF ¶ 50)

92.     Gerold Mosher and David Miles are the named inventors of the Asserted Patents and of the '008 and '442 patents.  (SUF ¶ 51)

93.     Silvergate owns the Asserted Patents as well as the '008 and '442 patents.  (SUF ¶ 52)

94.     The Asserted Patents and the '008 and '442 patents are listed in the FDA Orange Book under the entries for Epaned®.  (SUF ¶ 53)

95.     On October 31, 2018, Silvergate filed U.S. Patent Application No. 16,177,159 (the "'159 application").  (SUF ¶ 54)

18

96.     The '159 application claims priority to the '603 application.  (SUF ¶ 55)

**D.     Prosecution History Of The '008 Patent**

97.     The '603 application was filed with 20 claims, three of which were independent (application claims 1, 12, and 20).  (SUF ¶ 69)

98.     Original claim 1 of the '603 application recites as follows:

CLAIMS

WHAT IS CLAIMED IS:

1.  An oral liquid formulation, comprising:
     (i)      about 1 mg/ml enalapril maleate;
     (ii)     about 0.70 mg/ml of a sweetener that is sucralose;
     (iii)    a buffer comprising about 1.82 mg/ml citric acid;
     (iv)     about 1 mg/ml of a preservative that is sodium benzoate; and
     (v)      water;
     wherein the pH of the formulation is less than about 3.5; and
     wherein the formulation is stable at about 5±3 °C for at least 12 months.

(SUF ¶ 70)

99.     Original independent claims 1 and 12 contain a buffer with only "about 1.82 mg/ml citric acid," while original independent claim 20 contains a buffer with "about 1.82 mg/ml citric acid and about 0.15 mg/ml sodium citrate dihydrate."  (SUF ¶ 71)

100.    On September 2, 2016, in a first office action, the U.S. Patent and Trademark Office ("PTO") Examiner rejected all 20 claims of the '603 application as obvious.  (SUF ¶ 72)

101.    In this first office action, the Examiner rejected all 20 pending claims as obvious in view of five references: (1) U.S. Patent No. 8,568,747 (the "'747 patent") (PTX-213); (2) Rippley et al., *Pharmacokinetic Assessment of an Oral Enalapril Suspension for Use in Children*, Biopharm. Drug Dispos., 21:339-334 (2000) ("Rippley") (PTX-332); (3) Nahata et al., *Stability of Enalapril Maleate in Three Extemporaneously Prepared Oral Liquids*, Am. J. Health-System Pharm., 55:1155-1157 (1998) ("Nahata") (PTX-231); (4) the product information of Bicitra, Sodium Citrate and Citric Acid Oral Solution USP ("Bicitra"); and (5) the product

19

information of Ora-Sweet® SF ("Ora-Sweet").  (SUF ¶ 73)

102.    In the first office action, the Examiner also suggested "presenting evidence demonstrating criticality of the selection of the amounts and specific ingredients, such as evidence demonstrating that the prior art composition does not have the same long-term stability as the instantly claimed composition."  (SUF ¶ 74)

103.    On October 14, 2016, the Examiner held an interview with Silvergate.  (SUF ¶ 75)

104.    During the October 14, 2016 interview between Silvergate and the Examiner, Silvergate attempted to establish patentability by distinguishing the components and their specific concentrations in a formulation disclosed in the common specification (E5) with the components and concentrations of enalapril liquid formulations disclosed in the prior art that had been the subject of the Examiner's September 2, 2016 obviousness rejection.  (PTX-005 at SLVGT-EPA_0000836-37; Moreton Tr. 391-93)

105.    On January 17, 2017, in a second office action, the Examiner again rejected all 20 application claims of the '603 application as obvious.  The Examiner rejected all claims as obvious in view of the same prior art that had been identified in the first office action.  (SUF ¶ 76)

106.    In the second office action, the Examiner also rejected all claims as indefinite because of the term "stable."  (SUF ¶ 77)

107.    In the second office action, the Examiner stated that "oral liquid compositions comprising 1 mg/mL enalapril maleate, sweeteners such as mannitol, sucrose, sorbitol, and sucralose; buffers such as citric acid and sodium citrate; preservatives such as sodium benzoate; and water were well known at the time of the invention."  (SUF ¶ 78)

108.     In the second office action, the Examiner also stated that "the inventive example requires sodium citrate dihydrate and is not representative of the broadest claimed composition." (SUF ¶ 79)

109.     In the January 17, 2017 office action, the Examiner rejected the E5 comparison, stating:

> Further, the inventive example [E5] requires sodium citrate dihydrate, and is not representative of the broadest claimed composition. Applicant is invited to present evidence demonstrating that the amounts of the components taught by [the prior art] are different from the amounts recited in the instant claims.

(PTX-005 at SLVGT-EPA_0000837; *see also* Moreton Tr. 393)

110.     One reason the Examiner rejected the E5 comparison is because the E5 formulation contained sodium citrate dihydrate, while the broader pending independent claims of the '603 application did not; thus, E5 was not commensurate in scope with pending claims 1 and 12. (Moreton Tr. 391-92)

111.     On February 3, 2017, Silvergate submitted an amendment and response, in which it amended independent application claims 1, 12, and 20 of the '603 application, and cancelled application claims 3 and 14. (SUF ¶ 80)

112.     In the February 3, 2017 amendment, Silvergate amended the preamble of independent application claims 1, 12, and 20 of the '603 application from "An oral liquid formulation" to "A stable oral liquid formulation." Silvergate also amended independent application claims 1, 12, and 20 of the '603 application by adding the following claim limitation: "wherein the stable oral liquid formulation has about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of the given storage period." These amendments were made in response to the Examiner's indefiniteness

rejection.  (SUF ¶ 81)

113.    In the February 3, 2017 amendment, Silvergate also amended the buffer limitation of independent application claim 1 of the '603 application by adding the following claim language: "and about 0.15 mg/mL sodium citrate dihydrate."  (SUF ¶ 82)

114.    In the February 3, 2017 amendment, Silvergate also amended the buffer limitation of independent application claim 12 of the '603 application by adding the following claim language: "and about 2.9% (w/w of solids) sodium citrate dihydrate."  (SUF ¶ 83)

115.    In the February 3, 2017 amendment, Silvergate did not amend the buffer limitation of independent application claim 20 of the '603 application, which already recited "and about 0.15 mg/mL sodium citrate dihydrate" limitation.  (SUF ¶ 84)  Silvergate also argued to the Examiner in the Remarks section of the February 3, 2017 Amendment that the amended claims were non-obvious because they were distinguishable from the prior art formulations based on components and specific concentrations.  (PTX-005 at SLVGT-EPA_0000863, SLVGT-EPA_0000873-74; *see also* Moreton Tr. 395-98)  Silvergate also argued that "the cited references have not provided any reason to single out the specific components at the requisite concentrations for a pharmaceutical liquid recited in the instant claims."  (PTX-005 at SLVGT-EPA_0000863)  Silvergate included the following table distinguishing the claims from the prior art based on components:

| Enalapril Extemporaneous Formulation (Ora-Sweet/Ora-Plus) | Enalapril Powder for Reconstitution Formulation | Formulation of Present Claims |
|---|---|---|
| Enalapril | enalapril | enalapril |
| lactose | mannitol | sucralose |
| magnesium stearate | colloidal silicon dioxide | citric acid |
| sodium bicarbonate | sucrose | sodium citrate dihydrate |
| starch | glycerin | sodium benzoate |
| iron oxide | sorbitol | water |
| microcrystalline cellulose | flavoring | |
| carboxymethylcellulose sodium | citric acid | |
| xanthan gum | sodium phosphate | |
| carrageenan | methylparaben | |
| calcium sulphate | potassium sorbate | |
| trisodium phosphate | water | |
| citric acid | | |
| dimethicone | | |
| potassium sorbate | | |
| methylparaben | | |
| flavoring | | |
| sorbitol | | |
| glycerin | | |
| sucrose | | |
| water | | |

(PTX-005 at SLVGT-EPA_0000873; *see also* Moreton Tr. 395-98)

116. Silvergate went on to argue that "[i]n contrast [to the prior art formulations], the formulation of the present claims has only *four* ingredients along with enalapril and water." (PTX-005 at SLVGT-EPA_0000873) Silvergate also emphasized that the specific components and concentrations of the claimed formulations, including sodium citrate dihydrate at the recited concentration, were essential to the stability of the claimed formulations:

> As such, the prior art does not provide any expectation that any underline combination would be successful for stable enalapril oral liquid formulations, much less any expectation that the combination of [sic] with enalapril, citric acid, sodium citrate, sodium benzoate, sucralose, and water at the recited concentrations and at a pH of less than about 3.5 would be successful in forming a stable enalapril liquid formulation.

(PTX-005 at SLVGT-EPA_0000874; *see also* Moreton Tr. 397-98)

117. In response to the Examiner's obviousness rejection, Silvergate stated that "Nahata and the '747 patent do not disclose or suggest any liquid formulations of enalapril having this stability at *about 5±3 °C for at least 12 months* nor any methods of achieving this

stability." (PTX- 5 at SLVGT-EPA_0000868; *see also* Byrn Tr. 280)  Moreover, Silvergate

stated that "[n]one of the other cited references, Bicitra, Ora-sweet, and Rippley, reveal any

enalapril or other pharmaceutical liquid formulations having this stability or methods thereof."

(PTX-005 at SLVGT-EPA_0000868; *see also* Byrn Tr. 280)  Accordingly, Silvergate stated that

"[b]ecause this stability element is not present in any of the cited references, the Office has not

set forth a *prima facie* case of obviousness." (PTX-005 at SLVGT-EPA_0000868; *see also* Byrn

Tr. 280)

118.    In response to the Examiner's obviousness rejection, Silvergate also stated that

"there is no guidance whatsoever to keep or eliminate the components if one were to use Nahata

or the '747 patent as a starting point to arrive at the claimed enalapril liquid formulations."

(PTX-005 at SLVGT-EPA_0000873; *see also* Byrn Tr. 280)

119.    Silvergate further argued that the pending claims were distinguishable from the

prior art based on the claimed stability, providing as support a declaration from Dr. Mosher

("Mosher Declaration"). (PTX-005 at SLVGT-EPA_0000863-868, SLVGT-EPA_0000874-887;

Moreton Tr. 394-96, 655)

120.    The Mosher Declaration included data "depict[ing] the enalapril content of

formulations E7 at 5° C and 25° C and E8 at 5° C." (PTX-005 at SLVGT-EPA_0000883-885)

Formulations E7 and E8 were as follows:

| Composition of Enalapril Maleate Formulations | | |
|---|---|---|
| Component | E7 | E8 |
| Enalapril maleate | 1.00 | 1.00 |
| Citric acid anhydrous | 1.80 | 1.82 |
| Sodium citrate anhydrous | 0.16 | 0.15 |
| Sodium benzoate | 1.00 | 1.00 |
| Sucralose | 0.70 | 0.70 |
| Mixed berry flavor | 0.50 | 0.50 |
| Water | qs | qs |
| pH (measured) | 3.3 | 3.3 |
| qs = sufficient quantity | | |

(*Id.* at SLVGT-EPA_0000883)  Formulations E7 and E8 were exemplary embodiments of the

invention claimed in the Asserted Patents. (Mosher Tr. 839) The Mosher Declaration also described the claimed oral liquid formulations as "contain[ing] enalapril, sucralose, *a citric acid buffer*, sodium benzoate and water at a pH of less than 3.5." (PTX-005 at SLVGT-EPA_0000881) (emphasis added)

121.  In addition to the data in the Mosher Declaration, "the enalapril concentrations published by Nahata, the US 8,568,747 enalapril concentrations, and the concentrations from E7 and E8 [were] plotted graphically (Fig. 1: 5 °C and Fig. 2: 25 °C) with linear regression of the data for extrapolation." (PTX-005 at SLVGT-EPA_0000885-886) Figures 1 and 2 of the Mosher Declaration are reproduced below:



(*Id.* at SLVGT-EPA_0000885-886)

122.  According to the Mosher Declaration, "[t]he additional enalapril content data submitted for E7 and E8 shows that the formulations of the present application are significantly more stable, which in [Dr. Mosher's] opinion, reflects the superior results and advantages, obtained with the oral liquid enalapril formulation of the present claims." (*Id.* at SLVGT-EPA_0000887; *see also* Mosher Tr. 659)

25

123.    The Mosher Declaration further stated that the stability of "the oral enalapril liquid formulations of the present claims . . . is an important aspect of the present formulations." (PTX-005 at SLVGT-EPA_0000882; *see also* Mosher Tr. 656)  The stability "contributes to the consistency and uniformity of the formulations as well as allows for accuracy of dosing to patients."  (PTX-005 at SLVGT-EPA_0000882; *see also* Mosher Tr. 656)

124.    Silvergate's remarks accompanying the February 3, 2017 amendment referenced Figures 1 and 2 of the Mosher Declaration, stating:

> As evidenced by [Figures 1 and 2], the E7 formulation demonstrates no loss of enalapril for at least 12 months at 5° C and about 100 days at 25° C.  The E8 formulation, which has only one data point, is expected to trend similarly.  These results drastically contrast with the stability or lack thereof in the extemporaneous and reconstituted enalapril preparations where . . . the enalapril degrades substantially after initial preparation.  At about 90-100 days, the extemporaneous preparations are at about 95% of the starting enalapril concentration when stored at either 4° C or 25 °C and the reconstituted formulation degrades after 8 weeks at 25° C. The unexpected stability results of the E7 and E8 formulations are not taught by Nahata or the '747 patent, and could not have been predicted or contemplated by the cited prior art.  Nowhere does the prior art teach or suggest that a combination of enalapril, citric acid, sodium citrate, sodium benzoate, sucralose and water at the recited concentrations and at a pH of less than about 3.5 at the claimed concentrations would have resulted in such a dramatic stabilization of enalapril.  Accordingly, Applicant has submitted evidence supporting the unexpected technical results achieved by the claimed stable enalapril liquid formulations which rebut any presumption of *prima facie* obviousness.

(PTX-005 at SLVGT-EPA_0000875-878; *see also* Byrn Tr. 328)

125.    In response to the Examiner's statement that citric acid and sodium citrate were in prior art enalapril liquid formulations, Silvergate argued that the claimed concentrations of citric acid and sodium citrate were not disclosed in the prior art, rendering the amended '603 application claims patentable.  (Moreton Tr. 399-401; PTX-005 at SLVGT-EPA_0000863,

SLVGT-EPA-0000873-74)

126.    On March 20, 2017, the Examiner held a second interview with Silvergate. During the interview, "Examiners suggested removing the limitations directed towards the use of sucralose as the sweetener." (SUF ¶ 85; *see also* PTX-005 at SLVGT-EPA_0001150-51; Byrn Tr. 283-84)

127.    On March 22, 2017, Silvergate submitted a supplemental amendment in which it amended independent application claims 1 and 12 of the '603 application, and added application claims 21 and 22 to the '603 application. Silvergate "adopt[ed] the Examiner's suggestion for the claim amendments." (SUF ¶ 86)

128.    Specifically, Silvergate moved the sucralose claim limitations of independent claims 1 and 12 to dependent claims 21 and 22. (SUF ¶ 87)

129.    On April 19, 2017, the Examiner allowed claims 1-20 of the '008 patent. (SUF ¶ 88)

130.    The prosecution of the continuations of the '008 patent, including the two patents-in-suit here, did not include further relevant substantive communications or events pertinent to the arguments in this litigation. (SUF ¶ 89)

**VII.    Additional Facts Relating To Prosecution History Estoppel**

**A.    Amendment-Based Estoppel**

131.    As Dr. Moreton opined, the amendment Silvergate made during prosecution is a narrowing amendment. (Moreton Tr. 394, 399)

132.    An enalapril liquid formulation that does not have "about 0.15 mg/mL sodium citrate dihydrate" would have literally infringed original application claim 1 of the '603 application (pre-amendment), but would not literally infringe that claim post-amendment, after

27

the addition of the "about 0.15 mg/mL sodium citrate dihydrate" limitation.

133.    Dr. Moreton opined that "the amendment [to add sodium citrate to the buffer

limitations] is fundamental to the whole issue" of whether Bionpharma's ANDA Product

contains an equivalent buffer and is not, therefore, tangential.  (Moreton Tr. 511)

134.    Claim 20 of the '603 application, which recited a buffer that required "about 1.82

mg/ml citric acid and about 0.15 mg/ml sodium citrate dihydrate," was rejected as obvious in the

September 2, 2016 and January 17, 2017 office actions (PTX-005 at SLVGT-EPA_0000366; *see*

*also* Byrn Tr. 291), even though it already contained the sodium citrate limitation, because the

Examiner did not have the benefit of Silvergate's arguments – propounded in connection with

the February 3, 2017 amendment – that the specific concentrations of citric acid and sodium

citrate recited in the claim were not disclosed in the prior art (Moreton Tr. 401).

135.    Silvergate could have sought claims covering formulations requiring different

buffers altogether, or formulations without buffers (like Bionpharma's ANDA Product), but the

only data demonstrating formulation stability for 12 months or longer in the common

specification is for the E5 and E6 formulations, which used specific concentrations of citric

acid/sodium citrate buffers.  (PTX-003 at 37:17-39:12 (stability data in Table E-2); PTX-003 at

Examples A-G; Byrn Tr. 430-31; Moreton Tr. 537-38)

136.    Citric acid alone and citric acid with sodium citrate are not equivalent buffer

systems.  (Moreton Tr. 399)

137.    There is no persuasive evidence that the sodium citrate amendment was made to

"tidy up" the claims and make claims 1 and 12 co-extensive with claim 20.  (Byrn Tr. 290-92;

PTX-005 at SLVGT-EPA_0000858-860)  Silvergate and its expert, Dr. Byrn, pointed to no legal

or factual reason why the applicant would have wanted to make the claims "more consistent with

one another." (Byrn Tr. 290-91)

138.     Bionpharma's expert, Dr. Moreton, acknowledged that "the stability of the
inventive formulation was an element of how Silvergate overcame the obviousness rejection."
(Moreton Tr. 409)

139.     Dr. Byrn opined that the maleate buffer in Bionpharma's ANDA Product is
tangential to, and, in fact, is entirely unrelated to, the sodium citrate claim amendment. (Byrn Tr.
290-93) Dr. Byrn provided three reasons for this conclusion: (1) claim 20, which contained the
sodium citrate limitation, was also rejected as obvious; (2) the applicant stressed the superior
stability of the claimed invention and not the type of buffer; and (3) the applicant's argument
focused on rebutting the Examiner's *prima facie* case of obviousness. (Byrn Tr. 293) The Court
was not persuaded by Dr. Byrn on these points.

140.     After the amendment, the Examiner suggested moving sucralose, which was part
of the "inventive example," from the independent claims into the dependent claims, from which
Dr. Byrn concludes that adding sodium citrate could not have provided the impetus for
overcoming the obviousness rejection. (Byrn Tr. 283-84; PTX-005 at SLVGT-EPA_0000944)
The Court was not persuaded by Dr. Byrn on this point.

141.     Even though Silvergate's arguments to the Examiner relate specifically to a lack
of motivation to combine (Byrn Tr. 286-87), a lack of a reasonable expectation of success (*id.*),
and the unexpected stability of the claimed invention (Byrn Tr. 288), they nevertheless constitute
a clear and unmistakable disclaimer, to a POSA, of buffers that do not contain the claimed
concentrations of citric acid ***and*** sodium citrate.

### B.     Argument-Based Estoppel

142.     A reasonable competitor of Silvergate reading the table and the arguments

29

presented during prosecution, including the argument that "[i]n contrast [to the prior art formulations], the formulation of the present claims had only *four* ingredients along with enalapril and water" (PTX-005 at SLVGT-EPA0000873-874), would understand that the claims as amended required the exact recited four ingredients, along with enalapril and water, at the recited concentrations, and nothing more, or otherwise would not infringe (Moreton Tr. 512-13). Silvergate argued that additional ingredients in the prior art formulations are not needed or contemplated in the claimed enalapril liquid formulations because none of them are needed to produce an oral liquid formulation of the present claims that is stable and homogenous for at least 12 months. (PTX-005 at SLVGT-EPA0000873-74) A competitor would understand that Silvergate disclaimed formulations that do not contain the exact four ingredients in exact concentrations along with enalapril and water. (Moreton Tr. 512-13)

143. In the February 3, 2017 amendment, Silvergate stated that it "respectfully disagree[d]" with the indefiniteness rejection but made the amendments "in order to solely advance prosecution." (PTX-005 at SLVGT-EPA_0000861)

144. In the March 22, 2017 supplemental amendment, Silvergate summarized the March 20, 2017 interview, writing: "[i]t is the Applicant's understanding that the Examiners appreciated the superior stability provided by the components and pH as recited in the claims," adding "[i]t is further Applicant's understanding that Examiner Lundgren suggested moving the sweetener, sucralose, from the independent claims to dependent claims." (PTX-005 at SLVGT-EPA_0000944; *see also* Byrn Tr. 283-84)

145. During prosecution, the Examiner rejected all claims as obvious based on a number of prior art references stretching back almost 30 years. (PTX-005 at SLVGT-EPA_0000818) In response, the Applicant argued that the prior art did not teach the claimed

stability. (Byrn Tr. 285-86; Moreton Tr. 409)

146. In his declaration, Dr. Mosher pointed out the superior stability of the claimed invention in comparison to the prior art references. (Mosher Tr. 658; *see also* PTX-005 at SLVGT-EPA_0000883)

147. Silvergate argued during prosecution of the '603 application that the stability exhibited by the specific citric acid/sodium citrate buffered formulations claimed in the patents-in-suit was unexpected and, thus, not obvious. (Mosher Tr. 660-61; PTX-005 at SLVGT-EPA_0000875-78)

148. In response to the Examiner's arguments that "[i]t would be within the purview of the ordinarily skilled artisan to reconstitute enalapril tablets w/ Bicitra, Ora-Sweet, and Ora-Plus and remove components needed for powders or tablets," and that "a skilled artisan would reverse engineer the tablets dissolved in Ora-Sweet, Ora-Plus, and/or Bicitra and remove unnecessary excipients" (PTX-005 at SLVGT-EPA_0000837), Silvergate argued that the Examiner had not made a *prima facie* case of obviousness because the prior art provided no motivation to combine or expectation of success (Byrn Tr. 285-87; PTX-005 at SLVGT-EPA_0000871-874).

149. During prosecution, the Examiner invited the Applicant to submit evidence demonstrating the "criticality of the selection of the amounts and specific ingredients" for a formulation which included a limitation in the independent claims requiring sucralose. (PTX-005 at SLVGT-EPA_0000818)

150. The independent claims discussed throughout the amendment contained sucralose. (PTX-005 at SLVGT-EPA_00000858-60) At the Examiner's suggestion, Silvergate moved the sucralose limitation from the independent claims to the dependent claims, thus broadening the independent claims. (*Id.* at SLVGT-EPA_0000940-945; Byrn Tr. 283-84;

Moreton Tr. 408)  Thus, the claims the Examiner allowed were broader than the claims referenced throughout the prosecution.  (Moreton Tr. 408-09)

     151.    Silvergate's expert, Dr. Byrn, opined that the prosecution history of the '008 patent shows that all six ingredients listed or identified by Applicant – enalapril, citric acid, sodium citrate, sodium benzoate, sucralose, and water – are not critical to the invention, particularly given that the Examiner suggested moving sucralose from the independent claims to dependent claims, and Applicant did so.  (PTX-005 at SLVGT- EPA_0000941-944, 1150; *see also* Byrn Tr. 283-84)

     152.    Bionpharma's expert, Dr. Moreton, disagreed.  He opined that the arguments made by Silvergate during prosecution would have suggested to a reasonable competitor that the specific components of the claimed buffer were critical.  (*See* Moreton Tr. 512-13)  The Court was persuaded by Dr. Moreton on this point.

## VIII.  Facts Relating To Disclosure-Dedication Doctrine

     153.    Each asserted claim of the patents-in-suit requires "about 0.7 to about 1.2 mg/ml sodium benzoate."  (Moreton Tr. 500-01)

     154.    The common specification discloses that sodium benzoate is a suitable preservative for use in the disclosed formulations.  (Moreton Tr. 505-06; PTX-003 at 10:49-50)

     155.    The specification also discloses that a paraben or a mixture of parabens can be used as suitable preservatives in the disclosed formulations.  (Moreton Tr. 506-07; PTX-003 at 12:25-38)

     156.    The common specification describes a list of exemplary preservatives that are alternatives to sodium benzoate, including "parabens (such as methylparaben, ethylparaben, propylparaben, butylparaben and their salts)."  (PTX-003 at 10:11-20; *see also* Moreton Tr. 501-

02)

    157.    The full quote in the specification states:

> Preservatives include anti-microbials, anti-oxidants, and agents that enhance sterility. Exemplary preservatives include ascorbic acid, ascorbyl palmitate, BHA, BHT, citric acid, EDTA and its salts, erythorbic acid, fumaric acid, malic acid, propyl gallate, sodium ascorbate, sodium bisulfate, sodium metabisulfite, sodium sulfite, parabens (such as methylparaben, ethylparaben, propylparaben, butylparaben and their salts), benzoic acid, sodium benzoate potassium sorbate, vanillin, and the like.

> In some embodiments, the enalapril oral liquid formulation described herein comprises a preservative.

> In some embodiments, the preservative is a paraben and the sweetener is not a sugar (such as, but not limited to glucose, fructose, sucrose, lactose, maltose) or a sugar alcohol (such as, but not limited to xylitol, mannitol, lactitol, maltitol, sorbitol).

(PTX-001 at 10:5-20)

    158.    The common specification includes Example C, subtitled "Stability of Enalapril Maleate Formulations Containing Paraben Preservatives." (PTX-003 at 33:23-34:51) Example C discloses Silvergate prepared and tested for stability at least three enalapril maleate liquid formulations that contained methylparaben/propylparaben mixtures as preservatives. (Moreton Tr. 507-08; PTX-003 at 33:22-34:23) Within the Example C formulations, methylparaben and propylparaben would be present as free acids and not sodium salts. (Moreton Tr. 508; Byrn Tr. 301) Further, a POSA would know that the non-salts (not the salts) would be exerting antimicrobial activity. (Byrn Tr. 301)

    159.    While Example C discloses additional preservatives, such as potassium sorbate or sodium benzoate, there is nothing in the specification teaching that parabens must be used with another preservative. (Moreton Tr. 508-09; *see also generally* PTX-003)

    160.    Tables A-1 and C-1 show sodium benzoate and/or potassium sorbate in

formulations with methylparaben sodium and/or propylparaben sodium (or sodium benzoate alone). (PTX-001 at 31:26, 33:60)

161. The '482 patent, which is assigned to Silvergate, also claims priority to patents-in-suit. (DTX-1123) As a continuation patent, the '482 patent contains the same specification as the patents-in-suit. Claim 14 of the '482 patent requires a mixture of parabens as preservatives and does not require any other non-paraben preservative such as potassium sorbate or sodium benzoate. (Byrn Tr. 304)

162. Dr. Moreton explained it was known in the art that "methylparaben and propylparaben are the most used parabens and they are most often used together," because of their complementary physical and antimicrobial properties. (Moreton Tr. 502) Methylparaben and propylparaben are alkyl esters of p-hydroxybenzoic acid. (Moreton Tr. 503) As the chain lengths of the alkyl moiety increases, microbial activity increases, but solubility decreases. (*Id.*) Methylparaben and propylparaben are often used together because methylparaben is more soluble but less active and propylparaben is less soluble but more active. (Moreton Tr. 503-05, 561, 563-64; DTX-1095.3-4; DTX-1096.3-4; DTX-1100.1)

163. Both the methylparaben (DTX-1095) and propylparaben (DTX-1096) entries in the Handbook of Pharmaceutical Excipients disclose that methylparaben and propylparaben were commonly used together to preserve parenteral formulations (i.e., aqueous liquid injectable formulations). (Moreton Tr. 505; DTX-1095.4; DTX-1096.3) The Valkova reference (DTX-1100) states that "[p]ropylparaben is considered more active against most bacteria than methylparaben. However, because the latter is more soluble in water, they are often used as a mixture in commercial preparations." (DTX-1100.1)

## IX.    Facts Relating To Infringement

164.    Silvergate has stipulated that Bionpharma's ANDA Product does not literally infringe the Asserted Claims. (D.I. 102)

165.    Bionpharma's Dr. Moreton opined that (i) the methylparaben, propylparaben combination is disclosed in the common specification of the patents-in-suit and, therefore, dedicated to the public under the disclosure dedication doctrine; (ii) Silvergate is estopped under amendment-based estoppel because it narrowed the claims during prosecution to require sodium citrate; (iii) Silvergate is further estopped because it disclaimed formulations beyond the claims in its arguments before the PTO. (Moreton Tr. 499-500) Dr. Moreton additionally opined that the maleic acid and sodium maleate alleged to be the buffer in Bionpharma's ANDA Product is not equivalent to the buffer limitations in the patents; and the methylparaben-propylparaben preservative system is not equivalent to the sodium benzoate limitations in the patents. (*Id.*)

166.    Bionpharma's ANDA Product contains the following ingredients in the amounts shown:



(PTX-00482 at BION-ESOL-00000503)

167.    Bionpharma's ANDA Product is a solution.  As is undisputed (*see, e.g.*, Tr. 1204-06) (Bionpharma closing argument), the infringement analysis is conducted with respect to the compounds in solution after dissolution.

168.    The limitation "[a] stable oral liquid formulation" is met literally and not in dispute.  (D.I. 157 Ex. 1 ¶ 49)

169.    The limitation "about 0.6 to about 1.2 mg/mL enalapril or a pharmaceutically acceptable salt or solvate thereof" is met literally and not in dispute.  (D.I. 157 Ex. 1 ¶ 47)

170.    The limitation "water" is met literally and not in dispute.  (D.I. 157 Ex. 1 ¶ 48)

171.    The limitations "wherein the formulation is stable at about 5±3˚ C. for at least 12 months" and "wherein the formulation is stable at about 5±3˚ C. for at least 24 months" is met literally and not in dispute.  (D.I. 157 Ex. 1 ¶ 49; PTX-003 at SLVGT-EPA_0083167)

172.    The limitation "wherein the formulation does not contain mannitol" is met literally and not in dispute.  (D.I. 157 Ex. 1 ¶ 50)

173.    The limitation "wherein the formulation does not contain silicon dioxide" is met literally and not in dispute.  (D.I. 157 Ex. 1 ¶ 50)

174.    The limitation "pH is between about 3 and about 3.5" is met literally and not in dispute.  (D.I. 157 Ex. 1 ¶ 51)

175.    The limitation "treatment of heart failure" is met literally and not in dispute.  (D.I. 157 Ex. 1 ¶ 52)

176.    The limitation "treatment of left ventricular dysfunction" is met literally and not in dispute.  (D.I. 157 Ex. 1 ¶ 52)

177.    The limitation "therapeutically effective amount" is met literally and not in

dispute. (*See* D.I. 157 Ex. 2 at 20-21)

### A.    Amount

178.    The claims require 0.8-3.5 mg/mL citric acid and 0.1-0.8 mg/mL sodium citrate dihydrate.

179.    Bionpharma's ANDA Product contains 0.236 mg/mL of maleate. (Byrn Tr. 229-30; PTX-00476 at BION-ESOL-00000087; PTX-00478 at BION-ESOL-000000231)

180.    Bionpharma's ANDA Product contains "QS" or "quantum satis" of sodium hydroxide, meaning enough to get it to the correct pH, or sufficient quantity. (Byrn Tr. 231; Moreton Tr. 527; PTX-00478 at BION-ESOL-00000231)

181.    Bionpharma created exhibit batches for submission to the FDA; the batch records of the Bionpharma formulations show that the amount of sodium hydroxide added to the Bionpharma ANDA Product is between 0.030-0.032 mg/mL. (Byrn Tr. 232; PTX-00492 at BION-ESOL-00001783; PTX-00494 at BION-ESOL- 00001852; PTX-00495 at BION-ESOL-0000001917)

182.    The preservative limitation in the claims requires 0.7 to 1.2 mg/mL sodium benzoate.

183.    Bionpharma's ANDA Product contains 1.05 mg/mL methylparaben and 0.21 mg/mL propylparaben, for a total of 1.26 mg/mL preservative – 5% above the top of the claimed range. (Byrn Tr. 261-62; PTX-00478 at BION-ESOL-00000231)

### B.    Buffer Limitation

184.    The parties agree that the buffer limitations are responsible for maintaining formulation pH. (Byrn Tr. 235; Moreton Tr. 535)

185.    The specification confirms that the purpose of the buffer is to maintain the pH of

the liquid enalapril formulation. (Byrn Tr. 234; PTX-001 at 13:6-7)

186.    The parties agree that buffering agents as defined in the common specification maintain the pH of the enalapril liquid formulations of the patents-in-suit. (Byrn Tr. 235; Moreton Tr. 518; PTX-003 at 21:9-10) The buffer protects enalapril during storage and also in the stomach after ingestion. (Moreton Tr. 535)

187.    A buffer's function in the claims is to maintain pH, beyond any pH maintenance provided by maleic acid dissociated from enalapril maleate. (Moreton Tr. 535, 537) The claims require a separate, independent buffer component, to maintain pH beyond any pH maintenance provided by any acid disassociated from an enalapril salt. (Moreton Tr. 535-37) Every example listed in the common specification uses only the enalapril maleate form of enalapril and no other forms of enalapril. (Moreton Tr. 538) Drs. Moreton and Byrn agree there is no description in the common specification of enalapril formulations in which maleic acid (or any other acid) disassociated from an enalapril salt serves as the buffer. (Byrn Tr. 430-31; Moreton Tr. 538)

188.    At the 18th step in the manufacturing process of Bionpharma's ANDA Product, sodium hydroxide is added. (Moreton Tr. 528-29; DTX-1092.50) At that step, all the other components are in the formulation. (*Id.*) When sodium hydroxide is added, it can react with maleic acid, but it can also react with other acidic components in Bionpharma's formulation, such as enalapril itself, which has a carboxylic acid group with a pKa of 2.97; or the sodium hydroxide can react with the mixed berry flavor or methylparaben and propylparaben. (Moreton Tr. 529-31) If maleic acid and sodium hydroxide are not the only interacting species, then the amount of alleged buffer species generated from maleic acid is much reduced. (*Id.*)

189.    There is no evidence that in the formulation of Bionpharma's ANDA Product, maleic acid completely dissociates from enalapril maleate or that the sodium hydroxide reacts

completely with and only with maleic acid to form an appreciable buffer. (Moreton Tr. 527-28)

190.    Dr. Byrn admitted that he could have experimentally verified the existence of the alleged maleic acid/sodium maleate system in Bionpharma's ANDA Product but chose not to. (Byrn Tr. 439)

191.    Study 3 in the Pharmaceutical Development Report of Bionpharma's ANDA (DTX 1092.44-45) ("PDR") was performed in two samples of enalapril maleate and water only, with no other excipients, and the concentration of enalapril maleate was two-fold greater than the enalapril maleate formulation at issue (Moreton Tr. 531-33; DTX 1092.44-45).  In the study, the two samples were titrated with sodium hydroxide, and the pH changes were measured from pH 2.9 to 6.0.  (DTX 1092.77)

192.    The PDR graph does not show an appreciable maleic acid/sodium maleate buffer system in Bionpharma's ANDA Product as the experiment does not unequivocally demonstrate that maleic acid is the only compound reacting with sodium hydroxide.  (Moreton Tr. 532-33) The experiment contained enalapril, which has a pKa of around 2.97, and can also dissociate in water to impart alleged buffer species.  (*Id.*)  The study concludes with the assertion that "the *API* does impact *some* buffering capacity to the drug product."  (DTX- 1092.45) (emphasis added)  Therefore, at most the graph shows the buffering of a combination of enalapril and maleic acid but not maleic acid alone.  (Moreton Tr. 533)  In addition, the experimental solution did not have other excipients that are present in Bionpharma's ANDA Product formulation; it was not, therefore, representative of the conditions in Bionpharma's ANDA Product.  (Moreton Tr. 533)

193.    Drs. Byrn and Moreton agreed that for a buffer to function properly, the strength of the weak acid component (i.e., its pKa) must be within a certain range of the formulation pH,

although they disagreed as to the breadth of that range.  (Byrn Tr. 434-35; Moreton Tr. 519-22)

194.    Dr. Byrn conceded that maleic acid has no acidic hydrogen with a pKa within plus or minus one of the pH of Bionpharma's ANDA Product.  (Byrn Tr. 438)

195.    Dr. Byrn testified that a weak acid can function as a buffer within ±2 of the pKa of the weak acid.  (Byrn Tr. 434-35)  Dr. Byrn did not provide any support from literature for this opinion.  (*Id.*)  To the contrary, literature such as the Harris reference states that "outside of pKa ± 1 pH unit, there is not enough of either the weak acid or the weak base to react with added base or acid."  (DTX-1087.12; *see also* DTX-1086.4; Byrn Tr. 434-35, 438)

196.    The Henderson-Hasselbalch Equation provides that in a liquid formulation, when the pH equals the pKa of the first acidic hydrogen on maleic acid, the two species – maleic acid and maleate anion – are at a ratio of approximately 1:1.  (Byrn Tr. 432)  Drs. Byrn and Moreton agreed that the pKa of the first acidic hydrogen on maleic acid is 1.97.  (Byrn Tr. 432; Moreton Tr. 539)  The pH of Bionpharma's ANDA Product is about 3.3 and is controlled between 3.2 and 3.6.  (Byrn Tr. 432; Moreton Tr. 530)

197.    As the pH of an aqueous solution with maleic acid increases from 1.97 to 2.9 (approximate pH = 1 + pKa), there are more maleate species than maleic acid species in the solution.  (Byrn Tr. 432-33; Moreton Tr. 538-40)  As pH further increases to 3.3, there is very little maleic acid in Bionpharma's ANDA Product to neutralize any base added or generated over time.  (Byrn Tr. 432-33; Moreton Tr. 540)  Therefore, at a pH of 3.3, the ability of the alleged maleic acid/sodium maleate buffer to neutralize an added (or generated base) would be severely diminished.  (Byrn Tr. 432-33; Moreton Tr. 540)  Hence, the maleic acid from enalapril maleate would not be an effective buffer in Bionpharma's ANDA Product.  (Moreton Tr. 539-40; *see also* Byrn Tr. 433-34)

198.     The pKa of citric acid is 3.1, which is within ± 1 of pH of 3 to 3.5 for the formulation of the Asserted Claims and within the same distance from the pH of the Epaned® formulation.  (Moreton Tr. 539; *see also* Byrn Tr. 160)

199.     The inventor, Dr. Mosher, explained that buffers in the claimed enalapril formulations help adjust and maintain the pH because the pKa of citric acid is approximately that of the solution.  (Mosher Tr. 652-53)

200.     The concentration elements of the buffer limitation ("about 0.8 to about 3.5 mg/ml citric acid" and "about 0.1 to about 0.8 mg/ml sodium citrate") represent a range of buffer concentrations species – i.e., the concentration of actual weak acid and conjugate base species present and available to neutralize any acid or base added or generated over time.  (Moreton Tr. 546-47)  Dr. Moreton calculated the buffer species concentration for the claimed buffer limitations and for the accused maleic acid/sodium maleate system in Bionpharma's ANDA Product.  (Moreton Tr. 547-48)  For this exercise, he assumed that Dr. Byrn is correct that 100% of the maleic acid component of enalapril maleate disassociates into solution and that all of it reacts with sodium hydroxide to form the alleged maleic acid/sodium maleate system.  (*Id.*)  Even under this assumption, the claimed buffer limitations have, depending on the exact concentration of citric acid and sodium citrate used, anywhere between 2.24 and 10.5 times greater buffer species concentration than the accused maleic acid/sodium citrate system in Bionpharma's ANDA product.  (Moreton Tr. 548-49)  Dr. Byrn did not dispute the accuracy of Dr. Moreton's buffer species calculations.  (Byrn Tr. 441-42)

201.     Again, there is no evidence that 100% of maleic acid dissociates into solution and reacts with sodium hydroxide to form the alleged buffer.  (Moreton Tr. 527-28)  Therefore, the concentration of actual maleic acid/sodium maleate in solution is even smaller than hypothesized

by Dr. Byrn, so the difference between the total buffer species concentration of the claimed buffer and the alleged maleic acid/sodium maleate system in Bionpharma's ANDA Product, and their respective buffer capacities, is even greater. (*Id.*)

202. Consequently, the alleged maleic acid/sodium maleate system in Bionpharma's ANDA Product has substantially less buffer capacity than the buffer limitations of the claims require. (Moreton Tr. 548-50)

203. The specification states that "[s]table as used herein refers to enalapril oral liquid formulations having about 95% or greater of the initial enalapril amount and about 5% w/w or less total impurities or related substances at the end of a given storage period." (PTX-003 at 18:41-45)

204. Bionpharma does not contest that its product is stable. (Byrn Tr. 246; D.I. 157 Ex. 1 ¶ 49)

205. Bionpharma and Silvergate agree that Bionpharma's ANDA Product is stable as defined in the Asserted Claims "at about $5 \pm 3°$ C for at least 24 months." (Byrn Tr. 246; *see also* PTX-00485 at BION-ESOL- 00001758)

206. The Asserted Claims and the patent specification do not include any mention of *in vivo* stability, which means stability in the body of a patient. (Byrn Tr. 257-58)

207. Dr. Moreton admitted that neither the '987 nor '745 patent require that the formulation of the invention function to prevent enalapril degradation *in vivo*. (Moreton Tr. 415-16)

208. Nevertheless, on April 3, 2017, Silvergate filed the Citizens' Petition, requesting that the FDA deny biowaiver requests for generic versions of Epaned®. (DTX-1068 at SLVGT-EPA_0002581) In the Petition, Silvergate stated that citric acid and sodium citrate "act together

to keep Epaned® (enalapril maleate) Oral Solution 1 mg/mL in a stable pH band (*e.g.*, impacting shelf life – stability) and are thought to protect enalapril, ***after ingestion, from premature hydrolysis in the stomach's acidic environment.***" (*Id.* at SLVGT-EPA_0002588) (emphasis added) That is, in the Petition Silvergate expressly represented to FDA that a separate buffer of citric acid/sodium citrate was important to protecting enalapril during storage ***and*** from premature hydrolysis after ingestion in the acidic environment and elevated temperatures in the stomach. (Beckloff Tr. 131-32; Moreton Tr. 542-45; DTX-1068.1, DTX-1068.8, DTX-1068.18; DTX-2159) Silvergate explained to the FDA that any reduction in the amount of buffer (citric acid/sodium citrate) could materially affect the dosing of enalapril. (DTX-1068.1, DTX-1068.8)

209.    The Handbook of Pharmaceutical Excipients explains that maleic acid "is used in the pharmaceutical industry as a pH modifier and a buffering agent." (PTX-00497 at SLVGT-EPA_014306)

210.    Dr. Moreton admitted that the maleic acid and sodium maleate in Bionpharma's ANDA Product may provide buffering capacity. (Moreton Tr. 571)

211.    Bionpharma's Travis Webb admitted that sodium hydroxide was chosen for Bionpharma's formulation because "it's a commonly used pH adjustor." (Webb Dep. Tr. 87) The Quality Overall Summary of Bionpharma's ANDA also states that sodium hydroxide is a functional component for the formulation pH because it is added to adjust the pH to a predetermined target. (PTX-00478 at BION-ESOL-00000246-47) Bionpharma's PDR similarly states that the pH adjustment is performed using 1.0N sodium hydroxide to adjust the final pH as needed. (PTX-00498 at BION-ESOL-00000606-07)

212.    The formulator of Bionpharma's ANDA Product, Travis Webb testified that in developing the ANDA Product formulation, the product was targeted to a pH range of 3.1 to 3.7.

(Webb Dep. Tr. 125-27; PTX-00478 at BION-ESOL-00000238)

213.    Bionpharma's PDR acknowledges that judicious use of excipients creates a "buffering capacity of ~1 mMols/g of Enalapril Maleate." (PTX-00498 at BION-ESOL-00000622)

## C.    Preservative Limitation

214.    The preservative limitation in the Asserted Claims requires about 0.7 to about 1.2 mg/mL of sodium benzoate.

215.    Bionpharma's ANDA Product does not contain sodium benzoate; it contains methylparaben and propylparaben. (Moreton Tr. 553)

216.    Dr. Moreton agreed that an oral liquid formulation "will necessarily contain a preservative" in order to "mop up any stray microbes that would get in there." (Moreton Tr. 515-16)

217.    Travis Webb, the formulator of Bionpharma's ANDA Product, testified that methylparaben and propylparaben are used as a preservative, and have the same function as the sodium benzoate in Silvergate's Epaned® product. (Webb Dep. Tr. 111-12) He further testified that the parabens were selected for Bionpharma's ANDA Product solely because they are antimicrobial preservatives. (Webb Dep. Tr. 68, 77, 83-85)

218.    Usha Sankaran, Bionpharma's Associate Vice President of Regulatory Affairs, agreed that the function of the methylparaben and propylparaben in Bionpharma's ANDA Product is to be "antimicrobial preservatives." (Sankaran Dep. Tr. 207, 220-21)

219.    Methylparaben and propylparaben are structurally similar to sodium benzoate.

Each has the same core with different side chains:



Sodium Benzoate    Methylparaben    Propylparaben

(Byrn Tr. 270; PTX-00500 at SLVGT-EPA_0104311; DTX-1095.3; DTX-1096.3)

220.  The parabens are esters of p-hydroxybenzoic acid, whereas sodium benzoate is the sodium salt of benzoic acid.  (Moreton Tr. 554-55)

221.  The parabens have a different mechanism of action.  They work in different ways than sodium benzoate and have different physical properties as well.  (Moreton Tr. 555)

222.  Sodium benzoate is inactive and has to be converted to benzoic acid, at a pH below 5, in order for it to exert its antimicrobial effects.  (Moreton Tr. 555, 557; *see also* Byrn Tr. 160)  The optimal pH for the antimicrobial activity of the parabens is in the range of 4 to 8. (Moreton Tr. 557)

223.  A skilled formulator preparing an enalapril liquid formulation would have to consider the relative solubilities of the preservatives because she would have to tailor the manufacturing processes to the properties of the ingredients.  (Moreton Tr. 557)

224.  Methylparaben-propylparaben preservatives are lipophilic and less soluble in water.  (Moreton Tr. 555-56; DTX-1095.5; DTX-1096.4)  Solubility for methylparaben is 1 part per 400 parts of water while solubility for propylparaben is 1 part per 2500 parts of water. (Moreton Tr. 556)  Sodium benzoate on the other hand has higher solubility of 1 part per 1.8

45

parts of water. (*Id.*; DTX-1102.5)  Parabens are soluble in propylene glycol: 1 in 5 for methylparaben and 1 in 3.9 for propylparaben. (Moreton Tr. 555-56; DTX-1095.5; DTX-1096.4)  A formulator can get parabens into an aqueous solution by using their sodium salts, as Silvergate did in its studies. (Moreton Tr. 556)  A formulator can also dissolve the parabens in a co-solvent, such as propylene glycol, as Bionpharma did. (*Id.*)  Sodium benzoate does not need a co-solvent to dissolve in water. (Moreton Tr. 556-57; DTX-1102.5)

225.    Parabens are effective against yeasts and molds and gram-positive and gram-negative bacteria; they are considered by a POSA as generally antimicrobial and fungicidal. (Moreton Tr. 559; DTX- 1084.1; DTX-1085.1-4; DTX-1090.1-2; DTX-1100.1)

226.    Sodium benzoate, on the other hand, is only effective under acidic conditions, and the way in which it acts as a preservative is by entering the bacterial cell and inhibiting the fermentation of glucose. (Moreton Tr. 559; DTX1093.3; DTX-1099.1)  Sodium benzoate is considered bacteriostatic and fungistatic, not bactericidal and fungicidal. (Moreton Tr. 559)  It inhibits the growth of microorganisms but does not kill the microorganisms. (*Id.*)

227.    Dr. Moreton testified that sodium benzoate has antimicrobial effects and exerts effects against yeast at a pH less than five. (Moreton Tr. 570-71)

228.    Dr. Moreton also testified that, in the oral solution of the ANDA Product, the mixture of methylparaben and propylparaben has antimicrobial effects and exerts effects against yeast. (Moreton Tr. 571)

229.    Bionpharma's ANDA Product maintains a pH between 3.2 and 3.6. The methylparaben and propylparaben are effective at preventing microbial growth for the product in this range. (Byrn Tr. 261, 264-65; PTX-00478 at BION-ESOL-00000231, 258; PTX-00498 at BION-ESOL-00000606, 663)

46

230. The Epaned® product shows that the sodium benzoate preservative demonstrates antimicrobial effectiveness. It meets the specifications of the United States Pharmacopeia ("USP") methods <51>, <61>, and <62>, and has both antimicrobial and antifungal effects. The Epaned® solution shows an absence of Escherichia coli, or E. coli. (Byrn Tr. 267-68; PTX- 480 at SLVGT-EPA_0003225)

231. Bionpharma's ANDA Product shows substantially similar efficacy with the methylparaben/propylparaben preservative. The antimicrobial effectiveness meets the same requirements of the USP <51>, <61>, and <62>. Bionpharma's ANDA Product also has an absence of E. coli. (Byrn Tr. 268-69, 272; PTX-00498 at BION-ESOL-000000668)

232. Freezing would be another way of killing bacteria or preventing its growth and would be substantially different from the chemical action of sodium benzoate and methylparaben/propylparaben. (Byrn Tr. 272-73)

## X. Facts Relating To Indirect Infringement

233. Bionpharma's proposed label instructs healthcare workers to use Bionpharma's ANDA Product to treat heart failure and left ventricular dysfunction in a therapeutically effective amount. (Mahan Tr. 932-34; D.I. 157 Ex. 1 ¶ 52)

234. Dr. Mahan testified that the label will instruct "the prescriber . . . about the indications and use, the dosage administration, the side effects, and all aspects that would be important in using this medication with patients." (Mahan Tr. 932-33)

235. Left ventricular dysfunction is equivalent to asymptomatic left ventricular dysfunction. (Mahan Tr. 934)

236. The only indications for which Bionpharma's ANDA Product may be prescribed are hypertension, heart failure, and left ventricular dysfunction. (Mahan Tr. 934-35)

## LEGAL STANDARDS

### I.     Burden of Proof

The patent owner has the burden of proving infringement by a preponderance of the

evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir.

1988). This same burden of proof applies to both direct and indirect infringement. *See id.*; *see*

*also Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990) (induced

infringement).

### II.    Infringement

A patent is infringed when a person "without authority makes, uses, offers to sell, or sells

any patented invention, within the United States . . . during the term of the patent." 35 U.S.C.

§ 271(a). Courts employ a two-step analysis in deciding infringement. *See Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). First, a court must construe the

asserted claims. *See id.* Next, the trier of fact must compare the properly-construed claims to the

accused infringing product. *See id.*

A patent owner may prove infringement under two theories: literal infringement or the

doctrine of equivalents. Literal infringement occurs when "every limitation in a patent claim is

found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570,

1575 (Fed. Cir. 1995). Infringement under the doctrine of equivalents occurs when the accused

product embodies every element of a claim either literally or by an equivalent. *See id.* This

doctrine "allows the patentee to claim insubstantial alterations that were not captured in drafting

the original patent claim but which could be created through trivial changes." *Festo Corp. v.*

*Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002).

## A.    Doctrine of Equivalents

The Supreme Court has explained that the "scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described." *Id.*  Two frameworks are available for application of DOE: (1) the "function-way-result test," which asks whether the accused product performs "'substantially the same function in substantially the same way to obtain the same result'" as the patented invention; and (2) the "insubstantial differences test," which asks "whether the accused product or process is substantially different from what is patented." *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866-67 (Fed. Cir. 2017) (quoting *Graver Tank & Manufacturing Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 608 (1950)).[7]

"[T]he 'all elements' rule informs a DOE analysis by requiring that equivalence be assessed on a limitation-by-limitation basis, rather than from the perspective of the invention as a whole, and that no limitation be read completely out of the claim." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1017 (Fed. Cir. 2006).  A determination of infringement under the doctrine of equivalents presents a question of fact. *See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).

---

[7] The Supreme Court has also stated:

> The particular linguistic framework used is less important than whether the test is probative of the essential inquiry: Does the accused product or process contain elements identical or equivalent to each claimed element of the patented invention? . . . An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 (1997).

## B.   Limitations On DOE

The doctrine of equivalents is circumscribed by important limitations, several of which are involved in the instant action: prosecution history estoppel, disclosure-dedication, and claim vitiation.

### 1.   Prosecution history estoppel

As the Federal Circuit recently explained,

> Prosecution history estoppel arises when a patent applicant narrows the scope of his claims during prosecution for a reason "substantial[ly] . . . relating to patentability." A narrowing amendment is presumed to be a surrender of all equivalents within "the territory between the original claim and the amended claim." This presumption can be overcome if the patentee can show that one of the following "exceptions" to prosecution history estoppel applies: (1) the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question; (2) the equivalent was unforeseeable at the time of the application; or (3) there was some other reason suggesting that the patentee could not reasonably be expected to have described the equivalent. "[W]hether prosecution history estoppel applies, and hence whether the doctrine of equivalents may be available for a particular claim limitation, presents a question of law." In making this determination, we must "look to the specifics of the amendment and the rejection that provoked the amendment to determine whether estoppel precludes the particular doctrine of equivalents argument being made."

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1364 (Fed. Cir. 2020) (internal citations omitted).

In addition to estoppel based on narrowing claim amendments, prosecution history estoppel may also arise from "arguments made during prosecution of the application to secure the allowance of claims." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1350 (Fed. Cir. 2002). "Any argument-based estoppel affecting a limitation in one claim will also extend to all claims in which that limitation appears." *Id.*

## 2.  Disclosure dedication

Judge Connolly recently summarized the disclosure-dedication doctrine:

> Under the disclosure-dedication doctrine, a patentee can disclaim an equivalent by disclosing the equivalent in the written description but not claiming it. *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1363 (Fed. Cir. 2012).  The disclosure-dedication doctrine provides:

>> [W]hen a patent drafter discloses but declines to claim subject matter . . . this action dedicates that unclaimed subject matter to the public.  Application of the doctrine of equivalents to recapture subject matter deliberately left unclaimed would conflict with the primacy of the claims in defining the scope of the patentee's exclusive right.

> The doctrine "does not mean that any generic reference in a written specification necessarily dedicates all members of that particular genus to the public." Rather, for the disclosure-dedication doctrine to apply, "the disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed."  Furthermore, "before unclaimed subject matter is deemed to have been dedicated to the public, that unclaimed subject matter must have been identified by the patentee as an alternative to a claim limitation."  Thus, "[t]he proper inquiry is whether one of ordinary skill in the art could identify which subject matter has been disclosed and which subject matter has been claimed."

*Eagle Pharm., Inc. v. Slayback Pharma LLC*, 382 F. Supp. 3d 341, 344-45 (D. Del. 2019), *aff'd*,

958 F.3d 1171 (Fed. Cir. 2020) (internal citations omitted).

## 3.  Claim vitiation

As the Federal Circuit further explained in *Bio-Rad*,

> Claim vitiation presents another bar to a finding of infringement under the doctrine of equivalents.  "[S]aying that a claim element would be vitiated is akin to saying that there is no equivalent to the claim element in the accused device based on the well-established 'function-way-result' or 'insubstantial differences' tests."  More recently, we have explained that vitiation "is not an exception or threshold determination that forecloses resort to the doctrine of

> equivalents, but is instead a legal conclusion of a lack of
> equivalence based on the evidence presented and the theory of
> equivalence asserted."

967 F.3d at 1366-67 (internal citations omitted).

### C.    Indirect infringement

In addition to direct infringement, a patentee may show that an accused infringer is liable for indirect infringement. One form of indirect infringement is induced infringement, which requires a showing of direct infringement as well as that "the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent." *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009). Another form of indirect infringement is contributory infringement. To show contributory infringement, a patentee must prove, in addition to direct infringement, "the accused infringer had knowledge of the patent," "the component has no substantial non-infringing uses," and "the component is a material part of the invention." *Fujitsu Ltd. v. Netgear, Inc.*, 620 F.3d 1321, 1326 (Fed. Cir. 2010).

## DISCUSSION

### I.    Direct Infringement

The parties agree that Bionpharma's ANDA Product does not literally infringe any of the Asserted Claims. Silvergate asserts that Bionpharma infringes under the doctrine of equivalents. Only two claim limitations are in dispute: the buffer limitation and the preservative limitation. As explained below, Silvergate cannot and/or has not proven that Bionpharma's ANDA Product meets either of these limitations.

## A.     The Buffer Limitation

The "buffer limitation" appears in all of the Asserted Claims.  The "buffer limitation" requires the presence of "a buffer comprising about 0.8 to about 3.5 mg/ml of citric acid and about 0.1 to about 0.8 mg/ml sodium citrate."  Bionpharma's product contains no citric acid and no sodium citrate.  (D.I. 176 at 7) (citing ANDA No. 212408 at tbl. 2.3.P.1-1)  Silvergate contends that the enalapril maleate in the ANDA Product dissociates in solution to yield a maleic acid buffer, which is equivalent to the buffer of the claims.  (*Id.* at 3)  Bionpharma counters that Silvergate is barred from proceeding on a theory of DOE and, in any event, its product contains no buffer at all.

### 1.     Prosecution history estoppel

No asserted patent has any significant prosecution history.  Only the formerly-asserted and related '008 patent does.  Both parties' experts identified the same five prosecution events from which the Court must determine if prosecution history estoppel applies:

1. In March 2016, Silvergate filed the '603 application (which became the '008 patent), claiming oral liquid formulations of enalapril in 20 claims, including three independent claims.

2. In September 2016, the Examiner issued a first office action rejecting all claims as obvious.

3. In October 2016, Silvergate held an interview with the Examiner, distinguishing its claims from the prior art.

4. In January 2017, the Examiner issued a second office action, again rejecting the claims for obviousness.

5. In February 2017, Silvergate amended its claims to distinguish its invention from the prior art.

Because each of the Asserted Patents derives priority from one common application, they necessarily share the same prosecution history.  To Bionpharma, therefore, the prosecution

history of the application that became the '008 patent is representative of each asserted patent; and because, in Bionpharma's view, prosecution history estoppel attaches to the '008 patent, it attaches to each of the Asserted Patents. (*See* C.A. No. 19-1067 D.I. 176 at 6) Silvergate has no substantive response on this point, noting only (in a footnote) that it "disagrees." (D.I. 205 at 13 n.7)

Bionpharma is correct. "When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999).[8] Neither of the later-filed Asserted Patents has any substantive prosecution history. Therefore, any estoppel attaching to the '008 patent must likewise attach to the remaining Asserted Patents.

### a.    Amendment-based estoppel

In determining whether amendment-based estoppel applies, the Court follows the four-step test first articulated by the Federal Circuit in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1366-67 (Fed. Cir. 2003) (en banc). When there is (1) a narrowing amendment (2) made for the purposes of patentability, the Court assesses whether the alleged equivalent is (3) within the scope of the surrendered subject matter and (4) whether an exception applies. *See id.* It is Bionpharma's burden, as the accused infringer, to prove that a narrowing amendment occurred; the remaining inquiries must be proven by Silvergate, as the patentee. *See id.*

Bionpharma has proven that Silvergate made a narrowing amendment. As originally

---

[8] In the context of divisional applications, the Federal Circuit has also stated: "In prosecuting a related application the applicant is not barred from raising new arguments or correcting past errors." *Biogen, Inc. v. Berlex Labs., Inc.*, 318 F.3d 1132, 1141 (Fed. Cir. 2003). The asserted patents are continuations, not divisionals. (D.I. 176 at 6)

submitted in March 2016, the buffer limitations of the independent claims of the '603 application
read as follows:

- Claims 1 and 12: a buffer of "about 1.82 mg/mL of citric acid"
- Claim 20: a buffer of "about 1.82 mg/mL of citric acid and about 0.15 mg/mL of sodium citrate dihydrate"

After the Examiner's September 2016 obviousness rejection, October 2016 interview,
and January 2017 obviousness rejection, Silvergate amended the claims in February 2017 so that
all three independent claims required "a buffer comprising about 1.82 mg/mL of citric acid and
about 0.15 mg/mL of sodium citrate dihydrate." This narrowed the scope of claims 1 and 12.
Prior to amendment these claims required *solely* 1.82 mg/mL of citric acid, while after
amendment these same claims required *both* 1.82 mg/mL of citric acid *and* 0.15 mg/mL of
sodium citrate dihydrate. Embodiments containing citric acid but not sodium citrate dihydrate
would infringe the original claims but would not infringe the amended claims. Claim scope,
therefore, was narrowed.

Silvergate is correct that amendments which merely "make express what had been
implicit in the claim as originally worded" are not narrowing. *Interactive Pictures Corp. v.
Infinite Pictures, Inc.*, 274 F.3d 1371, 1377 (Fed. Cir. 2001). That is not, however, a fair
characterization of the amendment here. Silvergate's argument is that "citric acid and sodium
citrate dihydrate dissociate to the same species." (D.I. 179 at 11) The chemistry presented at
trial establishes that, on this point, Silvergate is correct about what occurs in the composition.
That is, pre- and post-amendment, at a certain time while practicing the claims, one has both
citric acid and sodium citrate dihydrate, whether one starts with both components or starts only
with citric acid. (*See, e.g.*, Byrn Tr. 156-57) Even so, the amendment is narrowing because a
formulation starting with just citric acid could have infringed prior to amendment but could not

infringe after amendment.

Moreover, as Bionpharma correctly states: "Silvergate and its expert have come forward with *no evidence* that formulations falling with the scope of the original claim 1 of the '603 application *inherently contain* what was added via amendment, 'about 0.15 mg/mL sodium citrate dihydrate' without altering the specific concentration (about 1.82 mg/mL) of citric acid required by the claims." (D.I. 189 at 21 n.6)

Additionally, the relative concentrations of the components are different, and narrower in scope, in the amended claims as compared to in the original claims. Pre-amendment, "if you have 1.82 milligrams of citric acid, that is going to equilibrate to a certain proportion when the pH is 3.5." (Byrn Tr. 157) But post-amendment, "[i]f you add in another .15 milligrams sodium citrate, maybe that brings it up to 1.9 something." (*Id.*) Thus, although "you are going to have the *same molecules* in the *same ratio*," you will nonetheless have "slightly different *amounts*" of those molecules present. (*Id.*) (emphasis added) That narrows the claim. (*See* D.I. 219 at 5) ("Thus, the amendment to the buffer limitation narrowed the scope of the application claims by requiring the addition of 'about 0.15 mg/ml sodium citrate dihydrate,' which means that, post-amendment, the claims require a higher concentration of citric acid and sodium citrate than what was required pre-amendment, which, in turn, means that, post-amendment, the claims require a higher buffer species concentration and thus higher buffer capacity.") (internal emphasis omitted)

Indeed, pre-amendment, a formulator could have used any quantity of sodium citrate in conjunction with the claimed 1.82 mg/ml citric acid to result in any amount of sodium citrate following dissociation. But post-amendment, only the quantities captured in the claim – 1.82 mg/ml *and* 0.15 sodium citrate – suffice. Hence, again, the post-amendment claims are

narrower.

Silvergate also argues that the amendment was made for "clarity," suggesting this (if true) somehow means it could not have been narrowing. (*See, e.g.*, D.I. 179 at 12-13, 15) Other than Dr. Byrn's conclusory speculation (*see* Bryn Tr. 292), there is no evidence to support the view that the amendment was made for clarification. Even if there were such evidence, a "clarifying" amendment that also, as here, plainly narrows the scope of a claim would, nonetheless, be a narrowing amendment for estoppel purposes.

Moving to the next step in the estoppel analysis, the Court concludes that the amendment was made for the purposes of patentability. Where there is an expressed reason for the narrowing amendment, such as "a substantive change to [the] claim that clearly responds to an examiner's rejection of that claim as unpatentable over prior art," then "prosecution history estoppel applies to that claim; only the question of the scope of the estoppel remains. No presumption needs to be applied in such a case because the reason for the amendment is clear." *Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1355 (Fed. Cir. 1988). Where, instead, "the prosecution history reveals no reason for the narrowing amendment," *Festo*, 344 F.3d at 1366, the Court "presumes that the patentee had a substantial reason relating to patentability."

Here, Silvergate's narrowing amendment was made in response to the Examiner's obviousness rejections. Twice during prosecution, the Examiner rejected Silvergate's claims as obvious. One of the rejected claims, '603 application claim 20, already included the "0.15 mg/mL sodium citrate dihydrate" limitation. In Silvergate's view, then, "adding the same sodium citrate language that was already found in rejected claim 20 to claims 1 and 12 could not have overcome the obviousness rejection, and thus could not have been related to patentability." (D.I. 179 at 14) The Court disagrees.

Silvergate made clear that it was the specific concentration of citric acid **and** sodium citrate that distinguished its invention from the prior art.  For example, the Examiner, in her pre-interview communication, suggested Silvergate should "present[] evidence demonstrating criticality of the selection of the amounts and specific ingredients" to overcome the prior art. (PTX-005 at SLVGT-EPA_0000818)  Post-interview, the Examiner suggested that Silvergate demonstrate how "the amounts of the components taught by [the prior art] *are different from the amounts recited in the instant claims*." (*Id.* at SLVGT-EPA_0000837) (emphasis added)  In response, Silvergate did exactly that, arguing that "the cited references have not provided any reason to single out the specific components at the requisite concentrations for a pharmaceutical liquid recited in the instant claims." (*Id.* at SLVGT-EPA_0000863)  Silvergate added: "Nowhere does the prior art teach or suggest that a combination of enalapril, citric acid, sodium citrate, sodium benzoate, sucralose and water *at the recited concentrations* . . . would have resulted in such a dramatic stabilization of enalapril." (*Id.* at SLVGT-EPA_0000878) (emphasis added)  Further confirming the importance of the "0.15 mg/mL of sodium citrate dihydrate" to patentability is a post-amendment interview summary, in which Silvergate expressed its "understanding that the Examiners appreciated the superior stability *provided by the components and pH as recited in the claims*." (*Id.* at SLVGT-EPA_0000944) (emphasis added)

In repeatedly relating its unexpected stability results to the *specific* concentrations of *specific* ingredients in the amended claims, Silvergate necessarily made the identity and concentration of its ingredients central to overcoming the obviousness rejection.  Silvergate has not met its burden to show otherwise. *See Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1357-58 (Fed. Cir. 2013) (stating this burden is on patentee).[9]

---

[9] In the alternative, the Court would apply the presumption that Silvergate made the amendment for a "substantial reason relating to patentability." *Festo*, 344 F.3d at 1366.  Because Silvergate

58

The Court, thus, turns to the third step of the estoppel analysis, determining the scope of the surrendered material. A narrowing amendment is presumed to be a surrender of all equivalents within "the territory between the original claim and the amended claim." *Festo*, 535 U.S. at 740.

Silvergate contends that the scope of surrender (if any) is extremely narrow. To Silvergate, the applicant, at most, disclaimed only buffers that fall within the space between "1.82 mg/mL of citric acid" and "1.82 mg/mL of citric acid and 0.15 mg/mL of sodium citrate dihydrate." The Court disagrees. Instead, as Bionpharma persuasively argues, "[t]hrough its amendment, Silvergate sought to exclude formulations that do not contain sodium citrate at the requisite concentration, which includes Bionpharma's ANDA product." (D.I. 176 at 24) In other words, Silvergate overcame the obviousness rejections by adding to independent claims 1 and 12 – and better explaining to the Examiner the importance of the narrower buffer limitation already contained in independent claim 20 – a specific amount of sodium citrate dihydrate, which alters the relative concentration of citric acid and sodium citrate in the final formulation. In doing so, Silvergate was touting the crucial importance to its invention of the presence of sodium citrate at a specific concentration. In this way, Silvergate disclaimed all formulations not containing *both* 1.82 mg/mL of citric acid *and* 0.15 mg/mL of sodium citrate dihydrate. Alternatively, at minimum, Silvergate has failed to meet its burden to prove, instead, that Silvergate by its amendment only disclaimed the more circumscribed amount of claim scope for which it now argues.

---

has not proven that the amendment was made for a reason *not* relating to patentability – and the Court finds no support in the prosecution history itself for Silvergate's position on this point – Silvergate fails to meet its burden at this step of the estoppel test, regardless of whether the Court concludes (i) the amendment was made for a reason relating to patentability or (ii) the record is silent.

Finally, Silvergate has also failed to persuade the Court that its amendment bears no more than a tangential relation to Bionpharma's accused equivalent.[10] *See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d. 1304, 1315 (Fed. Cir. 2008) ("To rebut the estoppel presumption with tangentiality, a patentee must demonstrate that the rationale underlying the amendment bore no more than a tangential relation to the equivalent in question, or, in other words, that the narrowing amendment was peripheral, or not directly relevant, to the alleged equivalent."). The crux of the tangentiality inquiry is "the patentee's objectively apparent reason for the narrowing amendment . . . [as] discernible from the prosecution history record." *Festo*, 344 F.3d at 1369. Here, the objectively apparent reason for the narrowing amendment that emerges from the prosecution history is that both the identity and concentration of ***both*** components of the claimed buffer – "about 1.82 mg/mL of citric acid" ***and*** "about 0.15 mg/mL of sodium citrate dihydrate" – are important to maintaining the long-term stability of the overall composition. It follows that the amendment bears ***more than a tangential relationship*** to the accused equivalent, maleic acid, just as it bears more than a tangential relationship to all potential equivalent buffers that omit citric acid and sodium citrate dihydrate. Silvergate has failed to meet its burden to prove its contrary view the amendment was "unrelated to buffers generally, let alone to maleic acid specifically." (D.I. 179 at 17)

Accordingly, the Court concludes that amendment-based prosecution history estoppel precludes Silvergate from proving that Bionpharma's ANDA Product meets the buffer limitation of the Asserted Claims due to the presence in Bionpharma's product of maleic acid.

### b.    Argument-based estoppel

To give rise to argument-based estoppel, a patentee's statements must clearly and

---

[10] Tangentiality is the only exception Silvergate contends applies.

unmistakably surrender subject matter. *See Cordis Corp. v. Medtronic Ave, Inc.*, 511 F.3d 1157,

1177 (Fed. Cir. 2008); *see also Intendis GmbH v. Glenmark Pharms. Inc.*, 822 F.3d 1355, 1365

(Fed. Cir. 2016) (internal quotation marks omitted) ("Argument-based estoppel only applies

when the prosecution history evince[s] a clear and unmistakable surrender of subject matter.").

"[W]hether or not actually required to secure allowance of the claim," an argument that is

nonetheless clear and "made during prosecution in support of patentability" may create an

estoppel against assertion of the doctrine of equivalents. *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d

1359, 1368 (Fed. Cir. 2007) (internal citations omitted). In determining whether that clear and

unmistakable surrender has occurred, "[t]he relevant inquiry is whether a competitor would

reasonably believe that the applicant had surrendered the relevant subject matter." *Id.*

Here, as Dr. Moreton persuasively explained, a reasonable competitor would interpret

Silvergate's statement that "the formulation of the present claims has only *four* ingredients along

with enalapril and water" as a disclaimer of formulations that *do not* contain only those four

specific ingredients at the claimed concentrations, along with enalapril and water. (Moreton Tr.

512-13) (discussing PTX-005 at SLVGT-EPA_0000873) Bionpharma's ANDA Product

contains at least six ingredients, not just four, and does not contain three of the four ingredients

(citric acid, sodium citrate, sodium benzoate) which Silvergate told the Examiner were among

the only necessary ingredients. (Moreton Tr. 512-13) (discussing PTX-005 at SLVGT-

EPA_0000873 and arguing that "additional excipients in the other formulations are not needed or

contemplated in the claimed enalapril liquid formulations as *none of them are needed or*

*necessary* to produce an enalapril liquid formulation of the present claims that is stable and

homogenous") (emphasis added)

Silvergate contends that it was only distinguishing prior art and not narrowly defining its

own terms. When an applicant's argument is meant to distinguishes one's invention from the prior art, the scope of that distinction must be considered. *See, e.g., AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382-83 (Fed. Cir. 2005). In *AquaTex*, for example, the patentee distinguished its invention from the prior art by suggesting that the prior art did not "teach[] or suggest[] the overall composition of materials" in the patented claims. *Id.* at 1383. Similarly, in *Eagle Comtronics, Inc. v. Arrow Comm'cn Labs., Inc.*, 305 F.3d 1303, 1316 (Fed. Cir. 2002), the patentee "repeatedly distinguished the prior art" by arguing that the prior art did not "teach[] or suggest[]" its specific invention, in an "attempt[] to distinguish the claimed seal location from the location found in the prior art." In both *AquaTex* and *Eagle Comtronics*, however, no estoppel arose because the patentee did not surrender ***all*** subject matter; instead, the patentee only pointed out differences between her invention and the prior art. *See AquaTex*, 419 F.3d at 1383; *Eagle Comtronics*, 305 F.3d at 1316.

Bionpharma has persuaded the Court that this is not what occurred here. Instead, in full context, a POSA would understand that Silvergate clearly and unmistakably disclaimed embodiments not containing citric acid and sodium citrate buffers. Silvergate overcame the Examiner's obviousness rejections by pointing to the specific concentrations and identity of its specific ingredients, including its two-component buffer of citric acid and sodium citrate. (*See, e.g.*, FF ¶¶ 111-29)

In the prosecution history, Silvergate repeatedly references the "requisite concentrations" of the components of its invention, and the specificity and combination of ingredients. (*See, e.g.*, FF ¶ 115) As Silvergate now emphasizes, these references are all made in the context of Silvergate's overall response to the Examiner's obviousness rejection and, specifically, were aimed at persuading the Examiner that she had not made even a *prima facie*

case of obviousness. Silvergate insists that it "never argued that those 'only four ingredients' were critical to overcoming the prior art; rather Silvergate contrasted the number of ingredients in the prior art to the number of ingredients in the claimed formulation to bolster Silvergate's arguments regarding the lack of a *prima facie* case for obviousness." (D.I. 205 at 16)

It is true, as Silvergate emphasizes, that the patentee's "[a]rguments must be viewed in context," *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 824-25 (Fed. Cir. 1992); *see also Galderma Labs., L.P. v. Amneal Pharm. LLC*, 806 F. App'x 1007, 1010 (Fed. Cir. 2020) ("Statements by the patent owner are not considered in a vacuum; rather, the skilled artisan would look at the record as a whole in assessing claim scope."), but Silvergate is not correct that a reasonable competitor, viewing Silvergate's statements in the full context of the entire prosecution history, would fail to understand that Silvergate was disclaiming embodiments that lacked citric acid and sodium citrate, for the reasons stated above.

In the Court's view, a POSA (just like a reasonable competitor) would have understood Silvergate's arguments – although couched in terms of explaining how there was not even a *prima facie* showing of obviousness, for reasons including the lack of a motivation to combine prior art references to arrive at the claimed invention – as clearly and unmistakably disclaiming buffers not containing citric acid and sodium citrate dihydrate at the claimed concentrations.

For all of these reasons, the Court concludes that Silvergate is barred by argument-based estoppel from alleging that Bionpharma's ANDA Product, which does not contain citric acid or sodium citrate, meets the buffer limitation.[11]

---

[11] To the extent the parties make arguments in the context of amendment-based estoppel that also apply to argument-based estoppel, the Court's analysis of such arguments should also be understood to apply in whatever context the parties have made them.

**2.    Silvergate failed to prove DOE infringement of the buffer limitation**

Even if Silvergate were not estopped from proceeding with its theory that Bionpharma's

ANDA Product infringes the buffer limitations under the doctrine of equivalents – which it is –

the Court would find no infringement for the additional reason that Silvergate has failed to prove,

by a preponderance of the evidence, that Bionpharma's product contains a buffer equivalent to

the buffer of the Asserted Claims.  Silvergate has failed to prove that the accused ANDA Product

even contains a buffer.  Silvergate has also failed to prove that, even assuming the product has a

buffer, any buffer in the ANDA Product is equivalent to the claimed citric acid-sodium citrate

buffer under the function-way-result or insubstantial differences tests.

First, Silvergate has failed to prove that Bionpharma's ANDA Product has a buffer.  As

used in the invention, a buffer "maintains the pH of the liquid enalapril formulation."  (PTX-003

at 13:16-19)  There are two ways to make a buffer.  The first is to mix a weak acid and its

conjugate base together in solution.  (Byrn Tr. 218-19)  When mixed, the weak acid and

conjugate base will equilibrate in solution and then function as a buffer within a certain pH

range.  (*Id.*)  The second method of creating a buffer is to mix a weak acid with a

substoichiometric amount of sodium hydroxide.  (Byrn Tr. 219)  Bionpharma's ANDA Product

does not make use of a weak acid-conjugate base buffer system.  (Byrn Tr. 228-29)  Nor does it

explicitly contain a weak acid-sodium hydroxide buffer.  (*Id.*)  It follows, then, that

Bionpharma's ANDA Product does not contain a buffer.  (*See* Moreton Tr. 537 (opining that

enalapril maleate is "not there to be a buffer"), 540 ("[M]aleic acid is not an effective buffer for

enalapril formulation."), 550 (opining that "judicious use of excipients" created product without

buffer))

Silvergate argues that, notwithstanding the fact that Bionpharma's ANDA Product does not involve either of the two methods for creating a buffer, the accused product nonetheless contains a buffer that is derived from chemical dissociation of the active ingredient in Bionpharma's ANDA Product. (Byrn Tr. 228) According to Silvergate, the buffer system in Bionpharma's ANDA Product is created when enalapril maleate dissociates in solution to its constituent parts of enalapril and maleate, the latter of which further dissociates into maleic acid and sodium maleate. (Byrn. Tr. 229-30)

Silvergate has failed to prove by a preponderance of the evidence that this is what occurs in Bionpharma's product. Dr. Byrn conducted no tests to confirm the presence or quantity of the purported dissociation. Instead, as Bionpharma's Dr. Moreton persuasively explained, Dr. Byrn simply assumed full and complete dissociation in solution. (Moreton Tr. 528) Silvergate's absence of evidence is all the more glaring given that Bionpharma presented evidence (on an issue on which it lacks any burden) that sodium hydroxide – which, during the preparation of Bionpharma's ANDA Product, is added last – may be reacting with other, non-maleate or non-enalapril constituents in yielding the final product. (Moreton Tr. 528-31)

In support of its buffer creation theory, Silvergate also points to a titration curve in Bionpharma's ANDA, which details the dissolution of enalapril maleate in water. (*See* DTX-1092) But the study in which the curve is reported is not representative of Bionpharma's ANDA Product. (Moreton Tr. 531-32) Instead, the compositions involved in the study omitted the components present in Bionpharma's ANDA Product and used a greater concentration of enalapril maleate than is present in Bionpharma's actual ANDA Product. (Moreton Tr. at 531-34) In short, Silvergate's evidence falls far short of proving that the inclusion of enalapril maleate necessarily "maintains the pH of the liquid enalapril formulation" as contemplated by

the patent.

Furthermore, Bionpharma's alleged maleic acid buffer cannot be a functioning buffer. At the claimed pH formulation range of 3.0-3.5, the diprotic hydrogens of maleic acid have pKas outside the pH range of ±1 of the formulation, which would render it ineffective as a buffer. That is, the Court is persuaded by Dr. Moreton that the effective pKa range is ±1, not ±2 as Dr. Byrn asserted (but for which he did not provide corroborating evidence). (*See* Byrn Tr. 222, 435, 437-39; Moreton Tr. 519-24; *see also* DTX-1086.4-5; DTX-1087.11-13)[12] Maleic acid is diprotic and has pKa values of 1.97 and 6.24. (Moreton Tr. 539) Neither of these are within ±1 pH of the claimed formulation pH of 3.0-3.5. Therefore, again, Silvergate has failed to prove that Bionpharma's ANDA Product contains a buffer.

Even assuming, contrary to the Court's conclusions, that the accused product's dissociated enalapril maleate constitutes a buffer, Silvergate has additionally failed to prove that this buffer is equivalent to the claimed citric acid-sodium citrate buffer. This conclusion follows whether one applies the function-way-result or insubstantial differences tests.

The function of a buffer in the invention of the Asserted Patents is, as both parties agree, to "maintain the pH of the liquid enalapril formulation." (PTX-003 at 13:16-19) There is no evidence that the pH of the liquid enalapril formulation in Bionpharma's ANDA Product is not maintained. In assessing function for purposes of DOE, however, more is required than simply maintaining pH.

Silvergate submitted to the FDA a Citizen Petition asserting that part of the function of

---

[12] Although both experts are POSAs, Dr. Moreton's experience with drug formulation – and Dr. Byrn's lack of experience – made Dr. Moreton more persuasive on several key disputed points. The Court also agrees with Bionpharma that Dr. Byrn's refusal to concede that "the addition of sodium citrate to the buffer limitations during prosecution was a narrowing amendment" undermined his credibility. (D.I. 176 at 14)

the buffer is to preserve stability of the formulation *in vivo*. (DTX-1068 at 8) ("These buffering agents act together to keep Epaned® . . . in a stable pH band . . . ***and are thought to protect enalapril, after ingestion, from premature hydrolysis in the stomach's acidic environment.***") (emphasis added)  While there is no *in vivo* stability limitation in the Asserted Claims (Byrn Tr. 257-258; Moreton Tr. 415-416), the Federal Circuit has "never held that a patent must spell out a claim element's function, way, and result in order for the doctrine of equivalents to apply as to that element," *Intendis*, 822 F.3d at 1362.  Instead, "[t]he relevant inquiry is what the claim element's function in the claimed composition is to one of skill in the art, and a fact finder may rely on extrinsic evidence in making this factual determination." *Id.*

The Court agrees with Bionpharma that the function as understood by a POSA for purposes of the function, way, result test must include preserving stability of the formulation *in vivo*, consistent with Silvergate's own Citizen Petition.  In that petition, Silvergate could hardly have been clearer, writing: "Any change in the amount of citric acid or sodium citrate, removal of one or more [of] these non active-ingredients, ***or replacement with different buffering components***, could materially affect the amount of enalapril that gets hydrolyzed in the stomach to the minimally bioavailable enalaprilat." (DTX-1068 at 8) (emphasis added)  There is no evidence whatsoever that Bionpharma's accused buffer performs the function of increasing bioavailability of enalapril; absent that evidence, the Court does not find equivalence. Accordingly, Silvergate has failed to prove that the purported buffer in Bionpharma's ANDA Product satisfies the function portion of the function, way, result test.

Silvergate has also failed to show that the accused buffer performs in substantially the same way as the claimed buffer.  The applicable "way" must be more than just Silvergate's broadly articulated "by absorbing excess ions" (D.I. 179 at 25), which would apply to all buffers

(Moreton Tr. 517; D.I. 206 at 13) – but Silvergate has not claimed *all* buffers.  Looking more closely at how the claimed composition and the accused ANDA Product perform, the record establishes that the buffer species concentration of the claims range from $4.55*10^{-6}$ mols to $2.13*10^{-5}$ mols of buffer species while, by contrast, Bionpharma's ANDA Product contains only approximately $2.03*10^{-6}$ mols of buffer species.  (Moreton Tr. 547-48)  Thus, Bionpharma's ANDA Product, if has a buffer, contains somewhere between 2.24- and 10.5-times fewer buffer species than the claimed buffer, indicating that it functions in a substantially different way than the claimed buffer.  (Moreton Tr. 548-49)  Silvergate asserts, but has not proven, that this difference does not matter.  (*See, e.g.*, D.I. 205 at 9)  Instead, the Court concludes that Silvergate has failed to meet the way prong of the test.

Given the Court's conclusions with respect to the function and way components, there is no need to address the result prong.

Finally, the Court's conclusion that Silvergate has failed to meet its burden is the same when applying the insubstantial differences test.  For at least the reasons stated above, Bionpharma's accused buffer operates substantially differently than does the claimed buffer.  Bionpharma's alleged buffer, therefore, is not insubstantially different.

Accordingly, Silvergate has failed to prove infringement of the buffer limitation.[13]

### B.    Preservative Limitation

Determining whether Silvergate proved that the "preservative limitation" of the Asserted Claims is met, under the doctrine of equivalents, by Bionpharma's ANDA Product requires assessing whether the accused product contains a substantial equivalent to the claimed "about 0.7 to about 1.2 mg/mL sodium benzoate."  It is undisputed that the Bionpharma ANDA Product

---

[13] The Court need not reach Bionpharma's claim vitiation defense.

does not contain sodium benzoate. (D.I. 157 Ex. 2 ¶ 42) Instead, the preservative in the accused product is a mixture of methylparaben and propylparaben. (DTX-1079.3 tbl. 2)

Bionpharma argues that its combined methylparaben/propylparaben preservative cannot be found to infringe under the doctrine of equivalents because this embodiment was dedicated to the public. Bionpharma additionally contends that Silvergate has failed to prove, in any event, that its preservative is equivalent to the claimed preservative. The Court agrees that Silvergate disclosed and dedicated a preservative mixture of propylparaben and methylparaben, preventing Silvergate from asserting infringement by equivalents based on that embodiment. The Court will not address whether Silvergate's infringement case also fails for lack of evidence.

The disclosure-dedication doctrine acts as a limitation on the doctrine of equivalents, foreclosing infringement theories with respect to equivalents that are described in the patent specification but not claimed. A putative equivalent is disclosed and dedicated when it is both identified as an alternative to the claim limitation, and specific enough that a POSA could identify that subject matter. *See Pfizer, Inc. v. Teva Pharm. USA, Inc.,* 429 F.3d 1364, 1379 (Fed. Cir. 2005).

The shared patent specification here discloses each of methylparaben and propylparaben individually. For example:

> Preservatives include anti-microbials, anti-oxidants, and agents that enhance sterility. Exemplary preservatives include ascorbic acid, ascorbyl palmitate, BHA, BHT, citric acid, EDTA and its salts, erythorbic acid, fumaric acid, malic acid, propyl gallate, sodium ascorbate, sodium bisulfite, sodium metabisulfite, sodium sulfite, ***parabens (such as methylparaben, ethylparaben, propylparaben, butylparaben and their salts)****,* benzoic acid, sodium benzoate potassium sorbate, vanillin, and the like.
>
> In some embodiments, the enalapril oral liquid formulation described herein comprises a preservative.

> In some embodiments, the preservative is a **paraben** and the
> sweetener is not a sugar (such as, but not limited to glucose,
> fructose, sucrose, lactose, maltose) or a sugar alcohol (such as, but
> not limited to xylitol, mannitol, lactitol, maltitol, sorbitol).

(PTX-003 at 10:12-27) (emphasis added)

Silvergate contends, nonetheless, that the patent does not disclose a **mixture** of these two

parabens as an alternative preservative, meaning that disclosure-dedication does not apply. (D.I.

179 at 19-20)  The Court disagrees.

As Bionpharma points out, the relevant inquiry is whether a POSA could identify, from

the patent disclosure, the alleged equivalent's existence and suitability as an alternative. (D.I.

206 at 2-3)  Bionpharma has proven that a POSA would have had such an understanding. Dr.

Moreton testified that a POSA would know that methylparaben and propylparaben are

commonly used together and would be a suitable alternative preservative. (Moreton Tr. 502)

Dr. Moreton further testified that the patent's disclosures demonstrate the parabens' suitability

specifically as an alternative to sodium benzoate. (Moreton Tr. 505-08; *see also* PTX-003 at

10:11-20, 10:28-29, 12:25-27)  The Court is persuaded that a POSA would understand, based

upon the disclosures in the specification, that (1) parabens or a mixture of parabens may be used

as a preservative in the claimed formulations; and (2) propylparaben and methylparaben are

specifically identified as such suitable parabens. By disclosing and then not claiming this

embodiment, Silvergate is estopped from proving DOE infringement based on it.

Although unnecessary to the Court's conclusion, this result is further supported by a

follow-on patent obtained by Silvergate on the basis of the same specification. Silvergate's '482

patent is a continuation of the '987 patent-in-suit. The '482 patent expressly claims an

embodiment with a mixture of propylparaben and methylparaben as a preservative. (*See* DTX-

1123 claim 14)  By seeking and obtaining a patent with a propylparaben/methylparaben

embodiment based on the same specification, Silvergate was representing that the specification

provided adequate written support for such an embodiment, as claimed in the '482 patent.

It is true, as Silvergate notes, that the level of disclosure for dedication purposes is not the

same as necessary for § 112 compliance purposes. (D.I. 179 at 18 & n.2; *see also Toro Co. v.

White Consol. Indus., Inc.*, 383 F.3d 1326, 1334 (Fed. Cir. 2004) ("[T]he level of disclosure

needed to implicate the disclosure-dedication rule is different from the level of disclosure

required under § 112 to support claims directed to the claimed invention, not to disclosures in the

written description that may implicate the disclosure-dedication rule.")) But that does not alter

the Court's conclusion. As the disclosure is sufficient to satisfy § 112 requirements for a

combined paraben preservative embodiment, it is also sufficient for disclosure-dedication

doctrine purposes. *See generally PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306

(Fed. Cir. 2008) ("It is elementary patent law that a patent application is entitled to the benefit of

the filing date of an earlier filed application only if the disclosure of the earlier application

provides support for the claims of the later application, as required by 35 U.S.C. § 112."); *CSP

Techs., Inc. v. Sud-Chemie AG*, 643 F. App'x 953, 958-59 (Fed. Cir. 2016) (filing of related

patent application indicates patentee's view of "these two embodiments" as "alternatives").

Therefore, Silvergate is precluded from arguing that Bionpharma's paraben mixture

preservative is an infringing equivalent. Accordingly, again, Silvergate has failed to prove

infringement under the doctrine of equivalents.

## II.  **Indirect Infringement**

Absent a finding of direct infringement, there cannot be indirect infringement, whether induced or contributory.  *See Vita-Mix Corp.*, 581 F.3d at 1328.  Therefore, the Court finds that the marketing of Bionpharma's ANDA Product will not cause indirect infringement of the Asserted Patents.

**CONCLUSION**

An appropriate Order follows.

# EXHIBIT 2

1

<pre>
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3                               - - -
       SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
 4                                          :
                   Plaintiff,               :
 5     v                                    :
                                            :
 6     BIONPHARMA, INC.,                    :    NO. 18-1962-LPS
                                            :    NO. 19-1067-LPS
 7                 Defendant.               :
       ------------------------------------
 8     SILVERGATE PHARMACEUTICALS, INC.,    :    CIVIL ACTION
                                            :
 9                 Plaintiff,               :
       v                                    :
10                                          :
       AMNEAL PHARMACEUTICALS, LLC,         :
11                                          :    NO. 19-678-LPS
                   Defendant.
12                               - - -

13                        Wilmington, Delaware
                          Monday, February 1, 2021
14                        Bench Trial - Volume A

15                               - - -

16     BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge

17                               - - -
       APPEARANCES:
18

19               MORRIS NICHOLS ARSHT & TUNNELL, LLP
                 BY:  MEGAN E. DELLINGER, ESQ.
20
                      and
21
                 WILSON SONSINI GOODRICH & ROSATI
22               BY:  WENDY L. DEVINE, ESQ., and
                      KRISTINA M. HANSON, ESQ.
23                    (San Francisco, California)

24                    and

25     Valerie J. Gunning              Brian P. Gaffigan
       Official Court Reporter         Official Court Reporter
</pre>

```
 1              Okay, Your Honor.  My first few slides, Your
 2   Honor, are just background slides, and I think the Court
 3   already has some background.  So just to get to the heart of
 4   the matter, I'm going to jump to Slide 1016.
 5              Six ways from Sunday, Your Honor.  It's an
 6   expression people use to convey that something has been done
 7   or changed extensively, thoroughly in every way imaginable.
 8   And we respectfully submit, Your Honor, that it is a very
 9   accurate characterization of just how much Bionpharma has
10   designed around Silvergate's patents in this case.
11              Because, Your Honor, there are no less than --
12              THE COURT:  This is the part you don't want the
13   public to see; right?
14              MR. ALUL:  No, no.  This is -- this is okay.
15   This is just listing the limitations.  This just lists the
16   limitations.  Yes.
17              THE COURT:  You go right ahead.
18              MR. ALUL:  So there are six different reasons we
19   don't infringe Silvergate's claims.
20              And I will note this, Your Honor.  In its
21   opening, Silvergate pitched this -- or characterizes
22   Bionpharma's noninfringement as simply just a matter of two
23   limitations.  That is actually not true because there are
24   six different reasons we don't infringe their claims.  There
25   are six elements our product don't meet.
```

1          First of all, Your Honor, all of the claims call

2     for a buffer that comprises two different qualitative

3     elements:  Citric acid and sodium citrate.

4          Bionpharma omitted those compounds from its

5     ANDA product in its entirety.  So we don't meet the citric

6     acid element of what the parties refer to as the buffer

7     limitation, and we don't meet the sodium citrate element of

8     the buffer limitation.

9          We also necessarily, Your Honor, don't meet the

10    quantitative elements of these formulations.  These are

11    concentrations ranges.

12          So not only are citric acid and sodium citrate

13    required to be present in the accused product, they're

14    required to be present at specific concentrations that

15    Silvergate claims.

16          And so because we don't have either compound, we

17    certainly can't meet the quantitative elements.

18          So there are four different reasons right there.

19          The next, Your Honor, all of the claims require

20    a preservative that is sodium benzoate, and it's also

21    required in a specific concentration.

22          We don't use sodium benzoate.  We don't have it.

23    There is no dispute there.  And we certainly can't meet the

24    quantitative element of the preservative limitation as well.

25          So we have six different reasons why we don't

1  infringe.

2         And as a matter of fact, Your Honor, last summer

3  Silvergate conceded no literal infringement, and there is a

4  stipulation on file to that -- on that point.

5         At this point, Your Honor, I'm going to need to

6  seal the courtroom.

7         THE COURT:  Okay.  We'll wait for Mr. English to

8  do that for us, please.

9         And that includes Mr. George; correct, as well,

10 Mr. Alul?

11        MR. ALUL:  Yes.  Yes, Your Honor.

12        (Following portion ordered sealed by the Court,

13 bound separately.)

14        THE TRIALanywhere HOST:  Everyone has rejoined

15 the court.

16        THE COURT:  Thank you.

17        MR. ALUL:  May I proceed, Your Honor?

18        THE COURT:  Yes.

19        MR. ALUL:  So, Your Honor, next up is our

20 second legal defense, which is amendment-based estoppel.

21        And here, this sort of ties in with the

22 discussion I had a few minutes ago about the prior art being

23 very populated with enalapril liquid formulations.

24        And you can see here, what we have here on this

25 slide, is the original claim 1 that was filed with the '603

1    application, which is the application that issued into the

2    first of the Epaned patents, the '008 patent.  And all the

3    patents-in-suit claim priority to the '603 application.  And

4    this is original claim 1 that was submitted with the

5    original application.

6              As you can see out of the gate, Silvergate knew

7    it wasn't going to be able to secure broad claim.  That is

8    why it filed for relatively narrow claims.

9              I mean, we see here as claim 1 is, you know, an

10   oral liquid formulation comprising specific ingredients at

11   specific concentrations.

12             So what happened during prosecution, Your

13   Honor?

14             Our expert, Dr. Chris Morton, is going to walk

15   the Court through the prosecution, explain that on September

16   2016 there was an Office Action issue where the -- all of

17   the claims, all 20 of the application claims, were rejected

18   as obvious.

19             And shortly after that, it was in January 2017,

20   yet a second Office Action came down, and the same

21   obviousness rejection was leveled our expert is going to

22   explain.

23             In addition, the Examiner rejected the claims

24   as indefiniteness -- as indefinite because of the term

25   "stable".  The Examiner felt that the term "stable" in the

1    claims was not defined and, therefore, it rendered the

2    claims ambiguous.

3              What did Silvergate do in response?

4              Your Honor, our expert is going to explain,

5    Silvergate essentially did -- it did four things.

6              First thing it did is -- and it may by hard to

7    see in this underlined language at the bottom, Your Honor,

8    but what it did was it, to address the Examiner's

9    indefiniteness rejection, it defined stable.

10             And that is this, this underlined "wherein"

11   language in this slide.

12             That was to address, again, the '112

13   indefiniteness rejection.

14             With respect to obviousness, Your Honor, what

15   Silvergate did was it amended the buffer limitations of

16   independent claims 1 and 12 to require sodium citrate at a

17   specific concentration.

18             Now, there were three independent claims, 1, 12,

19   and 20.  20 was the narrower independent claim.  The buffer

20   limitation of that claim, the evidence will show, Your

21   Honor, already required sodium citrate dihydrate and citric

22   acid.

23             So in effect what Silvergate did was it lifted a

24   limitation from a narrower claim and added it to the broader

25   claims.

1            And under Federal Circuit case law, Your Honor,

2    it's the *Deering Precision vs. Vector* case, that's 347 F.3d,

3    1326, that is a narrowing amendment for all of the

4    application claims.

5            And next, Your Honor, our expert is going to

6    explain -- our expert is going to walk the Court through

7    that February 2017 amendment in response to the Office

8    Actions and point out to the Court that Silvergate did two

9    additional things.

10           No. 1.  We concede, Your Honor, Silvergate did

11   try to distinguish its claims from the prior art based on

12   stability.

13           Bionpharma doesn't dispute that.  Our expert

14   Dr. Chris Morton isn't going to dispute that.

15           What Bionpharma did in addition to that, though,

16   separate and independent from that, as our expert is going

17   to explain and as some of the highlighted passages in my

18   next few slides show, it independently -- it distinguished

19   the claims from the prior art based on the specific

20   components and concentrations in the claimed elements.

21           And here we have a passage that shows where

22   Silvergate argued that there was no reason to single out the

23   specific components at the requisite concentrations.  That

24   is one way to distinguish the prior art.

25           Next, Your Honor, this is a slide that

1    Ms. Morgan talked about during her opening statement.

2           This was an excerpt in the amendment response.

3    It's table where Silvergate provides in the first two

4    columns the components of the prior art liquid formations of

5    enalapril, and then compares it with the components of the

6    claimed formulation.

7           And then in a paragraph right below it,

8    Silvergate argues:  "In contrast to the prior art

9    formulations, the formulation of the present claims has

10   only four ingredients along with enalapril and water."

11          And our expert is going to explain, Your Honor,

12   that this isn't just distinguishing the claims from the

13   prior art based on the specific components, which included,

14   Your Honor, sodium citrate, it goes beyond that.  Our expert

15   is going to explain that a reasonable competitor would

16   interpret this as a disclaimer.

17          Ms. Morgan said there was nothing in the

18   prosecution history saying our invention did this, did this.

19   The prior art -- our invention is not this.  This is the

20   language Ms. Morgan is looking for.

21          "In contrast ... the formulations of the present

22   claims has only four ingredients along with enalapril and

23   water."

24          And so our position is any accused products that

25   don't contain the specific four ingredients recited in the

Beckloff - direct

1    Q.    What was Silvergate's mission?

2    A.    Well, our mission was really to bring high-quality

3    pediatric-appropriate medicines to the industry.  It's a

4    greatly underserved patient population.  We really wanted

5    to change the way pediatric medicine is delivered in this

6    country, and we wanted to be able to provide the pediatric

7    patients that deserve the best care with the best medicines

8    to do that.

9            And that is what we set out to do.

10   Q.    Why did you think those needs were unmet?

11   A.    You know, as a society, we do -- you know, we put

12   children in high esteem, but actually the regulatory

13   burdens to bring pediatric medicines to the market,

14   pediatric-specific medicines to the market, is quite large.

15   And companies typically are not willing to overcome those

16   regulatory burdens.

17   Q.    So you mentioned Cardinal Health passed on the

18   opportunity.  Why do you think that was?

19   A.    I think largely because of the regulatory burdens and

20   the trailing obligations that FDA requires for pediatric

21   studies postapproval.  Those studies are very complex and

22   difficult to execute in this type of patient population.

23           MS. MORGAN:  Let's go to the next slide.

24   BY MS. MORGAN:

25   Q.    Looking at PDX-104.  Can you explain what we're

Beckloff - direct

1    looking at here?

2    A.      This is our first product, our Epaned Kit.

3    Q.      And taking a step back for just a second.

4            You mentioned earlier that Silvergate merged

5    with another company to become Azurity?

6    A.      Yes.

7    Q.      Who did they merge with?

8    A.      CutisPharma is the company that we merged with.

9            MS. MORGAN:  Can we go back to PDX-102.

10   BY MS. MORGAN:

11   Q.      Can you just briefly describe how and why the

12   marriage came about between Silvergate and CutisPharma?

13   A.      CutisPharma was a company that was focused on

14   compounding kits primarily for the geriatric patient

15   population, which was another very -- is a very underserved

16   patient population in this country.

17           Silvergate was focused exclusively on pediatric

18   medicine so we had sort of both ends of these highly

19   underserved patient populations.  It made perfect sense to

20   bring the companies together.

21           We brought, we brought the companies together

22   and formed Azurity where we continue to work on drugs in

23   pediatrics and geriatrics.

24   Q.      Thank you.

25           MS. MORGAN:  Now let's go back to PDX-104,

Beckloff - direct

1    please.

2    BY MS. MORGAN:

3    Q.      So talking about the Epaned Kit, Silvergate's first

4    product.  What is the active ingredient?

5    A.      Enalapril maleate.

6    Q.      And what is enalapril?

7    A.      It's an ACE inhibitor for controlled hypertension.

8    Q.      And how serious are the diseases for which enalapril

9    is indicated?

10   A.      They're very serious.  Uncontrolled hypertension, as

11   we have all heard, can result in severe medical problems or

12   the damages over time.

13   Q.      And you mentioned that the Epaned Kit was a powder

14   for reconstitution, I think.  Can you briefly describe how

15   the kit was provided to the pharmacist, to the patient?

16   A.      The kit was provided as a diluent and a powder and

17   bottled, provided to the pharmacist as a kit in the box,

18   both bottles would come in the box.

19           As a pharmacist received the prescription, a

20   diluent would be added to the bottle, and that would be

21   provided to the patient.

22   Q.      Were there any reported problems stemming from the

23   pharmacist's reconstitution of the kit?

24   A.      We had a number of issues over time that, that were

25   reported to us.  We had issues where the wrong diluent was

Beckloff - direct

1    used.  We had issues where there were contamination issues,

2    where it turned out to be the fibers from the pharmacist's

3    sweater.  We had reports of foreign matter in the -- in the

4    powders that turned out to be items that people had used to

5    poke a hole in the index seal on the top.

6              So we had a number of issues.

7    Q.    And prior to the Epaned Kit, was enalapril available

8    as a treatment option?

9    A.    It was available as a treatment option but only in a

10   tablet form.

11   Q.    And what was the brand name under which that was

12   sold?

13   A.    Vasotec.

14   Q.    And in this solid tablet form, is that suitable for

15   children?

16   A.    No, it's, it's not because small children really

17   don't have the ability to swallow tablets.  But in addition,

18   the doses are very difficult to obtain from a tablet.  You

19   have to cut it or you have to crush it or you have to

20   manipulate it in some way to get the appropriate dose for

21   the patient.

22   Q.    Well, what is the most typical way of putting it in a

23   form that was suitable for a delivery to a child?

24   A.    Typically it would be a compounded liquid.

25              MS. MORGAN:  Let's go to the next slide,

Beckloff - direct

1    PDX-105.

2    BY MS. MORGAN:

3    Q.      Can you just briefly describe what doctors or

4    pharmacists did with the enalapril tablets to put it in a

5    suitable form for children?

6    A.      The physicians would write the prescription for

7    liquid enalapril, provide that to the pharmacist.  The

8    pharmacist would then take tablets, count the number of

9    tablets out and crush -- typically crush them in a mortar

10   and pestle as you see here.

11           The powder would then be put into the bottle and

12   some type of diluent added to the bottle.

13   Q.      Are there drawbacks to compounding?

14   A.      There is a -- there are many drawbacks to

15   compounding.

16           So it depends on the accuracy of counting the

17   tablets.

18           It depends on the accuracy of making sure that

19   any of the utensils that are used to compound the product

20   are not contaminated with other drugs.

21           It depends on accurately adding powders to the

22   bottle.

23           And then accurately adding the appropriate

24   amount of diluent to the bottle.

25   Q.      And can parts of the tablet also not be consistently

Beckloff - direct

1    crushed up?

2    A.    No.   They would be typically, you know, chunks of

3    tablets that -- you know, it's hard to get it a consistent

4    particle size.

5              MS. MORGAN:   Let's go to the next slide,

6    PDX-106.

7    BY MS. MORGAN:

8    Q.    So when Silvergate set out to make the drug, what, in

9    general, are the formulation options for Silvergate?

10   A.    Well, this slide shows the formulation options with

11   solutions being the most desired formulations, and then down

12   through various formulation options to reconstituted powder

13   with a diluent.

14   Q.    And as you progress down the chart and we get to the

15   reconstituted, why are those at the bottom?

16   A.    Well, those particular formulations are prone to

17   potential mix-ups as we discussed with our kit in the

18   compounding or the formulating at the, at the pharmacy.

19   Q.    Are they typically easier to formulate, though?

20   A.    Typically easier to formulate because, primarily

21   because of stability issues.

22   Q.    So even this hierarchy, why did Silvergate develop a

23   reconstituted product for enalapril?

24   A.    When we began our collaboration, we, we modeled the

25   reconstituted powder from, from drugs that we knew were

Beckloff - direct

1    pediatric formulations, common pediatric formulations in the

2    pharmacy.

3    Q.      And were there also stability problems with

4    enalapril?

5    A.      There were stability issues with enalapril once

6    reconstituted.  It had a 60-day shelf life.

7    Q.      Well, put another way, is there a reason that

8    enalapril went the reconstituted path for your first product

9    as opposed to going for refrigerated solution related to

10   stability?

11   A.      Right.  I mean, enalapril --

12              MR. RUEDY:  Objection, Your Honor.  Matthew

13   Ruedy for Amneal.  We're getting into expert opinion here.

14              THE COURT:  Ms. Morgan.

15              MS. MORGAN:  Your Honor, I'm asking about

16   choices they made when they were developing their own

17   product.  This is squarely within his personal knowledge as

18   the chief development officer of Azurity.

19              THE COURT:  Mr. Ruedy.

20              MR. RUEDY:  It seems like he is expounding into

21   the realm of actual analysis of stability results, and in

22   my opinion, it's flowing into expert testimony.

23              THE COURT:  All right.  I'm going to overrule

24   the objection.  I understand him giving the testimony from

25   his perspective having lived through this experience and

# EXHIBIT 3

1/26/22, 2:00 PM                    Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

# Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

**f  SHARE (HTTPS://WWW.FACEBOOK.COM/SHARER/SHARER.PHP?U=HTTPS://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=N&APPL_NO=208686#32806)**

**🐦  TWEET (HTTPS://TWITTER.COM/INTENT/TWEET/?TEXT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS&URL=HTTPS://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=N&APPL_NO=208686#32806)**

**+**

**✉  EMAIL (MAILTO:?SUBJECT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS&BODY=HTTPS://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/RESULTS_PRODUCT.CFM?APPL_TYPE=N&APPL_NO=208686#32806)**

**Home (index.cfm?resetfields=1)** | **Back to Search Results**

## Product Details for NDA 208686

**EPANED (ENALAPRIL MALEATE)**
**1MG/ML**
**Marketing Status: Prescription**

**Active Ingredient:** ENALAPRIL MALEATE
**Proprietary Name:** EPANED
**Dosage Form; Route of Administration:** SOLUTION; ORAL
**Strength:** 1MG/ML
**Reference Listed Drug:** Yes
**Reference Standard:** Yes
**TE Code:** AB
**Application Number:** N208686
**Product Number:** 001
**Approval Date:** Sep 20, 2016
**Applicant Holder Full Name:** AZURITY PHARMACEUTICALS INC
**Marketing Status:**  Prescription
**Patent and Exclusivity Information (patent_info.cfm?Product_No=001&Appl_No=208686&Appl_type=N)**

# EXHIBIT 4

1/26/22, 2:01 PM                    Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

# Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

| **f** **SHARE (HTTPS://WWW.FACEBOOK.COM/SHARER/SHARER.PHP?U=HTTPS://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/PATENT_INFO.CFM? PRODUCT_NO=001&APPL_NO=208686&APPL_TYPE=N)** |
|---|
| **🐦** **TWEET (HTTPS://TWITTER.COM/INTENT/TWEET/?TEXT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS&URL=HTTPS://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/PATENT_INFO.CFM?PRODUCT_NO=001&APPL_NO=208686&APPL_TYPE=N)** |
| **+** |
| **✉** **EMAIL (MAILTO:?SUBJECT=ORANGE BOOK: APPROVED DRUG PRODUCTS WITH THERAPEUTIC EQUIVALENCE EVALUATIONS&BODY=HTTPS://WWW.ACCESSDATA.FDA.GOV/SCRIPTS/CDER/OB/PATENT_INFO.CFM?PRODUCT_NO=001&APPL_NO=208686&APPL_TYPE=N)** |

**Home (index.cfm?resetfields=1)** | **Back to Product Details**

Additional Information about Patents

- Patent information is published on or after the submission date as defined in 21 CFR 314.53(d)(5).
- Patent listings published prior to August 18, 2003, only identify method-of-use claims. The listed patents may include drug substance and/or drug product claims that are not indicated in the listing.
- As of December 5, 2016, an NDA holder submitting information on a patent that claims both the drug substance and the drug product (and is eligible for listing on either basis) is required only to specify that it claims either the drug substance or the drug product. Orange Book users should not rely on an Orange Book patent listing, regardless of when first published, to determine the range of patent claims that may be asserted by an NDA holder or patent owner.

## Patent and Exclusivity for: N208686

Product 001
ENALAPRIL MALEATE (EPANED) SOLUTION 1MG/ML

### Patent Data

| Product No | Patent No | Patent Expiration | Drug Substance | Drug Product | Patent Use Code | Delist Requested | Submission Date |
|---|---|---|---|---|---|---|---|
| 001 | 9669008 | 03/25/2036 | | DP | | | 06/09/2017 |
| 001 | 9808442 | 03/25/2036 | | | U-3 U-71 U-185 U-1723 U-1892 | | 11/20/2017 |
| 001 | 10039745 | 03/25/2036 | | DP | | | 08/23/2018 |
| 001 | 10154987 | 03/25/2036 | | | U-3 U-71 U-185 U-1723 U-1892 | | 01/04/2019 |
| 001 | 10772868 | 03/25/2036 | | DP | | | 09/23/2020 |
| 001 | 10786482 | 03/25/2036 | | DP | | | 10/08/2020 |
| 001 | 11040023 | 03/25/2036 | | DP | | | 06/25/2021 |
| 001 | 11141405 | 03/25/2036 | | DP | | | 10/19/2021 |

### Exclusivity Data

Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations

| Product No | Exclusivity Code | Exclusivity Expiration |
|---|---|---|
| Your search did not return any results | | |

**View a list of all patent use codes (results_patent.cfm)**
**View a list of all exclusivity codes (results_exclusivity.cfm)**

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————
BIONPHARMA INC.,

                        Plaintiff,                21-cv-10656 (JGK)

        - against -                               MEMORANDUM OPINION AND
                                                  ORDER
CORERX, INC.,
                        Defendant.
————————————————————————————————
JOHN G. KOELTL, District Judge:

    The plaintiff, Bionpharma Inc. ("Bionpharma"), brought this

action against the defendant, CoreRx, Inc. ("CoreRx"), for

breach of contract and declaratory judgment. On January 27,

2022, the Court granted the plaintiff's request for a

preliminary injunction pursuant to Federal Rule of Civil

Procedure 65, compelling the defendant to supply the plaintiff

with enalapril maleate oral solution in accordance with the

parties' Master Manufacturing Supply Agreement (the

"Agreement"). See Bionpharma Inc. v. CoreRx, Inc., 2022 WL

246742 (S.D.N.Y. Jan. 27, 2022) (hereinafter, "Opinion &

Order"). The preliminary injunction went into effect on February

4, 2022. ECF No. 79.

    Before the Court are four motions: (1) a motion by CoreRx

to (a) stay the preliminary injunction pending the resolution of

CoreRx's appeal from this Court's Opinion & Order, or (b) stay

the preliminary injunction temporarily for a brief period to

allow the court of appeals to consider a stay pending appeal,

                                1

pursuant to Federal Rule of Civil Procedure 62; (2) a motion by
CoreRx to require Bionpharma to post security to maintain the
preliminary injunction pursuant to Federal Rule of Civil
Procedure 65(c); (3) a motion by Azurity Pharmaceuticals, Inc.
("Azurity") to intervene for the limited purpose of appealing
this Court's Opinion & Order pursuant to either Federal Rule of
Civil Procedure 24(a) or (b); and (4) a motion by Azurity to
supplement the record. For the following reasons, (1) CoreRx's
motion for a stay pending appeal is **denied**, but its request for
an interim stay is **granted**; (2) CoreRx's motion requiring
Bionpharma to post a security bond is **granted**; (3) Azurity's
motion to intervene as of right is **denied**, but its alternative
request to intervene permissively is **granted**; and (4) Azurity's
motion to supplement the record is **denied**.

**I.**

The Court assumes general familiarity with the facts of
this case, which are set forth in the Opinion & Order. 2022 WL
246742, at *1-4.

In brief, Bionpharma is a generic pharmaceutical company
that sells an enalapril maleate oral solution product (the
"Product") that is marketed as a generic version of the branded
drug "Epaned." Id. at *1. Epaned is owned by Azurity, a
pharmaceutical company that is a competitor to Bionpharma. Id.
Azurity and its predecessor company have initiated a flurry of

2

patent litigation against Bionpharma for alleged violations of
the Epaned patents since August 2018, when Bionpharma submitted
an Abbreviated New Drug Application to the Federal Drug
Administration. Id. at *1-2. So far, none of these lawsuits have
been successful. Id.

In November 2020, Bionpharma and CoreRx, a pharmaceutical
Contract Development Manufacturing Organization, entered into
the Agreement, whereby CoreRx agreed to manufacture Bionpharma's
Product for commercial sale. Id. The Agreement provides, among
other things, that CoreRx must "accept all Firm Orders" made by
Bionpharma with few exceptions, that only Bionpharma can cancel
or defer orders, and — in a section entitled "Supply
Interruption" — that "[i]f CoreRx is unable to supply any
Product ordered by [Bionpharma] . . . , then CoreRx shall use
Commercially Reasonable Efforts to remedy the problem or secure
an alternative source of supply within a reasonable time." Id.
at *2. The Agreement also provides that Bionpharma promises to
indemnify CoreRx for any intellectual property infringement
claims that might be brought against CoreRx for manufacturing
Bionpharma's Product. Id. The Agreement provides that it would
be "in full force and effect for a period of five (5) years from
the commercialization of the last Product." Id.

Since the time that this Agreement was signed, Azurity has
become CoreRx's sister company. See Compl. ¶ 23, ECF No. 1. The

3

companies' boards share a number of members, and the companies
are owned by the same entity. Id.

On November 19, 2021, CoreRx notified Bionpharma that, "as
of December 1, 2021, CoreRx will be unable to supply enalapril
maleate for [Bionpharma's] Epaned product." Opinion & Order,
2022 WL 246742, at *3. After a brief, unsuccessful attempt by
Bionpharma and CoreRx to resolve the matter amicably, id.,
Bionpharma brought this action on December 13, 2021, ECF No. 1.
On the same day, Bionpharma moved for a preliminary injunction,
ECF No. 8, which the Court granted on January 27, 2022. See
Opinion & Order, 2022 WL 246742; see also ECF No. 79.

On February 2, 2022, Azurity moved to intervene in this
action for the limited purpose of appealing the Opinion & Order.[1]
ECF No. 66. On February 7, 2022, CoreRx moved to stay the
preliminary injunction and to require Bionpharma to post
security to maintain the injunction. ECF No. 82. The parties
agreed to expedite briefing on both motions. ECF Nos. 81, 86. On
February 22, 2022, CoreRx filed a notice of interlocutory appeal
from the Opinion & Order. ECF No. 103.

CoreRx's first shipment of the Product under the
preliminary injunction is due on March 4, 2022. See ECF No. 79.

---

[1] Azurity also sought to intervene for the purpose of moving the Court to
reconsider its Opinion & Order, ECF No. 66, but Azurity has since withdrawn
this portion of its motion, ECF Nos. 87, 104.

4

## II.

### A. Motion to Stay

CoreRx first moves to stay the preliminary injunction pending appeal. Alternatively, CoreRx seeks a limited interim stay to allow the court of appeals to consider whether a stay is warranted.

Under Federal Rule of Civil Procedure 62(c), the district court has the discretion to issue a stay pending appeal. There are four relevant factors to consider: (1) whether the movant will suffer irreparable injury absent a stay; (2) whether another party will suffer substantial injury if a stay is issued; (3) whether the movant has demonstrated a substantial possibility of success on the merits; and (4) the public interests that may be affected. See Hirschfeld v. Bd. of Elections in City of N.Y., 984 F.2d 35, 39 (2d Cir. 1993).[2] The movant bears the "heavy" burden of establishing that these factors weigh in its favor. See Barcia v. Sitkin, No. 79-cv-831, 2004 WL 691390, at *1 (S.D.N.Y. Mar. 31, 2004); see also D'Amico Dry D.A.C. v. Primera Mar. (Hellas) Ltd., 431 F. Supp. 3d 317, 319 (S.D.N.Y. 2019). In this case, these factors weigh strongly against granting a stay.

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

## 1.

The first factor, irreparable injury, requires an injury that is actual and imminent, not remote or speculative. Nat. Res. Def. Council, Inc. v. FDA, 884 F. Supp. 2d 108, 123 (S.D.N.Y. 2012). In favor of its motion for a stay, CoreRx argues that it "actually will suffer irreparable harm" if a stay is not granted, because enforcing the preliminary injunction will "expose CoreRx to liability for damages to Azurity in the eight or nine figures — enough to wipe CoreRx, which lacks assets sufficient to satisfy such a judgment, completely out of business," and "force CoreRx's hand in laying off over 200 workers currently employed in its factories." Def.'s Mem. in Supp. of Stay 14-15, ECF No. 84 ("Stay Mem."). But this claimed harm is speculative and remote. As Bionpharma rightly points out, CoreRx's claimed harm would follow "only from a chain of speculative future events": Azurity must sue CoreRx for patent infringement, the patents must be adjudged valid and infringed, CoreRx's defenses must fail, enhanced damages must be awarded, and Bionpharma must fail to indemnify CoreRx in violation of the Agreement. Pl.'s Opp. to Mot. to Stay 12, ECF No. 94 ("Stay Opp."). Even accepting Azurity's self-serving representation that it will sue its sister company for patent infringement as a result of this limited court order, CoreRx's claimed harm requires a series of completely speculative events to occur for

6

which there is no showing of likelihood. Indeed, CoreRx has not even attempted to prove that it is likely to lose a suit for patent infringement by Azurity.

Moreover, it is well established that "quantifiable money damages cannot be deemed irreparable harm." Harris v. Butler, 961 F. Supp. 61, 63 (S.D.N.Y. 1997). Unlike Bionpharma on the underlying motion, CoreRx complains about possible monetary damages from losing a patent infringement lawsuit, and does not allege that any reputational or other nonquantifiable harm will follow from the enforcement of its contractual duties. Nor has CoreRx made the "strong showing" necessary to show that economic loss would damage CoreRx's business irreparably. See D'Amico Dry, 431 F. Supp. 3d at 319 (quoting RxUSA Wholesale, Inc. v. Dep't of Health & Human Servs., 467 F. Supp. 2d 285, 301 (E.D.N.Y. 2006), aff'd sub nom. Dep't of Health & Human Servs., U.S. Food & Drug Admin. v. RxUSA Wholesale, Inc., 285 F. App'x 809 (2d Cir. 2008)). The first factor therefore weighs against CoreRx.

**2.**

The second factor, whether another party will suffer substantial injury if a stay is issued, also weighs against CoreRx. As the Court explained in its Opinion & Order, Bionpharma has made a strong showing of irreparable harm. CoreRx has provided no evidence to substantiate its claim that

7

Bionpharma will suffer "no material harm" if a stay is granted,
or that Bionpharma's harm is compensable. See Stay Mem. 16. The
Court continues to be persuaded that Bionpharma's inability to
fulfil orders for its Product that it is under contractual
obligation to supply, and its being forced to decline new
orders, as a result of CoreRx's breach will result in
substantial injury to Bionpharma's reputation and goodwill, and
that this is cognizable harm in this circuit. CoreRx's attempt
to distinguish this case from cases in this circuit finding
irreparable harm based on similar risks of reputational damage
is as unavailing here as it was on the underlying motion. The
second factor therefore favors denying CoreRx's request for a
stay.

### 3.

The third factor, likelihood of success on the merits, also
strongly favors denying CoreRx's motion for a stay. For the
reasons the Court outlined in its Opinion & Order, CoreRx is
unlikely to succeed on the merits of its appeal. First, CoreRx
is highly unlikely to succeed in demonstrating that the Court
abused its discretion in finding that Bionpharma has a strong
likelihood of success on the merits. As the Court explained,
Bionpharma has adequately demonstrated that it is likely to
succeed on its breach-of-contract claim against CoreRx. CoreRx's
repeated arguments that no such claim lies because the parties'

8

Agreement is "preempted by federal patent laws" as indicated in
Lear v. Adkins, 395 U.S. 653 (1969), and its progeny, or because
the Agreement is "unenforceable under New York law on grounds of
illegality" are unsubstantiated and are unavailing on the
merits. See Opinion & Order, 2022 WL 246742, at *6-7. CoreRx
does not attempt to allege that it did not breach its contract
with Bionpharma. Rather, it argues only that its unsubstantiated
fear of subjecting itself to a patent infringement suit is a
basis to breach its contractual obligations — a proposition for
which it admittedly has no support. Second, CoreRx is equally
unlikely to succeed in demonstrating that the Court abused its
discretion in finding that Bionpharma demonstrated irreparable
harm. CoreRx's continued attempts to show that Bionpharma will
suffer no irreparable harm absent an injunction are
unpersuasive. Like the first two factors, the third factor
weighs heavily against CoreRx.

**4.**

Finally, CoreRx fails to show that the public interest
weighs in favor of granting a stay. As the Court explained in
its Opinion & Order, if Bionpharma's Product were to be taken
off the market, children — Bionpharma's primary user — and their
parents would suffer. This harm is serious and tangible. This
harm is also not minimized by CoreRx's claim that other generic
versions of Epaned are now or will be on the market. Even

9

assuming that such generic versions are or will be available to patients and covered by their insurance, "forcing families to go through the burden of switching medications for their children does not serve the public interest." Opinion & Order, 2022 WL 246742, at *8.

On the other side of the ledger is CoreRx's repeated claim that it will lose Azurity's promised litigation and be forced into bankruptcy. These claims are wholly speculative and unproven. The fourth and final factor therefore weighs against CoreRx.

For the foregoing reasons, CoreRx's motion for a stay is **denied.** However, in deference to the court of appeals, CoreRx's alternative request that the Court temporarily stay the preliminary injunction is **granted.** The preliminary injunction requiring CoreRx to deliver a shipment of the Product to Bionpharma by March 4, 2022 is stayed until **March 2, 2022** to allow CoreRx to seek a stay from the court of appeals, and to allow the court of appeals to decide that request. But CoreRx is cautioned that this interim stay does not stay CoreRx's obligation to continue the preparation necessary to deliver the Product on March 4, 2022.

### B. Motion to Set Security

CoreRx also moves to require Bionpharma to post security to maintain the preliminary injunction.

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." As the court of appeals has explained, the bond requirement "serves a number of functions," including "assur[ing] the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff," and "provid[ing] the plaintiff with notice of the maximum extent of its potential liability." Nokia Corp. v. InterDigital, Inc., 645 F.3d 553, 557 (2d Cir. 2011). But the district court "has wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm, or where the injunctive order was issued to aid and preserve the court's jurisdiction over the subject matter involved." Doctor's Assocs., Inc. v. Distajo, 107 F.3d 126, 136 (2d Cir. 1997).

In this case, as is traditional, cf. Marro v. K-III Commc'ns Corp., 943 F. Supp. 247, 254 (E.D.N.Y. 1996) (denying bond under the "unusual and exigent circumstances presented"), a security bond is warranted, and CoreRx's motion to set security is **granted**. However, far from the multi-million-dollar figure

11

that CoreRx proposes, the Court agrees with Bionpharma that a
$200,000 bond is sufficient in this case. As Bionpharma
explains, this figure is calculated "based on the quantity of
bottles to be delivered times the transfer price sought by
CoreRx," Stay Opp. 19, and is therefore equivalent to "security
only for those damages, if any, that might be proximately caused
by the wrongful issuance of an injunction." Time Warner Cable,
Inc. v. DIRECTV, Inc., No. 06-cv-14245, 2007 WL 1296205, at *2
(S.D.N.Y. May 2, 2007). Bionpharma should file its bond by **March
3, 2022.**

### C. Motion to Intervene

Next, Azurity moves to intervene in this action for the
limited purpose of appealing the Opinion & Order. Azurity argues
that it should be entitled to intervene as a matter of right
under Federal Rule of Civil Procedure 24(a), or, in the
alternative, argues that the Court should allow Azurity to
intervene permissively under Federal Rule of Civil Procedure
24(b).

Federal Rule of Civil Procedure 24(a)(2) provides for
intervention as of right to any party who can: "(1) file a
timely motion; (2) show an interest in the litigation; (3) show
that its interest may be impaired by the disposition of the
action; and (4) show that its interest is not adequately
protected by the parties to the action." D'Amato v. Deutsche

12

Bank, 236 F.3d 78, 84 (2d Cir. 2001). The court of appeals has
instructed that "a failure to satisfy any one of these four
requirements is a sufficient ground to deny the application."
Floyd v. City of New York, 770 F.3d 1051, 1057 (2d Cir. 2014).
Separately, a movant may seek permissive intervention pursuant
to Federal Rule of Civil Procedure 24(b). Under that Rule, "the
court may permit anyone to intervene who . . . has a claim or
defense that shares with the main action a common question of
law or fact." Fed. R. Civ. P. 24(b)(1)(B). Although permissive
intervention is left to the discretion of the district court,
courts consider "substantially the same factors whether the
claim for intervention is 'of right' under [Rule 24(a)(2)], or
'permissive' under [Rule 24(b)(1)(B)]." R Best Produce, Inc. v.
Shulman-Rabin Mktg. Corp., 467 F.3d 238, 240 (2d Cir. 2006).
When considering a request for permissive intervention, however,
the central factor is "whether the intervention will unduly
delay or prejudice the adjudication of the original parties'
rights." Fed. R. Civ. P. 24(b)(3); see United States v. N.Y.C.
Hous. Auth., 326 F.R.D. 411, 418 (S.D.N.Y. 2018).

In this case, Azurity may not intervene as of right. It is
true that Azurity's motion is timely because Azurity has sought
to intervene "prior to any significant substantive motions" and
less than two months after Bionpharma brought this action. See
Bldg. & Realty Inst. of Westchester & Putnam Ctys., Inc. v. New

York, No. 19-cv-11285, 2020 WL 5667181, at *4 (S.D.N.Y. Sept. 23, 2020). Additionally, the Court will "not need to substantially extend any preexisting deadlines or reschedule any proceedings to accommodate the intervenor[]." See id. It is also true that Azurity adequately has shown an interest in the litigation that may be impaired in the disposition of this action. At the very least, Azurity has an economic interest in this case given its indemnity obligation to CoreRx for liability to Bionpharma in this action. See, e.g., Golden Ins. Co. v. PCF State Restorations, Inc., No. 17-cv-5390, 2018 WL 10593630, at *4-5 (S.D.N.Y. May 11, 2018).

However, Azurity has not shown that its interest is not adequately protected by CoreRx. "[W]hile the burden to demonstrate inadequacy of representation is generally speaking minimal, the Second Circuit has demanded a more rigorous showing of inadequacy in cases where the putative intervenor and a named party have the same ultimate objective." Bldg. & Realty Inst., 2020 WL 5667181, at *5. In such a situation, there is a "presumption of adequacy." Id.

In this case, both Azurity and CoreRx share the common objective of reversing the preliminary injunction so that CoreRx can continue to refuse to produce the Product to Bionpharma. Azurity has produced no evidence to show that CoreRx's representation is inadequate. While Azurity may take issue with

14

some of CoreRx's strategy in this action, "representation is not
inadequate simply because they have different ideas about how
best to achieve [their] goals." United States v. City of New
York, 198 F.3d 360, 367 (2d Cir. 1999). Further, the fact that
Azurity thinks it can better protect its own legal interests
"fall[s] short of establishing that [CoreRx] will not vigorously
[defend] this action and adequately [protect] the identical
objectives of both" Azurity and CoreRx. See Bldg. & Realty
Inst., 2020 WL 5667181, at *5. Nor is there any evidence
whatsoever that Bionpharma and CoreRx are colluding, or of
nonfeasance or incompetence on the part of CoreRx. See id.
Accordingly, Azurity has failed to demonstrate that its
interests are inadequately protected by CoreRx, and Azurity's
motion to intervene as of right is **denied.**

Nevertheless, permissive intervention is warranted in this
case. The test under Federal Rule of Procedure 24(b) is a
"flexible and discretionary one." Id. at *6. Indeed, "[e]ven if
intervention of right is unavailable, a court may still permit a
party to intervene if the party has a claim or defense that
shares with the main action a common question of law or fact."
N.Y.C. Hous. Auth., 326 F.R.D. at 418. As stated, whether
granting permissive intervention will unduly delay or prejudice
the adjudication of the rights of the existing parties is the
"the principal guide in deciding whether to grant permissive

15

intervention." Id. "[O]ther considerations include whether the applicant will benefit by intervention, the nature and extent of the intervenor['s] interests, whether [the intervenor's] interests are adequately represented by the other parties, and whether [the party] seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal issues present." Id.

Based on the facts of this case, the Court elects to exercise its "informed discretion" to grant permissive intervention for the limited purpose of appealing this Court's entry of a preliminary injunction. See id. "[W]hile existing adequate representation may militate against allowing permissive intervention, such intervention may still be appropriate," where, as here, "the addition of the intervenors will assist in the just and equitable adjudication of any of the issues between the parties." Id. Limited intervention by Azurity will provide the court of appeals with a "fuller picture" to evaluate whether this Court abused its discretion in granting Bionpharma's motion for a preliminary injunction. See id. at 419. Accordingly, Azurity's alternative request for permissive intervention is **granted.**

### D. Motion to Supplement the Record

Finally, Azurity moves to supplement the record with (1) the settlement agreement between it and CoreRx, and (2) the papers filed in connection with Azurity's motion to intervene, including a declaration by Eli B. Richlin, counsel for Azurity, and a declaration by Amit M. Patel, Chief Executive Officer for Azurity.

Under Federal Rule of Appellate Procedure 10(e), the district court may supplement the record "[i]f anything material to either party is omitted from or misstated in the record by error or accident." Fed. R. App. P. 10(e)(2)(B).

In this case, neither supplement is necessary. First, the gist of the settlement agreement was explained to the Court prior to the issuance of the Opinion & Order. In any event, the settlement agreement is already in the record as a result of the stipulation and order between Bionpharma and CoreRx dated February 10, 2022. ECF No. 89. Accordingly, Azurity's motion to supplement the record with the settlement agreement is **denied** as moot.

Second, Azurity's papers in connection with this motion are not necessary to correct the record, and it would be unfair to Bionpharma to include these papers in the record because it has not had an adequate time to respond to them. The papers submitted by Azurity were not a basis for granting the motion

for a preliminary injunction, and Azurity has withdrawn the request for reconsideration. Azurity's motion to supplement the record with these papers is therefore also **denied**.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit.

For the foregoing reasons, (1) CoreRx's motion for a stay is **denied**, but its alternative motion for an interim stay is **granted** until **March 2, 2022** to allow CoreRx to seek a stay from the court of appeals, and to allow the court of appeals to decide such a request. CoreRx should continue to prepare for its shipment to Bionpharma due March 4, 2022. (2) CoreRx's motion requiring Bionpharma to post a security bond is **granted**. Bionpharma shall file its bond in the amount of $200,000.00 with the Clerk of Court by **March 3, 2022**. (3) Azurity's motion to intervene as a matter of right is **denied**, but its alternative motion to intervene permissively is **granted**. (4) Azurity's motion to supplement the record is **denied**.

The Clerk is requested to close ECF Nos. 66 and 82.

**SO ORDERED.**

Dated:    **New York, New York**
        **February 24, 2022**

                                  **John G. Koeltl**
                          **United States District Judge**

# EXHIBIT 6

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

BIONPHARMA INC.,

                        Plaintiff,                21-cv-10656 (JGK)

        - against -                               OPINION AND ORDER

CORERX, INC.,
                        Defendant.

**JOHN G. KOELTL, District Judge:**

The plaintiff, Bionpharma Inc. ("Bionpharma"), brought this
action against the defendant, CoreRx, Inc. ("CoreRx"), for
breach of contract and declaratory judgment. The plaintiff now
moves for a preliminary injunction pursuant to Rule 65 of the
Federal Rules of Civil Procedure, seeking to compel the
defendant to supply the plaintiff with enalapril maleate oral
solution in accordance with the parties' Master Manufacturing
Supply Agreement. ECF No. 8. Specifically, the plaintiff seeks
to compel the defendant to fulfil the remainder of an order that
was previously due in December 2021 and to fulfil an additional
order that was placed on December 3, 2021 — the total of which
constitutes approximately 18,000 bottles of enalapril maleate
oral solution.

For the reasons that follow, the plaintiff's motion for a
preliminary injunction is **granted.**

1

# I.

The following constitutes the Court's findings of fact and conclusions of law.

"Bionpharma is a generic pharmaceutical company, founded in 2014 to develop and commercialize affordable, quality generic drugs." Krishnan Decl. ¶ 4, ECF No. 10.[1] "Bionpharma's business model is to partner with pharmaceutical manufacturers." Id. Under the terms of these partnerships, the pharmaceutical manufacturers manufacture the drugs, while Bionpharma bears responsibility for sourcing active ingredients, obtaining regulatory approval of the product from the Federal Drug Administration ("FDA"), and selling and distributing the drug product under the Bionpharma label. Id.

"CoreRx is a pharmaceutical Contract Development Manufacturing Organization." Damani Decl. ¶ 5, ECF No. 33. "On behalf of its pharmaceutical customers, CoreRx develops and manufactures clinical trial and commercial drug products." Id.

Bionpharma and CoreRx began doing business together in around 2017. Id. ¶ 10. At some point during their relationship, Bionpharma engaged CoreRx to conduct research and development for a new enalapril maleate oral solution product (the "Product") that Bionpharma would market as a generic version of

---

[1] Unless otherwise noted, this Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

the branded drug "Epaned," a product then-owned by Silvergate Pharmaceuticals ("Silvergate"). Krishnan Decl. ¶ 5. Epaned is now owned by Azurity Pharmaceuticals ("Azurity"), CoreRx's sister company. Id.; Marinelli Decl. ¶ 4, ECF No. 11.

In August 2018, Bionpharma submitted an Abbreviated New Drug Application ("ANDA") to the FDA, seeking regulatory approval to market the resulting Product. Krishnan Decl. ¶ 5. In December 2018, Silvergate sued Bionpharma in the United States District Court for the District of Delaware, alleging patent infringement on the basis of Bionpharma's submission. Id. ¶ 7; see also Compl. ¶ 11, ECF No. 1. Silvergate or Azurity brought additional patent infringement lawsuits against Bionpharma in June 2019 and September 2020. Krishnan Decl. ¶ 9. Thus far, none of these lawsuits have been successful, but on April 29, 2021, Judge Stark held that Bionpharma's Product did not violate Epaned's patents. See Silvergate Pharms., Inc. v. Bionpharma Inc., No. 18-cv-1962, 2021 WL 1751148 (D. Del. Apr. 29, 2021).

As this flurry of patent litigation was ongoing, Bionpharma engaged CoreRx to manufacture Bionpharma's Product for commercial sale. Krishnan Decl. ¶ 6. On or around November 24, 2020, Bionpharma and CoreRx executed a Master Manufacturing Supply Agreement (the "Agreement") concerning Bionpharma's Product. Id.; see also Krishnan Decl. Ex. F, ECF No. 10-1 ("Agreement"). As relevant here, the Agreement provides that

3

"CoreRx shall Manufacture and supply to [Bionpharma], and
[Bionpharma] shall purchase from CoreRx, Product that is ordered
by [Bionpharma]." Agreement § 5.1. Section 5.4 of the Agreement
clarifies that CoreRx must "accept all Firm Orders for a
particular calendar month" with few exceptions, and section 5.5
notes that only Bionpharma can cancel or defer orders. The
parties further agreed in section 5.11, entitled "Supply
Interruption," that, "[i]f CoreRx is unable to supply any
Product ordered by [Bionpharma] . . ., then CoreRx shall use
Commercially Reasonable Efforts to remedy the problem or secure
an alternative source of supply within a reasonable time."

The Agreement left open the price that Bionpharma would pay
CoreRx for manufacturing the Product (the "Transfer Price"). Id.
§ 6.2. However, the parties agreed that the price would "be
established by mutual agreement of the Parties on an annual
basis one (1) month prior to the commencement of [Bionpharma's]
next fiscal year." Id. Once established, that agreed-upon price
would "remain in effect for the applicable fiscal year." Id.

As part of the Agreement, Bionpharma also promised to
indemnify "CoreRx, its Affiliates and its and their respective
officers, directors, employees, and agents, and their respective
successors and permitted assigns" for any intellectual property
("IP") infringement claims that might be brought against CoreRx
for manufacturing Bionpharma's Product. Id. § 13.1. The parties

4

also limited liability, so that "in no event [would] either
party . . . be liable to the other party . . . for any punitive,
indirect or consequential damages or indirect or consequential
losses of any kind, nature or description whatsoever (including
economic losses or lost profits)." Id. § 13.5 (original
capitalization omitted).

The Agreement was to be "in full force and effect for a
period of five (5) years from the commercialization of the last
Product." Id. § 14.1. Finally, in the event of a dispute, the
parties agreed that they would:

> initially attempt in good faith to resolve any
> significant controversy, claim, allegation of breach or
> dispute arising out of or relating to this Agreement
> (hereinafter collectively referred to as a "Dispute")
> through negotiations between senior executives of
> [Bionpharma] and CoreRx. If the Dispute is not resolved
> within thirty (30) calendar days (or such other period
> of time mutually agreed upon by the Parties) of notice
> of the Dispute, then the Parties agree to submit the
> Dispute to non-binding mediation in an attempt to
> resolve the Dispute. Unless otherwise mutually agreed by
> the Parties, only if the Dispute is not resolved through
> negotiations or non-binding mediation as set forth
> herein, may a Party resort to litigation.

Id. § 16.7.

On August 17, 2021, after having won the above-mentioned
lawsuit against Silvergate in the District of Delaware,
Bionpharma commercially launched its Product. Krishnan Decl. ¶
8. Children suffering from cardiac conditions — specifically,
hypertension — became Bionpharma's main customers. Id. ¶ 35.

But Azurity's lawsuits did not end with Judge Stark's holding. In June 2021 and October 2021, Azurity brought additional patent infringement suits against Bionpharma based on Bionpharma's Product. Id. ¶ 9. In one of those cases, Azurity sought an injunction to force Bionpharma to withdraw its Product from the market and to cease selling any new Product, but that injunction was denied. Azurity Pharms., Inc. v. Bionpharma Inc., No. 21-cv-1286, ECF No. 87 (D. Del. filed June 22, 2021). In October 2021, Azurity also brought patent infringement lawsuits against CoreRx, accusing CoreRx of infringing the same patents Azurity asserted against Bionpharma on account of CoreRx's manufacturing of Bionpharma's Product. See Azurity Pharms., Inc. v. CoreRx, Inc., 21-cv-1522 (D. Del. filed Oct. 27, 2021); Azurity Pharms., Inc. v. CoreRx, Inc., 8:21-cv-2515 (M.D. Fla. filed Oct. 26, 2021). "Upon becoming aware of Azurity's lawsuits against CoreRx, Bionpharma immediately offered to indemnify CoreRx under the Agreement." Krishnan Decl. ¶ 11. Bionpharma also offered to help pay for separate counsel that CoreRx wanted to retain in addition to counsel provided by Bionpharma, even though this was not required under the Agreement. Id. Both of Azurity's actions against CoreRx have since been voluntarily dismissed. Azurity, 21-cv-1522, ECF No. 6 (D. Del.); Azurity, 8:21-cv-2515, ECF No. 16 (M.D. Fla.); see also id. ECF No. 45 (Report and Recommendation by Magistrate Judge recommending that

6

the district court deny Azurity's motion to reopen the case to
correct the notice of dismissal).

On November 19, 2021, CoreRx sent Bionpharma a letter
discussing pricing for products manufactured by CoreRx for
Bionpharma and "demanded to more than double the price" for the
Product. Krishnan Decl. ¶ 13; see Krishan Decl. Ex. I, ECF No.
14-2 (sealed). Bionpharma responded that the Transfer Price
should remain the same. Krishnan Decl. ¶ 14; see also Krishnan
Decl. Ex. J, ECF No. 10-5 & ECF No. 14-3.

On November 30, nine days after it unsuccessfully requested
a price increase, CoreRx sent a facsimile message to Bionpharma
stating that, "as of December 1, 2021, CoreRx will be unable to
supply enalapril maleate for [Bionpharma's] Epaned product. In
accordance with section 5.11 of the [Agreement] that addresses
Supply Interruptions, CoreRx will work with [Bionpharma] to
secure an alternative source of supply for this product."
Krishnan Decl. Ex. K, ECF No. 10-6. On December 1, Bionpharma
responded that CoreRx had not provided the reason for its
purported inability to supply the Product under section 5.11 and
advised CoreRx that CoreRx was in breach of the Agreement.
Krishnan Decl. ¶ 18; Krishnan Decl. Ex. L, ECF No. 10-7.
Bionpharma therefore invoked the alternative dispute resolution
procedures provided in section 16.7 of the Agreement and
demanded an "immediate meeting between senior executives." Id.

On December 3, 2021, Bionpharma submitted another order with
CoreRx for the Product. Krishnan Decl. Ex. N, ECF No. 10-9.

The parties and their counsel met for approximately 30
minutes on December 7, 2021. Krishnan Decl. ¶ 21; Damani Decl.
¶¶ 29-30. During this call, Bionpharma claims that CoreRx
refused to provide it with a reason for its inability to supply
the Product to Bionpharma in accordance with the Agreement.
Krishnan Decl. ¶¶ 21-22. CoreRx also informed Bionpharma that it
would not deliver the balance of the pending order due for
December delivery, and it would not deliver Bionpharma's
December 3 order. Id. ¶¶ 23-24.

"Due to CoreRx's conduct," Bionpharma claims that it has
been forced to turn down new orders for the Product. Id. ¶ 25.
Bionpharma claims that its reputation in the "small and highly
competitive" generic pharmaceutical industry as "an innovative
and reliable distributor of generic pharmaceutical products,"
id. ¶¶ 27-28, will be harmed as a result, id. ¶ 30. Indeed,
Bionpharma alleges that "[a] sudden failure to fulfil its
customers' orders for Product will reverse any gains made by
Bionpharma and will drive its customers to seek to purchase
their generic pharmaceutical products from any other of
Bionpharma's competitors. Failure to deliver product as ordered
is one of the most reputationally damaging events that a generic
pharmaceutical distributor could endure." Id. In addition,

Bionpharma notes, because it is already under contract to supply
its Product to certain customers, that "[i]f CoreRx's breaching
conduct continues, Bionpharma will be in breach of its own
contractual obligations to its customers, irreversibly damaging
its reputation and goodwill. Bionpharma will further need to
provide notice to the FDA of an interruption of the manufacture
of the Product likely to lead to a meaningful disruption in the
supply of enalapril maleate oral solution pursuant to Section
506C(a) of the Federal Food, Drug, and Cosmetic Act." Id. ¶ 31.
Bionpharma claims that it will cost it "hundreds of thousands of
dollars, and take at minimum nine months to identify and bring
online an alternate source of Product." Id. ¶ 34. Bionpharma
will exhaust the inventory it has on hand during this time.
Marinelli Decl. ¶ 7.

     In addition to arguing that CoreRx's failure to supply it
with the Product will harm Bionpharma's reputation and standing
in the industry, Bionpharma also argues that the public will be
harmed by CoreRx's conduct. Krishan Decl. ¶¶ 35-39. In
particular, Bionpharma notes that its generic product is cheaper
than Epaned, and that customers will be forced to pay higher
prices if its product is forced off the market. Id. Furthermore,
because of the process by which prescriptions are filled, if a
patient is prescribed Bionpharma's Product, that patient may not
be able to secure Epaned in the event his pharmacy is out of

Bionpharma's Product. Id. ¶ 39. Getting a new prescription can
be "challenging and time consuming" — not to mention, expensive
— "with the result that the patient may not be able to secure a
refill of his or her prescription before running out." Id.

Bionpharma brought this action on December 13, 2021. ECF
No. 1. On the same day, Bionpharma moved for a preliminary
injunction. ECF No. 8. On December 15, the parties agreed to a
stand-still pending this Court's decision on the preliminary
injunction. ECF No. 25.

## II.

"A party seeking a preliminary injunction must ordinarily
establish (1) irreparable harm; (2) either (a) a likelihood of
success on the merits, or (b) sufficiently serious questions
going to the merits of its claims to make them fair ground for
litigation, plus a balance of the hardships tipping decidedly in
favor of the moving party; and (3) that a preliminary injunction
is in the public interest." New York ex rel. Schneiderman v.
Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015). However, the
court of appeals has held that courts should hold movants "to a
heightened standard where: (i) an injunction is mandatory [as
opposed to prohibitory], or (ii) the injunction will provide the
movant with substantially all the relief sought and that relief
cannot be undone even if the defendant prevails at a trial on
the merits." Id. "Mandatory injunctions, for which the

10

[heightened] standard is appropriate, are those that <u>disturb the</u> <u>status quo</u> by ordering affirmative relief, while prohibitory injunctions preserve the status quo." <u>Johnson v. Kay</u>, 860 F.2d 529, 541 (2d Cir. 1988) (emphasis added). "The status quo is not the current state of affairs but the last actual, peaceable uncontested status which preceded the pending controversy." <u>DJ</u> <u>Direct, Inc. v. Margaliot</u>, 512 F. Supp. 3d 396, 407 n.5 (E.D.N.Y. 2021) (quoting <u>N. Am. Soccer League, LLC v. U.S.</u> <u>Soccer Fed'n, Inc.</u>, 883 F.3d 32, 37 (2d Cir. 2018)), <u>appeal</u> <u>dismissed</u> (July 6, 2021), <u>appeal withdrawn sub nom.</u> <u>DJ Direct,</u> <u>Inc. v. JCB Max LLC</u>, No. 21-239, 2021 WL 3555968 (2d Cir. July 13, 2021). When either condition necessitating the heightened standard is met, "the movant must show a clear or substantial likelihood of success on the merits, and make a strong showing of irreparable harm, in addition to showing that the preliminary injunction is in the public interest." <u>Actavis PLC</u>, 787 F.3d at 650.

Contrary to CoreRx's argument, the heightened standard is inapplicable in this case. Bionpharma seeks to compel CoreRx to provide it with a supply of enalapril maleate oral solution in accordance with the parties' Agreement. Far from "alter[ing] the status quo by doing more than is required by the Agreement," <u>see</u> <u>Tom Doherty Assocs., Inc. v. Saban Ent., Inc.</u>, 60 F.3d 27, 35 (2d Cir. 1995), the injunction here would "maintain[] the

11

situation that would prevail if the contract were properly performed," Velez v. Prudential Health Care Plan of N.Y., Inc., 943 F. Supp. 332, 338 (S.D.N.Y. 1996); see also Vestron, Inc. v. Nat'l Geographic Soc., 750 F. Supp. 586, 591 (S.D.N.Y. 1990). The injunction is therefore better categorized as prohibitory, rather than mandatory. Nor, as CoreRx appears to concede, is there anything about the circumstances of the case or the particular features of the injunction that would make relief irreversible. Cf. Tom Doherty, 60 F.3d at 35. Accordingly, Bionpharma need only make the less burdensome showing required of preliminary injunctions that seek to preserve the status quo. This conclusion, however, "is of little import in this case" because, in any event, Bionpharma has satisfied the heightened standard. See Actavis PLC, 787 F.3d at 651.

There is a further preliminary issue. The parties' Agreement provides that the parties must first attempt to resolve disputes through negotiations or non-binding mediation before they may resort to litigation, and CoreRx argues that this precludes injunctive relief in this case. But the Court is "being asked only to issue an injunction so that the [mediation] can go forward before there is a change in the status quo." See Rex Med. L.P. v. Angiotech Pharms. (US), Inc., 754 F. Supp. 2d 616, 620 (S.D.N.Y. 2010). The court of appeals has approved such preliminary injunctions when in aid of arbitration, noting that

12

"[a]rbitration can become a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, 910 F.2d 1049, 1053 (2d Cir. 1990). This reasoning is equally applicable with respect to mediation. Accordingly, the issue to be decided is whether the plaintiff has shown it is entitled to a preliminary injunction.

For the reasons that follow, Bionpharma has adequately demonstrated that it is entitled to a preliminary injunction.

## A. Irreparable Harm

First, Bionpharma has made a strong showing that it will suffer irreparable harm absent an injunction.

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990). "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." Id. A company's "loss of reputation, good will, and business opportunities" from a breach of contract can constitute irreparable harm. Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004); see also Reuters Ltd., 903 F.2d at 909 ("[I]rreparable harm has often consisted of the loss of customers and the competitive disadvantage that resulted from

a distributor's inability to supply its customers with the
terminated product.").

In this case, Bionpharma has made a strong showing that it
will suffer irreparable harm absent an injunction. CoreRx is
Bionpharma's exclusive supplier, and Bionpharma does not
stockpile its Product. While the Product supplied by CoreRx may
eventually be replaceable, it will take months to find an
alternative supplier. In the meantime, Bionpharma will be
completely unable to fulfil orders that it is under contractual
obligation to supply, and it will be forced to decline new
orders. Both of these consequences will result in substantial
injury to Bionpharma's reputation and goodwill in the small
generic pharmaceutical industry in which relationships and
reputation are paramount.

As the court of appeals has recognized, reputational
"injury of this sort is nearly impossible to value." Id. at 908;
see also id. at 907-08 ("[T]erminating the delivery of a unique
product to a distributor whose customers expect and rely on the
distributor for a continuous supply of that product almost
inevitably creates irreparable damage to the good will of the
distributor." (collecting cases)); Register, 356 F.3d at 404;
Angiotech Pharms., 754 F. Supp. 2d at 623. Indeed, depriving a
party of "the opportunity to sell an entire line of
merchandise," may cause that party to "incur injury to its

14

goodwill and reputation as a dependable distributor." John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 588 F.2d 24, 29 (2d Cir. 1978). This reputational damage is difficult to repair, because even in the event that Bionpharma finds an alternative supplier, "customers may . . . refuse to return to [Bionpharma], because of [its] lack of dependability in supplying its product." Angiotech Pharms., 754 F. Supp. 2d at 623. The court of appeals has held that this is precisely the sort of harm for which monetary damages are inappropriate. As the court of appeals noted in Register, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client" — or clients — "that would produce an indeterminate amount of business in years to come." Register, 356 F.3d at 404.

CoreRx's attempts to distinguish this case from those in this circuit in which courts have found irreparable harm based on similar risks of reputational damage are unavailing. First, the fact that the parties agreed in section 13.5 of the Agreement to limit liability for "any punitive, indirect or consequential damages or indirect or consequential losses of any kind, nature or description whatsoever (including economic losses or lost profits)" does not preclude injunctive relief. CoreRx cites to no case to support the proposition that because Bionpharma cannot seek consequential damages from CoreRx, it

15

follows that such damages may not be a basis for it to obtain
injunctive relief against CoreRx. In fact, as Bionpharma points
out, the parties' limitation of liability might cut the other
way in justifying the need for injunctive relief, because
"absent preliminary relief, [Bionpharma's] ability to be made
whole after a wrongful [breach] would be seriously jeopardized."
See Rockwood Pigments NA, Inc. v. Elementis Chromium LP, 2
N.Y.S.3d 94, 97 (App. Div. 2015). Second, Bionpharma is not
precluded from seeking such relief because "nothing in the
[Agreement] contemplates injunctive relief or specific
performance as a form of remedy." Def.'s Mem. in Opp. 15, ECF
No. 32. First, the fact that the Agreement does not preclude
such relief, when it explicitly precludes other sorts of relief
like consequential damages, can just as easily be interpreted to
allow this relief. Additionally, New York's Uniform Commercial
Code ("UCC") provides the default position that, absent
agreement to the contrary, "[s]pecific performance may be
decreed where the goods are unique or in other proper
circumstances." N.Y. U.C.C. Law § 2-716; see also N.Y. U.C.C.
Law § 1-302.

Finally, CoreRx is incorrect that Bionpharma's claims of
irreparable harm are merely conclusory. Bionpharma has produced
reliable affidavits swearing to its claimed harm, and Bionpharma

16

need not wait for the supply of its Product to dwindle before it can demonstrate such harm. See Reuters, 903 F.2d at 908-09.

Therefore, Bionpharma has made a strong showing of irreparable harm in the absence of an injunction. Bionpharma's total and sudden inability to supply its Product will result in reputational harm that is "incalculable in dollars and cents," and to which injunctive relief is particularly suited. Id. at 909.

### B. Likelihood of Success on the Merits

Second, Bionpharma has shown a substantial likelihood of success on the merits.

To establish a breach-of-contract claim under New York law, a plaintiff must demonstrate: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004)

CoreRx disputes the existence of a valid contract between the parties, and also disputes that it is in breach. Because the other elements are not disputed, the Court does not consider them. Ultimately, CoreRx's arguments are unpersuasive.

First, CoreRx rightly appears to concede that the parties entered into a contract when the Agreement was signed in November 2020. It also appears to concede that the Agreement has

17

not been terminated. Accordingly, there would appear to be a
valid contract.

     CoreRx argues that the contract is void because
"[e]nforcing the Contract in the manner Bionpharma advocates
would violate" federal patent laws. Def.'s Mem. in Opp. 10.
However, CoreRx's argument is unpersuasive. No court has yet
held that Bionpharma's Product violates any federal patents. To
the contrary, Judge Stark held that Bionpharma's Product did not
violate Silvergate's patent, and Azurity failed in its effort to
enjoin Bionpharma from selling the Product. CoreRx has made no
effort on this motion to demonstrate that its provision of the
Product would violate the patent laws. And CoreRx has pointed to
no case holding that a competitor's unsubstantiated allegation
that another company's product violates its patents thereby
voids that company's contracts.

     Notably, Lear v. Adkins, 395 U.S. 653 (1969), on which
CoreRx relies, does not support CoreRx's argument that
"contracts that frustrate the purposes of the federal patent
system are preempted and without force." Def.'s Mem. in Opp. 8.
In Lear, the United States Supreme Court considered the more
limited, specific question of whether the licensee estoppel
doctrine — under which a licensee operating under a licensing
agreement was estopped from denying the validity of his
licensor's patent in a suit for royalties under the agreement —

18

should be abrogated. Id. at 656. Balancing the "competing
demands of the common law of contracts and the federal law of
patents," id. at 668, the Court concluded that the federal
interest in promoting challenges to patent validity outweighed
the licensor's contract interests, id. at 668-71. Accordingly,
the defendant-licensee, Lear, Inc., could defend against the
plaintiff-licensor's breach of contract suit by arguing that the
patent on which their licensing agreement was based was invalid.
Id. Additionally, the Court held that Lear, Inc., was not
required to continue to pay royalties, as provided in the
contract, while it challenged the patent's validity in the
courts. Id. at 671-74. The Court reasoned that "[e]nforcing this
contractual provision would give the licensor an additional
economic incentive to devise every conceivable dilatory tactic
in an effort to postpone the day of final judicial reckoning,"
and that "the cost of prosecuting slow-moving trial proceedings
and defending an inevitable appeal might well deter many
licensees from attempting to prove patent invalidity in the
courts." Id. at 673. Additionally, "enforcing this contractual
provision would undermine the strong federal policy favoring the
full and free use of ideas in the public domain." Id. at 674.
Lear thus sought to enable challenges to patents by licensees.
It did not hold that any contracts to sell products that

19

allegedly infringe on patents are presumptively void. The other cases cited by CoreRx are similarly unsupportive.

Nor is CoreRx and Bionpharma's Agreement otherwise void for illegality under New York law. While it is true that "New York courts will not enforce illegal contracts," Schlessinger v. Valspar Corp., 686 F.3d 81, 85 (2d Cir.), certified question accepted, 975 N.E.2d 489 (N.Y. 2012), and certified question answered, 991 N.E.2d 190 (N.Y. 2013), no court has yet held that CoreRx's provision of the Product violates any law. CoreRx has failed to make any proffer that would raise doubts as to the legality of the Agreement. Bionpharma has thus sufficiently demonstrated that it has a valid contract with CoreRx.

Second, Bionpharma has sufficiently shown that CoreRx likely breached their Agreement. CoreRx has refused to supply Bionpharma with the remainder of its order due in December 2021, and it has also refused to acknowledge the new order placed by Bionpharma on December 3, 2021 as the Agreement requires. Both of these actions constitute a breach of contract.

CoreRx argues that its failure to fill Bionpharma's orders does not constitute a breach of contract because "CoreRx has acted in the manner prescribed by Section 5.11 of the Contract, which governs 'Supply Interruptions.'" Def.'s Mem. in Opp. 13. But CoreRx has not demonstrated that it is unable to supply the Product ordered by Bionpharma, as required by that provision.

20

Indeed, there was no hint of such inability when, on November 19, 2021, CoreRx demanded a price increase; CoreRx mentioned an interruption for the first time only after Bionpharma rebuffed its price increase. CoreRx's attorney was also unable to provide this Court with a reason for this purported supply interruption when asked on December 14, 2021. During the hearing before the Court on January 25, 2022, CoreRx's counsel disclosed for the first time that CoreRx had agreed in a confidential settlement agreement with Azurity that Azurity's patent cases against CoreRx would be dismissed, and that CoreRx would be subject to suit if it continued to provide the Product to Bionpharma. Putting aside the validity of such an agreement, it does not demonstrate an inability to produce the Product. CoreRx has failed to demonstrate the applicability of section 5.11, which governs supply interruptions. Section 5.11 does not negate CoreRx's breach.

CoreRx separately argues that its failure to fill Bionpharma's orders does not constitute a breach of contract because the parties had "failed to reach mutual agreement on an annual basis with regards to product pricing," and that there is therefore "no supply agreement in place for [CoreRx] to have even breached." Def.'s Mem. in Opp. 14. But the Agreement says no such thing. The Transfer Price provision's emphasis on "mutual agreement" instead implies that the parties must both

agree as to the price, and that one party may not offer a price increase on a take-it-or-leave-it basis. Cf. Ry. Supply & Mfg. Co. v. Safie Bros. Co., 201 F. Supp. 690, 691 (S.D.N.Y. 1962) (absent terminology to the contrary, "the clause pertaining to price revision permitted the parties to mutually agree upon new terms for subsequent quarters of the year, but their failure to do so did not terminate the contract"). There is no other provision in the Agreement that suggests that a failure to agree on price allows CoreRx to terminate the contract. First, "[i]f it was intended that when a party called for revision of prices, if his proposal was not accepted, the contract would be terminated, it would seem that even businessmen would so provide in the agreement." Id. Second, section 2-305 the UCC provides the default position that, where the price is left to be agreed by the parties and they fail to agree, that failure to agree does not terminate the contract; instead, the parties are bound to a "reasonable price at the time of delivery." N.Y. U.C.C. Law § 2-305(1)(b). There is no basis for CoreRx's argument that the parties' failure to agree on a price increase excuses CoreRx's breach. Bionpharma has adequately shown that it is likely to prove that CoreRx breached their Agreement.

Therefore, Bionpharma has shown a substantial likelihood of success on the merits.

22

### C. **Balance of the Equities and the Public Interest**

Finally, Bionpharma has made a strong showing that the balance of equities tips in its favor and that an injunction is in the public interest.

In determining whether the balance of the equities tips in the plaintiff's favor and whether granting the preliminary injunction would be in the public interest, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, as well as the public consequences in employing the extraordinary remedy of injunction." Yang v. Kellner, 458 F. Supp. 3d 199, 216 (S.D.N.Y.), aff'd sub nom. Yang v. Kosinski, 805 F. App'x 63 (2d Cir. 2020), and aff'd sub nom. Yang v. Kosinski, 960 F.3d 119 (2d Cir. 2020).

In this case, both the balance of equities and the public interest favor granting the preliminary injunction. For the reasons described above, Bionpharma will suffer irreparable harm to its reputation and goodwill absent an injunction. On the other side of the scale, CoreRx argues that it risks being liable for millions of dollars to Azurity if it must continue to abide by the Agreement. Even putting aside the implausibility of the claim that Azurity, CoreRx's sister company, would risk bankrupting CoreRx, CoreRx's claimed harm does not outweigh that of Bionpharma. Bionpharma's Agreement with CoreRx specifically

23

provides that it will indemnify CoreRx for any costs associated
with patent infringement. While CoreRx "doubts" that Bionpharma
"has the financial capital to reimburse CoreRx for any
meaningful share of a damages award," Def.'s Mem. in Opp. 20
n.3, this conclusory doubt does not suffice to tip the balance
of the equities to CoreRx's side. In any event, CoreRx was — or
should have been — aware that contracting with Bionpharma to
manufacture a generic version of Epaned might expose it to
potential liability. That CoreRx may now regret doing so because
of "doubts" about Bionpharma's ability to pay — or because of
fears of subsequent litigation by Azurity — does not tip the
equities in CoreRx's favor.

Moreover, an injunction is plainly in the public interest,
and this tips the scales further in Bionpharma's favor.
Bionpharma's Product is the generic version of brand-name
Epaned. It is cheaper than Epaned, and many insurers cover only
Bionpharma's Product. If Bionpharma's Product were to be taken
off the market, children — Bionpharma's primary user — and their
parents would suffer. CoreRx disputes that Epaned is that much
more expensive than Bionpharma's Product. But for families with
sick children, even a small price increase can make a
significant difference. Moreover, CoreRx does not dispute that
forcing families to go through the burden of switching

24

medications for their children does not serve the public
interest.

Against this strong public health interest, CoreRx relies
only on the public interests served by adherence to the federal
patent laws. But this interest is slight when no court has ever
found Bionpharma to be in breach of the federal patent laws.

Given the strong likelihood that CoreRx's conduct will
drive Bionpharma's Product — the sole generic alternative to
brand-label Epaned — off the market, and the likelihood that
ailing patients, and in particular children, will suffer as a
result, Bionpharma has made a strong showing that the balance of
equities tips in its favor and that an injunction is in the
public interest.

**CONCLUSION**

The Court has considered all of the arguments raised by the
parties. To the extent not specifically addressed, the arguments
are either moot or without merit. The plaintiff's motion for a
preliminary injunction is **granted.** The Clerk of Court is
directed to close Docket No. 8.

The parties should immediately begin mediation as provided
in their Agreement, and the case is stayed pending such
mediation.

The plaintiff should submit a proposed preliminary injunction in two days. The defendant may submit any objections one day thereafter.

SO ORDERED.

Dated:    New York, New York
          January 27, 2022

                                 John G. Koeltl
                United States District Judge

# EXHIBIT 7

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| BIONPHARMA INC. | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 21-10656-JGK |
| | ) | |
| v. | ) | [PROPOSED] |
| | ) | PRELIMINARY INJUNCTION |
| CORERX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

This matter having been opened to the Court by Holland & Knight LLP, attorneys for plaintiff Bionpharma Inc. (Charles A. Weiss, Esq., and Marisa Marinelli, Esq., appearing), on notice to and in the presence of Buchanan Ingersoll & Rooney PC, attorneys for defendant CoreRx, Inc. (Peter S. Russ, Esq., and Matthew L. Fedowitz, Esq., appearing), and the Court having considered the filings submitted by the parties and heard argument of counsel, for the reasons set forth in the Opinion and Order entered on January 27, 2022 (D.I. 50) and good cause appearing, it is ORDERED, ADJUDGED, AND DECREED that Bionpharma Inc.'s motion for a preliminary injunction shall be and hereby is GRANTED as follows:

1.      Defendant CoreRx, Inc. ("CoreRx"), its officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them who have actual notice of this preliminary injunction by personal service or otherwise are hereby ENJOINED AND RESTRAINED from failing to have CoreRx fill the orders for enalapril maleate oral solution ("Product") placed by plaintiff Bionpharma Inc. ("Bionpharma") under the parties' Master Manufacturing Supply Agreement (the "Agreement") in purchase order 4500001497 and purchase order 4500001835, as more specifically set forth in paragraphs 2 and 3 below.

2.     CoreRx shall fill the balance of purchase order 4500001497, amounting to 12,459 bottles of Product, according to the terms therein by no later than March 4, 2022.

3.     CoreRx shall fill purchase order 4500001835, for 6,000 bottles of Product, according to the terms therein, by no later than March 17, 2022.

4.     For clarity, this preliminary injunction does not (i) relieve Bionpharma of its obligation under the Agreement to pay CoreRx for the Product to be manufactured and delivered pursuant to paragraphs 2 and 3 in accordance with the terms of such purchase orders, or (ii) otherwise relieve any party of its respective obligations under the Agreement.

IT IS FURTHER ORDERED that:

5.     The parties should immediately commence mediation as set forth in the Agreement.

6.     This case is stayed pending the conclusion of mediation or further order of the Court.

7.     The parties shall submit a joint status report by February 28, 2022.

JOHN G. KOELTL, U.S.D.J.

DATED: 2/4/22

2

# EXHIBIT 8

EXECUTION VERSION

## MASTER MANUFACTURING SUPPLY AGREEMENT

This **Master Manufacturing Supply Agreement** (this **"Agreement"**) is hereby entered into as of November __, 2020 (the **"Effective Date"**) by and arch between CoreRx, Inc., a Florida corporation**,** with offices located at 14205 Myerlake Circle, Clearwater FL 33760 and its Affiliates, (collectively, **"CoreRx"**) and Bionpharma Inc., (**"Bion"**), a Delaware corporation, having its principal place of business at 600 Alexander Road, Suite 2-4B, Princeton, NJ 08540 (each, a **"Party"** and collectively, the **"Parties"**).

### Background

Bion is in the business of commercializing various generic pharmaceutical products. CoreRx has experience in manufacture and supply of Products.

**NOW THEREFORE**, in consideration of the mutual promises, covenants and agreements hereinafter set forth and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Bion and CoreRx hereby agree as follows:

## ARTICLE 1. DEFINITIONS

**1.1    Defined Terms**. Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning set forth below:

**"Affiliate(s)"** means as to a Party, any party which controls, is controlled by, or is under common control with such Party. For purposes of the foregoing definition, the term "control" (including with correlative meaning, the terms "controlling", "controlled by", and "under common control with") as used with respect to any applicable party, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such party, whether through ownership of equity, securities, or partnership interest or by contract, or otherwise.  Ownership of more than fifty percent (50%) of the securities or other ownership interests representing the equity, the voting stock or general partnership interest in an entity, or greater than fifty percent (50%) interest in the income of such corporation or other business entity shall, without limitation, be deemed to be control for purpose of this definition.

**"ANDA"** means an Abbreviated New Drug Application prepared in conformance with applicable FDA regulations for filing with the FDA for marketing authorization of a given Product.

**"Agency"** means any applicable local, national or supranational government regulatory authority involved in granting approvals and/or exercising authority with respect to the manufacture of a pharmaceutical product in the Territory, including in the FDA.

**"API"** means the active pharmaceutical ingredient and related substance or substance combination used in manufacturing the Product.

**"Applicable Laws"** means all laws, rules, regulations and guidelines of any Governmental Authority with jurisdiction over the development, manufacturing, exportation, importation, promotion, marketing, sale or distribution of the Product and/or the performance of a Party's obligations under this Agreement, to the extent applicable and relevant, and including specifically, but without limitation, the FD&C Act, all cGMP and current Good Clinical Practices or similar standards or guidelines of the FDA and including trade association guidelines, where applicable, as well as U.S. export control laws and the U.S. Foreign Corrupt Practices Act.

1

**"Batch"** means the Product that results from a single Manufacturing process, inclusive of Material.

**"Bion Intellectual Property"** means Know-How, including Bion Improvements, that is owned or Controlled by Bion or its Affiliates during the term of this Agreement and that is necessary for or directly related to the Manufacture, use, sale, offering for sale or importing of the Products, including any tangible materials that are provided by Bion to CoreRx for use in the conduct of any Program. The term Bion Intellectual Property does not include any Know-How, which is, as of the Effective Date or later becomes, generally available to the public, excluding Bion Confidential Information or Know-How owned or Controlled by Bion that is publicly disclosed by a Third Party without the consent of Bion, and Know-How included in Bion Patent Rights.

**"Bion Patent Rights"** means those Patent Rights that Cover Bion Intellectual Property and are Controlled by Bion at any time during the term of this Agreement.

**"Business Day"** means any day other than a Saturday, a Sunday, or a national holiday in the United States.

**"Business Failure"** means (i) an actual failure of CoreRx (or any of its Affiliates) to pay its (or their respective) employees or vendors, or to meet its (or their respective) other financial obligations, (ii) a determination by Bion (in its reasonable belief) that CoreRx (or any of its Affiliates) may be unable to pay its (or their respective) employees or vendors, or to meet its (or their respective) other financial obligations, and CoreRx's failure to provide assurances (within thirty (30) days after written notice thereof by Bion) reasonably satisfactory to Bion that CoreRx (and its Affiliates) will be able to make such payments and meet such obligations, (iii) CoreRx (or any of its Affiliates) becoming the subject of any voluntary or involuntary receivership proceeding, bankruptcy, insolvency, liquidation, or assignment for the benefit of creditors, (iv) a determination by Bion (in its reasonable belief) that CoreRx (or any of its Affiliates) may become the subject of any voluntary or involuntary receivership proceeding, bankruptcy, insolvency, liquidation, or assignment for the benefit of creditors, and CoreRx's failure to provide assurances (within thirty (30) days after written notice thereof by Bion) reasonably satisfactory to Bion that any such proceeding or action will not occur, or (v) a determination by Bion (in its reasonable belief) that CoreRx may be unable to satisfy any of its obligations under this Agreement (which may be based on actual or perceived risks, including performance risks, ethical risks, financial solvency risks or other risks); in each case of any of the foregoing, even if as a result of Force Majeure.

**"cGMP"** means current good manufacturing practices as set forth in 21 C.F.R. §§ 210 and 211, or any Applicable Law, similar regulations, guides, guidances or directives, as amended from time to time.

**"Commercialize"** or **"Commercialization"** means the commercial exploitation of a Product through (i) manufacturing and selling the Product, (ii) assigning or licensing some or all the commercial rights to the Product to third parties, (iii) entering into a joint venture, partnership or other business arrangement regarding the manufacture, marketing and/or sale of the Product, or (iv) some other agreement or arrangement to produce revenue from the Product.

**"Commercially Reasonable Efforts"** means, with respect to each Party, the efforts and commitment of resources in accordance with such Party's reasonable business, legal, medical, and scientific judgment that are consistent with the efforts and resources such Party uses for other Product owned by it or to which it has exclusive rights, which are of similar market potential and at a similar stage in their life cycle, taking into account the competitiveness of the marketplace, the regulatory structure involved, the profitability of the applicable Product and other relevant factors, including technical, legal, scientific, medical, sales performance, and/or marketing factors. The term "Commercially Reasonable" shall have correlative meaning.

**"Confidential Information"** means all non-public information of any kind whatsoever (including without limitation, data, materials, compilations, formulae, models, patent disclosures, procedures, processes, projections, protocols, results of experimentation and testing, specifications, strategies,

2

techniques and all non-public Intellectual Property and Know-How ), and all tangible and intangible embodiments thereof of any kind whatsoever (including without limitation, materials, samples, apparatus, compositions, documents, drawings, machinery, patent applications, records and reports), which are disclosed by either party to the other Party including any and all copies, replication or embodiments thereof. The terms, subject matter and substance of this Agreement shall be deemed the Confidential Information of both Parties. Confidential Information shall not include information which: (a) is known to the receiving Party, as evidenced by the receiving Party's prior written records, before receipt thereof under this Agreement; (b) is disclosed to the receiving Party by a third person who is under no obligation of confidentiality to the disclosing Party hereunder with respect to such information and who otherwise has a right to make such disclosure; (c) is or becomes generally known in the public domain through no fault of the receiving Party; or (d) is independently developed by the receiving Party, as evidenced by the receiving Party's written records, without access to such information

**"Control" or "Controlled"** means, with respect to any information, intellectual property right or Regulatory Approval, possession by a party of the ability (whether by ownership, license or otherwise) to grant access, rights, title, possession, a license or a sublicense, as applicable, to such intellectual property right without violating the terms of any Third Party agreement, court order, or other arrangement or legal obligation.

**"CoreRx Equipment"** means all equipment and machinery used to (or otherwise necessary for), directly or indirectly, Manufacture Product,

**"CoreRx Intellectual Property"** means Know-How that is owned or Controlled by CoreRx or its Affiliates during the term of this Agreement and that is related to the Manufacture, use, sale, offering for sale or importing of the Products, including any tangible materials that are provided by CoreRx to CoreRx for use in the conduct of any Program. The term CoreRx Intellectual Property does not include any Know-How, which is, as of the Effective Date or later becomes, generally available to the public, excluding CoreRx Confidential Information or Know-How owned or Controlled by CoreRx that is publicly disclosed by a Third Party without the consent of CoreRx, and Know-How included in CoreRx Patent Rights.

"**CoreRx Patent Rights**" means those Patent Rights that Cover CoreRx Intellectual Property and are Controlled by CoreRx at any time during the term of this Agreement.

**"Cover"** means (a) with respect to a granted patent, a Valid Claim thereof would be infringed in the absence of a right, authorization, consent or license with respect to such claimed subject matter, or (b) with respect to a patent application that has not been granted, a Valid Claim thereof, that if granted, would be infringed in the absence of a right, authorization, consent or license with respect to such claimed subject matter.

**"Delivery"** or **"Deliver"** or **"Delivered"** means CoreRx's delivery of Product in accordance with the Delivery Terms.

**"Delivery Address"** means, with respect to a given order of Product, the address where the quantities of Product under such order are to be shipped, as set forth in the applicable order.

**"Delivery Date"** means the date by which Bion shall take delivery of Product as set forth in a Firm Order.

**"Delivery Terms"** means, with respect to a given Product, the delivery terms (based on Incoterms 2010) for the delivery of such Product.  Unless otherwise set forth in the Addendum for a given Product, the "Delivery Terms" for each Product shall be FCA the Delivery Address.

**"Dollar"** means the United States dollar.

**"DMF"** means the drug master file as described in 21 C.F.R. §314.420 containing detailed information concerning the synthesis, manufacture, analysis and stability of the API as required for the manufacture, importation, marketing and sale of the Product in the Territory.

3

**"Drug Product"** means a drug product as defined in 21 C.F.R. §314.3 for administration to human subjects.

**"Facility"** means with respect to a given Product, (a) CoreRx's M-1 facility located at 14205 Myerlake Circle, Clearwater, FL 33760 and/or M-2 facility located at 5777 Myerlake Circle, Clearwater FL 33760, and/or M-3 facility located at 5733 Myerlake Circle, Clearwater, FL 33760, as well as (b) such other facility where such Product may be Manufactured as approved by Bion in writing pursuant to Section 3.7.

**"FDA"** means the United States Food and Drug Administration or any successor agency thereto.

**"FD&C Act"** means the Food, Drug & Cosmetic Act of 1938 and applicable regulations promulgated thereunder, as amended from time to time.

**"Firm Order"** means a purchase order for a given Product issued by Bion (and/or its Affiliate, as applicable) under this Agreement and the relevant Addendum. Each Firm Order shall specify the quantity of Product ordered, the pack size, the required Delivery Date, and the Delivery Address (as well as any specific shipping instructions, if applicable), in each instance in accordance with this Agreement.

**"First Commercial Sale"** means the means the first transfer for value in an arms-length transaction to a Third Party distributor, agent or end user in a country within the Territory after obtaining all Regulatory Approvals necessary for such transfer in such country.

**"GAAP"** means United States Generally Accepted Accounting Principles in effect from time to time, consistently applied.

**"Governmental Authority"** means any court, tribunal, arbitrator, agency, legislative body, commission, official or other instrumentality of (i) any government of any country, or (ii) a federal, state, province, county, city or other political, administrative or regulatory subdivision thereof.

**"Know-How"** means, with respect to a given Product, proprietary information concerning: manufacturing protocols and methods, Product formulations, product specifications, processes, product designs, plans, trade secrets, ideas, concepts, manufacturing information, engineering and other manuals and drawings, standard operating procedures, flow diagrams, chemical, pharmacological, toxicological, pharmaceutical, physical and analytical, safety, quality assurance, preclinical data, quality control and clinical data, technical information, and research records.

**"Label**,**" "Labeled"** or **"Labeling"** shall refer to such labels and other written, printed or graphic matter, (i) upon a Product or any container or wrapper utilized with the Product, or (ii) accompanying a Product, including without limitation, package inserts.

**"Latent Defect"** means any deficiency (including any Product that fails to meet the representations, warranties or other quality requirements set forth in this Agreement) that was not discovered by Bion upon a reasonable inspection of the Product (based on physical inspection, identity test and review of the certificate of analysis).

**"Losses***"* means any and all liabilities, losses, fines (including criminal, administrative and civil fines), costs, damages or expenses, including reasonable attorneys' fees.

**"Manufacture"** or **"Manufacturing"** or **"Manufactured"** means, with respect to a given Product, all operations performed by CoreRx for the manufacture and commercial supply of such Product hereunder, including, as applicable, receipt (including testing) and storage of Materials, production, formulation, filling, visual inspection, packaging, labeling, handling, warehousing, quality control testing (including in-process, initial release and stability testing), release, as applicable, and shipping of Product, and also including such activities as may be specified in the ANDA approval and master batch records

**"Materials"** means all raw materials, including API, components (including packaging materials), and

4

other potential product-contacting items necessary for, or otherwise used in, the Manufacture of Product hereunder, as applicable.

**"Minimum Remaining Percentage"** means, with respect to a given Product, the minimum percentage of the maximum shelf-life for such Product that is required to be remaining at the time of Delivery of such Product hereunder, which shall in all cases be ninety (90%).

**"Orange Book"** means the *Approved Drug Product with Therapeutic Equivalence Evaluations* published by the FDA, as amended.

**"Overhead"** means all customary and usual operating expenses directly related to the Product incurred by and in support of the particular manufacturing cost centers, purchasing department and quality assurance operations, related to the Product (including labor, related payroll taxes and employee benefits), depreciation, general taxes, rent, repairs and maintenance, supplies, utilities and factory administrative expense.

**"Packaging"** means all primary containers, including bottles, cartons, shipping cases or any other like matter used in packaging or accompanying a Product.

**"Patent Rights"** means patents and patent applications, divisionals, continuations, continuations-in-part, reissues, extensions, supplementary protection certificates and foreign counterparts thereof.

**"Person"** means an individual, corporation, partnership, limited liability company, firm, association, joint venture, estate, trust, governmental or administrative body or agency, or any other entity.

**"Pharmacovigilance Expenses"** means expenses related to managing and administering to safety reporting system and its related activities for the sale of pharmaceutical products in the Territory as required by Applicable Law.

**"Proceedings"** means, without limitation, governmental, judicial, administrative or adversarial proceedings (public or private), litigation, suits, arbitration, disputes, claims, causes of action or investigations.

**"Product"** or **"Products"** means the particular Products to be supplied hereunder. Product supplied hereunder in liquid, powder or semi-solid form will be provided in final finished packaged form ready for marketing, distribution and sale or other use and Product supplied hereunder in capsule or tablet form will be provided in bulk format. For clarity, unless the context otherwise requires, references to "Product" in this Agreement shall be construed to refer to each given Product hereunder (and thus understood to mean a given Product on a "Product-by-Product" basis); provided, that to the extent the term "Product" is used more than one time in a given provision herein, the first such reference shall be understood to mean "a given Product" and each successive reference shall be understood to mean "such Product".

**"Quality Agreement"** means that certain quality agreement to be executed by the Parties (or their respective Affiliates) setting out the roles and responsibilities related to the Manufacturing of Product, as such agreement may be amended from time to time by the Parties.

**"Reference Product"** means all approved strengths and dosage forms that are approved for sale of the reference listed brand Drug Product, listed in the Orange Book or other relevant database of the FDA.

**"Regulatory Approval"** means the applicable approvals necessary to make Product, including applications submitted to the FDA, and all applicable product and/or establishment licenses, registrations, permits or other authorizations as may be necessary in connection with the applicable Product, and which are necessary for the commercial manufacture, commercialization, use, storage, importation, transport, promotion, pricing, distribution or sale of such Product in the Territory, including, without limitation, an ANDA

**"SDE Agreement"** means a safety data exchange agreement to be entered into by the Parties which addresses pharmacovigilance matters.

5

**"Specifications"** means, with respect to a given Product, the then most current specifications for both the API and the Product established by CoreRx and approved by Bion, as set forth in any applicable application for Regulatory Approval, or prior to the application, as embodied in applicable documents leading up to such application (e.g., in connection with a bioequivalence study), or as may be superseded in the future by an applicable Regulatory Approval for such a Product, including (as applicable) any supplements or amendments thereof and statements of pharmaceutical manufacturing, filling, storage and quality control procedures, submission batch specifications, and Labeling and Packaging specifications (as such may be revised from time to time in accordance with Applicable Laws) together with any additional specifications that may be agreed to between the Parties.

**"Territory"** means the United States, its territories and possessions including, without limitation, Puerto Rico and the District of Columbia.

**"Therapeutic Equivalent"** means a Drug Product that is therapeutically equivalent (as such term is defined in the Orange Book) to the Reference Product.

**"Third Party"** or **"Third Parties"** means any Person or entity other than a Party or its Affiliates.

**"Third Party Claim"** means any claim, demand, proceeding, action or cause of action by a Third Party.

**"Transfer Price"** means the price agreed by the Parties for a Product as specified in Attachment 2 hereof, and mutually amended from time to time by electronic email or other written format.

**"Validation"** or **"Validating"** or **"Validated"** means documented evidence that provides a high degree of assurance that the Manufacturing process controls are adequate to consistently produce a Product, in accordance with cGMPs and Bion Intellectual Property, and that meets the Product Specifications.

**"Valid Claim"** means a claim of (a) a granted patent which has not been disclaimed, abandoned or surrendered or declared invalid or unenforceable in a final, unappealable or unappealed decision of a judicial or administrative court, government agency or patent office of appropriate jurisdiction, or (b) a patent application which has not been formally terminated or abandoned, without right of appeal, without issuance of a patent, or has not been in active prosecution for more than five (5) years without issuance of a patent.

**"Violation"** means that either CoreRx, or any of its officers, directors, or subcontractors has been: (a) convicted of any of the felonies identified among the exclusion authorities listed on the U.S. Department of Health and Human Services, Office of Inspector General website, including 42 U.S.C. 1320a-7(a) (https://oig.hhs.gov/exclusions/authorities.asp); (b) identified in the OIG List of Excluded Individuals/Entities (LEIE) database (https://oig.hhs.gov/exclusions/index.asp) on said website or the U.S. General Services Administration's list of Parties Excluded from Federal Programs (http://www.sam.gov); or (c) listed by any US Federal agency as being suspended, debarred, excluded, or otherwise ineligible to participate in Federal procurement or non-Procurement programs, including under 21 U.S.C. 335a (http://www.fda.gov/ora/compliance_ref/debar/) (each of (a), (b) and (c) collectively the "**Exclusions Lists**").

**"Waste"** means any waste material, pollutant, contaminant, toxin, carcinogen, biohazard, radioactive or hazardous gaseous, liquid or solid material of any kind or any other waste that may or could pose a hazard to the environment or human health or safety, including any routine process waste or any by-product, arising from Manufacture of Product, including petroleum, petroleum hydrocarbons, petroleum products or petroleum by-products, radioactive materials, asbestos or asbestos-containing materials, gasoline, diesel fuel, pesticides, radon, urea formaldehyde, mold, lead or lead-containing materials, polychlorinated biphenyls and any other chemicals, materials, substances or wastes in any amount or concentration which are now or hereafter become defined as or included in the definition of

6

"hazardous substances", "hazardous materials", "hazardous wastes", "extremely hazardous wastes", "restricted hazardous wastes", "toxic substances", "toxic pollutants", "pollutants", "regulated substances", "solid wastes", or "contaminants" or words of similar import under Applicable Laws.

**1.2    Other Defined Terms**. The following terms shall have the meanings set forth in the section appearing opposite such term:

| | |
|---|---|
| **"Agreement"** | Preamble |
| **"Approved Manufacturer"** | Section 5.14 |
| **"Bion"** | Preamble |
| **"Bion Improvements"** | Section 10.4 |
| **"Bion Parties"** | Section 13.2 |
| **"Continuous Improvement Program"** | Section 6.4 |
| **"CoreRx"** | Preamble |
| **"CoreRx Parties"** | Section 13.1 |
| **"Data Set"** | Section 7.14 |
| **"Deficiency"** | Section 12.3 |
| **"Dispute"** | Section 16.7 |
| **"Effective Date"** | Preamble |
| **"Force Majeure Event"** | Section 16.9 |
| **"Offer Notice"** | Section 15.1 |
| **"Party(ies)"** | Preamble |
| **"Supply Interruption"** | Section 5.11 |
| **"Taxes"** | Section 6.8. |

## ARTICLE 2.  MASTER AGREEMENT; SCOPE OF WORK; DEVELOPMENT

**2.1    Master Agreement**. This Agreement establishes the general terms and conditions applicable to CoreRx's Manufacture and supply of the Product hereunder and the performance of activities under this Agreement with respect to the Product hereunder.ARTICLE 3.  FACILITY AND EQUIPMENT

**3.1    Implementation.** CoreRx will design the layout of the portion of the Facility used to Manufacture Products and equip the production line(s) for the Products located at the Facility in accordance with a jointly agreed plan and schedule as may be necessary to deliver a production line that meets the specifications for the production line and the Facility that are established by mutual agreement of the Parties. CoreRx shall not change the specifications for the production line specifications without consulting Bion. On not less than seven days' notice to CoreRx, Bion will have the right to inspect the progress of work at the Facility relating to the performance of this Agreement at all reasonable times during the implementation process and to confer with CoreRx to confirm compliance with the agreed specifications for the production line(s) for the Products, and Bion will be consulted concerning any matters that could cause a delay in completion of the production line(s) at the Facility.  Bion and CoreRx will, from time to time during the implementation process, confer regarding the quality standards for the layout of the production line operations.

**3.2    Maintenance and Operation**. CoreRx agrees, at its own cost, to maintain and operate the Facility, and the CoreRx Equipment used directly or indirectly to Manufacture Product, in an acceptable state of repair and operating efficiency, and in accordance with Applicable Law (including cGMPs) all applicable Bion Intellectual Property and all applicable Agency requirements.

**3.3    Qualification and Validation**. CoreRx, at its cost, shall be responsible for Validating the CoreRx Equipment (including conducting installation, operational and performance qualification), production, cleaning, packaging, process and any other appropriate steps performed at the Facility in accordance with the Bion Intellectual Property and as required by, and in accordance with, the Applicable Laws (including cGMPs); Validation procedures used by CoreRx immediately prior to the Effective Date may be used; provided that such procedures (i) are found to be acceptable to Bion, (ii)

7

meet applicable regulatory requirements and (iii) are found acceptable by Agency inspectors, if applicable. If Bion or any Agency finds CoreRx's Validation procedures to be unacceptable, then all Validation must be repeated to meet the criteria given in the Bion Intellectual Property and all applicable regulatory requirements and guidelines and to receive all Agency and Bion approvals. Notwithstanding the foregoing, if Bion reasonably finds, or any Agency finds, CoreRx's validation or qualification procedures to be unacceptable, then all validation or qualification must be repeated to meet the criteria given in the cGMPs and Bion Intellectual Property and, as applicable, to the satisfaction of the Agency or Bion, as applicable. CoreRx shall ensure the cleanliness of the equipment, using a cleaning validation procedure that complies with FDA requirements, prior to Manufacturing Product.

**3.4    Equipment Problem**. CoreRx agrees that in the event that either CoreRx Equipment is inoperable and such inoperation is expected to result in a delay of supply of Product to Bion, CoreRx shall notify Bion immediately in writing of such problem and CoreRx shall work to expeditiously rectify any such problems. CoreRx will inform Bion immediately if Delivery of any Firm Order will be delayed. With respect to all CoreRx Equipment, CoreRx shall be responsible for the costs of all maintenance and repairs, including all spare parts.

**3.5    Changes and Change Control**.

3.5.1 Notwithstanding anything herein to the contrary or in the Quality Agreement, except as otherwise agreed to by Bion in writing or as may be required to comply with the Applicable Laws (including cGMPs), CoreRx shall not amend, change, or supplement any of the following without Bion's prior written consent: (1) the Product Specifications; (2) the Materials; (3) the specifications for Materials that have regulatory impact (e.g., specification is listed in the regulatory filing) or the potential for quality impact on the Products; (4) the source of Materials that have regulatory impact (e.g., supplier is listed in the regulatory filing) or the potential for quality impact on the Products; (5) the Bion Intellectual Property or CoreRx Intellectual Property; (6) the equipment and machinery, other than in-kind replacements, used in the Manufacture of Product that have a direct impact on the quality of the Product; (7) the test methods used in connection with the Manufacturing of Product that have regulatory impact (e.g., method is listed in the regulatory filing) or the potential for quality impact on the Products; (8) the process for Manufacturing Product or Materials; (9) the cleaning process or procedures used at any time on the equipment and machinery used in the Manufacture of Products; and/or (10) any DMF for a Product.

3.5.2 Any change in any of the foregoing shall, in each instance, comply with the Applicable Laws (including cGMPs) and shall be made in accordance with the Quality Agreement. In the event that CoreRx is required to change any of the foregoing in order to comply with the Applicable Laws (including cGMPs) or such change is otherwise agreed to by Bion in writing, CoreRx shall: (x) immediately notify Bion of such change and use commercially reasonable efforts to implement such change as soon as reasonably practicable; (y) be responsible, at its expense, for ensuring that all Product Manufactured following such change meets the Product Specifications and the Product quality and yields achieved during the validation batches; and (z) provide Bion with all information with respect to the Manufacture of the Product in connection with such change needed to amend any regulatory filings (including ANDAs) maintained with respect to the subject Product. To the extent permitted by Applicable Laws, CoreRx shall continue to supply Bion with Product approved under any applicable existing DMF and/or Bion's existing regulatory filings (including ANDAs), as applicable, for the subject Product until such time as the Product Manufactured following such change is permitted under the amended regulatory filings therefor. In the event that CoreRx intends to change any of the foregoing, Bion shall work in a timely fashion to provide any required response to CoreRx.

3.5.3 Prior to implementing any such change, the Parties shall agree on the reasonable costs thereof; provided that CoreRx shall use commercially reasonable efforts to mitigate the costs thereof. Notwithstanding the foregoing, (i) if the change is required by Applicable Laws and such required change benefits the Manufacture of the Product, as well as the manufacture of other products by CoreRx at the Facility, then Bion shall be responsible for reimbursing CoreRx for a proportionate share of the

DB1/ 89530007.8

costs (based on the relative benefits to the Products hereunder and the benefits to such other CoreRx products taking into account the remaining duration of the Term), and in the event that the Parties disagree as to such costs or such proportionate share, the matter shall be resolved in accordance with Section 16.7 (and in making its determination the Parties shall take into account the remaining duration of the Term) and (ii) in all other cases, CoreRx shall bear all costs of such change.

**3.6    Discretionary Changes**. In the event that either Party desires to propose discretionary changes (i.e., changes which are not required by cGMPs or other Applicable Laws) during the Term to the Product Specifications or to the Manufacturing process (in each case, which discretionary changes would otherwise require consent as set forth in Section 3.6.1), the Parties shall discuss such discretionary changes and any Manufacturing issues identified by either Party in connection with implementing such change. In all cases, such discretionary changes shall be made in accordance with any change control procedures in the Quality Agreement to the extent applicable. The provisions of Sections 3.6.2 and 3.6.3 shall apply with respect to implementing any such discretionary change. Notwithstanding the foregoing, in all cases, the Product Specifications may be amended or supplemented from time to time by Bion upon written notice to CoreRx in accordance with any change control procedures in the Quality Agreement.

**3.7    Manufacturing at Facility**. CoreRx shall Manufacture all Product supplied hereunder at the Facility.  Manufacturing of Product may not be relocated from the Facility without Bion's prior written consent (it its sole discretion). Any such relocation of the Manufacturing of a given Product shall comply with the Applicable Laws (including cGMPs) and shall be made in accordance with Sections 3.6.2 and 3.6.3, and the Quality Agreement, to the extent applicable. Without limiting the foregoing, in the event that CoreRx desires to relocate the Manufacturing of any Product, in connection with such relocation, the Parties shall discuss any amendments to this Agreement as reasonably requested by Bion or the CoreRx (as the case may be), including with respect to (i) the Delivery Terms, (ii) provisions related to transfer of title, in each case, to take into account the relocation of such activities, and (iii) the procedures to be followed to secure any Regulatory Approvals required by in connection with such relocation. CoreRx shall be responsible for the costs of any relocation and any Product cost increase in connection with such relocation.

**3.9    Manufacture of Product**. For the avoidance of doubt, each change referred to in Section 3.5 or Section 3.6 or Section 3.7 shall be agreed to by the Parties (to the extent such agreement is required pursuant to Section 3.5 or Section 3.6 or Section 3.7), as applicable, including the implementation date of any such change, only as it applies to Manufacturing of Product.

**3.10    Storage**. CoreRx shall, in accordance with the Applicable Laws (including cGMPs), Bion Intellectual Property, and Product Specifications, maintain adequate storage accommodations for all of the Materials, Product and any other materials or products reasonably requested by Bion.  CoreRx shall notify Bion immediately whenever the inventories of Materials become insufficient to Manufacture the Product to meet the Delivery Date(s).  Products that have been quality control released by CoreRx shall be stored by CoreRx in separate segregated area until Delivered.

**3.11    Waste**. In connection with the Manufacture of Product hereunder, CoreRx shall be solely responsible for maintaining safety procedures in connection with the Manufacture of Product and for the generation, treatment, storage and/or disposal of Waste relating thereto, all of which shall comply with all Applicable Laws, including all applicable environmental and occupational safety and health requirements in the jurisdiction of the Facility. At the request of Bion, CoreRx shall provide a Certificate of Destruction to Bion upon completion of disposal of any Waste.

## ARTICLE 4. MATERIALS

**4.1    Materials**. CoreRx shall be responsible for procuring all Materials in adequate quantities to Manufacture each Product. CoreRx shall purchase adequate quantities of the Materials. Bion and CoreRx shall be responsible for negotiating the price for such Materials. For clarity, the Transfer Price already takes into account the costs of Materials, and Bion shall not be liable to CoreRx for any

increases in the cost of such Materials except as provided in Section 6.2.

**4.2    API Supply**. With respect to API for each Product, CoreRx shall take actions to ensure that all API supplied by the API manufacturer is manufactured in accordance with cGMP and all Applicable Laws and that the manufacturer has a successful history in satisfying all FDA requirement at the facility supplying the API; that the API is consistent with the applicable Product Specifications and Regulatory Approval (or associated application prior to approval) and is in compliance with applicable compendial (e.g. United States pharmacopeia) specifications for such API; and that the manufacturer of the API provides letters of authorization necessary or useful for the FDA to access the DMF for the API to the extent necessary or useful to support Bion's efforts to obtain and maintain Regulatory Approvals for the Product in the Territory. The Parties shall also take steps to identify an alternate source for API no event later than twelve (12) months after the filing of Regulatory Approval for the Product in the Territory.

## ARTICLE 5.  PRODUCT ORDERS; DELIVERY

**5.1    Manufacture and Supply of Product**.  Subject to the receipt of marketing approval, Bion hereby appoints CoreRx to Manufacture Product at the Facility. CoreRx accepts such appointment to Manufacture Product and to do such other acts as are herein authorized. Subject to the terms and conditions of this Agreement, CoreRx shall Manufacture and supply to Bion, and Bion shall purchase from CoreRx, Product that is ordered by Bion pursuant to Firm Orders submitted in accordance with this Agreement. Product shall be Manufactured and supplied by CoreRx in accordance with this Agreement and the relevant Firm Order. Subject to the terms and conditions of this Agreement, each Firm Order shall be considered a separate Firm Order and shall be valid and binding upon its submission by Bion in accordance with this Agreement. Bion shall purchase the Products exclusively from Core Rx and CoreRx shall Manufacture and supply the Products exclusively for Bion and not for any Third Party. Product Manufactured under this Agreement pursuant to Firm Orders shall be the exclusive property of Bion.

**5.2    Monthly Forecast**. During the Term of this Agreement, Bion shall provide to CoreRx, on a monthly basis, a non-binding rolling forecast of its Product requirements for the next twelve (12) months (or for the remainder of the Term, whichever is less).  The forecasts for the first three (3) months of any 12-month period shall represent binding purchase obligations of Bion with respect to the Products.

**5.3    Firm Orders**.  Bion shall place Firm Orders for its requirements of each Product at least ninety (90) days before the requested Delivery Date unless an alternative lead time for a given Product is otherwise agreed, in which event Bion shall place such Firm Order no later than the number of days equal to such lead time.  Firm Orders will be made on such form of purchase order or document as Bion may specify from time to time in writing; provided that the terms and conditions of this Agreement shall be controlling over any terms and conditions included in any Firm Order. Any term or condition of such Firm Order that is different from or contrary to the terms and conditions of this Agreement shall be void, unless otherwise agreed between the Parties in writing.

**5.4    Delivery Against Firm Orders**. CoreRx will acknowledge all Firm Orders within five (5) days following receipt of same and will deliver all orders within ninety (90) days following the date such Firm Order is received.  CoreRx will accept all Firm Orders for a particular calendar month to the extent that the Firm Order (a) does not exceed the amount of the binding Forecast for such calendar month by more than twenty percent (20%), and (b) requires delivery no less than ninety (90) days following the date on which CoreRx receives the Firm Order. CoreRx will not be in breach of this Section 5.4 if CoreRx's failure to supply Products is due to a Force Majeure event or if CoreRx's failure is limited to quantities in excess of the quantities specified in this Section 5.4; provided that CoreRx shall use Commercially Reasonable Efforts to Manufacture additional quantities of Product that exceed 120% of the binding forecast. CoreRx shall Deliver Product under each Firm Order no later than the Delivery Date specified in the applicable Firm Order; provided, however, that no Delivery of Product shall be

10

made more than two (2) Business Days in advance of the date specified for Delivery in a Firm Order without Bion's prior written approval. The Facility shall be indicated on documents accompanying each shipment of Product. In the event CoreRx will fail to meet a Delivery Date set forth in a Firm Order, CoreRx shall bear the incremental costs required for expedited transport above and beyond the cost incurred by the method outlined in the Delivery Terms.

**5.5    Cancellation or Deferral**.  Bion may cancel or defer any Firm Order, in whole or in part, without penalty, provided that such cancellation or deferral notice is received by CoreRx 15 days prior to CoreRx's scheduled commencement of the manufacture of the Product under such Firm Order. If Bion cancels or defers a Firm Order, in whole or in part, with less than the aforementioned notice, CoreRx shall use its best efforts to minimize any charges to Bion

**5.6    Delivery**. CoreRx shall effect Delivery of each Firm Order in accordance with the Bion Intellectual Property, Applicable Laws (including cGMPs) and the Product Specifications (and for clarity, CoreRx shall only effect Delivery of Product pursuant to a Firm Order). CoreRx shall Deliver or arrange for Delivery of Product to the Delivery Address and in accordance with the Delivery Terms, in order to fill such Firm Order. Each container shall be marked as to the identity of the Product, the quantity of Product, the related Firm Order number, the related Bion product code and any other information required by the Firm Order. CoreRx shall bear all risk of loss or damage with respect to Product(s) until such Product(s) are Delivered to Bion.  Each Delivery of Product shall be accompanied by a packing slip and a Material Safety Data Sheet for such Product. CoreRx shall also provide Bion with Agency certification, for those countries in which the applicable Agency is in the practice of requiring any such certifications.

**5.7    Transfer of Title**. Title to Product supplied hereunder shall pass to Bion contemporaneously with the transfer of risk of loss, as established by the Delivery Terms.

**5.8    Packaging**. All Product supplied hereunder shall be packaged in accordance with the Quality Agreement, and CoreRx shall ensure that such packaging is otherwise in accordance with the Bion Intellectual Property and Applicable Laws (including cGMPs), as well as the applicable Product Specifications. Without limiting the foregoing, all Product supplied hereunder shall also be labeled with a traceable batch number and the date of Manufacture. In addition, the packing slip shall contain gross, tare and net weights of the Product.

**5.9    Handling and Storage Prior to Delivery**. Prior to Delivery of Product to Bion, CoreRx shall handle and store all Product (including all Materials used in the Manufacture of such Product) in accordance with the Bion Intellectual Property and Applicable Laws (including cGMPs), as well as the applicable Product Specifications.

**5.10   Certificate of Analysis**. Prior to Delivery of Product CoreRx shall provide to Bion a certificate of analysis (COA) and a Certificate of Compliance (COC) for all manufacturing Batches. The COA shall contain the following information: (i) name, address, and contact phone number of the Facility where the Product was Manufactured, (ii) Product name, (iii) CoreRx batch number, (iv) date of Manufacture, (v) date of release, (vi) date of expiry, (vii) a list of each test performed, the acceptance limits as indicated in the Product Specifications, and the results obtained (and the COA should document actual values, where specifications are quantitative, and maintain the significant figures and rounding of numbers defined in the Product Specifications); and (vii) a release statement signed and dated by CoreRx indicating that the batch: (1) meets the Product Specifications; (2) was Manufactured in accordance with cGMPs, ANDAs, Applicable Laws, DMF (if applicable), the Bion Intellectual Property, and the controlled validated process; and (3) used only Materials that met their specifications. The COA should clearly state if reduced or skip lot testing is used to release the lot of Product provided to Bion. The CoreRx shall list only those process changes that required Bion review and approval in accordance with the Quality Agreement, manufacturing deviations (as defined in the Quality Agreement) and out of Product Specification (OOS) investigations applicable to the Product. In addition, a Certificate of Compliance shall be provided to Bion, which document shall be used to notify

11

Bion of any process changes, rework, reprocessing, significant manufacturing deviations, or OOS investigations associated with the Batch. CoreRx shall not Deliver Product unless and until such Product has been quality released by Bion based upon such COA. If quality control release of the Product is delayed for more than ninety (90) days due to an investigation, CoreRx will provide all necessary assistance to close any deviation in less than thirty (30) days thereafter.

**5.11  Supply Interruption**.  If CoreRx is unable to supply any Product ordered by Bion in accordance with the terms of this Agreement, then CoreRx shall use Commercially Reasonable Efforts to remedy the problem or secure an alternative source of supply within a reasonable time at no cost to Bion, and any such alternative source of supply shall be on terms substantially identical with the terms of this Agreement.  If CoreRx is unable to remedy the problem or secure an alternative source of supply within two (2) months after its initial failure to supply, then CoreRx shall consult with Bion and the parties shall work together to remedy the problem. If CoreRx is unable to remedy the supply problem after an aggregate period of three (3) months (or longer as agreed in writing by the Parties), commencing with the date upon which such failure to supply began, then Bion shall have the right (but not the obligation), to take the following actions with respect to the affected Product:

(i)      Bion may cancel any outstanding Firm Order for such Product, and Bion shall have no obligation to CoreRx for any Firm Order of the Product to the extent the Product has not been supplied as of the date of delivery of such cancelation notice; and/or

(ii)     if CoreRx is unable to the Product for a period exceeding one hundred and twenty (120) days from the confirmed delivery date on two consecutive occasions during any twelve (12) month period (**"Supply Interruption"**) then Bion may have the applicable Product manufactured by an Approved Manufacturer rather than by CoreRx.  With respect to any Supply Interruption, CoreRx shall reimburse Bion within thirty (30) days of written demand for any actual cover costs paid by Bion to any customer of Bion or its Affiliates pursuant to Bion's ordinary course contractual arrangement with such customer providing for payment to such customer in the event of a failure of supply of any Product by Bion or its Affiliates (**"Cover Costs"**), provided that Bion shall use Commercially Reasonable Efforts to mitigate such Cover Costs including by using any available safety stock and canceling orders promptly upon notice of a Supply Interruption.

**5.12  Business Failure**. If, from time to time during the Term, a Business Failure occurs, then Bion shall have the right (but not the obligation) to exercise the rights and remedies set forth in Section 5.12, and in connection therewith, the provisions set forth in Section 5.12 shall apply, mutatis mutandis.

**5.13  Subcontracting**. Prior to engaging a given Affiliate or Third Party subcontractor to perform any Manufacturing activities hereunder, CoreRx shall notify Bion thereof and discuss such subcontracting with Bion; provided that in all cases, CoreRx shall not subcontract any of its obligations hereunder, including any obligations to Manufacture any Product, to an Affiliate or Third Party without the prior written consent of Bion. With respect to any subcontracting (including to an Affiliate or a Third Party), CoreRx shall remain fully responsible and liable for all obligations hereunder, and fully guarantees and warrants the performance (in accordance with this Agreement) of any responsibilities so subcontracted, and assumes full vicarious liability for such activities performed by any subcontractor. Without limiting the foregoing, CoreRx shall cause any and all such subcontractors to comply with the applicable terms and conditions of this Agreement (including with respect to technology transfers (including as set forth in Section 5.14), intellectual property ownership provisions (including as set forth in Article 11) and any and all audit and inspection rights, including under Article 9). Any subcontracting of any Manufacturing or other activities hereunder shall be subject to the other applicable terms and conditions of this Agreement, in each case, to the extent applicable. Notwithstanding the foregoing, the use of a Third Party subcontractor shall not result in any increase in the Transfer Price, unless Bion expressly agrees in writing to an increase in the Transfer Price as a result thereof.

**5.14  Approved Manufacturer**. CoreRx shall, within thirty (30) days of Bion's request at any time after a Product has received Regulatory Approval, assist Bion in the designation, qualification and

12

maintenance of Bion or its' designee as an alternative supplier of such Product (each, an "**Approved Manufacturer**") in the event of a Supply Interruption. Bion shall require any Approved Manufacturer to agree in writing to observe the terms of this Agreement relating to confidentiality and the manufacture of Products. CoreRx will (i) provide the Approved Manufacturer copies of the physical embodiment of all processes, protocols, procedures, methods, tests and other know-how, relating to the Manufacturing of such Product and (ii) make available to the Approved Manufacturer via telephone or email, on a mutually convenient timetable, reasonable technical assistance with respect to the Manufacture of Product(s). In addition, upon the request of Bion from time-to-time during the Term, CoreRx shall provide reasonable technical assistance to the Approved Manufacturer with respect to such Approved Manufacturer's receipt, adoption and establishment of the manufacturing process for the Product, including: (a) allowing representatives of Approved Manufacturer to observe the manufacturing process at the Facilities, on a mutually convenient timetable, in connection with such transfer, (b) supplying analytical test methods and other testing know-how including method validation reasonably required to perform release testing or other testing as may be required by the applicable Agency or other regulatory authority, and (c) providing Approved Manufacturer with appropriate quantities of reference standards and samples related to such Product in order to facilitate its testing. In addition, (i) Approved Manufacturer shall have the right to reference CoreRx's (and its Affiliates') regulatory filings and such other regulatory submissions controlled by CoreRx (or any its Affiliates) reasonably necessary for the manufacture of such Product, and CoreRx (and its Affiliates) shall grant, and hereby does grant, to Approved Manufacturer such right of reference and (ii) Approved Manufacturer shall have the right to use any know-how owned or otherwise controlled by CoreRx or any of its Affiliates to make, have made and use the Products.

**5.15  Samples**. Upon Bion's request, CoreRx will provide to Bion, at no additional cost, samples of Product from a Bion-specified Batch in quantities reasonably requested by Bion for inspection, testing and analysis.  CoreRx will ship such samples as requested by Bion to a Bion designated address.

**5.16  Assistance with Regulatory Filings**. CoreRx shall be responsible for preparing documents to support ANDAs or other filing submissions for Products, as reasonably required by Bion, and shall provide a copy of such documents to Bion for review prior to submission to Agency by Bion. CoreRx shall continue to provide all such documents reasonably requested by Bion for maintenance of such ANDAs or other filing submissions. CoreRx shall continue to provide ongoing support reasonably requested by Bion for ANDA for each of the Products. CoreRx shall be responsible, at its cost, for receiving and maintaining any Facility licenses, authorizations, accreditations, permits and/or registrations granted or filed with an Agency, including those required for Manufacture of Products. CoreRx shall also provide Bion with Agency certification, for those countries in which the applicable Agency is in the practice of requiring any such certifications. For clarity, Bion shall be permitted to share information provided by CoreRx under this Section 5.16 with Affiliates and Third Parties (including sublicensees and Agencies) and such Affiliates and Third Parties shall be entitled to use such information in support for Products. If any Products are to be filed by Bion, in its sole discretion, in another country, and Bion selects to work with CoreRx in these countries, CoreRx will provide the support and cooperation for filing and work with Bion to get the Facility inspected and approved by the applicable country Agency, subject to mutually acceptable economic terms to be reached by the Parties.

**5.17  Product Supply.** CoreRx shall Manufacture and supply Products exclusively for Bion and not for any Third Party.

**5.18  Exclusivity**. Except as pursuant to this Agreement, neither Party nor their respective Affiliates shall for the duration of the Term of this Agreement develop or manufacture (including contract manufacturing) any other Drug Product for sale or distribution in the Territory that references the ANDA for the Reference Product or any foreign equivalent outside the Territory (regardless of whether such Product(s) are marketed under a generic, branded or private label) to any Third Party if either Party knows or has reason to know that such product will be sold or distributed in the Territory during the Term of this Agreement in the Territory. In providing or granting any rights to the Product outside the

13

DB1/ 89530007.8

Territory, the Parties shall obtain from each such grantee, licensee, beneficiary or acquiree (including Affiliates) of such rights their binding written agreement that they shall only sell and distribute the Product(s) within their specified territory, and not within any part of the Territory during the Term of this Agreement.

## ARTICLE 6.  FINANCIAL PROVISIONS

**6.1**     Except as explicitly provided in this Agreement, each Party shall be solely responsible for all costs and expenses associated with carrying out its responsibilities under this Agreement.  The Product shall be manufactured at CoreRx's manufacturing facility that is FDA inspected and approved, and meeting all FDA requirements for manufacturing, pilot batches (engineering batches), exhibit (submission) batches, conduct stability studies and produce stability reports in form and substance capable of supporting FDA approval of the ANDA for the Product. For the sake of clarity, all costs for any external, out-of-pocket development costs including but not limited to: finished Product formulation development, finished Product analytical method transfer, project management, equipment qualification, engineering batch and registration batch engineering, pilot, pivotal or exhibit batches (excluding API required for such development batches) hereafter shall be borne by CoreRx.

**6.2     Transfer Price**. For each unit of Product ordered by Bion under Firm Orders hereunder and supplied by CoreRx to Bion in accordance with the terms and conditions of this Agreement, Bion shall pay CoreRx the Transfer Price, which payments shall be made in accordance with Section 6.8. The Transfer Price shall be established by mutual agreement of the Parties on an annual basis one (1) month prior to the commencement of Bion's next fiscal year, and once established shall remain in effect for the applicable fiscal year. When establishing the Transfer price for any fiscal year, the Parties shall each seek to identify opportunities to negotiate more favorable Materials prices. Notwithstanding the foregoing, the Transfer Price may be increased during a fiscal year if the cost of a Material increases by 10% of the cost for that Material upon which the most recent Transfer Price was based

**6.3     Productivity/Cost Improvements.** CoreRx agrees to use Commercially Reasonable Efforts to identify and implement all potential areas of cost improvement. At the request of Bion, appropriate representatives of Bion and CoreRx shall meet from time to time during the Term to discuss and agree on (a) objectives for a continuous improvement program, including cost improvements ("**Continuous Improvement Program**") and (b) the means of measuring and implementing the results of the Continuous Improvement Program. Progress against objectives shall be measured quarterly. CoreRx shall use all reasonable endeavors to achieve the agreed objectives and targets identified for the relevant period. The net benefits of cost reductions and improved efficiencies shall be shared equally by the Parties, including as reductions to the Transfer Price under this Agreement. In such case, the Parties shall reasonably discuss and agree on the amount of such reductions to the Transfer Price.

**6.4     Records**. Each Party shall keep and maintain or cause to be maintained books and records pertaining to its activities in connection with this Agreement.

**6.5**     R e s e r v e d .

**6.6     Invoicing, Payment and Taxes.** (a) Upon shipment of a Product to Bion, CoreRx shall submit invoices therefor to Bion. Bion shall pay each invoice within sixty (60) days from the date the Product arrives at Bion's designated port.  All payments under this Agreement shall be made in U.S. Dollars.

14

(b) CoreRx shall be liable for all income and other taxes (including interest) ("**Taxes**") imposed upon any payments made by Bion to CoreRx under this Agreement.

## ARTICLE 7. QUALITY

**7.1    Compliance and Investigation**. CoreRx shall Manufacture and supply Product in accordance with the Quality Agreement, the Product Specifications and Applicable Laws (including cGMPs) and strictly in accordance with the Bion Intellectual Property and any applicable DMF.  CoreRx shall notify Bion immediately of any difficulty in Manufacturing Product in accordance with all of the terms and conditions of this Agreement. Bion may, at its option, investigate the cause of any failure, or require CoreRx to do so and provide Bion with a written report summarizing the results of CoreRx's investigation. CoreRx shall complete any quality investigation within the number of days established in the Quality Agreement.

**7.2    Audits and Inspection of Facility**.  From time to time as requested by Bion, CoreRx shall permit one or more qualified technical specialists from Bion (or its designee), upon reasonable prior notice and during normal business hours, to conduct audits (including quality, safety and environmental) and other inspections of the Facility or any other facility which is proposed to be used to Manufacture Product, provided such audits shall not last more than five (5) days per site (or such longer period of time as Bion (or its designee) may reasonably require to conduct such audit or inspection). Bion shall not be obligated to pay CoreRx for such visits, but Bion shall be solely responsible for its out-of-pocket costs to conduct such site visits.  Observations and conclusions of Bion's audits and inspections will be issued to CoreRx.  CoreRx shall provide a written response within fifteen (15) Business Days of receipt of such observations and conclusions. The Parties will discuss such response and promptly agree on corrective action to be implemented. The agreed corrective action shall be implemented by CoreRx, at CoreRx's expense. If reasonably necessary (as determined by Bion), Bion shall have the right, at CoreRx's expense, to direct any actions with respect to implementation of corrective action with the assistance of CoreRx in order to ensure that any such corrective actions are appropriately completed. Bion may, in its sole discretion, suspend any Firm Orders until the agreed corrective action has been fully implemented.  Bion shall have the right to review all relevant documentation.

**7.3    Quality Control Tests**. CoreRx shall perform, at its quality control laboratories, such quality control tests as are indicated in the Bion Intellectual Property and the Product Specifications, in accordance with the test methods and procedures described by Bion. The final release of each Batch of Product shall be done by Bion following the process specified in the Quality Agreement, and the procedures to be followed in the event of a Batch failure are specified in the Quality Agreement. Core Rx shall be responsible for any Batch failure unless the failure is not associated with any testing Manufacturing or packaging process carried out by CoreRx as provided in this Agreement.

**7.4    Production Batch Failure**. Should any production Batch fail to meet the quality control Specifications, or be produced in a manner not corresponding to the Bion Intellectual Property or Bion-approved Manufacturing documents or not in accordance with Applicable Laws (including cGMPs), CoreRx shall immediately notify Bion.  Such Batch shall not be Delivered hereunder.

**7.5    Retention Samples**. CoreRx is responsible for maintaining, retaining and storing retention samples sufficient to perform full specification analyses, which storing and testing are as indicated in the Bion Intellectual Property and/or the Specifications, as applicable. Such amounts shall be retained for the longer of (i) the expiration period of the Product plus one (1) year or (ii) such longer period of time as may be required by the Applicable Law.

**7.6    Notification of Agency Action**. Each Party shall immediately notify the other Party of any information such Party receives regarding any threatened or pending action by any Agency that has the potential to impact any Product supplied to Bion hereunder, including any Agency non-approval or regulatory action.  Upon receipt of any such information, the Parties shall consult in an effort to arrive

15

at a mutually acceptable procedure for taking appropriate action; provided, however, that nothing contained herein shall be construed as restricting the right of either Party to make a timely report of such matter to any Agency or take other action that it deems to be appropriate or required by Applicable Law.

**7.7   Safety or Efficacy Claims**. Each Party shall immediately notify the other Party of any information of which it is aware concerning Product supplied to Bion which may affect the safety or efficacy claims or the continued marketing of the Product. Any such notification will include all related information in detail. Upon receipt of any such information, the Parties shall consult in an effort to arrive at a mutually acceptable procedure for taking appropriate action; provided, however, that nothing contained herein shall be construed as restricting the right of either Party to make a timely report of such matter to any Agency or take other action that it deems to be appropriate or required by Applicable Law. Each Party will notify the other immediately of any health hazards with respect to Product which may impact employees involved in the Manufacturing of Product.

**7.8   Complaints**. Each Party shall immediately notify the other Party of any complaints received by such Party concerning a Product supplied hereunder. CoreRx shall investigate complaints as requested by Bion and shall take corrective action to avoid future occurrences.

**7.9   Agency Inspection**. CoreRx hereby agrees to notify Bion in writing immediately of any proposed visit or inspection by any governmental authority, including, any Agency (such as the FDA, DEA, etc.) or any environmental regulatory authority if such visit or inspection has the potential to impact Product, and agrees to permit one qualified representative of Bion to be present on site if requested by Bion. CoreRx hereby agrees to advise Bion, without undue delay, after the commencement of any unannounced visit or inspection relating to the Facility or the Manufacture of Products by any governmental authority (even if such visit constitutes a pre-approval inspection or similar review), including any Agency or any environmental regulatory authority, and agrees to permit one or more qualified representative(s) of Bion to be present on site for the portion of the audit affecting Product if requested by Bion. If Bion is not present during such proposed or unannounced visit or inspection, CoreRx shall provide brief daily summary reports during the course of the inspection to the extent the inspection relates to the Manufacture of Products. CoreRx shall promptly provide a written summary report of the results of the inspection to Bion in English to the extent the inspection relates to the Manufacture of Products. CoreRx shall promptly (and in no event later than one (1) Business Day) furnish Bion summaries of all observations, notes, reports, documents or correspondence with respect to any Agency requests or inspections of the Facility related to the Manufacture of Products, as well as a copy of each such observation, notes, report, document or correspondence and any proposed corrective actions, responses and other changes arising out of such review or inspection by such Agency. To the extent any of the Agency observations or requests relate to the Facility or the Manufacture of Products, CoreRx shall fully cooperate with Bion and take into consideration any of Bion's inputs, suggestions and other corrective measures to address any of such Agency's concerns and permit one or more qualified representative(s) of Bion to observe and assist CoreRx in responding to such Agency's observations. CoreRx shall fully apprise Bion of any corrective measures effectuated as a result of any inspection and permit one or more qualified representative(s) of Bion to ensure such corrective measures have adequately been implemented in accordance with the timelines and criteria and other commitments made by CoreRx to the Agency in question.

**7.10   Restricted Categories**. CoreRx hereby declares and covenants that as of the Effective Date of this Agreement it is not, and during the Term shall not, produce, package, label, warehouse, quality control test (including in-process, release and stability testing), release or ship any chemical entity classified as penicillin's, hormones, alkaloids, Beta-lactam antibiotics such as cephalosporin's, carbapenems or monbactams; sex hormones, cytotoxic or cytostatic anti-neoplastic agents; other highly active compounds; biological preparation containing live viruses or microorganisms; or other toxic,

16

non-drug substances or live agents "technical poisons" including pesticides, herbicides, fungicides, in the Facility.

**7.11  Labeling**. Bion may specify required labeling on Product and all components and containers. CoreRx will comply with all specified labeling as to each Product and each component and container and shall use only labeling which has been approved in writing by Bion in advance. CoreRx shall not use Bion labels on any products except Product for which such use has been approved by Bion. CoreRx shall not modify the Bion labels in any way without Bion's prior written consent.

**7.12  Materials**. CoreRx shall maintain an adequate system, which functions as a risk-based assessment of its suppliers of Materials that are components of or may come in contact with the Product (such as primary packaging materials, excipients, and APIs). Furthermore, Bion may, at its option, independently conduct audits or participate in CoreRx audits (including quality, safety and environmental) of CoreRx's suppliers of such Materials, on a routine or for-cause basis. As a result of such audits, if necessary, Bion shall have the right to direct CoreRx to disqualify a supplier as a source of Materials.  CoreRx shall identify a new supplier as a source of Materials and replace the disqualified supplier with such new supplier, pursuant to the provisions set forth in Section 3.6. Notwithstanding the foregoing, CoreRx shall be fully responsible for sourcing and testing of Materials, qualification and management of its supplier(s) of Materials.

**7.13  Batch Records**. CoreRx shall provide Bion with all Batch records and any investigation or deviation reports related to Product for each Batch. Investigations into process deviations must be approved by Bion.

**7.14  Data Sets**. CoreRx will on an ongoing basis collect, graph, trend, and analyze data of and from the Manufacturing of each Batch of Product, and the accumulated data from all Batches of Product shall be the data set (**"Data Set"**). CoreRx will update the Data Set promptly following the Manufacture of each Batch of Product. The Data Set will include the following Manufacturing data for each Batch of Product, as may be modified by Bion from time to time: yield; cycle-time; lot numbers of Materials used; in-process testing results; Critical Process Parameters (or CPPs); Critical Quality Attributes (or CQAs); and Proactive Process Analysis (PPA).  On or before the last day of each calendar month during the Term, CoreRx will update the Data Set (in graphical format, as appropriate) in writing to include each Batch of Product Manufactured during the month; complete review and approval of the Data Set by CoreRx management; and submit the approved Data Set in writing to Bion for review. The Parties acknowledge the Data Set will, among other things, provide the basis for ongoing process improvement and trend analysis. In the event that a deviation occurs during the Manufacturing of a Batch of Product, as part of the investigation of such deviation pursuant to Section 12.3, CoreRx will update the Data Set to include the data for such Batch within seven (7) calendar days of the occurrence or identification of such deviation, whichever is later; and CoreRx will generate run charts of data (from the updated Data Set) which include data from not less than ten (10) consecutive batches of Product Manufactured immediately preceding the deviation event to establish a baseline of Manufacturing performance against which the deviation Batch data may be compared. CoreRx shall be responsible for ensuring, verifying and delivering this Data Set.

**7.15  Quality Agreement**. The Parties shall negotiate in good faith and enter into a Quality Agreement with respect to the Manufacture of such Product within a reasonable time prior to the anticipated First Commercial Sale of the first Product. The Parties shall also negotiate in good faith and enter into a Safety date Exchange Agreement covering safety data exchange, adverse event reporting, patient support and management of patient compliance concerning the Products.

17

## ARTICLE 8.  REGULATORY MATTERS

**8.1    Records**.  CoreRx shall retain all records related to the (i) Manufacture of Product(s) for a period of not less than two (2) years from the expiration of the approved shelf life of the Product(s) to which said records pertain (or such longer period as required by Applicable Law) and (ii) Manufacture of Validation batches for five (5) years past the effective date of termination of this Agreement or two (2) years beyond the approved shelf life of the applicable Product(s), whichever is shorter (or such longer period as required by Applicable Law) (each such period shall be referred to as the "**Retention Period**"). CoreRx shall provide Bion with complete and accurate copies of the appropriate documents for each production Batch, upon Bion's request. CoreRx shall, at the end of the Retention Period, either destroy the records or return the records to Bion at Bion's written instructions.

**8.2    Audit Rights**. CoreRx's Records shall be open to inspection and subject to audit and/or reproduction, during normal working hours, by Bion or its authorized representative (i) as required by governmental authorities or (ii) as may desirable by Bion for any other valid business purpose.  CoreRx shall preserve such Records for a period of ten (10) years after the end of the Term or for such longer period as may be required by Applicable Law. For the purpose of such audits, inspections, examinations and evaluations, Bion or its authorized representative shall have access to such records beginning on the Effective Date and continuing until ten (10) years after the satisfaction of CoreRx's obligations under this Agreement. In addition, CoreRx shall provide adequate and appropriate workspace for Bion or its authorized representatives to conduct such audit. Bion or its authorized representative shall give CoreRx reasonable advance notice of an intent to audit.

**8.3    Subcontractors**. For clarity, CoreRx shall ensure that any subcontractor performing any Manufacturing activities complies with the foregoing provisions of Sections 8.1 and 8.2.

**8.4    Decisions on Recalls**. As between the Parties, Bion shall have the sole and absolute discretion as to whether to institute a recall or withdrawal Product (whether instituted at the request of an Agency or voluntarily instituted by Bion for any reason); provided that, to the extent practical, Bion shall notify CoreRx thereof prior to implementation. Notwithstanding anything to the contrary contained herein, CoreRx shall have no right to institute any recall or withdrawal of any Product.  CoreRx agrees to abide by all decisions of Bion to recall or withdraw Product.

**8.5    Recalls**. In the event that Product(s) are recalled or withdrawn, CoreRx shall fully cooperate with Bion in connection with such recall or withdrawal. If such recall or withdrawal is caused by Product that contains a Deficiency or by CoreRx's negligence or breach of this Agreement, CoreRx shall reimburse Bion for (i) all costs associated with the manufacturing of the recalled or withdrawn Product, including the Transfer Price for Product and other formulation, packaging and distribution expenses o Product (and including materials used in connection therewith), and (ii) all expenses incurred in connection with such recall or withdrawal.

**8.6    Marketing Authorizations**. As between the Parties, Bion (or its designee) shall have the sole right to prepare and file ANDAs for the Products with the applicable governmental authorities.  Without limiting CoreRx's obligations under Section 5.16, CoreRx shall provide Bion with such information and assistance as Bion may reasonably request for purposes of applying for and maintaining any ANDAs for Product including providing Bion with all reports, authorizations, certificates, methodologies, specifications and other documentation in the possession or under the control of CoreRx (or any of its Affiliates) relating to the Manufacture of Product or any component thereof for such filings.

**8.7    DMFs**. Without limiting CoreRx's obligations under Section 5.16, CoreRx shall provide Bion with such information and assistance as Bion may reasonably request for purposes of applying for and maintaining any DMFs, as applicable, for Product Manufactured and supplied under this Agreement.

18

**8.8    Disclosure of Audits**.  CoreRx acknowledges that governmental authorities (including Agencies) may, in conducting an inspection of Bion, request copies of reports of Bion audits of its suppliers. For clarity, in response to such a request, Bion may provide to the governmental authority (including any Agency) the report of any compliance audit conducted in accordance with this Agreement or the Quality Agreement.

## ARTICLE 9. COMMERCIALIZATION

**9.1    Marketing, Sales and Distribution Obligations.** Bion shall be responsible for all decisions regarding Commercialization of the Product or Products.

**9.2    Commercialization Outside the Territory.** For the avoidance of doubt, it is understood and agreed that Bion, as the holder of the ANDA for each Product shall have the right to commercialize any Product that has received final Regulatory Approval for sale in the Territory in countries that are outside the Territory, provided that If Bion requests that CoreRx provide a technology transfer for the production of the applicable Product outside the Territory for Commercialization outside the Territory, then CoreRx shall receive a technology transfer payment from the new manufacturer or the entity marketing the Product in the new countries.

## ARTICLE 10. INTELLECTUAL PROPERTY

**10.1    Bion Intellectual Property**. As between the Parties, Bion shall own all right, title and interest in and to the Bion Intellectual Property (including any and all information and data contained therein), and CoreRx is not acquiring any ownership interest in any Bion Intellectual Property (including any and all information and data contained therein) hereunder.

**10.2    CoreRx Intellectual Property**. As between the Parties, CoreRx shall own all right, title and interest in and to the CoreRx Intellectual Property, and Bion is not acquiring any ownership interest in any CoreRx Intellectual Property hereunder. CoreRx agrees and acknowledges that no information, know-how, data or other intellectual property, other than the Bion Intellectual Property, shall be used by or on behalf of CoreRx in the Manufacture of Products hereunder. If CoreRx uses any CoreRx Intellectual Property in the Manufacture of any Product then Bion shall have a non-exclusive, perpetual, irrevocable, paid-up and royalty-free license, including the right to grant sublicenses, under such CoreRx Intellectual Property to the extent necessary or useful for Bion to Develop, Manufacture or Commercialize the applicable Product.

**10.3    Grant of License.** Bion hereby grants to CoreRx a non-exclusive license to use, the Bion Intellectual Property solely to Develop the Products in accordance with this Agreement and to Manufacture Products for Bion in accordance with this Agreement. Unless otherwise consented to by Bion in writing, (i) CoreRx shall not use the Bion Intellectual Property (or any Specifications or   any DMF) for any purpose other than the the Manufacture of Products for Bion hereunder and (ii) CoreRx shall not use any proprietary and/or confidential information or data of or provided by Bion or its Affiliates in the Manufacture of Product hereunder other than the Bion Intellectual Property.

**10.4    Improvements**. (a) Unless otherwise agreed in writing, all discoveries, improvements and/or inventions by CoreRx or any of its Affiliates, whether patentable or not, resulting from CoreRx's or its Affiliates' use of the Bion Intellectual Property or the Manufacture of Products shall be the sole and exclusive property of Bion ("**Bion Improvements**"), and shall be deemed to be Bion Confidential Information. For the avoidance of doubt, Bion Improvements shall automatically become part of Bion Intellectual Property and shall be subject to the license referenced in Section 10.3.

(b) Each Party shall promptly notify the other Party if it becomes aware of any Bion Improvement, and CoreRx shall reasonably assist Bion in protecting Bion's proprietary rights any Bion Improvement. CoreRx hereby represents and warrants to the Bion that all of its employees, officers, independent contractors, and agents who may perform activities under this Agreement have executed agreements (prior to performing any activities under this Agreement) requiring assignment to CoreRx of all

19

intellectual property made in performing activities under pursuant to this Agreement. CoreRx shall (at Bion's reasonable expense) take all reasonable additional actions and execute such agreements, instruments, and documents as may be reasonably required to perfect Bion's right, title, and interest in, to, and under Bion Improvements.

**10.5  IP Enforcement Matters**. If either Party learns of any actual or threatened infringement or misappropriation or any attack on the validity or enforceability by a Third Party with respect to Bion Intellectual Property anywhere in the Territory, such Party shall promptly notify the other Party and shall provide such other Party with available evidence of such events. Bion shall have the first option to pursue any enforcement or defense of Bion Intellectual Property against infringement or misappropriation, including defense against a declaratory judgment action alleging invalidity or non-infringement of any of the Bion Intellectual Property; provided, that Bion pays all costs and expenses related to the same, keeps CoreRx reasonably informed of its progress and provides CoreRx with copies of any substantive documents related to such proceedings and reasonable notice of all such proceedings. Any recovery of damages or other sums recovered in a proceeding or action covered by this Section 10.5 shall be applied first in satisfaction of any unreimbursed expenses and legal fees of Bion and next, if applicable, in satisfaction of the costs and expenses incurred by CoreRx in connection therewith, including reasonable attorneys' fees involved in the prosecution and/or defense of any proceeding or action and, if after such reimbursement any funds shall remain from such damages or other sums recovered, the remaining recovery shall be retained one hundred percent (100%) by Bion. In any infringement or misappropriation suit that Bion may institute to enforce Bion Intellectual Property, or in any declaratory judgment action alleging invalidity, non-infringement or non- misappropriation of any Bion Intellectual Property brought against CoreRx or Bion, the other Party shall, at the request and expense of the Party initiating or defending the suit or action, cooperate and assist in all reasonable respects, having its employees testify when requested and making available relevant records, papers, information, specimens and the like. In addition, upon the reasonable request of the Party instituting an action under this Section 10.5, or if required by Applicable Law, the other Party shall join such action and shall be represented using counsel of its own choice, at the requesting Party's expense; provided, that if Bion does not initiate an action hereunder on the advice of outside patent counsel, then CoreRx may not require Bion to join such action but CoreRx may have Bion join such action as an involuntary Party, but Bion shall not be required to participate in such action.

10.6  **IP Defense Matters**. If any notice of infringement or misappropriation is received by, or a suit is initiated against, Bion or CoreRx by a Third Party concerning the Manufacture, use, importation, offer for sale, or sale of a Product in the Territory, the Parties shall consult in good faith regarding the best response before either Party responds to the Third Party.


### ARTICLE 11. CONFIDENTIALITY AND PUBLIC DISCLOSURE

**11.1  Confidential Information.** (a) During the Term of this Agreement and for five (5) years thereafter without regard to the means of termination, each Party (i) shall maintain in confidence all Confidential Information of the other Party; (ii) shall not use such Confidential Information for any purpose except as permitted by this Agreement; and (iii) shall not disclose such Confidential Information to anyone other than those of its Affiliates, sublicensees, prospective sublicensees, employees, consultants, agents or subcontractors who are bound by written obligations of nondisclosure and non-use no less stringent than those set forth in this Article 11 and to whom such disclosure is necessary in connection with such Party's activities as contemplated in this Agreement. Each Party shall ensure that such Party's Affiliates, sublicensees, prospective sublicensees, employees, consultants, agents and subcontractors comply with these obligations. Each Party shall notify the other promptly on discovery of any unauthorized use or disclosure of the other's Confidential Information.

(b) Notwithstanding the provisions of Section 11.1(a), a receiving Party may disclose Confidential Information of the disclosing Party to the extent such disclosure is (i) made in response to a valid order

20

or subpoena of a court of competent jurisdiction or other governmental body of a country or any political subdivision thereof of competent jurisdiction; provided, that receiving Party provides the other Party with prior written notice of such disclosure (if practicable) in order to permit the other Party to seek a protective order or other confidential treatment of such Confidential Information; and provided further that any Confidential Information so disclosed will be limited to that information that is legally required to be disclosed in such response to such court or governmental order or subpoena; (ii) otherwise required by Applicable Laws; provided, that receiving Party provides the disclosing Party with prior written notice of such disclosure (if practicable) in order to permit the disclosing Party to seek a protective order or confidential treatment of such Confidential Information; and provided further that any Confidential Information so disclosed will be limited to that information that is legally required by Applicable Law to be disclosed; (iii) made by the receiving Party to a Regulatory Authority, as required to obtain or maintain Regulatory Approvals; provided that reasonable efforts shall be used to ensure confidential treatment of such Confidential Information; (iv) made by the receiving Party to a Third Party as may be necessary or useful in connection with the Commercialization of a Product (including the manufacture of a Product); provided the Third Party is bound by written confidentiality obligations no less protective that those set forth in this Agreement; (v) made by receiving Party to a U.S. or foreign tax authority to the extent legally required by Applicable Laws to be disclosed; (vi) made by receiving Party to its representatives or to Third Parties in connection with sublicensing or financing activities of the receiving Party; provided that the Third Party is bound by written confidentiality obligations no less protective that those set forth in this Agreement; (vii) made by receiving Party or any of its representatives in the filing or publication of Patent Rights relating to the Product to the extent such disclosure in the filing or publication of Patent Rights is reasonably necessary for support of the Patent Rights; (viii) made by receiving Party to comply with Applicable Laws related to securities laws disclosure requirements or any disclosure requirements of any applicable stock market or securities exchange; or (ix) made by receiving Party in compliance with Section 11.2.

**11.2 Press Releases and Public Announcements**. No public announcement or disclosure may be made by either Party with respect to the subject matter of this Agreement without the prior written consent of the other Party; provided, that the provisions of this Section 11.2 will not prohibit (a) any disclosure required by any applicable legal requirement, including any legal requirement or listing standard of any exchange or quotation system on which the disclosing Party's securities are listed or traded or to be listed or traded (in which case the disclosing Party will provide the other Party with the opportunity to review in advance the disclosure and to contest the same, including reasonable opportunity to seek a protective order or to seek confidential treatment of such disclosures under Rule 24b-2 of the Securities Exchange Act of 1934, as amended), (b) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement, (c) any disclosure made by Bion or CoreRx to their respective employees, collaborators, licensors, licensees, contract research organizations, business partners, investors, potential investors, lenders and potential lenders provided the person receiving the disclosure has undertaken a confidentiality obligation to Bion or CoreRx, as the case may be, substantially similar to the confidentiality obligations the Parties have undertaken to each other under this Agreement, or (d) any disclosure made pursuant to a press release in a form mutually agreed to by the Parties (or any other subsequent disclosure containing substantially similar information).

### ARTICLE 12. REPRESENTATIONS AND WARRANTIES

**12.1 General Representations and Warranties**. Each of Bion and CoreRx represents, warrants, covenants and agrees that, at all times during the Term, (a) it is a corporation duly organized and validly existing and in good standing under the laws of its jurisdiction of organization, (b) it is qualified or licensed to do business and in good standing in every jurisdiction where such qualification or licensing is required, (c) it has the corporate power and authority to execute, deliver and perform its obligations under this Agreement, and the execution, delivery and performance of this Agreement by it has been duly authorized by all necessary corporate action, (d) this Agreement has been duly executed and

DB1/ 89530007.8

delivered by it, and (e) this Agreement constitutes the valid and binding obligations of it, enforceable against it in accordance with its terms except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting creditor's rights generally, or general principles of equity.

**12.2   Representations, Warranties and Covenants for Product**. CoreRx represents, warrants and covenants that all Product shall, at the time of Delivery, (a) be Manufactured in accordance with, and shall meet, the Product Specifications, (b) be Manufactured in accordance with all Applicable Laws (including cGMPs) in effect on the day of Delivery, (c) be Manufactured in accordance with any applicable DMF, (d) be Manufactured in accordance with the Bion Intellectual Property (unless otherwise agreed by the Parties writing or in accordance with the Quality Agreement), (e) not be adulterated or misbranded within the meaning of the U.S. Federal Food, Drug and Cosmetic Act (the "**Act**"), or any similar Applicable Law of any other jurisdiction, (f) not be an article that may not, under the provisions of the Act, or any similar Applicable Law of any other jurisdiction, be introduced into stream of commerce, and (g) have at least the Minimum Remaining Percentage of its maximum shelf-life, as evidenced by expiry dating, remaining.

**12.3   Inspection**. Bion (or its agent) shall inspect at Bion's discretion (based minimally on physical inspection, identity test and review of the certificate of analysis provided by CoreRx pursuant to Section 5.10) the Product following Delivery for variances and defects. If Bion claims that a shipment of Product did not, at the time of Delivery, meet the representations, warranties or covenants specified in Section 12.2 or the quality requirements set forth in Article 8 (a "**Deficiency**"), Bion shall notify CoreRx based on the foregoing inspection within **[**ninety (90)**]** days after receipt of such Product at Bion's (or its designee's) site, which notice shall provide the quantities affected, the basis for the claim and other information reasonably necessary for CoreRx to assess the claim. Notwithstanding the foregoing, if Bion claims that the Deficiency is a Latent Defect, Bion shall have the obligation to provide such notification to CoreRx in writing within ninety (90) days after Bion's discovery of such Latent Defect (or within ninety (90) days after Bion is notified in writing by a Third Party of such Latent Defect, if later). If Bion and CoreRx are unable to agree as to whether such Product contains a Deficiency, the Parties shall cooperate to have the Products in dispute analyzed by an independent testing laboratory of recognized repute selected by Bion and approved by CoreRx, which approval shall not be unreasonably withheld. The results of such laboratory testing shall be final and binding on the Parties on the issue of whether such Product contains a Deficiency. Such testing shall be for the determination of financial liability only and shall not determine releasability of Product. If the Products are determined to not contain a Deficiency, then Bion shall bear the cost of the independent laboratory testing and pay the Transfer Price with respect to the Products in accordance with this Agreement. If the Products are determined to contain a Deficiency, then CoreRx shall bear the cost of laboratory testing, and CoreRx shall, at Bion's election, either replace the rejected Products within **[**thirty (30)**]** days of the date of such determination, at no cost to Bion, or refund to Bion the Transfer Price paid for such Products plus any applicable delivery charge.

**12.4   Return or Destruction**. Any Product that is determined to contain a Deficiency and that is in Bion's possession shall, at Bion's option, either be returned to CoreRx or destroyed in accordance with Applicable Laws, in each case, at CoreRx's expense.

**12.5   Manufacturing Process and Validation**. CoreRx represents, warrants and covenants to Bion that (i) the Manufacturing process and test methods for Product (including all future process changes or test method changes prepared in connection with the Manufacture of Product) shall be validated prior to the filling of any Firm Orders; provided, however, that Bion may, in its sole discretion, accept Product from CoreRx prior to the completion of such validation and (ii) the Manufacturing process and test methods (and any change in the Manufacturing process or test methods) for Product shall, in each case, comply with the Applicable Laws (including cGMPs), and any such changes thereto shall be made in accordance with Sections 3.5-3.7 (to the extent applicable) and the Process Change Policy as specified in the Quality Agreement.

22

**12.6  Encumbrances**. CoreRx represents, warrants and covenants that, save for security interests expressly given in favor of Bion or its Affiliates, it will have good and marketable title, free and clear of any pledge, lien, restriction, claim, charge, security interest and/or other encumbrance, to all Product to be Delivered hereunder, and all Product supplied to Bion shall be free and clear of all pledges, liens, restrictions, claims, charges, security interests and/or other encumbrances at the time of Delivery.

**12.7  Employee Matters**. CoreRx represents, warrants and covenants that it shall comply with all rules and obligations vis-à-vis employees and self-employed consultants (if any), used in the Manufacture of Product or otherwise at the Facility, and, as set out by the Applicable Laws, collective and individual agreements, including (a) payment of salaries, social security charges, insurances and withholding taxes on the income received by the workers involved in the performance of this Agreement, as well as (b) any other obligations deriving from the employment agreement and/or self- employment agreement, including provisions protection of the personnel, safety and physical integrity, in full compliance with the Applicable Laws and the individual and collective agreements. CoreRx expressly undertakes to perform this Agreement using only personnel duly employed in accordance with the Applicable Laws.

**12.8  DISCLAIMER**. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, ALL OF WHICH ARE HEREBY SPECIFICALLY EXCLUDED AND DISCLAIMED.

### ARTICLE 13. INDEMNIFICATION

**13.1  Bion Indemnification**. Bion shall protect, defend, indemnify, and hold harmless CoreRx, its Affiliates and its and their respective officers, directors, employees, and agents, and their respective successors and permitted assigns ("**CoreRx Parties**") from and against any and all Losses from Third Party Claims to the extent occurring, growing out of, incident to, or resulting directly or indirectly from: (a) a claim by a Third Party that the use of the Bion Intellectual Property by CoreRx (as directed by Bion) to Manufacture Product for Bion hereunder infringes the intellectual property rights of such Third Party; or (b) the sale of a Product by Bion but only in the event such Product was Manufactured by CoreRx in strict accordance with the Product Specifications and otherwise in accordance with the terms and conditions of this Agreement; except in each case to the extent CoreRx is obligated to indemnify Bion pursuant to Section 13.2.

**13.2  CoreRx Indemnification**. CoreRx shall protect, defend, indemnify, and hold harmless Bion, its Affiliates and its and their respective officers, directors, employees, and agents, and their respective successors and permitted assigns ("**Bion Parties**") from and against any and all Losses from Third Party Claims occurring, growing out of, incident to, or resulting directly or indirectly from: (a) the failure of Product provided by CoreRx hereunder to meet the representations, warranties or covenants set forth in Section 12.2 ; (b) a breach by CoreRx of any of its representations, warranties, covenants, agreements or obligations under this Agreement (including any Addenda) or the Quality   Agreement; (c) the negligence, recklessness or willful misconduct of CoreRx in Manufacturing Product or in the performance of its other obligations under this Agreement (including any Addenda) or the Quality Agreement; (d) a Manufacturing Infringement Claim; (e) the acts or omissions of CoreRx, its employees, agents or subcontractors in using the CoreRx Equipment in the Manufacturing of Product, or (f) any breach of the obligations undertaken by CoreRx vis-à-vis its personnel and self-employed consultants, including the obligations regarding salary, social security insurances and taxes.

**13.3  Indemnification Procedures**. The indemnified Party shall give the indemnifying Party CoreRx (a) prompt written notice of any claims made for which the indemnified Party knows or reasonably should know the indemnifying Party may be liable under the foregoing indemnification and (b) the opportunity to defend, negotiate, and settle such claims. Notwithstanding the foregoing, the failure to give such written notice will not affect the indemnification provided hereunder except to the extent the indemnifying Party shall have been actually prejudiced as a result of such failure. The indemnified

23

Party shall provide the indemnifying Party with all reasonable information in its possession, and all reasonable authority and all assistance, reasonably necessary to enable the indemnifying Party to carry on the defense of such suit; provided, however, that the indemnified Party reserves the right to retain its own counsel at its own expense to defend itself in such suit

**13.4   Settlement**. The indemnified Party shall not be responsible to or bound by any settlement made by the indemnifying Party without the indemnified Party's prior written consent, and the indemnifying Party shall not agree to or enter into any settlement without the indemnified Party's prior written consent; provided, however, that the indemnifying Party shall not be required to obtain such consent if the settlement involves only the payment of money and will not result in the indemnified Party becoming subject to injunctive or other similar type of relief and provided that such settlement does not require an admission by the indemnified Party and includes an unconditional release of the indemnified Party from all liability on claims that are the subject matter of such proceeding

**13.5   Limitation of Liability**. Except for breach of confidentiality obligations under Article 12 AND EXCEPT AS OTHERWISE PROVIDED IN SECTIONS 13.1-13.2, WITH RESPECT TO THIRD PARTY CLAIMS, IN NO EVENT SHALL EITHER PARTY OR ITS AFFILIATES OR ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS BE LIABLE TO THE OTHER PARTY OR ITS AFFILIATES OR ITS OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS FOR ANY PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES OR INDIRECT OR CONSEQUENTIAL LOSSES OF ANY KIND, NATURE OR DESCRIPTION WHATSOEVER (INCLUDING ECONOMIC LOSSES OR LOST PROFITS) SUFFERED OR INCURRED BY SUCH PARTY ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR AS A RESULT OF ANY ACTIVITIES HEREUNDER, REGARDLESS OF WHETHER ARISING FROM BREACH OF CONTRACT, WARRANTY, TORT, STRICT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY IS ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGE OR IF SUCH LOSS OR DAMAGE COULD HAVE BEEN REASONABLY FORESEEN.

**13.6   Insurance.** Not later than thirty (30) days before the date of the First Commercial Sale of any Product, Bion will, at its expense, and CoreRx will, at its expense, obtain and maintain in full force and effect, comprehensive general liability insurance, including product liability insurance with a minimum coverage of $2,000,000 per occurrence (or claim) and $5,000,000 in the aggregate limit of liability per year. Each Party shall have included the other Party as an additional insured to such Party's insurance policy. Upon a Party's reasonable request, the other Party hereto shall provide the requesting Party with certified copies of all applicable endorsements and certificates of insurance, both evidencing such coverage, which shall also state that a minimum of thirty (30) calendar days prior written notice of any proposed cancellation, or expiration without renewal, and five (5) Business Days' prior written notice of any proposed change in carriers or material terms of coverage. If the above policies are reported on a "claims made basis" then the applicable Party shall provide coverage five (5) years after the Agreement has terminated.  For clarity, the foregoing insurance requirements shall not in any way limit either Party's liability with respect to its indemnification or other obligations under this Agreement.

## ARTICLE 14. TERM AND TERMINATION

**14.1   Term.** This Agreement shall commence on the Effective Date and shall continue in full force and effect for a period of five (5) years from the commercialization of the last Product, unless earlier terminated pursuant to this Article 14 or mutually terminated by the Parties in writing (such period of time as this Agreement is in effect, the "**Term**"). At the request of Bion during the Term, the Parties shall negotiate in good faith a renewal of this Agreement in whole or on a Product-by-Product basis; provided, however, that as part of such negotiations, either Party may propose alternative terms, including alternative financial terms, which may apply during any such renewal period. For clarity, (i) neither Party shall have any obligation to renew this Agreement unless and until agreed to by such Party, and (ii) unless otherwise expressly agreed to by the Parties in writing, any new or different terms which are negotiated as part of the renewal, if any, shall only apply during the renewal period and shall

24

not in any way alter the terms of this Agreement during the initial Term.

**14.2   Breach**. If either Party shall materially breach this Agreement (or a given Addendum to the extent that the material breach relates solely to such Addendum or the Product thereunder), the non- breaching Party may give written notice to the other Party, specifying the nature of the material breach and, if such material breach is not remedied within thirty (30) calendar days of receipt of such notice (provided, however, that the cure period shall be suspended during any time that a Party seeks resolution of a dispute as to whether an alleged material breach occurred pursuant to any dispute resolution mechanisms under this Agreement), then the non-breaching Party shall have the right, in its sole discretion, immediately to terminate this Agreement upon written notice to the breaching Party. Notwithstanding the foregoing, if such material breach relates only to a given Product, then the non- breaching Party shall only have the right to terminate the applicable Addendum to which such material breach relates and this Agreement, and all other Addenda shall not be affected by such termination.

**14.3   Bankruptcy.** This Agreement may be terminated by written notice given by a Party upon the occurrence of any of the following with respect the other Party: (a) such other Party becomes insolvent, or (b) voluntary or involuntary proceedings by or against such other Party are instituted in bankruptcy or under any insolvency law, which proceedings, if involuntary, shall not have been dismissed within ninety (90) days after the date of filing, or (c) a receiver or custodian is appointed for such other Party, or proceedings are instituted by or against such other Party for corporate reorganization or the dissolution of such other Party, which proceedings, if involuntary, shall not have been dismissed within ninety (90) days after the date of filing, or (d) such other Party makes an assignment of substantially all of its assets for the benefit of its creditors, or substantially all of the assets of such other Party are seized or attached and not released within ninety (90) days thereafter.

**14.4   Study Failure**. In the event that any required or agreed study(ies) for a Product, including, without limitation, Bio-Equivalence Studies, fail more than two (2) times, Bion may terminate this Agreement with respect to the applicable Product upon ten (10) Business Days' notice to CoreRx.

**14.5   Termination for Refusal to File.**  In the event that FDA issues a "Refusal To File" for a Product Regulatory Approval application because of a deficiency arising out of the dossier provided by CoreRx for the preparation of such application for Regulatory Approval, Bion shall reasonably work together in good faith with CoreRx and provide CoreRx one-hundred and eighty (180) calendar days to cure such problem so that Bion may re-file an application for Regulatory Approval that addresses the reasons for the refusal to file. In the event that a second refusal to file is received, or Bion believes in good faith, after reasonable consultation with CoreRx after the aforementioned one hundred eighty (180) calendar days allowed to resolve the problems associated with the "Refusal To File", that it is commercially unreasonable to re-file, Bion may terminate this Agreement with respect to the applicable Product upon thirty (30) calendar days' notice to CoreRx.

**14.6   Termination for Efficacy Study Requirement.** If applicable and in the event that FDA determines that the formulation of a Product shall not be eligible for final Regulatory Approval in the absence of efficacy or clinical studies, then Bion may terminate this Agreement with respect to the applicable Product upon sixty (60) calendar days' notice to CoreRx.  Such termination shall be deemed an expiration of this Agreement with respect to the applicable Product pursuant to Section 14.1 and neither Party shall be deemed to have breached this Agreement as a result of such determination by FDA or to have any liability at law or equity to the other as a result of such termination.

**14.7   Termination for Supply Interruption.** Bion may terminate this Agreement pursuant to a Supply Interruption pursuant to Section 5.11.

**14.8   Termination for Force Majeure**. Bion may terminate this Agreement in the event of a Force Majeure that lasts for more than one hundred twenty (120) days with notice to CoreRx.

**14.9   Termination for Government or Legal Action.** Bion may terminate this Agreement with notice to CoreRx if (i) a permanent injunction is issued by a court of competent jurisdiction enjoining Bion's

DB1/ 89530007.8

sale of a Product; or (ii) sale of a Product has been enjoined or is the subject of active litigation that claims that the Manufacture or sale of the Product infringes a Third Party Patent Rights or market exclusivity rights.

**14.10 Consequences of Expiration or Termination.**

14.10.1 In the event that this Agreement is terminated in accordance with Sections 14.2 or 14.7, Bion shall have the right (but not the obligation) to (a) keep any or all outstanding Firm Orders in place, in which case CoreRx shall Manufacture and Deliver, in accordance with this Agreement, all quantities of Products ordered pursuant to such Firm Orders (regardless of whether the Delivery Date for such Products is before or after such termination) and Bion shall pay the Transfer Price with respect to such Products which meet the representations, warranties and covenants set forth in this Agreement or (b) cancel any or all outstanding Firm Orders, and with respect to any such cancelled Firm Orders, Bion shall have no further liability with respect thereto; provided that Bion shall only have the right to cancel Firm Orders pursuant to this clause (b) if this Agreement is terminated by Bion pursuant to Section 14.2 or Section 14.7.

14.10.2   Reserved.

14.10.3   Upon the expiration or termination of this Agreement, CoreRx shall assist Bion in effecting a smooth transition to an alternate supplier(s) for the manufacture of Products. Without limiting the generality of the foregoing, at the request of Bion, CoreRx shall support the technical transfer of the Manufacture of the Product to an alternate source(s) (including as set forth in Section 2.10).

14.10.4   Upon expiration or termination of this Agreement (or a given Addendum, as applicable), Bion and CoreRx shall immediately settle all outstanding invoices and other monies owed to the other pursuant to this Agreement (or such Addendum, as applicable). The termination or expiration of this Agreement (or a given Addendum, as applicable) shall not affect the rights and obligations of the Parties accruing prior to such termination or expiration. Subject to the foregoing, expiration or termination of this Agreement (or a given Addendum, as applicable) shall relieve and release all Parties from any liabilities and obligations under this Agreement (or such Addendum, as applicable), other than those specifically set forth in this Section 14.10 and those that survive termination in accordance with Section 14.12.

14.10.5   If this Agreement is terminated by Bion in accordance with Section 14.3 or Section 14.7, then the Parties agree to implement a transition plan, and to negotiate in good faith to allow Bion to lease the equipment, space, and personnel used to manufacture the Products pursuant to this Agreement, or acquire the Facility, equipment, and personnel used to manufacture the Products pursuant to this Agreement from CoreRx, provided such lease or acquisition will be structured in a manner that does not adversely impact another CoreRx customer then using another portion of the Facility for the production of products at the time of termination.

14.10.6   In the event that this Agreement is terminated in its entirety, then all Addenda then in effect shall automatically terminate as of the date of termination of this Agreement.

**14.11 Termination of Individual Addendum**. In the event that only a given Addendum expires or is terminated, as applicable, then the foregoing provisions of this Article 14 shall only apply to such Addendum and the Product thereunder.

**14.12 Survival**. In the event of a termination or expiration of this Agreement, only the following provisions shall survive termination or expiration: Articles 1, 10 (to the extent applicable), 11, and 13, and Sections 6.5-6.7, 7.5-7.6, 7.9, 8.1-8.2, 8.8, 12.8, 16.1-16.6, 16.8 and 16.10-16.12.

## ARTICLE 15. COMPANY EVENTS

**15.1  CoreRx Company Event**. If CoreRx determines to commence the process for the sale of CoreRx, then CoreRx shall, within seven (7) days of the Board of Director's determination to commence such sale process, provide a written notice to Bion, setting forth the intent of CoreRx to

DB1/ 89530007.8

commence a sale process and written assurances that CoreRx will continue to comply with the terms of this Agreement.

**15.2 Assignment**. This Agreement shall be binding upon and inure to the benefit of each of the Parties hereto and their respective successors and approved assigns, provided, however, that CoreRx may not assign or transfer this Agreement whether by operation of law or otherwise without the prior written consent of Bion (which shall not be unreasonably withheld, conditioned or delayed). Each Party may assign this Agreement or grant a security interest in this Agreement as collateral security for purposes of obtaining financing or to any Party's lenders as collateral security. Subject to compliance with Section 15.1, no consent shall be required for a Party to assign this Agreement or transfer this Agreement by operation of law is in connection with a merger or acquisition or sale of all or substantially all of the assets of the assigning Party or to assign this Agreement to an Affiliate (provided, however, in the case of CoreRx, such Affiliate must be able to discharge its obligations under this Agreement including the various Addendums and CoreRx shall continue to remain responsible for the acts or omissions of such Affiliate). This Agreement shall be binding upon and shall inure to the benefit of the Parties and their successors and permitted assigns. Any assignment or transfer in contravention of this Agreement shall be null and void.

## ARTICLE 16. MISCELLANEOUS

**16.1 Interpretation and Construction**. Unless the context of this Agreement otherwise requires, (i) the terms "include," "includes," or "including" shall be deemed to be followed by the words "without limitation" unless otherwise indicated; (ii) words using the singular or plural number also include the other; (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement; (iv) the terms "Article," "Section" and "Attachment" refer to the specified Article, Section and Attachment of this Agreement, and (v) words of any gender include each other gender. Whenever this Agreement refers to a number of days, unless otherwise specified, such number shall refer to calendar days. The headings and paragraph captions in this Agreement are for reference and convenience purposes only and shall not affect the meaning or interpretation of this Agreement. This Agreement shall not be interpreted or constructed in favor of or against either Party because of its effort in preparing it.

**16.2 Independent Contractor Status**. The Parties shall at all times act as and be deemed to be independent contractors. Nothing in this Agreement shall be construed to render either Party as the agent, partner, joint venturer or employee of the other Party for any purpose whatsoever, and neither Party shall have any authority to enter into any contracts (other than settlement agreements pursuant to the applicable provisions of this Agreement) or assume any obligations for the other Party nor make any warranties or representations on behalf of that other Party.

**16.3 Waiver**. The waiver by either Party of a breach of any provision contained herein shall only be effective if in writing and shall in no way be construed as a waiver of any succeeding breach of such provision or obligation or the waiver of the provision or obligation itself.

**16.4 Severability**. If any provision of this Agreement shall be held illegal or unenforceable, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

**16.5 Further Assurances**. Each Party hereto agrees to execute, acknowledge and deliver such further instruments and documents, and to do all such other acts, as may be reasonably necessary or appropriate in order to carry out the purposes and intent of this Agreement

**16.6 Notices**. Any notice or other communication to be given under this Agreement by any Party to any other Party shall be in writing and shall be either (a) personally delivered, (b) mailed by registered or certified mail, postage prepaid with return receipt requested, (c) delivered by reputable overnight express delivery service or same-day local courier service, (d) delivered by confirmed (or answered back) telex or facsimile transmission, to the address of the applicable Party as set forth below, or to

27

such other address as may be designated by the Parties from time to time in accordance with this Section 16.6. Notices delivered personally, by overnight express delivery service or by local courier service shall be deemed given as of actual receipt. Mailed notices shall be deemed given ten (10) Business Days after mailing and five (5) Business Days after expedited mailing services. Notices delivered by telex or facsimile transmission shall be deemed given upon receipt by the sender of the answerback (in the case of a telex) or transmission confirmation (in the case of a facsimile transmission); provided, however, that telex or facsimile that is sent after 5:00 pm (recipient's local time) shall be deemed given at 9:00 am (recipient's local time) on the next Business Day.

| | |
|---|---|
| If to Bion at: | Bionpharma Inc. |
| | 600 Alexander Road, Suite 2-4B |
| | Princeton, NJ 08540 |
| | Telecopier: (609) 380-3311 |
| | With a copy by email to admin@bionpharma.com |
| | |
| If to CoreRx at: | CoreRx Inc. |
| | 14205 Myerlake Circle |
| | Clearwater, FL 33760 |
| | Telecopier: (727) 259-6971 |
| | |
| | With a copy by email to todd.daviau@corerxpharma.com. |

or to such other address as each Party may designate for itself by like written notice.

**16.7  Dispute Resolution.** The Parties shall initially attempt in good faith to resolve any significant controversy, claim, allegation of breach or dispute arising out of or relating to this Agreement (hereinafter collectively referred to as a "**Dispute**") through negotiations between senior executives of Bion and CoreRx. If the Dispute is not resolved within thirty (30) calendar days (or such other period of time mutually agreed upon by the Parties) of notice of the Dispute, then the Parties agree to submit the Dispute to non-binding mediation in an attempt to resolve the Dispute. Unless otherwise mutually agreed by the Parties, only if the Dispute is not resolved through negotiations or non-binding mediation as set forth herein, may a Party resort to litigation.

**16.8  Governing Law, Jurisdiction and Waiver of Jury Trial.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York. The United Nations Convention on International Sales of Goods shall not apply to the transactions contemplated by this Agreement. The Parties irrevocably agree that the State and Federal Courts located in the State, City, and County of Southern District of New York, shall have exclusive jurisdiction to deal with any disputes arising out of or in connection with this Agreement and that venue is proper in such Courts, and each Party irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the courts of the Southern District of New York and agrees not to bring any claim regarding such a dispute in any other court, and to waive unconditionally any objection to the laying of venue in such forum, including any claim of inconvenient forum. Each Party hereby expressly consents and submits to the personal jurisdiction of the Federal and State Courts in the State and County of the Southern District of New York. EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF THIS AGREEMENT.

**16.9  Force Majeure.** A Party shall not be liable for nonperformance or delay in performance, except for defaulted obligations of payment, to the extent that such nonperformance or delay in performance is not due to its negligence and is caused by any event reasonably beyond the control of such Party, including wars, hostilities, revolutions, riots, civil commotion, national emergency, strikes, lockouts, unavailability of supplies, epidemics, fire, flood, earthquake, force of nature, explosion, terrorist  act,

embargo, or any other Act of God, (each a **"Force Majeure Event"**). In the event of any such delay, the delayed Party may defer its performance for a period equal to the time of such delay, provided that the delayed Party gives the other Party written notice thereof promptly and, in any event, within thirty (30) calendar days of discovery thereof, and uses its good faith efforts to cure the excused breach. In the event of a Force Majeure that lasts for more than one hundred twenty (120) days, then Bion shall have the right upon written notice to CoreRx to terminate this Agreement or any one or more Addenda in accordance with Section 14.8.

**16.10   Entire Agreement; Amendments**. This Agreement and any Attachments and Schedules attached hereto, constitute the entire agreement between CoreRx and Bion with respect to the Products in the Territory and supersede all prior representations, understandings and agreements with respect to such Products, including the Confidentiality Agreement effective October 16, 2014 between the Parties. Furthermore, this Agreement shall supersede any and all pre-printed terms on any orders, invoices, and other related documents and any and all orders issued by CoreRx. This Agreement may only be amended by a statement in writing to that effect signed by duly authorized representatives of Bion and CoreRx. The intent of this Agreement is to include items necessary for the proper execution and completion of the performance under this Agreement. The documents comprised by this Agreement are complementary, and what is required by any one shall be as binding as if required by all. Words and abbreviations that have known or technical trade meanings are used in this Agreement in accordance with such recognized meanings. In the event of a conflict or inconsistency between this Agreement and any exhibit, schedule and attachments, the terms and conditions of this Agreement shall prevail.

**16.11 Counterparts**. This Agreement may be executed in one or more counterparts, including by transmission of facsimile or PDF copies of signature pages, each of which shall for all purposes are deemed to be an original and all of which together shall constitute one instrument.

**16.12 Third Party Beneficiaries.** No term or provision of this Agreement is intended to be, or shall be, for the benefit of a sub-contractor, supplier, any individual member of the control group utilized for the bioequivalence studies, firm, organization, or corporation not a party hereto, and no such other Person, firm, organization or corporation shall have any right or cause of action hereunder.

**16.13 Use of Affiliates**. Bion shall have the right to exercise its rights and perform its obligations under this Agreement either itself or through any of its Affiliates, provided that Bion shall remain solely responsible for the acts, omissions and performance of such Affiliate as if such acts, omissions and performance had been provided by Bion itself under this Agreement. In addition, in each case where a Party's Affiliate has an obligation pursuant to this Agreement or performs an obligation pursuant to this Agreement (to the extent permitted hereunder), (i) such Party shall cause and compel such Affiliate to perform such obligation and comply with the terms of this Agreement and (ii) any breach of the terms or conditions of this Agreement by such Affiliate shall be deemed a breach by such Party of such terms or conditions.

*[Remainder of this page intentionally left blank signature page follows]*

40

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be duly authorized, executed, and delivered this Agreement intending it to take effect as of the Effective Date.

**CORERX INC.**

Name:
Title:  President and Chief Executive Officer

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be duly authorized, executed, and delivered this Agreement in tending it to take effect as of the Effective Date.

**BIONPHARMA INC.**

_____ 11/24/2020

Name: Venkat Krishnan

Title:  President and Chief Executive Officer

*[Signature Page to Master Manufacturing Supply Agreement]*

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be duly authorized, executed, and delivered this Agreement in tending it to take effect as of the Effective Date.

**BIONPHARMA INC.**

Name: Venkat Krishnan
Title:   President and Chief Executive Officer

## <u>ATTACHMENT 1</u>
### PRODUCTS

**Table 1.  Identification of Reference Product**

| Product | API | Dosage Form; Route | Strengths | Proprietary Name |
|---|---|---|---|---|
| Enalapril Solution | Enalapril Powder for Oral Solution | Solution | 1mg/mL | Epaned® |

ATTACHMENT 2 has been intentionally omitted.

**Exhibit 1 to Addendum Product Specifications**

(See Attached)

**[Attach Specifications as Exhibit 1]**

**Exhibit 2 to Addendum Certain Bion Intellectual Property**

(See Attached)

**[List relevant Bion Intellectual Property on this Exhibit 2]**

# EXHIBIT 10

M1PAABIOC                    Conference

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BIONPHARMA INC.,

4             Plaintiff,

5        v.                        21 CV 10656 (JGK)

6   CORERX, INC.,

7             Defendant.

8   ------------------------------x
                                   New York, N.Y.
9                                  January 25, 2022
                                   10:30 a.m.
10
    Before:
11
                    HON. JOHN G. KOELTL,
12
                                   District Judge
13
                         APPEARANCES
14
    HOLLAND & KNIGHT LLP
15       Attorneys for Plaintiff Bionpharma
    BY:  CHARLES A. WEISS
16       MARISSA A. MARINELLI

17

18  BUCHANAN INGERSOLL & ROONEY PC
         Attorneys for Defendant Corerx
    BY:  PETER S. RUSS
19       MATTHEW L. FEDOWITZ

20

21

22

23

24

25

2

M1PAABIOC                    Conference

1          (Case called)

2          (Case called)

3          THE COURT:  Who is on the line for the plaintiff?

4          MR. WEISS:  For plaintiffs, your Honor, it is Charles

5     Weiss, W-E-I-S-S, and Marissa Marinelli, M-A-R-I-E-L-L-I, both

6     of Holland & Knight, New York.

7          THE COURT:  All right.  Who is on the phone for the

8     defendant?

9          MR. RUSS:  Your Honor, Peter Russ, R-U-S-S.  And with

10    me is Matthew Fedowitz, F-E-D-O-W-I-T-Z, both from Buchanan,

11    Ingersoll & Rooney.

12         THE COURT:  Okay.  This is a motion for a preliminary

13    injunction.  I am prepared to listen to the parties.  I am

14    familiar with the papers.  I had thought that the parties had

15    reached an agreement that would have preserved the status quo

16    pending ultimate decision on the merits.

17         So with that, a background, Mr. Weiss.

18         MR. WEISS:  Yes, your Honor.

19         The parties have agreed preserve the status quo in

20    terms of maintaining the ability of Corerx to manufacture the

21    product and still Bionpharma's orders under the contract at

22    issue if the Court were to grant a preliminary injunction.  So,

23    for example, that Corerx has the raw materials necessary to

24    make the product, that Corerx would maintain those materials in

25    its inventory unless Bionpharma asked to have them transferred

M1PAABIOC                    Conference

1   out to someone else, that Corerx would not disassemble its

2   manufacturing line or things like that.  So, the transfer

3   agreement was to preserve that and the parties did do that and

4   we do that have that in place which would resolve the temporary

5   restraining order.

6          So, next as the Court knows, is the relief sought by

7   plaintiff Bionpharma to compel Corerx to continue performance

8   under the supply agreement in a manner that would tied it over

9   until Bionpharma is able to get a new manufacturer up and

10  running.

11         The ultimate relief that Bionpharma would seek in

12  terms of final judgment, et cetera, is broader than that.  But

13  in terms of a preliminary injunction, we are at this point not

14  asking the Court to compel Corerx to perform in perpetuity

15  until the contract expires but just to tie Bionpharma over.

16  And from the information that's been developed since we were

17  last in front of your Honor and conversations with the client,

18  that would be satisfied if Corerx were to fill the remaining

19  quantities of the order that were due to be placed in December

20  and one additional order.

21         So, essentially, that is three batches of products

22  would be sufficient to tie Bionpharma over until its able to

23  get a new manufacturer up and running.  And given that this is

24  only a preliminary injunction, we're seeking final judgments on

25  the merits, we think it's appropriate to limit the request

4

M1PAABIOC                        Conference

1    what's necessary to get over the hump, so to speak.

2              THE COURT:  What you said is not crystal clear to me.

3    Fill the remaining quantities of the December order and then

4    you said "three batches".

5              MR. WEISS:  Sorry, your Honor.

6              So, the December order was three batches.  That was

7    partially filled and there were roughly, the balance of the

8    December order is roughly two more batches.  In addition,

9    Bionpharma placed another order for one more batch.  So, if we

10   look at the total that is being sought, it is the balance of

11   the December order which is just a little bit more than two

12   batches, plus, the additional batch, additional order that was

13   placed.

14             THE COURT:  When was the additional order placed?

15             MR. WEISS:  That was placed at around the time that we

16   filed the lawsuit.  We're pretty certain given the fact that

17   the Court had already said they wouldn't perform that they

18   would not accept that order but we didn't want to be in a

19   position that the Court would say, well, you didn't place your

20   order under the agreement.  So, that order would have been

21   placed in any event.  If the parties did not have this dispute,

22   Bion went ahead and placed it and as expected the Court didn't

23   accept it.

24             THE COURT:  When was the date of that order?

25             MR. WEISS:  I will have to look for the specific date,

M1PAABIOC                    Conference

1    your Honor.  I believe it was in early January.

2              THE COURT:  That wasn't specifically referred to in

3    the papers, I don't think.

4              MR. WEISS:  No.  It was not, your Honor.  We did say

5    in the papers in terms of the relief sought that it was to have

6    Corerx to continue to perform under the agreement at least

7    until Bionpharma was able to get a new supplier.  We now know

8    what that would require and it's basically three batches.

9              THE COURT:  Okay.  That's helpful.

10             MR. WEISS:  Okay.  Should I continue, your Honor, with

11   the merits or --

12             THE COURT:  Yes, in just a moment, but I had one other

13   question.

14             In terms of all of the -- litigation, there were the

15   lawsuits, among others, against as already brought against

16   Corerx.  Azurity voluntarily dismissed those lawsuits against

17   Corerx, right?  There were two lawsuits against Corerx and

18   Azurity had already dismissed those lawsuits?

19             MR. WEISS:  Yes, your Honor.  One in Delaware and one

20   in Florida voluntarily dismissed.

21             THE COURT:  Okay.  Are there any continuing lawsuits

22   that are now pending for patent infringement?

23             MR. WEISS:  Against Bionpharma, there is.  There is

24   the case that was referred to in our opening papers which was

25   the one in Delaware where Azurity sort of preliminary

6

M1PAABIOC                    Conference

1    injunction against Bionpharma and that was denied.  So, I

2    believe that technically there's two cases under two separate

3    docket numbers and they have been consolidated and they're both

4    in front of Judge Stark.  So, for all practical purposes, it's

5    one case.  But there's that case continues to be in existence

6    and the parties I believe are having I believe to be a

7    preliminary scheduling conference.  I also --

8              By the way, your Honor, I'm sorry.  I have the answer

9    to your Honor's question about when the other order was made

10   placed.

11             THE COURT:  Okay.

12             MR. WEISS:  That was placed on December 3, 2021, and

13   that is in fact Exhibit Ten as in November to the declaration

14   of the Bionpharma CEO that was filed in support of the motion

15   for preliminary injunction.

16             THE COURT:  So, it wasn't in January.  It was --

17             MR. WEISS:  Well, the prior order was placed for

18   delivery for final delivery in December.  It was actually

19   placed on at the end of the summer.

20             THE COURT:  Okay.  I got it.

21             MR. WEISS:  So, this one called for delivery to be

22   done on March 3, 2022 because the contract provides a certain

23   period of time for advanced notice.  So, that's where that

24   order is, Exhibit N.

25             THE COURT:  And what's the total amount of the product

7

M1PAABIOC                    Conference

1    that's covered by those three batches?

2         MR. WEISS:  The unfilled quantity of the order that

3    was due in December is a little over 12,000.  I'm going to get

4    that number right now.  I do have it in front of me.  And so,

5    that is precisely, the amount is, it's a little over 12,000.

6         THE COURT:  Okay.  And the other is for six thousand?

7         MR. WEISS:  Correct, your Honor.

8         THE COURT:  A total of 18,000?

9         MR. WEISS:  Yes.

10        THE COURT:  What are the uses.

11        MR. WEISS:  It's bottles.  It's 18,000 bottles of the

12   product.  And the outstanding balance of the order that was due

13   in December that was partially filled, this is the Krishnan

14   Declaration, Paragraph Four, it's 12,459 but if we say 12,000,

15   that's fine.

16        THE COURT:  Okay.

17        MR. WEISS:  There is just one other thing I want to

18   add just to be complete, your Honor, which is your Honor asked

19   about the patent infringement cases.

20        So, the two cases against Corerx were voluntarily

21   dismissed.  As your Honor knows, we raised the Two Dismissal

22   Rule, that that extinguishes whatever claims Azurity would have

23   against patent infringement.  Azurity in the Florida case filed

24   a motion in the district court to reopen the case to convert

25   the voluntary dismissal order to trigger the Two Dismissal Rule

8

M1PAABIOC                    Conference

1    to a stipulation.

2           THE COURT:  The magistrate judge recommended that

3    motion be denied.

4           MR. WEISS:  Your Honor is ahead of me on that.  That's

5    what I wanted to say, that's an important declaration and that

6    will go to the district judge.

7           THE COURT:  Okay.  With respect to the mediation

8    provision in the contract, I assume that if I granted the

9    preliminary injunction, you'd still go through with the

10   mediation under the contract.

11          MR. WEISS:  We would unless both parties decided it

12   was not helpful.

13          THE COURT:  Okay.  You've gone through the first step

14   which was the negotiations and now you have a second step which

15   is mediation.

16          MR. WEISS:  Yes.

17          THE COURT:  And that has a time limit, doesn't it, 30

18   days?

19          MR. WEISS:  Yes, your Honor.  Well, it says that if

20   it's not resolved in 30 days, there is to be mediation.  I want

21   to get the exact language and make sure that I'm stating it

22   accurately, yes.  So, the nonbinding mediation provision in

23   16.7 just says it's to occur.  It doesn't set a timeline.  The

24   30 days, as I thought, is for the parties to try to resolve it

25   through discussions between senior executives.  That has had a

9

M1PAABIOC                    Conference

1    30-day number in it.  There's no number provided for nonbinding

2    mediation.

3              THE COURT:  Okay.  All right.  I'm familiar with the

4    papers.  Anything you'd like to tell me on the merits of the

5    preliminary injunction?

6              MR. WEISS:  Other than to say, your Honor, that we

7    believe we've clearly satisfied not only likelihood of success

8    on the merits but a record that would establish summary

9    judgment in our favor, that was the standard by which it's not.

10   And we think irreparable harm, although, there's some criticism

11   made of it by defendant, we think that's plainly established by

12   the declaration.  And the irreparable harm in this situation

13   with a supply agreement has been recognizing the case as we

14   cited as irreparable harm.

15             So, unless your Honor has other questions, I will just

16   leave it at that.

17             THE COURT:  Okay.  Mr. Russ.

18             MR. RUSS:  Yes, your Honor.  Thank you.

19             Initially, I also want to thank the Court for granting

20   the continuance in this case as a result of my health.  That

21   was very appreciated.  Thank you, your Honor.

22             Your Honor, one of the focus points in your questions

23   concerned the temporary relief that Bionpharma is seeking the

24   number of bottles that it wishes to tied itself over.  And I

25   think the first thing I want to say about that is essentially

10

M1PAABIOC                    Conference

1   what Bionpharma is seeking is an injunction during the ADR

2   process and to compel Corerx to produce during that period of

3   time.  And as we've said in our papers, doing so would violate

4   the patents at issue.  The Azurity patents are deemed to be

5   valid under 25 U.S. 282.  And compelling Corerx to produce

6   would cause it to violate the patents.  But more importantly,

7   the Supreme Court in --

8           THE COURT:  Hold on.  Let me just stop you there.

9   There's no case that I know of that says that that is a

10  sufficient basis for denying an injunction that would otherwise

11  enforce a contract.  There's no case that I'm aware of and none

12  that you've cited that cites that as pervasive.  And while the

13  patent may be presumed to be valid, there is a preliminary

14  injunction was denied and so far all of the other cases have

15  been dismissed.

16          So, it's hard to say that simply because there is a

17  patent out there that that would prevent the issuance of

18  preliminary injunction to effectively enforce the contract

19  while the parties continue to discuss under the mandatory

20  mediation.  As to that, you all acknowledge that at least in

21  the Second Circuit which is obviously binding on me, which is

22  also the majority rule, you can get an injunction in aid of

23  arbitration and I don't see the basis for distinguishing that

24  from an injunction in aid of contractually bound mediation.

25          MR. RUSS:  Your Honor, I believe that the Supreme

M1PAABIOC                    Conference

1   Court has taken up this issue of what is allowed and not

2   allowed when a patent, where the validity of a patent is being

3   challenged.  In Lear v. Atkins, the Supreme Court addressed the

4   very issue we have here being may contract rights which may

5   violate the U.S. patent laws be enforced while the validity of

6   that patent is being adjudicated.  Here, that patent, the two

7   patents at issue are being adjudicated in the Azurity v. Bion

8   litigation.  The Lear Court held that the contracts may not be

9   enforced during this challenge period.  And to quote directly

10  from the Lear court, your Honor.

11         "The decisive question is whether overriding federal

12  policies would be significantly frustrated if licensees could

13  be required to continue to pay royalties during the time they

14  are challenging patent validity in the courts.  It seems to us

15  that such a requirement would be inconsistent with the aims of

16  Federal Patent Policy."And that's Lear 395 U.S. 653 at 673.

17         So, following Lear --

18         THE COURT:  Hold on.  This is not a case about

19  requiring the continuation of royalties on a contested patent.

20  It's requiring a supply contract.

21         Go ahead.

22         MR. WEISS:  Well, if the Lear court was, it's a

23  federal pre-emption case.  And as we know, the Lear court

24  basically determined the contract estoppel was no longer the

25  law of the land and the federal pre-emption, in this case, the

12

M1PAABIOC                    Conference

1    patent laws pre-empted contract rights.

2         And following Lear it would simply be inconsistent

3    with the aims of that Federal Patent Law to compel Corerx to

4    manufacture a product while the validity of an existing patent

5    being challenged by a third party, and that's exactly what we

6    have here.  In Lear the issue was to contract rights --

7         THE COURT:  Okay.  It would be surprising that all you

8    had to do to invalidate a supply contract is to bring a patent

9    case, get a preliminary injunction denied and refuse to comply

10   with the supply contract.

11        Go ahead.

12        MR. RUSS:  Well, you know exasperating matters here,

13   your Honor, is we know with certainty that Corerx will be sued

14   about by Azurity for willful infringement by Bion.

15        THE COURT:  Please, please, you don't know that.

16   They're sister companies.  Azurity voluntarily dismissed

17   lawsuits against Corerx.  If it's so clear that Azurity would

18   sue Corerx, it's hard to believe that they would have

19   voluntarily dismissed two other lawsuits against Corerx.  Why

20   did they dismiss the two other lawsuits if it's so clear that

21   they'll now sue?

22        MR. RUSS:  They dismissed those lawsuits because

23   Corerx agreed not to produce the lawsuit, your Honor.  That's

24   why those lawsuits -- and this is not a case where the two

25   dismissal --

M1PAABIOC                    Conference

1              THE COURT:  Hold on.  One interpretation of what

2      happened was you have two sister companies and one says, okay,

3      we won't do this any more.  And the other company says fine,

4      we've now placed you in a position where you are not going to

5      help our competitor.  That's wonderful.  So, we're not going to

6      sue you.

7              It would be surprising then if pursuant to a court

8      order they were required to produce 18,000 and their sister

9      company would then turn around and say now you are required to

10     do that by court order.  We're now going to sue you again.

11             MR. RUSS:  Producing --

12             THE COURT:  Hold on.  So, you say you can state with

13     definiteness that they will be sued by Azurity is not so clear

14     to me.

15             Go ahead.

16             MR. RUSS:  Well, producing pursuant to a court order

17     does not insulate Corerx from a claim of willful infringement.

18     We are simply not insulated.  It may be a reason but it may not

19     be a reason that is going to allow us to escape liability.

20             Also --

21             THE COURT:  Hadn't Bionpharma agreed to indemnify you?

22             MR. RUSS:  Bionpharma offered an indemnification.

23     That does not strip away our obligation to exercise our valid

24     business judgment to act in a way that we believe is in the

25     parties' best interest.  That indemnification is of

14

M1PAABIOC                    Conference

1    questionable value in any event.  Prior to this litigation

2    being filed Corerx asked Bionpharma to provide some

3    substantiation for that indemnity by way of copies of financial

4    statements or other comfort and Bionpharma refused.  So, that

5    indemnification is of questionable value.  And again, it does

6    not strip away our obligation to exercise our valid business

7    judgment.

8            THE COURT:  Can I just ask you one other question?

9            MR. RUSS:  Certainly.

10           THE COURT:  Corerx declined to produce any further

11   product.  But so far as I could tell from the papers, it didn't

12   give a reason.  And I think when I asked you about this last

13   time you also declined to provide a reason.  Is there any

14   reason now in the record why Corerx said that it was just not

15   going to produce the product any more?

16           MR. RUSS:  Your Honor, what we said was there was a

17   supply interruption and we are not reading "a supply

18   interruption" as narrowly as Bion.  It's not a defined term.

19   Bion is asserting that a supply interruption means we don't

20   have the raw materials and that causes supply interruption.

21   The reason we are not producing is because we have a good faith

22   belief that we are going to get sued for willful infringement

23   and face substantial damages including the prospect of treble

24   damages.

25           THE COURT:  How is that supply interruption?

15

M1PAABIOC                    Conference

1          MR. RUSS:  If we cannot produce the product without

2     violating a deemed valid patent, if we are unable to produce

3     that patent without opening ourselves up to damages that could

4     I would wipe out our entire company, that constitutes a supply

5     interruption.

6          THE COURT:  Okay.

7          MR. RUSS:  I also want to take exception to Bion's

8     characterization that Corerx and Azurity are sister companies.

9     There is a relationship there and which is very common in the

10    industry, where a parent company, in this case Novaquest, which

11    is a fund manager, has made investments in a number of

12    pharmaceutical companies including Corerx and Azurity.  These

13    companies operate independently from one another.  And when

14    this matter first came out, the CEO of Corerx went to Novaquest

15    and asked that Azurity back off and not sue it.  And as the

16    declaration of the CEO, Mr. Damani, states, November said, no,

17    we are not taking sides here.  The parties can battle it out as

18    they see fit.  If a common investment created a sister company

19    dynamic here, then we would be a sister company with Bion.

20    Bion is owned by a company called Signet LLC.  Signet has a 17

21    million dollar investment in Corerx and there are common

22    directors on the boards of Corerx and Bion.  Nobody would

23    suggest that they are in cahoots or operating in conjunction

24    with one another.  They've sued one another.  Likewise, the

25    same holds true for the Corerx surety relationship.  They've

16

M1PAABIOC                    Conference

1    sued one another or more for the point, Azurity has sued

2    Corerx.

3              THE COURT:  Okay.  It would seem that there would be a

4    reasonable resolution of the preliminary injunction by just

5    presiding the 18,000 bottles without prejudice, and it would

6    resolve the preliminary injunction.  And I tried to suggest a

7    reasonable resolution when the case first came before me.  And

8    you all did work out a reasonable resolution.  It seems plain

9    that you have an agreement with a mediation clause.  So, even

10   if I grant the preliminary injunction you've got to go to

11   mediation to try to work it out.  Why the parties can't work

12   out a reasonable resolution of providing 18,000 bottles of

13   product which doesn't seem to be such an enormous amount of

14   product and it would be even taking into account all of what

15   are, I think, highly speculative damages on the part of the

16   defendant if it provides product as an interim resolution.

17   That doesn't seem as though it will other than a reasonable

18   interim solution while the parties continue to litigate this

19   case and the case in Delaware.

20             MR. RUSS:  Well, your Honor, as I said, Lear court has

21   addressed this issue and has indicated that during the pendency

22   of that additional litigation where the patent is being

23   challenged it's improper to compel the, in this case, the

24   production of the product.  And the product of the product --

25             THE COURT:  Hold on just a moment.  I'll let you

M1PAABIOC                    Conference

1    continue with the legal argument in just a moment.  I was

2    simply suggesting that there is a reasonable interim solution.

3    You don't want to take it, that's fine.  That's what I'm here

4    for.  The same way in as Delaware, the judge in Delaware denied

5    a preliminary injunction in the patent suit, I have a

6    preliminary injunction.  The parties have a possibility of

7    avoiding what could be an adverse decision but they don't have

8    to take it.  You all worked out what was a reasonable

9    resolution for a standstill while you reached the preliminary

10   injunction.

11          As I said, $18,000 bottles doesn't seem like an

12   enormous amount and it's hard to believe that the speculative

13   damages from producing 18,000 bottles in order to continue what

14   would be a continuation of the status quo under the agreement

15   seems like, doesn't seem like such an enormous amount.  But you

16   don't have to do it.  I'll decide the preliminary injunction

17   and you all can then decide to do whatever you want, both in

18   the mediation and any other relief you want from any

19   preliminary injunction.  I was simply suggesting what would

20   appear to me to be a reasonable resolution.  the parties

21   reasonably responded when I suggested such a resolution last

22   time but you don't have to do that.  I can decide the

23   preliminary injunction.

24          So, go ahead, you were telling me on how Lear so

25   clearly precludes the preliminary injunction.  So, go ahead.

18

M1PAABIOC                    Conference

1            MR. RUSS:  And I also want to say that the 18,000

2    bottles -- but this is a bit of a binary decision here.  We are

3    either going to be required to violate the soon to be valid

4    Azurity patent or we're not.  Even producing one bottle is

5    going to open us up to susceptible damages from Azurity and

6    that is the problem.  It's not the quantity.  It's the act of

7    producing in violation of the patent.

8            I also I think want to address --

9            THE COURT:  Hold on.

10           As long as you raised it, what would the damages be

11   for the production of one bottle?

12           MR. RUSS:  Azurity will sue us for willful

13   infringement and --

14           THE COURT:  Would damages be for producing one bottle?

15           MR. RUSS:  The damages -- I mean --

16           Mr. Fedowitz, do you want to address --

17           MR. FEDOWITZ:  Your Honor, I could do the calculation

18   real quick.  For 18,000 bottles, that would equate to about

19   nine million dollars going at five hundred dollars a bottle,

20   which is what Azurity sells it for.

21           THE COURT:  That's willful, right?

22           MR. FEDOWITZ:  No.  That's just calculating 18,000

23   times 18,000 times $500 a bottle gives you nine million

24   dollars.

25           THE COURT:  All right.  Go ahead.

19

M1PAABIOC                    Conference

1          MR. RUSS:  I guess the final point I'm going to make,

2     your Honor, is as we're talking about the entitlement to

3     injunctive relief here, I do take issue that Bion has properly

4     pled irreparable harm.  You know, irreparable harm is the most

5     important prong of the four-prong test for entitlement to an

6     injunction.  And there is a specific provision in the contract

7     that deals with supply interruption, and that's provision

8     Section 5.11.

9          The parties agreed that in the event of a supply

10    interruption that a monetary remedy would appropriate.  And in

11    that Section 5.11 the parties agree that the remedies of cover

12    damages would be appropriate in the event of a supply

13    interruption.  So, the parties have already agreed that a

14    monetary remedy is appropriate and therefore, Bion has failed

15    to establish that damages are not appropriate here and that

16    injunctive relief it an entitlement.  So, I do take issue with

17    Mr. Weiss' conclusion that they have established irreparable

18    harm.

19          We do not believe that they have.  Money damages are

20    certainly able to satisfy any issues that they have as a result

21    of the supply interruption.  In fact, it was contemplated under

22    the contract.

23          THE COURT:  Okay.  Anything further?

24          Mr. Weiss.

25          MR. WEISS:  Thank you, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M1PAABIOC                    Conference

1          There's just a few points I want to address that was

2     raised by Mr. Russ.  First, with respect to the sister company

3     ownership issue, we're not talking simply about that there's a

4     venture capital firm that's invested in a company.  We're

5     talking about controlling ownership, if not wholly owned

6     subsidiary data.  And Azurity was purchased by Novaquest.

7     Corerx was purchased by Novaquest.  In fact, Novaquest bought

8     out the interests that Bion had in Corerx.  And as set forth in

9     our complaint Paragraph 23 a majority of the Corerx board are

10     board members of Azurity.  There was never that degree of

11     relationship between Bion and Corerx.  And the agreement, the

12     clients affiliate under common control with the ability to

13     control 50 percent, et cetera, and when you have majority board

14     members of both, that amply establishes that.  So, there is a

15     distinction there.

16          With respect to the supply interruption issue, we had

17     address this previously.  I don't want to spend much time on

18     it.  Even if the voluntary actions of Corerx to put itself in a

19     position where it would breach an agreement with Azurity

20     constitutes a supply interruption.  There is nothing in the

21     contract which says that Bionpharma's excusive remedy is

22     provided in the supply interruption.  That should rather, a

23     holistic reading of that, this is an exclusive requirements

24     contract and the holistic reading of that is clear that if

25     there's a supply interruption, Bionpharma is released from its

M1PAABIOC                    Conference

1    obligation to buy exclusively from Corerx.  So, that is that

2    issue.

3            The third point that I wanted to address is the

4    exposure of Corerx to a potential claim by Azurity.  Counsel

5    addressed hypothetical patent infringement damages, the $500

6    per bottle is wrong, as set forth in the Azurity declaration.

7    I'm not going to elaborate on that.

8            But what I do want to point out is if there is any

9    liability of Corerx to Azurity for producing the product, that

10   would be under the contract between them.  There was the Two

11   Dismissal, the patent infringement claim, if it ever existed

12   has been extinguished by operation of law.  So, might there be

13   a breach of contract claim by Azurity against Corerx, yes, we

14   cannot exclude that possibility, certainly.

15           However, the only information about the terms of that

16   agreement were in Paragraph 16 of the declaration of Corerx's

17   CEO, Mr. Damani.  This is at Docket Entry 33, Paragraph 16 and

18   he said the part of the party settlement -- I'm quoting now.

19           "Corerx agreed that he is making, using, selling,

20   importing or offering to sell the products.  importantly,

21   Corerx was not compensated for entering into the settlement."

22           The settlement agreement, the contract was never

23   entered into evidence.  We do not know what the other terms of

24   that are.  We do not know if there's liquidated damages or not.

25   We don't know if perhaps that agreement may say "In the event

M1PAABIOC                    Conference

1    of a court order you can perform". We simply don't know. And

2    so, the argument about $500 per bottle for breach of patent

3    infringement is just wrong legally because there is no

4    cognizable patent infringement claim and what ever damages

5    exist under the breach of contact cannot be proven by Corerx

6    because its elected not to put the contract into evidence.

7            The last point I wanted to make is Lear v. Adkins.

8    Lear v. Adkins is an interesting case. It was a certiorari to

9    the Supreme Court of California. Atkins was an individual. He

10   was an engineer who was an employee of Lear. This is the

11   aviation company, Lear. And he invented an improved gyroscope.

12   He left Lear and then he sued Lear for patent infringement

13   based on patents that he had filed in his own name. And here

14   is the question that the Supreme Court as the Supreme Court put

15   it. this is page 395 U.S. at 655 carryover to 656. And Atkins

16   sued Lear in state court in California for violating the

17   contract between them under which he said Lear had to pay him

18   royalties. And here is how the Supreme Court framed the issue.

19           "The question that remains unsettled in this case,

20   after eight years of litigation in the California court is

21   whether Atkins will receive compensation for Lear's use of

22   those improvements which the inventor has subsequent patented.

23   At every stage of this lawsuit, Lear has sought to prove that

24   despite the grant of a patent by the patent office, none of

25   Atkins' improvements were sufficiently novel to warranty the

23

M1PAABIOC                    Conference

1    award of a monopoly under the standards delineated and

2    governing federal statute.  Moreover, the company has sought to

3    prove that Adkins attained his patent by means of fraud on the

4    patent office.

5         In response, the inventor has argued that since Lear

6    has entered into a licensing agreement with Atkins, it was

7    obliged to pay the agreed royalties regardless of the

8    underlying patent.

9         Then we go on, the Supreme Court says, the U.S.

10   Supreme Court says that the California Supreme Court

11   unanimously ruled in favor of Mr. Atkins.

12        And they explain what the Supreme Court of California

13   said. "While the court recognized that generally a manufacturer

14   is free to challenge the validity of an inventor's patent, it

15   held that one of the oldest doctrines in the field of patent

16   law established that so long as a licensee is operating under a

17   license agreement, he is estopped to deny the validity of his

18   licensor's patent in a suit for royalties under the agreement.

19   And if goes on from there.

20        But the issue here in the Lear v. Adkins case has

21   nothing to do with the issue at bar here.  This is whether the

22   Lear company, which had a royalty agreement with Mr. Atkins,

23   can defend a claim for breach of contract by saying that Atkins

24   obtained his patents by fraud and that they're invalid, and the

25   Supreme Court of California under state contract law, applying

24

M1PAABIOC                    Conference

1    common law contract issues that the Lear company was estopped

2    to deny the validity and enforceability of the patent, even

3    though they say was obtained by fraud and they are prepared to

4    show.  And then the U.S. Supreme Court held that no, that the

5    importance of getting rid of bad patents outweighs a state

6    common law interest in saying that a licensee is estopped to

7    challenge validity.  There is just no applicability in this

8    case of Lear v. Atkins at all.

9           So, unless the Court has any questions, I would stop

10   talking.

11          MR. RUSS:  May I respond, your Honor?

12          THE COURT:  Yes.

13          MR. RUSS:  Mr. Weiss made a number of points.

14   Initially, I just wanted to address the Two Dismissal Rule that

15   Mr. Weiss came back to.  The Two Dismissal Rule under Federal

16   Rule of Civil Procedure 41 is meant to dissuade a plaintiff

17   from bringing serial litigation.  In other words, bringing a

18   suit in a court, dismissing it, bringing another suit,

19   dismissing it and so forth in a harassing manner.  Courts have

20   interpreted that rule so as that if the parties mutually agree

21   and stipulate to a dismissal that that preclusive effect does

22   not take effect because you are not really dissuading the

23   behavior that the rule is meant to dissuade.

24          And I'd point the Court to the case in 2021 CAC Mara

25   v. Red Brick, 2021 Westlaw 3048495 for that proposition that

M1PAABIOC                    Conference

1    the Two Dismissal Rule would be inapplicable in the situation

2    like here

3              THE COURT:  I'm sorry.  Didn't the magistrate judge

4    disagree with you?

5              MR. RUSS:  No.  The fact is regardless of what the

6    magistrate judge may decide as far as the process for reopening

7    the case, it was a voluntary dismissal agreed to by the

8    parties.  This is not a case where we have serial litigation

9    filed by a plaintiff and dismissed in a harassing manner.  So,

10   there was a motion to reopen that case to procedurally clarify

11   how the parties had agreed to resolve their differences, but

12   that doesn't change the manner in which how the parties agreed

13   to resolve their differences.  It was voluntary and consensual

14   by both parties.

15             THE COURT:  Okay.  Go ahead.

16             MR. RUSS:  The last couple points I want to make is

17   with regard again to the concept that the Court could enter an

18   injunction here compelling Corerx to perform and somehow

19   insulate Corerx from liability against or by Azurity.  And

20   again, there is no carve out providing Corerx with a defense

21   that we are compelled to violate the party by court order.

22   That is simply not a defense that is open to us.  And to the

23   extent that we do produce one bottle, we will be susceptible to

24   damages not only for the bottles that we produce but for all of

25   the bottles that we have produced up until that time.

26

M1PAABIOC                    Conference

1           And to the extent that your Honor would like to see a

2      copy of that agreement between Azurity and Corerx, we would be

3      willing to produce that document under seal so that we can

4      dissuade the Court that there's any funny business and the

5      speculation Mr. Weiss raises can be put to bed.  That's simply

6      not the case.  So, if your Honor would let us do it and permit

7      us to submit that under seal, we would be willing to do so.

8           THE COURT:  No, that's not necessary.  But I would

9      point out that in the first negotiations between the parties,

10     so far as I can tell from the papers, when Corerx was asked for

11     an explanation about why it was not producing the product, it

12     didn't come up with an explanation because we can't do that

13     because we would be violating a patent.  And when I asked about

14     it at our last conference, I also wasn't given that

15     explanation.

16           So, and you can correct me if I'm wrong.  The

17     construction of the argument that unavailability of the product

18     really means we can't produce the product because we would be

19     violating the patent comes late.

20           MR. RUSS:  Your Honor, during the initial discussions

21     between the parties there wasn't a representation that Corerx

22     cannot produce the product.  I mean, yes we would violate the

23     patent but we would also be violating the confidentiality

24     provision that we had in our agreement with Azurity.

25           And when your Honor asked me, I wish it could have

27

M1PAABIOC                    Conference

1    been different but I was hamstrung by the confidentiality

2    provision that my client had with the Azurity.  And as I've

3    said, we're happy to provide that agreement because now that

4    Mr. Weiss is casting shade on it, we will provide that

5    agreement so the Court can satisfy itself there's no funny

6    business here.  If that agreement provides that if Bion

7    produces any quantity -- I strike that.  I'm sorry.  If Corerx

8    produces any quantity of the product, not only will it be sued

9    for willful infringement for the going forward bottles but for

10   all of the bottles produced up until that time.  And, again, we

11   can extrapolate the damages that a willful infringement action

12   could result in.

13         So, it's serious business.  It may have been disclosed

14   later than I would have liked but it doesn't change the fact

15   that that is the reason for the supply interruption.  And we

16   never said, in fairness we never said there's input or piece of

17   raw material that we're unable to you secure.  We at all times

18   said there was a supply interruption and we are prohibited by

19   the U.S. patent laws for moving forward and producing this

20   product which again, we believe the contract.

21         THE COURT:  Wait.  Wait.  Wait a moment.

22         It's not really the U.S. patent laws that are

23   determining what's going on.  It's the fact that Corerx entered

24   into an agreement with Azurity whereby Azurity was able to

25   agree with Corerx that if it produced, if Corerx produced any

28

M1PAABIOC                    Conference

1    further bottles of the product, it would come at a great cost

2    to Corerx or at least the possibility of a great cost to

3    Corerx.  So, by contract between Azurity and Corerx, Azurity

4    was restricting the supply of the product to its competitor,

5    Bionpharma.  And you can quote that in the patent laws if you

6    wish but it's an agreement between the parties.

7         Now, what the validity of that agreement is is an

8    interesting question which may at some point be litigated,

9    bears little relationship to Lear.  It is not surprising that

10   Corerx would not want to come forward earlier with the true, if

11   you will, reason that it was simply not going to produce any

12   further product because it had agreed with Azurity that it

13   would not produce any further product, which doesn't really

14   help Corerx's position so much.

15        MR. RUSS:  Well, if I may, I don't think we can fail

16   to see the joinder between the violation of the U.S. patent

17   laws and the agreement between Corerx and Azurity which again,

18   we're willing to provide the Court under seal so that the Court

19   can understand exactly what's at issue.  And I apologize that

20   it's coming in at a late time in this argument but we're still

21   able to do that.

22        You know, the agreement is to be produced, we will be

23   sued for willful violation of the patent.  So, these issues are

24   intertwined.  It's not just an agreement with Azurity, hey, you

25   know for this financial benefit do not produce the product for

M1PAABIOC                    Conference

1    Bion.  That's not the situation.  The situation here is we will

2    be sued for willful infringement if we produce, which is why we

3    are where we are today.

4           And again, Bion can accept the liability that comes

5    with producing a product during the pendency of its action with

6    Azurity and in the Delaware court.  We are a small company.  We

7    cannot face that exposure.  An action for willful infringement,

8    which we believe could be successful against us, is going to

9    put us out of business.  And because there is no defense to

10   willful infringement because we're following a directive or

11   complying with the preliminary injunction, we're still going to

12   get sued and face that exposure and our very existence is at

13   issue here, your Honor.

14          So, I would respectfully disagree that this is only

15   about an agreement between Azurity and Corerx.  The

16   underpinnings of that agreement is the validity of the patents

17   and again, we will get sued for willful infringement.  We know

18   that.  And again, the agreement that sets forth that

19   proposition we will be happy to produce under seal.

20          THE COURT:  Okay.  So, you all are welcome to talk

21   about the issues.  I will have a decision on the motion for a

22   preliminary injunction shortly unless I am told that there is

23   some resolution before that.

24          Okay.  Anything further?

25          MR. WEISS:  Not from the plaintiff.

30

M1PAABIOC                    Conference

1          Thank you, your Honor

2          MR. FEDOWITZ:  Mr. Weiss talked about the pricing

3     earlier about five hundred dollars being too high.  Even if we

4     go with the price that Bionpharma sells it at, we're still

5     looking at the numbers for the 18,000, the $3,240,000.  So,

6     that's something to keep in mind.

7          Mr. Weiss also stated or discussed the Doctrine of

8     Contract Estoppel and the California decision on Lear.  At 674

9     in Lear v. Atkins it specifically states that the parties'

10    contract is no more controlling on this issue than the state's

11    doctrine of estoppel.  And that's what Lear v. Adkins did away

12    with, was that estoppel doctrine.

13         THE COURT:  Okay.  Thank you, all.

14         I always recommend that parties attempt to talk.  You

15    all are sophisticated lawyers.  You can bring in any other

16    parties to your discussions that you think have an interest in

17    your discussions, but I expect to decide the motion for

18    preliminary motion soon.

19         Okay.  Thank you, all.  I appreciated the papers and

20    much appreciated the argument.

21         Great.  Bye now.

22         (Adjourned)

23

24

25

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SILVERGATE PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 18-1962 (LPS) |
| | ) | C.A. No. 19-1067 (LPS) |
| v. | ) | |
| | ) | |
| BIONPHARMA INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FINAL JUDGMENT**

This action, having been tried before the Court from February 1, 2021 through February 5, 2021, Honorable Leonard P. Stark, Chief District Judge presiding, the evidence and testimony of witnesses of each side having been heard and a decision having been rendered;

IT IS HEREBY ORDERED AND ADJUDGED this 29th day of April 2021, for the reasons set forth in the Opinion dated April 27, 2021 (D.I. 257) that:

1.     Judgement is entered in favor of Bionpharma Inc. ("Bionpharma") and against Silvergate Pharmaceuticals Inc. ("Silvergate") on Silvergate's claim that Bionpharma's Abbreviated New Drug Application ("ANDA") No. 212408 and the commercial manufacture, use, offer for sale, sale, and/or importation into the United States of the proposed generic product described therein infringes claims 4, 7, and 10 of U.S. Patent No. 10,039,745 ("the '745 Patent").

2.     Judgment is entered in favor of Bionpharma and against Silvergate on Bionpharma's counterclaim for declaratory judgment of noninfringement of claims 4, 7, and 10 of the '745 Patent.

3.     Judgement is entered in favor of Bionpharma and against Silvergate on Silvergate's claim that Bionpharma's ANDA No. 212408 and the commercial manufacture, use,

offer for sale, sale, and/or importation into the United States of the proposed generic product described therein infringes claims 20, 23, and 30 of U.S. Patent No. 10,154,987 ("the '987 Patent").

4.    Judgment is entered in favor of Bionpharma and against Silvergate on Bionpharma's counterclaim for declaratory judgment of noninfringement of claims 20, 23, and 30 of the '987 Patent.

SO ORDERED this 29th day of April, 2021.

_____

CHIEF, UNITED STATES DISTRICT JUDGE

# EXHIBIT 13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SILVERGATE PHARMACEUTICALS, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> BIONPHARMA INC. <br><br> *Defendant.* | C.A. No. 20-1256 (LPS) |

### JOINT STIPULATION FOR DISMISSAL

Plaintiff Silvergate Pharmaceuticals, Inc. ("Silvergate") and Defendant Bionpharma Inc. ("Bionpharma") hereby stipulate, subject to approval of the Court, to dismiss with prejudice the above captioned case:

WHEREAS, on December 12, 2018 and June 7, 2019, Silvergate instituted Civil Action Nos. 18-1962 and 19-1067, respectively, in this Court ("First Wave Suits"), alleging that Bionpharma's Abbreviated New Drug Application ("ANDA") No. 212408 ("Bionpharma's ANDA"), which seeks approval from the United States Food and Drug Administration ("FDA") to market an enalapril maleate oral solution, 1 mg/mL ("Bionpharma's ANDA Product"), infringes Silvergate's U.S. Patent Nos. 9,669,008, 9,808,442, 10,039,745, and 10,154,987 ("the First Wave Patents");

WHEREAS, on September 18, 2020, Silvergate instituted the instant action ("Second Wave Suit") alleging that Bionpharma's ANDA infringes U.S. Patent No. 10,772,868 ("'868 patent");

WHEREAS, on September 29, 2020, Silvergate filed an amended complaint in the Second Wave Action adding a claim alleging that Bionpharma's ANDA infringes U.S. Patent No. 10,786,482 ("'482 patent");

WHEREAS, on February 1-5, 2021, this Court held a consolidated bench trial in the First Wave Suits;

WHEREAS, on March 4, 2021, Silvergate filed a second amended complaint in the Second Wave Suit adding a claim seeking a declaratory judgment that Bionpharma's ANDA product will infringe U.S. Patent No. 10,918,621 ("'621 patent") (the '868, '482, and '621 patents, collectively, "Second Wave Patents");

WHEREAS, on March 31, 2021, Silvergate filed a motion for preliminary injunction in the First Wave Suits and in the Second Wave Suit (C.A. No. 18-1962, D.I. 231; C.A. No. 19-1067, D.I. 218; C.A. No. 20-1256, D.I. 67);

WHEREAS, on April 27, 2021, this Court issued an Opinion in the First Wave Suits (C.A. No. 18-1962, D.I. 257; C.A. No. 19-1067, D.I. 244), finding that Bionpharma's ANDA and the product described therein do not infringe the asserted claims of the First Wave Patents;

WHEREAS, on April 29, 2021, this Court entered Final Judgments in the First Wave Suits (C.A. No. 18-1962, D.I. 270; C.A. No. 19-1067, D.I. 257) in favor of Bionpharma on Silvergate's infringement claims, and in favor of Bionpharma on Bionpharma's counterclaims for non-infringement;

WHEREAS, on April 30, 2021, Silvergate filed a notice of appeal in the First Wave Suits (C.A. No. 18-1962, D.I. 271; C.A. No. 19-1067, D.I. 258);

WHEREAS Silvergate disputes the Court's April 27, 2021 Opinion in the First Wave Suits and has appealed that Opinion and the final judgments in the First Wave Suits;

WHEREAS Bionpharma contends the Final Judgments entered in the First Wave Suits bar Silvergate's infringement claims in the Second Wave Suit pursuant to the doctrine of collateral estoppel;

2

WHEREAS Silvergate contends the issues on appeal in the First Wave Suits will affect the scope of the issues in the Second Wave Suit;

WHEREAS Silvergate reserves all rights to bring an action against Bionpharma with respect to the Second Wave Patents in the event that the Federal Circuit reverses or vacates all or a relevant portion of the Final Judgments entered in the First Wave Suits;

IT IS HEREBY STIPULATED AND AGREED by the undersigned counsel for Silvergate and Bionpharma, subject to the approval of the Court, that all claims and counterclaims, defenses, motions and petitions asserted in this action are dismissed **WITH PREJUDICE**, except that such dismissal is **WITHOUT PREJUDICE** to Silvergate's ability to re-assert the Second Wave Patents against Bionpharma in the event that the Federal Circuit renders a decision whereby collateral estoppel would not apply to bar Silvergate's assertion of the Second Wave Patents against Bionpharma.  In the event that Silvergate pursues such relief, Bionpharma shall retain the right to respond with any and all defenses and counterclaims.  Each party shall bear its own costs and attorneys' fees with respect to the matters dismissed in this Second Wave Suit.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP  PHILLIPS, MCLAUGHLIN & HALL, P.A.


*/s/ Megan E. Dellinger*       */s/ John C. Phillips, Jr.*
Jack B. Blumenfeld (#1014)     John C. Phillips, Jr. (#110)
Megan E. Dellinger (#5739)     Megan C. Haney (#5016)
1201 North Market Street      1200 North Broom Street
P.O. Box 1347         Wilmington, DE  19806
Wilmington, DE  19899      (302) 655-4200
(302) 658-9200        jcp@pmhdelaw.com
jblumenfeld@morrisnichols.com    mch@pmhdelaw.com
mdellinger@morrisnichols.com

             *Attorneys for Defendant Bionpharma Inc.*
*Attorneys for Plaintiff Silvergate*
*Pharmaceuticals, Inc.*

May 17, 2021

3

SO ORDERED this ___ day of May, 2021.

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT 14

# LITIGATION SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") the effective date of which is the date of execution of this Agreement by the latest-signing Party below ("Effective Date") between Azurity Pharmaceuticals, Inc. ("Azurity"), on behalf of itself and its Affiliates, on the one hand, and CoreRx, Inc. ("CoreRx"), on behalf of itself and its Affiliates, on the other hand, to resolve the parties' dispute relating to the Epaned® Patents (defined below). Azurity and CoreRx are each a "<u>Party</u>" and collectively the "<u>Parties</u>".

WHEREAS, this Agreement is in relation to litigation in the United States District Court for the Middle District of Florida, *Azurity Pharmaceuticals, Inc. v. CoreRx, Inc.*, No. 8:21-cv-02515-TPB-SPF and a related action in the U.S. District Court for the District of Delaware (1:21-cv-01522) (collectively, the "Action");

WHEREAS, Azurity alleges that it is the owner of the Epaned® Patents (defined below) and holder of New Drug Application ("NDA") No. 208686 for an oral liquid pharmaceutical product containing enalapril maleate, 1 mg / mL;

WHEREAS, in the Action, Azurity asserted certain claims of the Epaned® Patents against CoreRx;

WHEREAS, Azurity has brought suits against Bionpharma (defined below) in the United States District Court for the District of Delaware, *Azurity Pharmaceuticals, Inc. v. Bionpharma Inc.,* C.A. Nos. 21-1286-LPS and 21-1455-LPS, *Silvergate Pharmaceuticals, Inc. v. Bionpharma, Inc.,* C.A. Nos. 18-1962-LPS, 19-1067-LPS, and 20-1256-LPS ("Bionpharma Actions") alleging infringement of the Epaned® Patents and other patents owned by Azurity;

WHEREAS, the Parties now wish to enter into this Settlement Agreement to resolve the Action; and

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the Parties intending to be legally bound do hereby agree as follows:

1. <u>Definitions</u>. The following terms will have the meanings provided below:

    1.1 "<u>Affiliate</u>" means a Person that controls, is controlled by, or is under common control with a party. For the purposes of this definition, the word "control" (including, with correlative meaning, the terms "controlled by" or "under common control with") means the actual power, either directly or indirectly through one or more intermediaries, to direct the management and policies of such Person, whether by the ownership of more than fifty percent (50%) of the voting stock of such Person, or by contract, or otherwise. For the avoidance of doubt, with respect to CoreRx, Affiliate does not include Bionpharma (defined below).

    1.2 "<u>ANDA</u>" means an Abbreviated New Drug Application, as defined in 21 U.S.C. § 355(j), *et seq*., and the regulations promulgated thereunder. For avoidance of doubt, an ANDA does not include any New Drug Application filed pursuant to 21 U.S.C. § 355(b)(2).

1

1.3    "Bionpharma" means Bionpharma, Inc. with headquarters at Suite2-4B 600 Alexander Road, Princeton, NJ 08540 and its Affiliates.

1.4    "Bionpharma ANDA" means any ANDA filed by Bionpharma in which the product that is the subject of Epaned® NDA is the Reference Listed Drug, including ANDA No. 212408, and any amendments or supplements thereto.

1.5    "Change of Control" shall mean the occurrence of any of the following events: (i) an acquisition of a company by another entity by means of any transaction or series of related transactions, (ii) a sale of all or substantially all of the assets of a company or (iii) an acquisition of a majority of the shares of, or controlling interest in, or effective right to control, a company.

1.6    "CoreRx Formulation" means the product manufactured by CoreRx that is the subject of Bionpharma's ANDA No. 212408 concerning enalapril maleate oral solution, 1 mg / mL, including amendments and/or supplements thereto.

1.7    "Epaned® NDA" means NDA No. 208686 and any amendments or supplements thereto.

1.8    "Epaned® Patents" means U.S. Patent Nos. 11,040,023 and 11,141,405.

1.9    "Final Court Decision" means (i) a final judgment of a U.S. District Court or a final decision on the merits of the United States Patent and Trademark Office Patent Trial and Appeal Board from which no appeal has been taken and the time for appeal has expired; (ii) the mandate of the United States Court of Appeal of the Federal Circuit with respect to an appeal of a final judgment from a U.S. District Court; or (iii) the mandate of the United States Court of Appeal of the Federal Circuit with respect to an appeal of a final decision on the merits of the United States Patent and Trademark Office Patent Trial and Appeal Board.

1.10    "Person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, governmental authority, or other entity or organization.

1.11    "Third Party" means any Person other than Azurity, CoreRx and their respective Affiliates.  Bionpharma (defined below) is a Third Party.

2.    Releases, Dismissal of Action, Representations, Acknowledgements.

2.1    On the Effective Date of the Agreement or as soon as practicable thereafter, the Parties shall file a joint motion to dismiss without prejudice all claims and counterclaims pending against each other in the Action.  Each Party shall bear its own costs and attorneys' fees.  If for any reason the District Court raises an objection to the Parties' joint motion to dismiss the Actions, the Parties shall confer promptly and in good faith in order to take action consistent with this Settlement Agreement to secure entry of a dismissal of the Action.

2.2    In consideration of the mutual execution of this Agreement and upon the terms and subject to the conditions of this Agreement, and further subject expressly to the occurrence of the dismissal of the Action pursuant to Section 2.1 above, CoreRx, on behalf of itself, its Affiliates, and each of its respective agents, representatives, assigns, predecessors, and successors, hereby

2

fully, finally and irrevocably releases, relinquishes, acquits and discharges Azurity and its Affiliates, and each of its respective agents, representatives, assigns, predecessors and successors of and from any and all pending and potential claims, counterclaims, liabilities, defenses, demands, all manner of actions, and causes of action, reasonable attorneys' fees and other damages or costs of whatever nature, both at law and in equity, based on activities on or before the Effective Date which could have been, are, or were asserted in the Action. The foregoing in Section 2.2 shall not apply if Azurity brings a proceeding in court or any other forum in accordance with the last sentence of Section 2.5 should CoreRx resume manufacturing of CoreRx Formulation after the Effective Date.

2.3    In consideration of the mutual execution of this Agreement and upon the terms and subject to the conditions of this Agreement, Azurity, on behalf of itself, its Affiliates, and each of its respective officers, director, employees, agents, representatives, assigns, predecessors, and successors, hereby fully, finally and irrevocably releases, relinquishes, acquits and discharges CoreRx and its Affiliates, and each of its respective officers, director, employees, agents, representative, assigns, predecessors and successors from payment of damages for its acts of alleged infringement of the Epaned® Patents relating to the CoreRx Formulation prior to the Effective Date on the condition that, and for so long as, CoreRx and its Affiliates refrain from the activities prohibited by Section 2.4 below. To the extent that CoreRx or its Affiliates engage in any of the activities prohibited by Section 2.4 below, except in case of Failure to Fund, the release contained in this Section 2.3 shall no longer be effective. The foregoing in Section 2.3 does not and shall not apply to any customer of CoreRx and/or any Third Party and does not apply to Bionpharma and its Affiliates, and each of its respective agents, representative agents, representatives, assigns, predecessors and successors even if Bionpharma becomes an agent, representative, assign, or successor of CoreRx in the future. For the avoidance of doubt, nothing in this paragraph or anything in this Agreement releases, relinquishes, acquits, or discharges, or acts as a dismissal or settlement of any of Azurity's pending or potential claims counterclaims, liabilities, defenses, demands, all manner of actions, and causes of action, reasonable attorneys' fees and other damages or costs of whatever nature, both at law and in equity, against Bionpharma or in any of the Bionpharma Actions, and including specifically alleged damages for Bionpharma's alleged infringement of the Epaned® Patents and other alleged Azurity owned patents.

2.4    In consideration of the mutual execution of this Agreement and upon the terms and subject to the conditions of this Agreement, and further subject expressly to the occurrence of the dismissal of the Action pursuant to Section 2.1 above, as of the Effective Date, CoreRx (on behalf of itself and its Affiliates) agrees not to make, use, sell, import, and/or offer to sell and/or induce or contribute to others doing the foregoing within the United States the CoreRx Formulation prior to (i) the expiration of all relevant claims of the Epaned® Patents; (ii) a Final Court Decision holding all relevant claims of the Epaned® Patents invalid or unenforceable; or (iii) the date of a Final Court Decision affirming a decision of the United States Patent and Trademark Office Patent Trial and Appeal Board that all claims of the Epaned® Patents are unpatentable or otherwise cancels such claims.

2.5    Notwithstanding the foregoing, nothing in this Settlement Agreement shall prevent or impair the right of either Party to bring a proceeding in court or any other forum for breach of this Settlement Agreement (including, without limitation, any claim for infringement of any intellectual property based upon activities that are not the subject of the releases, waivers or

3

covenants not to sue granted hereunder) or any representation, warranty or covenant herein or to bring a proceeding in court or any other forum concerning any product that was not the subject of the Action or any activities after the Effective Date. In addition, for the avoidance of doubt, nothing in this Settlement Agreement shall prevent or impair the right of Azurity to bring a proceeding in court or any other forum for infringement of the Epaned® Patents and for damages for CoreRx's infringement prior to the Effective Date of this Agreement if CoreRx resumes manufacturing the CoreRx Formulation after the Effective Date, except in the case of a Failure to Fund.

2.6     Each Party (on behalf of itself and its Affiliates) represents, warrants and covenants to the other Party that it has not assigned or transferred, and will not assign or otherwise transfer, to any Person (other than an Affiliate) any matters released by such Party in this Section 2.

3.     <u>No License; No Covenant; No Authorization</u>.  The Parties agree that nothing in this agreement authorizes, licenses, or grants, either explicitly or implicit any rights to CoreRx, any of its Affiliates, Bionpharma, or any other Third Party either retroactively or prospectively to make, use, sell, import, and/or offer to sell and/or induce or contribute to others doing the foregoing within the United States the CoreRx Formulation at any time.  The Parties agree that nothing in this Agreement constitutes a license or a covenant not to sue from Azurity with respect to the Epaned® Patents.

4.     <u>No Payment to Azurity</u>.  The Parties acknowledge and agree that CoreRx has not paid and shall not pay any sum to Azurity pursuant to this Agreement.  To the extent any other aspect of this Agreement is construed to compensate or satisfy Azurity for its alleged infringement related to the CoreRx Formulation, this amount, however calculated, cannot account for the full alleged injury allegedly sustained by Azurity as a result of all alleged infringement activities related to the CoreRx Formulation, specifically Bionpharma's alleged infringement of the Epaned® Patents. Therefore, the Parties acknowledge and agree that if Azurity's Epaned® Patents have been infringed, Azurity has not received full compensation for the alleged infringement related to the CoreRx Formulation, and specifically has not received full compensation for Bionpharma's alleged infringement of the Epaned® Patents.

5.     <u>Confidentiality</u>.  The contents of this Agreement, any and all communications between the Parties regarding the same, including any term sheets ("Epaned® Agreement Terms") shall be highly confidential and neither Party may disclose the Epaned® Agreement Terms to any other Person, other than those employees, officers, directors and advisors of each Party who need to know such information for the sole purpose of effecting the intent of the Agreement and who agree to keep such information highly confidential.  The Parties agree that failure to comply with the terms of this Section 5 shall be a material breach of this Agreement.

5.1     No Party shall make any external announcement or other publicity relating to the Agreement.  The Parties shall not issue a press release related to the Agreement except that each Party may publicly disclose (i) that the Action has been resolved by mutual agreement, (ii) that there was no monetary payment made in connection with the Agreement and (iii) that the Agreement does not contain a patent license, and (iv) that the agreement does not contain a covenant not to sue.

5.2     No Party (nor any such Party's Affiliates) shall seek to rely upon and/or enter this Settlement Agreement or any acknowledgment set forth herein into evidence in any proceeding other than in a proceeding relating to a claimed breach of this Agreement.

5.3     Notwithstanding the foregoing, this Agreement may be disclosed as required by applicable laws and regulations to which a Party may be subject, including as required by any subpoena, court order, or other compulsory legal process. If a Party is subpoenaed or otherwise required by law to give testimony or provide information which in any way relates to this Agreement, such Party shall give the other Parties prompt notice of such requirement and, unless otherwise required by law, shall make no disclosure until the other Parties have had a reasonable opportunity to contest the right of the requesting person to such disclosure. The Parties shall provide each other with all reasonable cooperation and generally make their agents, employees, and contractors available to give testimony or to provide reasonable assistance in connection with any lawsuits, claims, proceedings and investigations relating to this Agreement.

6.      <u>Indemnification</u>.  Azurity agrees to indemnify and hold harmless each of CoreRx, its Affiliates and their respective officers, directors, shareholders, members, managers, employees, agents, and representatives (each, an "Indemnified Party" and collectively, the "Indemnified Parties") against any and all losses, claims, damages, liabilities, penalties, obligations and expenses, including the reasonable costs for counsel or others in investigating, preparing or defending any action or claim, whether or not in connection with litigation in which any Indemnified Party is a party, or enforcing these indemnity provisions, as and when incurred without the necessity of Indemnified Party being required to first pay it, caused by, relating to, based upon or arising out of (directly or indirectly) the breach of contract or other claim incurred by an Indemnified Party to the extent arising out of or related to this Agreement ("Related Bion Action").

6.1     The Indemnified Parties shall appoint a counsel of their choice to defend them in a Related Bion Action, reasonably satisfactory to Azurity, Azurity's consent to the choice of such counsel not to be unreasonably withheld (the "Defense Counsel"). Azurity agrees that it will not interfere with said counsel's independence of professional judgment or with the client-lawyer relationship. Prior to the Change in Control of Azurity, CoreRx and Azurity agree to cooperate in the conduct, defense, and/or settlement of a Related Bion Action. Such cooperation includes, but is not limited to, the provision of information, documents, and other materials reasonably necessary to Azurity and CoreRx's agreement that it shall not enter into a settlement of the Related Bion Action without the consent of Azurity (collectively, "CoreRx's Cooperation Obligations").

6.2     Contemporaneously with the execution of this Agreement or within 5 business days thereafter, Azurity shall wire $250,000 to the retainer account of CoreRx with Defense Counsel (the "Initial Retainer"). Initial Retainer shall be replenished by Azurity with subsequent payments of $250,000 up to a maximum of $1 million (the "Retainer"). The Effective Date of this Agreement shall be delayed until a wire for the Initial Retainer has been received by Defense Counsel. This Retainer shall be used solely for the purposes (or items) identified in Section 6. Failure to pay the Initial Retainer shall render this Agreement *void ab initio*. At the conclusion of all pending and threatened Related Bion Action including all appeals, Azurity shall be entitled to a refund of any unused portion of the Retainer. If CoreRx resumes manufacturing the CoreRx Formulation after the Effective Date in violation Section 2.4, it shall immediately return any and

5

all remaining amounts in the Retainer to Azurity. Nothing in this section 6.2 shall limit the obligations of Azurity under any other section of this Agreement.

6.3     Upon a Change of Control of Azurity, CoreRx may, at its written election, terminate CoreRx's Cooperation Obligations. However, the Parties agree that any settlement in any Related Bion Action must be approved by Azurity Escrow Owner (described below), and for any amounts over what is available in the Escrow (described below) by the post-Change of Control Azurity entity, which will not be unreasonably denied. The Parties agree to reasonably collaborate on any Related Bion Action and CoreRx agrees to keep Azurity and, if the Escrow is created, the Azurity Escrow Owner promptly informed of any developments in a Related Bion Action. To the extent any aspect of a Related Bion Action has or has the potential to have an adverse impact on the Epaned® Patents or Bionpharma Actions, Azurity shall have the right to intervene in any Related Bion Action and CoreRx shall not object or restrict Azurity's right to intervene.

6.4     Azurity shall pay reasonable expenses incurred by any Indemnified Party in defending, participating in, or settling any action, proceeding or investigation in which such Indemnified Party is a party or is threatened to be made a party or otherwise is participating in by reason of Related Bion Action, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise. Such reasonable expenses shall be paid promptly. CoreRx agrees to promptly provide invoices for expenses incurred in a Related Bion Action and provide reasonable documentation to substantiate the reasonableness of the expenses incurred as is customarily provided by law firms for such expenses. To the extent the Parties dispute the reasonableness of certain expense(s) in a Related Bion Action, Azurity shall have the right to such reasonable further information and clarification from the Defense Counsel for such expenses as is customary and reasonable. The rights provided herein shall not be deemed exclusive of any other rights to which the Indemnified Parties may be entitled.

6.5     Prior to any change in control of Azurity, Azurity shall deposit $20 million in an escrow account ("Escrow") controlled by CoreRx. A post-Change of Control representative set up by Azurity to represent the interests of the current owners (the "Azurity Escrow Owner") shall be entitled to the balance remaining in such Escrow Account, if any, which are not needed to pay the indemnification obligations of Azurity as set forth in this Agreement at the conclusion of all pending and threatened Related Bion Action including all appeals. Such escrow account shall be set up in form and substance satisfactory to CoreRx. Azurity's failure to fund the Escrow as set forth herein (the "Failure to Fund") shall relieve CoreRx of all its obligations under this Agreement but shall not deprive it of the benefits of this Agreement. If CoreRx resumes manufacturing the CoreRx Formulation after the Effective Date in violation of Section 2.4, it shall immediately return any and all remaining amounts in the Escrow to Azurity Escrow Owner and there shall be no further funding of the Escrow.

6.6     In the event a dispute arises between the Parties regarding whether the obligations of this Section 6 are triggered and/or whether a Party has complied with its obligations under this Section 6 (or is in breach thereof), the prevailing party shall be entitled to be paid all its fees and expenses by the losing party, including all attorneys' fees, related to such dispute.

7.     <u>Solvency Representation</u>. Azurity represents and warrants that: (a) it has sufficient cash on hand or other sources of immediately available funds, to pay all the indemnification obligations

set forth above (the "Indemnification Obligations") and (b) immediately after giving effect to the Indemnification Obligations contemplated by this Agreement, Azurity shall be solvent and shall (i) be able to pay its debts as they become due; (ii) own property that has a fair saleable value greater than the amount required to pay its debt; and (iii) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the Indemnification Obligations contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of Azurity. In connection with the Indemnification Obligation contemplated hereby, Azurity has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

8. Each Party further represents and warrants that:

8.1 It has corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery by this Agreement and the performance by it of its obligations hereunder, has been duly authorized by all necessary corporate actions on its part.

8.2 This Agreement has been duly executed and delivered by its and constitutes a valid and its binding obligation, enforceable against it in accordance with its terms.

8.3 The execution and delivery by it of this Agreement, the performance by it of its obligations hereunder does not and will not contravene any provision of its organizational documents.

9. Governing Law. The Agreement will be governed by and interpreted and enforced with, the laws in force in the State of Delaware, without regard to its conflict of laws provisions.

10. No Implied Consents. Nothing in the Agreement will be deemed to be Azurity's consent to or approval of any ANDA or similar application or filing by either CoreRx or Bionpharma or any of their respective Affiliates, or to permit either CoreRx or Bionpharma or any of their respective Affiliates the right to reference or cross-reference any Epaned® NDA or similar application or filing.

11. Expenses and Defense. Each Party will pay its own expenses incurred in connection with its negotiation of this Agreement. Each Party agrees to use its respective reasonable best efforts to defend the Agreement in any government investigation or litigation brought by any person or entity other than the Parties.

12. Counterparts. This Agreement may be executed in counterparts, each of it shall be an original, and which together shall form one and the same Agreement.

*[Signature Page Follows.]*

Azurity Pharmaceuticals, Inc.

By: _____

Name: _____

Title: _____

Dated: _____

CoreRx, Inc.

By: _____

Name: _____

Title: _____

Dated: _____

CONFIDENTIAL DRAFT
SETTLEMENT COMMUNICATION—GOVERNED BY F.R.E. 408

Azurity Pharmaceuticals, Inc.                CoreRx, Inc.

By: _____        By: _____

Name: _AMIT PATEL_____        Name: _____

Title: _CEO_____        Title: _____

Dated: _11/24/2021_____        Dated: _____

| Azurity Pharmaceuticals, Inc. | CoreRx, Inc. |
|---|---|
| By: _____ | By: _____ |
| Name: _____ | Name: _Ajay Damani_ |
| Title: _____ | Title: _CEO_ |
| Dated: _____ | Dated: _11/24/21_ |

1

# EXHIBIT 15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | C.A. No. 8:21-cv-2515-TPB-SPF |
| CORERX, INC., | ) ) ) | |
| Defendant. | ) | |

### <u>NOTICE OF DISMISSAL WITHOUT PREJUDICE</u>

Plaintiff Azurity Pharmaceuticals, Inc. hereby notifies the Court of the dismissal **without prejudice** of all claims against Defendant CoreRx, Inc. pursuant to Federal Rule of Civil Procedure 41(a)(1)(A).  Defendant has neither served an answer nor a motion for summary judgment in this action.


Dated: November 26, 2021          Respectfully submitted,

                                 */s/ Woodrow H. Pollack*
                                 Woodrow H. Pollack
                                 **SHUTTS & BOWEN, LLP**
                                 4301 W Boy Scout Blvd Ste 300
                                 Tampa, FL 33607-5716
                                 (813) 463-4894

                                 *Attorneys for Plaintiff Azurity*
                                 *Pharmaceuticals, Inc.*

1

OF COUNSEL:

Wendy L. Devine
Kristina M. Hanson
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
One Market Plaza
Spear Tower, Suite 3300
San Francisco, CA  94105
(415) 947-2000

Ty W. Callahan
**WILSON SONSINI GOODRICH & ROSATI, P.C.**
633 West Fifth Street, Suite 1550
Los Angeles, CA  90071
(323) 210-2900

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 26, 2021 a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent via e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Woodrow H. Pollack*
Woodrow H. Pollack

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AZURITY PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-1522 (LPS) |
| | ) | |
| CORERX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## NOTICE OF DISMISSAL WITHOUT PREJUDICE

Plaintiff Azurity Pharmaceuticals, Inc. hereby notifies the Court of the dismissal **without prejudice** of all claims against Defendant CoreRx, Inc. pursuant to Federal Rule of Civil Procedure 41(a)(1)(A). Defendant has neither served an answer nor a motion for summary judgment in this action.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Megan E. Dellinger*
_____
Jack B. Blumenfeld (#1014)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
mdellinger@morrisnichols.com

*Attorneys for Plaintiff Azurity
Pharmaceuticals, Inc.*

November 26, 2021